**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

DIANTHE MARTINEZ-BROOKS,     :
REJEANNE COLLIER,     :
JACKIE MADORE; and     :
KENNETH CASSIDY, individually,     :
and on behalf of all others similarly situated, :
     :
     Petitioners,     :
     :
v.     :     Civ. No. _____
     :
D. EASTER, Warden of Federal     :
Correctional Institution at Danbury, and     :
MICHAEL CARVAJAL, Director of the     :     April 27, 2020
Federal Bureau of Prisons, in their official     :
capacities     :
     :
     Respondents.     :

**PETITION FOR WRIT OF HABEAS CORPUS**
**PURSUANT TO 28 U.S.C. §2241 AND**
**REQUEST FOR EMERGENCY ORDER OF ENLARGEMENT**

**PRELIMINARY STATEMENT**

The Federal Correctional Center at Danbury ("FCI Danbury") is a low security federal correctional institution located in Danbury, Connecticut. That city, within the New York City metropolitan area, is part of the epicenter of our nation's struggle with the novel COVID-19 virus and resulting coronavirus disease ("COVID-19").

As COVID-19 ravages the New York Metropolitan area, the risks posed by COVID-19 to people confined in prisons, working in prison, and their communities are stark and alarming. For reasons beyond their control, people in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain

1

specific products for cleaning or laundry, avoid high-touch surfaces, or sanitize their own environment. And those problems are no more evident than at FCI Danbury, a prison consisting of a men's low security complex, a women's low-security satellite facility, and a women's minimum security satellite facility, which has been one of the hardest hit prisons run by the Federal Bureau of Prisons nationwide.

Petitioners bring this action against the Warden of FCI Danbury and the Director of the Federal Bureau of Prisons ("BOP") on behalf of themselves and the class of prisoners held at FCI Danbury who are at imminent risk of contracting COVID-19, which feeds on precisely the unsafe, congregate conditions in which they are held. Respondents are aware of the grave dangers posed by COVID-19 and have failed to implement measures to comply with their constitutional obligations to those in their custody. Because of their unlawful and unconstitutional confinement, Petitioners seek emergency orders requiring a two-part response, the immediate transfer of the most medically vulnerable individuals to home confinement or other appropriate settings and immediate implementation for those who remain of the social distancing and hygiene measures essential to lowering the risk of the disease and of death.

## PARTIES

1.      Petitioner Dianthe Martinez-Brooks, BOP Register Number 71331-050, is a 50 year-old woman who, at all times relevant herein has been in the custody of the BOP at FCI Danbury, and is currently housed in FCI Danbury's women's minimum-security camp (the "camp"). Ms. Martinez-Brooks suffers from systematic lupus erythematosus, an inflammatory autoimmune disease of the connective tissue, for which she takes corticosteroids that has resulted in her being immunocompromised. Ms. Martinez-Brooks also suffers from asthma and

hypertension. All three of those diagnosed medical conditions place Ms. Martinez-Brooks at significantly heightened risk of severe illness or death in the event she becomes infected with COVID-19.

2.      Petitioner Rejeanne Collier, BOP Register Number 21263-05, is a 64 year-old woman who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury, and is currently housed in FCI Danbury's women's minimum security camp. Ms. Collier is at heightened risk of mortality from COVID-19 because she suffers from lupus and hypertension and, while in custody, she has been treated for both intestinal cancer and a spot on her lung. She also suffers from hepatitis C and hypertension.

3.      Petitioner Jackie Madore, BOP Register Number 08721-036, is a 50 year-old woman who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury, and is currently housed in the low security satellite facility ("FSL"). She transferred to that building to participate in the Residential Drug Abuse Program (RDAP), which is currently suspended. Ms. Madore is at heightened risk of mortality from COVID-19 due to hypertension. She also suffers from hypothyroidism, and hepatitis C.

4.      Petitioner Kenneth Cassidy, BOP Register Number 48169-054, is a 54 year-old man who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury, and is currently housed in FCI Danbury's men's facility. Mr. Cassidy has significant cardiovascular issues, including ischemic heart disease, unstable angina, and hypertension. He has suffered three heart attacks. He has chronic bronchial asthma and other respiratory problems which have resulted in multiple bouts of pneumonia.  He is also morbidly obese. Each of these conditions

places Mr. Cassidy at dramatically heightened risk of death from COVID-19; the combination of all these conditions creates exponential danger.

5.      Respondent D. Easter is the Warden at FCI Danbury and has oversight responsibility for all three units in the facility. As Warden of FCI Danbury, Respondent Easter is responsible for and oversees all day-to-day activity at FCI Danbury, and all aspects of the operation and of the functioning of FCI Danbury. Her responsibilities include ensuring the safety of all in the institution and ensuring the orderly running of the institution. Respondent Easter is aware of the harms of COVID-19, but she has adopted and enforced a policy that leaves Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. Respondent Easter is the immediate physical custodian responsible for the detention of the Petitioners at FCI Danbury. She is sued in her official capacity.

6.      Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons and, in that capacity, is responsible for the safety and security of all persons, including Petitioners and all proposed Class Members, serving federal sentences at BOP facilities, including FCI Danbury. He is sued in his official capacity.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 2241 because Petitioners seek relief from being held in custody in violation of the Eighth Amendment to the U.S. Constitution.

8.      In addition, the Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 1331 (federal question) in that the Petitioners' claims arise under the federal statute providing for habeas corpus, 28 U.S.C. § 2241, and under Article I, § 9, cl. 2 of the U.S.

4

Constitution (Suspension Clause), as Petitioners are held in violation of the Eighth Amendment to the U.S. Constitution.

9.      Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## CLASS ACTION ALLEGATIONS

10.      Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2241 and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

11.      Petitioners seek to represent a class consisting of all individuals currently in custody at FCI Danbury or who will become in custody at FCI Danbury during the course of the COVID-19 pandemic (the "Class").

12.      Petitioners also seek to represent a subclass (the "Subclass") consisting of all individuals in custody at FCI Danbury or who will become in custody at FCI Danbury during the course of the COVID-19 pandemic who are aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of stroke; and people with any

condition specifically identified by CDC, currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19.

13.     The members of the Class and Subclass are too numerous to be joined in one action, and their joinder is impracticable. Upon information and belief, the class exceeds 1,000 individuals.

14.     Common questions of law and fact exist as to all Class and Subclass members and predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amount to Constitutional violations; (2) what measures Respondents took in response to the COVID-19 crisis; (3) whether Respondents implemented an adequate emergency plan during the COVID-19 crisis; (4) whether Respondents' practices during the COVID-19 crisis exposed people at FCI Danbury to a substantial risk of serious harm; (5) whether the Respondents knew of and disregarded a substantial risk of serious harm to the safety and health of the Class; and (6) what relief should be awarded to redress the harms threatened to members of the Class as a result of the conditions.

15.     Absent class certification, individuals detained at FCI Danbury during the COVID-19 pandemic would face a series of barriers in accessing the relief sought. FCI Danbury has suspended visitation and FCI Danbury prisoners have limited access to communication with the outside world, impeding their ability to obtain legal representation and to pursue remedies, including through litigation. A large portion of the Class and Subclass has limited educational backgrounds. And a significant percent of them suffer from physical or mental impairments. For some, English is not their first language.

16.     Respondents' practices and the claims alleged in this Petition are common to all members of the Class and Subclass.

17.     The claims of Petitioners are typical of those of the Class and Subclass. Petitioners are threatened with imminent inhumane conditions of confinement at FCI Danbury.

18.     The legal claims of Petitioners are the same or similar to those of all Class and Subclass members, and the harms suffered by them are typical of those suffered by all the other Class members.

19.     Petitioners will fairly and adequately protect the interests of the Class and Subclass. The interests of Petitioners as class representatives are consistent with those of the Class and Subclass members. In addition, counsel for Petitioners are experienced in class action and civil rights litigation.

20.     Counsel for Petitioners know of no conflicts of interest among Class or Subclass members or between the attorneys and Class members that would affect this litigation.

21.     Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for the party opposing the Class.

22.     The party opposing the Class has acted and refused to act on grounds generally application to the Class, such that final injunctive and declaratory relief is appropriate as to the Class as a whole.

23.     Use of the class action mechanism is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial,

administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

24.     This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class and Subclass members is impracticable.

## STATEMENT OF FACTS

**I.     Petitioners Are Members of the Population Particularly Vulnerable to COVID-19**

25.     Petitioners, current detained at FCI Danbury, are individuals who are particularly vulnerable to serious illness or death if infected by COVID-19.

26.     Petitioner Dianthe Martinez-Brooks is a 50-year-old female who suffers from asthma, hypertension, arthritis and systemic lupus erythematosus (SLE). She takes Atenolol for hypertension and has a Proventil emergency inhaler and Asmanex Twisthaler (mometasone furoate inhalation powder, 220 mg) for her asthma. Since her incarceration, she has been proscribed steroids once for the joint and muscle inflammation associated with her lupus. [Declaration of Dianthe Martinez-Brooks, submitted herewith as Exhibit C ("Martinez-Brooks Decl.") ¶ 2].

27.     As a result of her medical condition, Ms. Martinez-Brooks has effectively been condemned to serve her sentence at substantial risk of serious illness or death. As a result of her hypertension, Ms. Martinez-Brooks is significantly more vulnerable to complications should she contract COVID-19. Indeed, the WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing conditions. For those with

hypertension, the mortality rate was 8.4%.[1] That same report indicates that the mortality rate for chronic respiratory disease such as asthma was 8.0%. *Id.*

28.     As a lupus patient, Ms. Martinez-Brooks is also at greater risk from COVID-19 in two respects. As with other lupus patients, Ms. Martinez-Brooks has been prescribed corticosteroids which weaken the immune system and render the patient immunocompromised. Both that compromised immune system and lupus itself are risk factors for an increased chance of infection and for the development of a more severe form of COVID-19.[2]

29.     Although the Judgment in her criminal case only sentences Ms. Martinez-Brooks to an additional two years in prison [Martinez-Brooks Decl. ¶ 3], as a result of her medical condition there is a grave risk that she will not make it out of FCI Danbury alive or will become terribly ill.

30.     Petitioner Rejeanne Collier is a 64-year-old female who suffers from systemic lupus erythematosus (SLE), hypertension and Hepatitis C. She has had surgery for intestinal cancer while in BOP custody and has been diagnosed with a spot on her lung. *See* Motion to Reduce Sentence, *United States v. Collier*, 6:12-cr-06003-CJS (N.D.N.Y. Apr. 16, 2020) (Doc. 64 at 13). As set forth above, these conditions condemn her to serve a sentence at substantial risk

---

[1] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf (hereinafter "WHO-China Joint Mission Report").

[2] *See People who are at higher risk*, *Centers for Disease Control and Prevention: Coronavirus Disease 2019 (COVID-19)* (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html; Amr H. Sawalha et al, *Epigenetic dysregulation of ACE2 and interferon-regulated genes might suggest increased COVID-19 susceptibility and severity in lupus patients*, Clinical Immunology (2020): 108410, https://www.sciencedirect.com/science/article/pii/S1521661620302394 ("propos[ing] that lupus patients might be at an increased risk for infection by SARS-CoV-2 and for developing a more severe form of COVID-19, independent of the possible effect of immunosuppressive medications").

of serious illness or death.  The mortality rate for COVID-19 with pre-existing hypertension is 8.4%; for cancer, the mortality rate is 7.6%.[3] She is also at significantly greater risk as a result of her lupus. To the extent that the as yet incompletely diagnosed spot on her lung represents either lung cancer or some other form of respiratory compromise, that condition will also place her at substantially elevated risk of significant illness or death in the event she contracts coronavirus. The Judgment in her criminal case sentences Ms. Collier to an additional four years in prison. As a result of her medical condition there is a grave risk that she will not make it out of FCI Danbury alive or will become terribly ill.

31.     Petitioner Jackie Madore is a 50-year-old female who suffers from hypertension, hypothyroidism, and Hepatitis C. As a result of her hypertension alone, without consideration of the complicating effects of her other conditions, she has a substantially elevated risk of severe illness or mortality in the event she contracts COVID-19 while confined at FCI Danbury.[4] As a result of her medical condition, Ms. Madore has effectively been condemned to serve her sentence at substantial risk of serious illness or death. The Judgment in her criminal case only sentences Ms. Madore to an additional 20 months in prison. As a result of his medical condition, there is a grave risk that he will not make it out of FCI Danbury alive or will become terribly ill.

32.     Petitioner Kenneth Cassidy is a 54-year-old male with a significant number of risk factors putting him at high risk of severe illness or death in the event he contracts COVID-19. Mr. Cassidy has significant cardiovascular issues, including ischemic heart disease (i.e., deficient blood supply from a narrowing of the blood vessels), unstable angina, and hypertension. He has suffered three heart attacks, including two in his thirties. He has chronic bronchial asthma and

---

[3] *See* WHO-China Joint Mission Report at 12.
[4] *See id.*

other respiratory problems which have resulted in his having contracted pneumonia at least 21

times in his life. He also has chronic gastrointestinal and gastroesophageal disease including

diverticulosis and he is morbidly obese. He suffers significant food allergies and is on a restricted

diet as a result of his diverticulosis. He is on numerous different medications/interventions for

these conditions.

33.     As a result of his medical condition, Mr. Cassidy has effectively been condemned

to serve his sentence at substantial risk of serious illness or death. Pursuant to the above-cited

WHO-China Joint Mission Report, each of these conditions puts Mr. Cassidy at significantly

elevated risk of mortality in the event he should contract COVID-19: The mortality rate for

hypertension is 8.4%; the mortality rate for chronic respiratory disease is 8.0%, the mortality rate

for cardiovascular disease is 13.2%.[5] Moreover, a recent study found that obesity was the single

biggest chronic risk factor for hospitalization for COVID-19.[6] COVID-19 infection in a patient

presenting with all four medical conditions will undoubtedly be deadly.[7]

34.     The Judgment in his criminal case only sentences Mr. Cassidy to an additional 11

months in prison.  [Declaration of Kenneth Cassidy, submitted herewith as Exhibit D ("Cassidy

---

[5] *See id,*

[6] Christopher M. Petrilli et. al., Factors Associated With Hospitalization and Critical Illness Among 4,103 Patients with COVID-1 Disease in New York City (Apr. 11, 2020), available at https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1.full.pdf; *see also* Tiernan Ray, *NYU scientists - Largest US study of COVID-19 finds obesity the single biggest 'chronic' factor in New York City's hospitalizations* (April 12, 2020), https://www.zdnet.com/article/nyu-scientists-largest-u-s-study-of-covid-19-finds-obesity-the-single-biggest-factor-in-new-york-critical-cases/

[7] Safiya Richardson, et al., Presenting Characteristics, Comorbidies, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area, J. AM. MED. ASS'N (Apr. 22, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2765184 (in study of 5,700 patients, finding that the most common comorbidities with COVID-19 were hypertension (56.6%), obesity (41.7%), and diabetes (33.8%)).

11

Decl.") ¶ 3].  As a result of his medical condition, there is a grave risk that he will not make it out of FCI Danbury alive or will become terribly ill.

## II.  The Layout of the Facilities at FCI Danbury Gives Rise to an Urgent Need for Social Distancing that Remains Unmet More than Six Weeks into the National COVID-19 Pandemic

### A.  Physical Layout of FCI Danbury's Three Facilities

35.  As of April 23, 2020, the BOP reports that 1,046 people were held at FCI Danbury. They were divided among the units as follows: 165 women are incarcerated at the satellite prison, 153 women are incarcerated at the camp, and 728 men are incarcerated at the men's prison.[8]

### 1.  Women's FSL

36.  The women in the satellite facility ("FSL") are housed in a single dormitory-style room that accommodates approximately 160-170 beds. [Declaration of Christina Korbe, submitted herewith as Exhibit E ("Korbe Decl.") ¶ 8]. The room is divided into cubicles, each containing two bunk beds, separated by approximately four feet. [Declaration of Marius (Marie) Mason, submitted herewith as Exhibit F ("Mason Decl.") ¶ 7; Declaration of Kimberly Hoisington, submitted herewith as Exhibit G ("Hoisington Decl.") ¶ 4]. Beds in each cubicle are immediately adjacent to the cubicle wall, which does not reach to the ceiling. In some instances the wall does not even reach the top of the bunk bed, so women on the top bunk sleep right next to the woman on the top bunk in the adjacent cubicle. [Mason Decl. ¶ 7; Korbe Decl. ¶ 10].

---

[8] See BOP, "Population Statistics" (last updated Apr. 23, 2020), https://www.bop.gov/about/statistics/population_statistics.jsp

a.  All of the women in the FSL share the same three bathrooms, each of which includes between 4-8 toilets, sinks, and showers. [Mason Decl. ¶ 10; Korbe Decl. ¶ 8].

b.  The FSL also includes a common area where the women have access to 6-12 shared phones (not all of which are working) and 6 shared computers (only 4 of which are working), which are located in close proximity to one another. [Korbe Decl. ¶ 11; Mason Decl. ¶8].

c.  The women in the FSL eat meals together in the dormitory. Meals are brought to all of the prisoners in the dormitory at the same time.

d.  On April 25, around 40 women were moved from the dorm area to sleep in the dining hall/kitchen area.

e.  On information and belief, there is no medical staff permanently assigned to the FSL or available 24 hours a day. A doctor and a physician's assistant rotate between the three FCI Danbury facilities and are there during limited hours on weekdays. In order to request medical care, a requester must go to "pill call" in the morning, where a pharmacy technician dispenses medications, and fill out a sick call slip. The requester must then wait until she is called in to be seen, which can take weeks. Emergencies require a call from a correctional officer for a medical professional to come to the FSL. Prior to the pandemic, there were two psychologists who were at the FSL on a daily basis, but they have rarely been present since the pandemic (as psychology programming has been canceled).

2.    Women's Camp

37.    The women at the camp occupy a single building divided into four dormitories, each containing 25 cubicles with bunk beds sleeping two each, and nine rooms that can each hold 4 to 5 women. Prior to the lockdown of the facility on April 15, there were approximately 43 women housed in the nine rooms. After the lockdown, those women were moved to the dormitories. [Martinez-Brooks Decl. ¶¶ 4-5].

a.    The cubicles in the dormitories—which currently house all of the women in the camp—have no doors and their dividing walls do not extend to the ceilings. In many cubicles, the beds are positioned perpendicular to the partitions and extend the full width of the cubicle. In this configuration, the partition is the only separation between the beds. Even where beds are placed parallel to the partition, there is not six feet of separation between them. [*Id*. ¶ 7].

b.    As of April 21, 2020, A and B dorms each house 48 women; C dorm houses 47 women and D Dorm houses 7. Each dorm has a common area containing toilets, sinks and showers. A dorm has 4 showers and three toilets. B dorm has 5 working toilets and 6 showers; C dorm has 5 toilets and 5 showers. D Dorm has 3 toilets and three showers.  [*Id*. ¶¶ 6-7].

c.    There are four phones, 7 computers for email, and 3 working video-visiting machines, clustered together in a single common area shared by the entire population of the camp. The common area also contains hot water taps and sinks for washing dishes. [Martinez-Brooks Decl. ¶ 9].

14

a. The camp is currently on lockdown. Pursuant to the lockdown, the women in each dorm unit are permitted to leave the dorm for 45 minutes in the morning and one hour later in the day, at different times. They can use the facilities in the common room during these times. Within these short time periods, the 47-48 woman census of A, B, and C dorm must each negotiate the sharing of the four common phones, the 7 computers and 3 video chat machines. [Martinez-Brooks Decl. ¶ 11].

b. Recently, women who are out of their dorm during their designated recreation time have been going to visit friends in other dorms. [Martinez-Brooks Decl., ¶ 15].

d. There is no actual medical clinic in the camp and there is no medical staff permanently assigned to the camp or available 24 hours a day. Rather, there are a series of offices: two are used by medical staff, one by dental staff, and one by psychology. During this lockdown, a sick call request is made to physician's assistants when they come to the unit in the morning to dispense medications and the requester must wait until she is called in—often days later.  Emergencies require a call from a correctional officer for a medical professional to come to the camp.  [*Id*. ¶ 21].

3.    Men's Prison

38.    The men's facility contains 13 units, comprised of 10 units designed for dormitory-style housing and three units of individual cells. There is also a Special Housing Unit for solitary confinement.

a. The dormitory units (designated C through L Units) consist of rows of bunk beds lined in two rows three to four feet apart across a middle aisle, with no barriers between the beds.  [Cassidy Decl. ¶ 32]. A man in that unit would, therefore, sleep within 3-4 feet of five other men. [*Id.*]. The average dorm unit would also contain a bathroom with 5 stalls and a urinal, 5-6 sinks (generally consisting of five cold-water wash sinks and a single hot-water slop sink for washing eating utensils) and a shower area approximately two feet across a hall from the toilets with three to four showers. [*Id.* ¶ 33]. The sinks are located approximately four inches apart and people occasionally have to share the same sink.  [*Id.*].

b. The dorms also contain 2 television rooms, approximately 10 x 12 feet that can accommodate approximately 20 prisoners each and typically hold 15-20 people at a time.  [*Id.* ¶ 35]. There is also a small telephone room, approximately 3 x 8 feet, containing two telephones. The telephones, which are about eight inches apart, are almost always in use. When two prisoners are using the telephones, they have to stand within two feet of each other. Typically, there are two prisoners on the phones, and the rest wait in a line in the hallway, standing right next to each other, close enough to touch each other. [*Id.* ¶ 36].

c. There is also a small computer room in each dorm measuring approximately 8 x 10 feet containing three computers, an eating table and an ice dispenser. There are no barriers between the computers and, at any given time, there will be three people in the room using the computers, three people standing behind them in the

room waiting to use the computers, and several more lined up shoulder to shoulder outside the room. [*Id*. ¶ 37].

d. The three units of individual cells (A, B and M Units) consist of two floors of cells measuring 8 x 4 feet, containing a bunk bed for two men with a toilet/sink. [Declaration of Rafael Almonte, submitted herewith as Exhibit H ("Almonte Decl."), ¶ 6]. Prior to the emergence of COVID-19 in the facility, only one of the cell block units (M Unit) was in use and housed primarily military veterans, older men and those with serious medical conditions. A second cellblock (A Unit) has since been devoted to prisoners who are positive for coronavirus. [Almonte Decl. ¶ 17]. The facility has also activated one of the dorms (K Unit)—which had previously been emptied because of the need for asbestos remediation—to serve as an isolation unit at the prison. [*Id.* ¶ 4; Cassidy Decl. ¶ 42]. B Unit has since been converted to serve as a quarantine unit for individuals being released or sent to home confinement.

e. The cellblock units also contain a TV room that can accommodate 30 men who sit close together and a computer room containing 3 stations right next to one another. There are also two small rooms containing one phone each. [Almonte Decl. ¶ 8].

f. There is a single medical clinic for men at FCI Danbury. Before the outbreak, it was typically staffed by one physician and two physician assistants. The physician from the women's facilities would occasionally come to the men's prison to see patients. [Almonte Decl. ¶ 11]. Since the lockdown, a social worker is coming

into the units to conduct sick call triage of men exhibiting symptoms. [Cassidy

Decl. ¶ 18]. At times she brings along the prison's dental hygienist. [*Id.*] The

clinic is not staffed by medical staff 24 hours a day.

g. There is also a dining hall in the men's prison that serves all of the units in the

prison. The men's prison also includes an outdoor space for recreation ("rec

yard"). The space is accessed through a single 4 foot wide door and men entering

and exiting the rec yard must line up in close proximity to file through the door.

During recreation, prisoners stand right next to one another and are unable to

observe social distancing. [Cassidy Decl. ¶ 29].

**B.      COVID-19 Outbreak at FCI Danbury**

39.     FCI Danbury is in the center of the global COVID-19 storm. The United States

currently has the greatest number of infections of any country in the world. As of April 27, 2020,

there were approximately 966,000 reported COVID-19 cases and more than 55,000 deaths in the

United States.[9] And, the New York City metropolitan area, in which FCI Danbury is located, is

currently at the epicenter of the coronavirus pandemic in this country. As of April 27, 2020, there

are over 422,000 positive cases of COVID-19 in New York, Connecticut and New Jersey. As of

that date, there have been 30,000 deaths in those three states, representing 55% of the total

confirmed deaths from COVID-19 reported nationwide.[10] In New York City and the seven

counties most proximate to FCI Danbury (Westchester, Putnam, Dutchess and Nassau counties

in New York and Fairfield, Litchfield and New Haven counties, Connecticut), there were an

aggregate of 242,000 cases of COVID-19 and 21,000 deaths. *Id.* In Connecticut alone, the

---

[9]  COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns
Hopkins University (JHU), https://www.arcgis.com/apps/opsdashboard/index.html.

Connecticut Department of Public Health ("DPH") has reported that, as of April 27, 2020, in

Connecticut, there were 25,269 confirmed cases and 1,924 deaths attributed to COVID-19.

Fairfield County, where FCI- Danbury is located has the highest number of confirmed cases of

COVID-19 and deaths attributed to COVID-19 in the state: as of April 27, 2020, there were

10,529 confirmed cases of COVID-19 and 707 COVID-19 associated deaths.[11]

40.     FCI Danbury is the site of one of the worst COVID-19 outbreaks at BOP facilities

nationwide. As of April 15, at least 44 prisoners and 39 staff members have or had tested

positive for COVID-19.[12] One person incarcerated at FCI Danbury has died of COVID-19. On

April 24-26, 2020, at least two women from the FSL were brought to the hospital because of

severe COVID-19 symptoms. On information and belief, at least ten more women in the FSL

tested positive during those same days.

41.     The incidence rate at Danbury exceeds 2.8% of the total prisoner population at the

facility—among the highest concentrations of positive tests per capita of any facility in the

Bureau of Prisons network.

42.     The incidence of staff COVID-19 infections at FCI Danbury is likewise, among

the highest incidence per capita of staff infections in the BOP system.

43.     The BOP reports the number of positive cases for inmates and staff at each

facility on its website. But the BOP's numbers do not include people who previously tested

---

[10] *Id.*
[11] See https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4232020.pdf?la=en
[12] *See* Laura Cassels, *COVID-19 deaths in federal prisons rise to 15; about 700 staff and inmates* sick, Phoenix, April 15, 2020, https://www.floridaphoenix.com/2020/04/15/covid-19-deaths-in-federal-prisons-rise-to-15-about-700-staff-and-inmates-sick/

positive for COVID-19 and have since been deemed recovered by BOP.[13] The BOP provides no explanation as to what qualifies as "recovery."

44.     BOP's data does not state where the incarcerated people who tested positive have been housed, and who may have been exposed to staff members who have tested positive.

45.     As set forth in detail below, *see* paragraphs 131-141, there is ample evidence to indicate that FCI Danbury appears to be avoiding testing prisoners who present with symptoms of COVID-19 infection.

46.     COVID-19 is at Danbury and individuals are infected. What cannot be known is how many currently have the infection or exposure. In the absence of any information from the BOP about the number of tests actually administered at FCI Danbury and the criteria employed at that institution to determine whether and when to perform COVID-19 testing, no reliable information is public about the degree to which the infection has spread at FCI Danbury.

47.     Respondents have failed to prioritize medically vulnerable prisoners for release to home confinement or to other destinations appropriate to reduce population density at FCI Danbury and enhance opportunities for social distancing.

48.     On information and belief, Respondents have also reversed prior determinations to release medically vulnerable individuals pursuant to de-densification efforts and have advised medically-vulnerable individuals who had previously been notified that they were to be released to home confinement that they are no longer eligible for such release because they had not completed one-half of their sentences.

49.     Further, on information and belief, FCI Danbury has indefinitely suspended the administrative remedy process; staff informed prisoners that, due to the state of emergency under

---

[13] Federal Bureau of Prisons, https://www.bop.gov/coronavirus/

which the facility is operating, staff are unavailable to review, investigate and respond to grievances. [Cassidy Decl. ¶ 25].

50.     FCI Danbury is grossly ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The combination of an epidemic striking a facility that houses over 1,000 people and FCI Danbury's inability to provide appropriate medical care under normal circumstances is likely to result in serious illness and death, if people remain confined there at current population levels and under current conditions.

51.     At current facility population levels, prisoners at FCI Danbury cannot comply with the Centers for Disease Control and Prevention ("CDC") guidelines for physical distancing, a "cornerstone" of risk reduction in prisons.[14]

52.     As long as prisoners are unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections at FCI Danbury.

53.     The failure to implement appropriate social distancing measures has led to the creation of crisis conditions at FCI Danbury.

54.     On April 24-26, 2020, several prisoners at the FSL have shared an account of a 43 year-old woman housed at the satellite facility whose serious symptoms, including profuse

---

[14]  *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), at 4 ("CDC Interim Correctional Facility Guidance") ("Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19"); *id.* ("Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic."), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

vomiting and dry heaving, over several hours, were disregarded by correctional staff before she was finally taken to the hospital. [See Korbe Decl. ¶¶ 16-17; Hoisington Decl. ¶¶ 16-17].

    a.  The woman at issue had been sick for a couple of weeks with a sore throat and body aches.

    b.  On April 24, she said that she couldn't breathe and that her lungs felt like they were filling with fluid. She began vomiting, and was vomiting, dry heaving, and violently struggling for air for hours. At one point she had to be wheeled in a wheelchair by a correctional officer from the bathroom because she couldn't walk.

    c.  Other prisoners tried to advocate for her to receive medical treatment and were told that the hospital can't take her unless she's dying, and that the prisoners would get disciplinary reports and get locked down if they continued advocating on her behalf. The prisoners were told that they were not doctors and were instigating the sick woman's behavior.

    d.  By late at night on April 24 or early morning on April 25, the sick woman had been taken to the hospital. At the hospital, she tested positive for COVID-19.

    e.  The next day on April 25, roughly 40 inmates who were determined to have had recent contact with the sick prisoner were moved out of the dormitory into a separate area of the facility and were tested for COVID-19.

    f.  On information and belief, at least ten of those inmates tested positive for COVID-19.

g.  Thereafter, all of the prisoners who had been removed from the dormitory returned for some time to gather their personal property, use phones and computers, use bathrooms, and take showers. On information and belief, even after they were removed to isolation, several of these women were able to return to the dormitory to gather snacks and other belongings.

h.  The phones, computers, and bathrooms were not sanitized immediately afterwards.

i.  The other inmates in the dormitory are using these same phone, computers, and bathrooms.

j.  Some inmates who had contact with the sick woman were not among those removed from the dormitory and are still living there.

k.  As a result of failure to implement social distancing and to plan for contagion within the facility, FCI Danbury had no appropriate location to isolate the women who newly-tested positive for COVID-19 and was required to take those women to sleep in the dining hall/kitchen.

l.  Prisoners have been warned that they will get disciplinary reports if they tell anyone about what is going on in the facility. A prisoner who relayed information about the sick woman to her attorney via phone was given a disciplinary report for sharing information about another prisoner.

55.    FCI Danbury is undergoing a serious outbreak and worse will likely follow with devastating consequences for Petitioners and other vulnerable prisoners, correctional staff, local health care workers, their families, and the broader community.

23

### III.     Prisons Are Especially Susceptible to COVID-19 Contagion

56.     The COVID-19 virus is highly infectious and can be spread "easily and

sustainably" from person-to-person.[15] The virus can live on plastic and steel surfaces for up to 72

hours, and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up

to 27 feet in length.[16]

57.     To date, the virus is known to spread from person to person through respiratory

droplets, close personal contact, and from contact with contaminated surfaces and objects, where

the virus can survive for up to three days. Critically, people who are asymptomatic or pre-

symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its

spread.  [Declaration of Jaimie Meyer, M.D. submitted herewith as Exhibit A ("Meyer Decl.") ¶

20].

58.     There is no vaccine against COVID-19 and there is no known medication to

prevent or treat infection from COVID-19. Social distancing, or remaining physically separated

from known or potentially infected individuals, and vigilant hygiene, including washing hands

with soap and water, are the only known effective measures for protecting vulnerable people

from COVID-19.

59.     As a result, the only assured way to curb the pandemic is through dramatically

reducing contact for all. Consequently, every American institution—from schools to places of

worship, from businesses to legislatures—has been exhorted or ordered to reduce the number of

---

[15] See Centers for Disease Control and Prevention, *How COVID-19 Spreads* (accessed Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[16]  Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at https://doi.org/10.1056/NEJMc2004973 (accessed Apr 2, 2020); Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020),

people in close quarters, if not to empty entirely.[17] People also have been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces, using products with particular alcohol contents, and closing off any areas used by a sick person.[18]

60.     In light of this public health crisis, in late March 2020, the Governors of New York and Connecticut took the strictest measure yet to fight the virus's spread. In recognition that the most effective way to reduce the spread of the virus, they issued "stay at home" executive orders for all residents and banned all non-essential public gatherings.[19]

61.     People in congregate environments, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as evidenced by the rapid spread of the virus in cruise ships and nursing homes.

62.     Indeed, the CDC has identified prisons, along with nursing homes, long-term care facilities, group homes, and cruise ships, as environments that are especially susceptible to rapid

---

https://jamanetwork.com/journals/jama/fullarticle/2763852 (accessed Apr 2, 2020).
    [17] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* WASH. POST, (Mar. 14, 2020), https://cutt.ly/etYRnkz; Centers for Disease Control and Prevention, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n; Centers for Disease Control and Prevention, *Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k; Centers for Disease Control and Prevention, Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19), https://cutt.ly/stRPvg4; Nat'l Conf. of State Legislatures, Coronavirus and State Legislatures in the News, https://cutt.ly/4tRPQne.  As of April 3, 2020, fully 311 million Americans were being urged by their City, County, Parish, Territory, and/or State governments to stay at home to reduce the spread of coronavirus.  See Sarah Mervosh, Denise Lu, Vanessa Swales, *Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (last updated Apr. 3, 2020), available at https://cutt.ly/CtDMZY0.
    [18] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.
    [19] *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order; *Gov. Ned Lamont announces ban on gatherings of more than 5 people as COVID-19 death toll hits 21 and unemployment claims surge to 148K,* HARTFORD COURANT (Mar. 26, 2020,

outbreaks of infection due to close person-to-person contact among large, confined populations.[20]

63.     Spaces within jails and prisons are often poorly ventilated; the lack of ventilation promotes highly efficient spread of diseases through droplets. [Meyer Decl. ¶ 9].

64.     Prisoners and staff interact in close proximity under cramped conditions that are designed to confine people rather than distance them; as a result, correctional facilities are highly susceptible to rapid transmission of the virus through contact, including asymptomatic carriers who show no signs of illness, and common surfaces.

65.     Absent significant de-densifying, people who are confined in prisons, jails, and detention centers, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission. [Meyer Decl. ¶¶ 9, 11].

66.     As one court, quoting another, recently summarized the problem: "Prisons are 'powder kegs for infection' and have allowed 'the COVID-19 virus [to] spread[] with uncommon and frightening speed,'" *United States v. Salvagno*, 5:02cr00051-LEK (N.D.N.Y. Apr. 23, 2020) (Doc. 1166 at 8) (quoting *United States v. Skelos*, No. 15-CR-317, 2020WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020)).[21]

---

10:21 pm), https://www.courant.com/coronavirus/hc-news-coronavirus-updates-0326-20200326-guqhxagmd5fidprf6el6wpvity-story.html.

[20] *See* CDC Interim Correctional Facility Guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correctiondetention/guidance-correctional-detention.html.

[21] Editorial, No One Deserves To Die of COVID-19 in Jail: But More Than 100 Inmates Already Have, N.Y. Times, Apr. 23, 2020), available at https://www.nytimes.com/2020/04/23/opinion/coronavirus-prisons.html ("Social distancing in prisons in nearly impossible."); U.S. Dep't of Justice, FY 2020 Performance Budget Congressional Submission, Federal Prison System, Buildings and Facilities (finding that the size of the inmate population in federal prisons exceeds their rated capacity by 12 to 19 percent), available at https://www.justice.gov/jmd/page/file/1144631/download

67.     Correctional settings also increase the risk of contracting and spreading an

infectious disease, like COVID-19 because they typically house high numbers of people with

chronic, often untreated underlying health conditions, such as diabetes, heart disease, chronic

lung and liver diseases, asthma, and lower immune systems from HIV. This chronic underlying

illness, in turn, is often exacerbated by minimal levels of sanitation, limited access of personal

hygiene, limited access to medical care, and no possibility of staying at a distance from others.[22]

68.     Indeed, outbreaks of the flu regularly occur in prisons, and during the H1N1

epidemic in 2009, many jails and prisons dealt with high numbers of cases.[23]

69.     Prisons are not isolated from communities, and infections in prisons give rise to

the risk of "community spread." Even when prison visitors are reduced, staff, contractors and

vendors go from prisons to communities and can bring infectious diseases into facilities and then

into communities. The turnover of prison populations means that people cycle in and out, as well

as transfer from one facility to another.

70.     Such movement creates an ever-present risk that persons, including asymptomatic

carriers, will carry the virus into and out of those facilities, spread infection, and trigger

---

[22] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45:8 Clinical Infectious Diseases 1047 (Oct. 2007), available at https://academic.oup.com/cid/article/45/8/1047/344842 (incarcerated people at increased risk for transmission of blood-borne pathogens, sexually transmitted diseases, certain antibiotic resistant infections, Staph. Infection, tuberculosis, influenza, and varicella-zoster); World Health Organization, Prisons and Health, *Infectious diseases in prison* at 73 (2014), available at http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1.
[23] *See Interim Guidance for Correctional and Detention Facilities on Novel Influenza A (H1N1) Virus*, CDC (May 24, 2009 at 6:00 pm), available at https://www.cdc.gov/h1n1flu/guidance/correctional_facilities.htm; Wen-Cheng Chao, Po-Yu Liu, Chieh-Liang Wu, *Control of an H1N1 outbreak in a correctional facility in central Taiwan*, 50:2 J. MICROBIOLOGY, IMMUNOLOGY AND INFECTION 175 (Apr. 2017), available at https://www.sciencedirect.com/science/article/pii/S1684118215007550; *H1N1 outbreak in 2013 inside Canada's largest correctional facility offers lessons on COVID-19: report*, NATIONAL POST (Mar. 24, 2020 at 12:00 am), available at https://nationalpost.com/news/h1n1-outbreak-in-2013-at-canadas-largest-correctional-facility-being-studied-to-fight-covid-19-inside-prisons.

outbreaks inside and in communities. Prison health is an issue of public health as what happens in prison has widespread ramifications beyond the walls of the prison. [Meyer Decl. ¶ 8.][24]

71.     Evidence of the degree of risk in prisons is mounting. The estimate is that recent outbreaks in the Cook County Jail in Chicago and at the Rikers Island Jail in New York are the highest transmission rates for COVID-19 in the world.[25] As of April 20, 2020, eight hundred New York City correctional employees had tested positive and eight had died. Including prisoners, there have been 10 deaths and more than 1,200 confirmed cases in New York City's jails.[26]

72.     In Arkansas, 38% of the positive COVID-19 cases in the state are concentrated in one prison, which has 850 confirmed cases.[27]

73.     As of April 26, 2020, at least 12,613 people in jails and prisons had tested positive for the illness.[28] The number of new cases among prisoners is more than doubling each week.

---

[24] *See* ACLU, *COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails* (April 22, 2020), https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf (epidemiological model indicating that, "as a result of the constant movement between jails and the broader community, our jails will act as vectors for the COVID-19 pandemic in our communities.").

[25] *See* Alleen Brown, *Inside Rikers: An Account of the Virus-Stricken Jail from a Man Who Managed to Get Out*, Intercept, April 21 2020, https://theintercept.com/2020/04/21/coronavirus-rikers-island-jail-nyc/; Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times, April 8, 2020, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[26] Deanna Paul & Ben Chapman, *Rikers Island Jail Guards Are Dying in One of the Worst Coronavirus Outbreaks*, Wall Street Journal, April 22, 2020, https://www.wsj.com/articles/rikers-island-jail-guards-are-dying-in-one-of-the-worst-coronavirus-outbreaks-11587547801

[27] *See* Zach Budryk, *38 percent of Arkansas COVID-19 cases concentrated in state prison*, The Hill, April 21, 2020, https://thehill.com/homenews/state-watch/493988-38-percent-of-arkansas-covid-19-cases-concentrated-in-states-prison

[28] Sharon Dolovitch, "Covid-19 Jail/Prison Confirmed Cases & Deaths," *UCLA Covid-19 Behind Bars Data Project*, https://docs.google.com/spreadsheets/d/1X6uJkXXS-O6eePLxw2e4JeRtM41uPZ2eRcOA_HkPVTk/edit#gid=1197647409.

The "curve," which may be flattening due to social distancing in some localities, is not flattening in prison; to the contrary, the virus is soaring in prisons.[29]

74.     Sixteen prison systems—including the Federal Bureau of Prisons which has already experienced major outbreaks throughout its network—are not releasing information about how many prisoners they are testing.[30] Of the rest, only eight systems had tested more than 400 of the people in their custody by the week beginning April 20, 2020.[31]

75.     Therefore, the data of more than 12,000 people in prison and jails testing positive is most likely a significant undercount.

76.     In Ohio, mass testing of everyone at the Marion Correctional Institution revealed 1,828 confirmed cases among prisoners, which represents 73% of the population. One hundred and nine staff members at the facility were also positive.[32]

## IV.     COVID-19 Infection in the Prison Demographic Is Deadly

77.     Many incarcerated individuals are at heightened risk of serious illness and death from COVID-19 because their demographic profile and histories make them part of a cohort that is especially vulnerable. People over the age of fifty face greater chances of serious illness or death from COVID-19. In a February 28, 2020, WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79 years old had an 8% mortality rate. For individuals 50-59, the

---

[29] *See* **Error! Main Document Only.**"Tracking the Spread of Coronavirus in Prisons" THE MARSHALL PROJECT, Apr. 24, 2020 3:05 pm, available at https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons
[30] *Id.*
[31] *Id.*
[32] *See* Bill Chappell & Paige Pfleger, *73% Of Inmates At An Ohio Prison Test Positive For* Coronavirus, NPR, April 20, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus

mortality rate was 1.3%. For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was 0.2%.[33]

78.     People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, are at elevated risk as well.[34]

79.     The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[35]

80.     In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.

81.     Most people in higher risk categories who develop serious illness will need advanced medical help and support. This level of supportive care requires highly specialized

---

[33] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO China Joint Mission Report); ICNARC Report on COVID-19 in Critical Care, at 19 (Apr. 17, 2020), available at https://www.icnarc.org/About/Latest-News/2020/04/04/Report-On-2249-Patients-Critically-Ill-With-Covid-19 (in study of 6,750 patients admitted to critical care, finding that majority of patients over 60 died in critical care).

[34] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[35] WHO-China Joint Report at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19- final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.[36]

82.    COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

83.    Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

84.    Even some younger and healthier people who contract COVID-19 are susceptible to severe strokes and may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[37]

---

[36] Kevin McCoy and Katie Wedell, '*On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients*, USA TODAY (Mar. 27, 2020), available at https://bit.ly/2V7rLsS.

[37] *See Young and middle-aged people, barely sick with covid-19, are dying of strokes,* WASH POST. (Apr. 25, 2020 at 2:12 pm), available at https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/; *see also* Covid-19 causes sudden strokes in young adults, doctors say, CNN (Apr. 23, 2020 at 7:41 am), available at https://www.cnn.com/2020/04/22/health/strokes-coronavirus-young-adults/index.html.

85.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[38] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.

86.     Most people in high-risk categories who develop serious illness require advanced medical support, including specialized equipment, such as ventilators, and large teams of highly trained care providers, such as ICU doctors, nurses, and respiratory therapists. [Meyer Decl. ¶ 22]. The artificial ventilation process is itself invasive and dangerous, and some patients must be placed in medically induced comas for such treatment.

87.     Given the need for advanced and urgent intervention, often in an ICU environment, people with severe cases of COVID-19 cannot be shackled or otherwise restrained, nor can they be subjected to constant, close supervision by correctional staff, as they would be in a typical correctional setting.

88.     FCI Danbury is not equipped to provide advanced support in an ICU setting with ventilators, certainly not for a substantial group of seriously ill prisoners who may require such specialized care.

89.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, amputation due to

---

[38] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM) https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879; World Health Organization, Q&A: Similarities and differences – COVID-19 and influenza (Mar. 17, 2020), available at https://www.who.int/news-room/q-a-detail/q-a-similarities-and-differences-covid-19-and-influenza#:~:text=Mortality%20for%20COVID%2D19,quality%20of%20health%20care  (COVID-19 crude mortality ratio is between 3-4%; for seasonal influenza mortality is usually well below 0.1%);

clotting and reduced blood flow, loss of respiratory capacity, and tissue damage in other vital organs, including the heart and liver.[39]

90.     In sum, to buffer against the outbreak of a highly infectious, deadly virus in a closed detention setting requires urgent and decisive action to protect the health of those confined in the prison, those who work there, and the medical professionals who will treat those who become infected.

## V.     Spread of Disease in BOP Facilities Requires De-Densifying and Providing Social Distancing for Those Who Remain

91.     Available statistics reveal a public health disaster erupting across BOP facilities that worsens with each passing day.

92.     From March 20 to April 25, confirmed COVID-19 cases among BOP prisoners and staff rose from 2 to 1047 across 42 facilities nationwide.

93.     Severe outbreaks at FCI Oakdale in Louisiana, FCI Elkton in Ohio, and FCI Butner in North Carolina, already have resulted in dozens of confirmed COVID-19 infections among prisoners and staff, many more suspected but unconfirmed cases, and 22 prisoner deaths throughout the system.[40]

---

[39] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl; Melissa Healy, *Coronavirus infection may cause lasting damage throughout the body, doctors fear*, LA TIMES (Apr. 10, 2020), available at https://cutt.ly/htNrJ77; see also Di Wu et al., *Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19*, MEDRXIV 2020.04.05.20053819 (2020); Declaration of Dr. Jonathan Golob, *Dawson v. Asher*, No. 2:20-cv-00409-JLR-MAT at ¶ 4 (W.D. Wash., Mar. 16, 2020), available at https://cutt.ly/AtNrFOl.

[40] Current information about the census of COVID-19 positive prisoners and staff in the Bureau of Prisons system is maintained on a COVID-19 resource page on the Federal Bureau of Prisons website available at https://www.bop.gov/coronavirus.  Historical statistics have been compiled and updated daily by the Federal Defenders of New York, Inc. and are available at https://federaldefendersny.org/.

94.     That surge of COVID-19 cases inside the federal prison system has dwarfed the national percentage increase in confirmed cases over the same time period.[41]

95.     According to CDC guidelines, only two measures are known to be effective in reducing the spread of this disease: (1) diligent "social or physical distancing," which involves keeping at least six feet of space between people to avoid transmission of the virus, and (2) vigilant hygiene practices, including frequently washing hands and regularly disinfecting surfaces. Physical distancing is a necessary predicate for hygiene practices to have any meaningful impact.[42]

96.     Because asymptomatic or pre-symptomatic people can transmit the virus to others, it is critical to follow CDC guidelines, including social distancing, even among people who show no signs of COVID-19 and appear to be healthy.

97.     The only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally and at FCI Danbury in particular is to downsize immediately the incarcerated population and, for the prisoners who remain at the institution, to undertake aggressively the detection, prevention, and treatment measures that public health and medical experts have recommended, including effective social distancing.

98.     These measures are not possible in prisons, like FCI Danbury, without substantial reductions in the prisoner population.

99.     What some officials call "modified lockdowns" are not what self-quarantining and social distancing entails. Prisoners and staff interact in many ways, and when facilities have

---

[41] Comparisons of the respective increases in confirmed cases of COVID-19 over the last several weeks in the general and prison populations have likewise been compiled by the Federal Defenders of New York, Inc. and are available at https://federaldefendersny.org/.

[42] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

dorm-like arrangements, prisoners sleep, eat, congregate, recreate, and receive medical treatment in close proximity.

100.    Implementation of necessary hygiene practices is also impossible, particularly when adequate supplies of free soap, sanitizers, disinfectants, and paper towels are not readily available in prisons. [Meyer Decl. ¶¶ 9, 11, 39].

101.    Correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19 so as to protect them and permit risk mitigation for all people held or working in facilities. Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

102.    Calling for immediate and extensive "efforts to decarcerate" to protect both prisoners and the general public, the *New England Journal of Medicine* explained:

> The boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel. Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. . . .To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.[43]

---

[43] Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons*, NEW ENGLAND JOURNAL OF MEDICINE (Apr. 9, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

103.     Consistent with these public health recommendations, many jurisdictions have already taken steps to protect those in custody from the impending spread of COVID-19 by releasing people in an effort to reduce populations.[44]

104.     In New York City, public officials, the jail oversight board, and doctors working at Rikers Island have acknowledged that the City's jails are unsafe and that releasing people is the medically appropriate and humane option.[45] *See* Statement of New York City Board of Correction, March 17, 2020 (calling on the City to release people from criminal custody, prioritizing people over 50, those with underlying health conditions, detained for administrative reasons, and those who have been convicted and sentenced to one year or less).[46]

---

[44] For example, in Washington, the governor has, as of April 23, commuted almost 300 sentences, and more than 40 people have received work release furloughs; Kentucky's governor signed an executive order on April 2, 2020, commuting the sentences of 186 people convicted of felonies, and the state plans to release 743 others who are within 6 months of completing their sentences; the governor of Oklahoma has commuted the sentences of more than 450 people; the number of people being paroled from state prisons in Michigan has reportedly increased by about 1,000 people per month to reduce prison density during the pandemic; and the California Department of Corrections and Rehabilitation announced on March 31 that it would expedite the transition to parole for 3,500 nonviolent offenders with 60 days or less left on their sentences.  *See Responses to the COVID-19 pandemic*, Prison Policy Initiative (Apr. 24, 2020), https://www.prisonpolicy.org/virus/virusresponse.html. Numerous cities and counties have also taken steps to reduce jail populations, including: from March 18 to April 15, 2020, the Washington, D.C., jail population decreased by more than 21%; the San Mateo County Sheriff's Office in California has released 382 people from their two county jails, including those who are 65 and older; after an April 3, 2020, ruling from the Massachusetts Supreme Judicial Court, almost 300 people were released from jails across the state.  *Id*.

[45] *See* Ross MacDonald (@RossMacDonaldMD), Twitter (March 18, 9:51 p.m.) https://twitter.com/RossMacDonaldMD/status/1240455796946800641 (Dr. MacDonald is the Chief Medical Officer for Correctional Health Services ("CHS"), which provides healthcare to New York City's Department of Corrections); Rachel Bedard, (@rachelbedard), Twitter (March 18, 8:34 a.m.) https://twitter.com/rachelbedard/status/1240255196644741120 (Dr. Bedard is the Director of Geriatrics and Complex Care for CHS); Jonathan Giftos (@JonGiftosMD), Twitter (March 18, 10:37 p.m.) https://twitter.com/JonGiftosMD/status/1240467288198873088 (until January 2020, Dr. Giftos was the ClinicalDirector of Substance Use Treatment for CHS).

[46] *New York City Board of Correction Calls for the City to Begin Releasing People from Jail as Part of Public Health Response to COVID-19* (Mar. 17, 2020), https://www.nysenate.gov/newsroom/in-the-news/julia-salazar/nyc-board-correction-calls-city-begin-releasing-people-jail

105.     On March 20, 2020, Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues — those people are likely to die from a coronavirus infection."[47]

106.     Several doctors working in New York City's jails have echoed the calls to release vulnerable people. Dr. Rachael Bedard, senior director of the geriatrics and complex care service at Rikers Island, has described depopulation as "[t] he only meaningful public health intervention."[48] In correctional facilities, "if you think about how many excess human contacts [there are], even compared to something like a shelter setting, you can imagine why viral spread in this environment is extra dangerous."

107.     Ross McDonald, the Chief Medical Officer for Correctional Health Services, which provides healthcare to New York City's Department of Corrections, said Rikers was a "public health disaster unfolding before our eyes." He stressed: "This is not a generational public health crisis, rather it is a crisis of a magnitude no generation living today has ever seen." He also warned that it was "unlikely" they will be able to stop the growth in the jail, and predicted that 20% of those infected would need hospital treatment and 5% would need ventilators. He called for the release of "as many vulnerable people as possible"[49]

---

[47] Jen Ransom and Alan Feuer, *'A Storm Is Coming': Fears of a Prisoner Epidemic as the Virus Spreads in the Jails*, N.Y. Times (March 20, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html

[48] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients From the Coronavirus*, New Yorker (Mar. 20, 2020), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-tosave-her-elderly-patients-from-the-coronavirus.

[49] Miranda Bryant, Coronavirus spread at Rikers is a 'public health disaster', says jail's top doctor, THE GUARDIAN (Apr. 1, 2020 10:36 am), Available at https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster

108.    Members of Congress have, likewise, recognized the urgency of reducing prison populations as a means of achieving social distancing in those institutions. On March 23, 2020, a bipartisan group of fourteen U.S. Senators sent a letter to U.S. Attorney General Barr and BOP Director Carvajal to express their "serious concern for the health and wellbeing of federal prison staff and prisoners . . . especially those who are most vulnerable to infection." The Senators wrote that they reviewed the BOP's COVID-19 Action Plan and noted that it did not include any measures to protect the most vulnerable staff and prisoners. The Senators urged DOJ and BOP to release to home confinement certain individuals who were elderly, ill, or incarcerated for non-violent offenses and are near release.

109.    Senator Dick Durbin of Illinois, founding Chairman and current member of the Senate Judiciary Committee's Subcommittee on Human Rights and the Law (subsequently renamed the Subcommittee on Constitution, Civil Rights, and Human Rights) and current ranking member on the Subcommittee on Immigration has called on the federal government to take action to protect staff and people detained in federal prisons. "Federal prisons will inevitably be a hotspot for the spread of coronavirus, especially among vulnerable staff and prisoners," Durbin said. "It is imperative for BOP to take immediate action to protect staff and prisoners at federal prisons throughout the country and ensure that facilities are prepared to address this threat."[50]

---

[50] *Durbin Discusses Coronavirus Threat At Federal Prisons With Council Of Prison Locals*, Dick Durbin United States Senator Illinois (Mar. 24, 2020), https://www.durbin.senate.gov/newsroom/press-releases/durbin-discussescoronavirus-threat-at-federal-prisons-with-council-of-prison-locals; Letter, https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

110.    On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act, P.L. 116-136), which authorizes the BOP Director to lengthen the maximum amount of time for which a prisoner may be placed on home confinement "as the Director determines appropriate" when the Attorney General "finds that emergency conditions will materially affect the functioning" of BOP.

111.    The authority is limited to "the covered emergency period," which is defined as the period spanning from the President's declaration of a national emergency with respect to COVID-19 to the date that is 30 days after the date on which the declaration terminates.

112.    The United States Department of Justice has also called for urgent action to reduce prison populations in the BOP to achieve necessary social distancing. On March 26, 2020, Attorney General William Barr sent a memo to the Director of BOP "directing [him] to prioritize the use of [his] various statutory authorities to grant home confinement for prisoners seeking transfer in connection with the COVID-19 pandemic" because "for some eligible prisoners, home confinement might be more effective in protecting their health."[51]

113.    The Attorney General specifically recognized that "there are some at-risk prisoners who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."[52]

114.    Attorney General Barr further identified "[t]he age and vulnerability of the prisoner to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and "the security level of the facility," with "priority given" to prisoners

---

[51]  Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf

[52]  *Id.*

incarcerated "in low and medium security facilities," as two of the critical, discretionary factors for consideration. *Id*.

115.    In an April 3, 2020, memorandum to Respondent Carvajal, following the dramatic increases in confirmed COVID-19 cases at FCI Danbury and two other BOP facilities (FCI Oakdale in Louisiana, and FCI Elkton in Ohio), Attorney General Barr affirmed the BOP's "profound obligation to protect the health and safety of all inmates."[53]

116.    Attorney General Barr stated: "As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below."

117.    Attorney General Barr further recognized that, despite "extensive precautions to prevent COVID-19 from entering [BOP] facilities and infecting our prisoners," those measures "have not been perfectly effective." Accordingly, he ordered the BOP to take more aggressive

---

[53]  Memo from Attorney General to Director of Bureau of Prisons, April 3, 2020, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf

steps, immediately, to transfer prisoners to home confinement, even if electronic monitoring will
not be available.

118.    Echoing the warnings of public health experts, Attorney General Barr stated:
"Given the speed with which this disease has spread through the general public, it is clear that
time is of the essence."  *Id*.

## VI.    Respondents Have Failed to Proceed as Promptly as Required in this Crisis to De-Densify and to Implement the Necessary Social Distancing at BOP Facilities and at FCI Danbury in Particular

119.    Notwithstanding Attorney General Barr's statements, the recommendations of
public health officials and the efforts of multiple state jurisdictions to decarcerate their prison
populations, Respondents have failed to use the BOP's available statutory authority to reduce the
population of FCI Danbury to mitigate the severe risk posed by COVID-19. Instead, the facility
has reversed course, refusing to follow through with transfers to home confinement for
individuals previously identified for such home confinement based on their medical
vulnerability, and failing to timely respond to requests for emergency compassionate relief or to
take other measures appropriate for a public health crisis.

120.    According to the BOP's website, from March 26 (the date of Attorney General
Barr's first memo) through April 25, the agency placed 1576 prisoners nationwide into home
confinement—which would constitute only 0.9 percent of the approximately 171,000 prisoners
currently held in BOP custody.  However, the real number of those released to home
confinement may well be less. As the Wall Street Journal reported on April 23: "The bureau said
it has started placing at least 1,440 of the roughly 175,000 prisoners it holds into home
confinement, but didn't say how many of those people have actually been released." Sadie

41

Gurman & Rebecca Davis O'Brien, *Confusion Hampers Coronavirus-Driven Inmate Releases*, Wall Street Journal, April 23, 2020;[54] *see also* Joseph Neff & Keri Blakinger, *Few Federal Prisoners Released Under COVID-19 Emergency Policies: A Federal Judge Called the Bureau of Prisons Release Process "Kafkaesque"*, The Marshall Project, Apr. 25, 2020 (only 1,027 more prisoners allowed to serve the rest of their sentence in home confinement since Attorney General Barr's April 3 urgent memo, "about half of 1 percent of the more than 174,000 people in the bureau's custody").[55]

121.    The BOP has not disclosed the number of prisoners it typically released per day prior to Attorney General Barr's memos, nor has it disclosed how many new prisoners have entered BOP custody during the same time period. In short, data from the BOP demonstrate that it is not releasing enough prisoners to protect federal prisons from COVID-19.

122.    Indeed, despite concerns by government officials and public health experts, the BOP continues to transfer people from facility to facility. Those transfers increase the likelihood that the virus will be transmitted within the incarcerated population.[56]

123.    On information and belief, the first person at FCI Danbury (then housed in the M Unit of the men's prison) tested positive for COVID-19 on or about March 28, 2020.  [Almonte Decl. ¶ 12].

---

[54] Available at https://www.wsj.com/articles/justice-department-clarifies-coronavirus-driven-inmate-releases-11587594242.

[55] Available at https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies.

[56]  Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transferring Prisoners: Sources*, ABC News (Mar. 23, 2020, 1:22PM), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416

124.    Prior to testing positive for COVID-19, the individual was in contact with many

prisoners and staff, necessitating a proper public health response to contain the infection,

including the immediate introduction of social distancing and enhanced hygiene measures.

125.    However, as set forth above, the very configuration of the confined prison space

with sleeping quarters and all ancillary facilities in close physical proximity and multiple

prisoners in the same physical space and requiring simultaneous access to the limited available

resources, precludes the requisite social distancing without dramatic de-densification.  Under

existing conditions, neither class members nor staff in any of the three units at FCI Danbury can

stay at least six feet away from other people and, therefore, engage in effective social distancing,

as called for by the CDC.

126.    Moreover, FCI Danbury has failed to take appropriate action as set forth in the

relevant CDC Guidance in response to those tests confirming the existence of the virus within its

population but rather, persisted in practices and policies which are contrary to social distancing

directives and are inconsistent with the needs for enhanced hygiene.

127.    Respondents' failures to adopt and implement adequate policies and procedures to

prevent and mitigate the spread of COVID-19 fall into several broad categories which are

discussed below.

   A.    **Failures to Triage Cases, Diagnose and Isolate Disease**

128.    If an incarcerated person exhibits symptoms of COVID-19, the CDC Guidance

calls for the individual to be immediately given a face mask, paced in isolation, provided a

medical evaluation and treatment, and evaluated for possible testing.  By contrast, FCI Danbury

has deliberately not sought out potential cases of coronavirus and has not implemented the

measures called for by the CDC Guidance. By failing meaningfully to isolate prisoners and staff

who are positive for coronavirus, or who exhibit symptoms highly indicative of coronavirus and

present a substantial risk of infecting other prisoners and staff in the unit, the Respondents have

been deliberately indifferent to the known serious medical needs of the Petitioner class.

129.    Since the lockdown began, sick call triage in the men's facility is conducted by a

social worker without medical training, and who is openly contemptuous of the men's needs.

[Cassidy Decl. ¶ 18][57]

130.    At men's and women's facilities, prisoners who present for sick call who do not

exhibit fever are denied access to any further medical follow-up. [*Id.*; Korbe Decl. ¶¶ 4-6,

Hoisington Decl. ¶ 6].

131.    Prisoners who complain to staff of symptoms consistent with COVID-19—

including coughing, congestion and shortness of breath—are routinely unable to obtain

immediate medical examination, are not tested for COVID-19, and are returned to the general

population until their symptoms worsen. [Hoisington Decl. ¶¶ 5-7, 14-15; Korbe Decl. ¶¶ 7, 12;

Mason Decl. ¶ 19; Almonte Decl. ¶ 20].[58]

---

[57]   As Mr. Cassidy states:
    The social worker, Ms. Adamson, has told us "you are all fucking children with nothing
    more than a flu so stop your shit you're not going home early."  She has said, "if you did
    the crime stop crying and do the time."  She has said, "I don't need medical training to
    tell you you're not sick so go lay the fuck down."  [Cassidy Decl. ¶ 18].
[58]   As Ms. Hoisington – who was subsequently hospitalized with confirmed COVID-19 infection
and a temperature of 102 degrees on admission [Hoisington Decl. ¶ 5, 8] – recounts:
    I had been feeling sick for a couple weeks before I went to the hospital. I had put
    in a request to see medical, and had been given two different "idles" to miss
    programs because I was sick. On March 26 I reported to staff that I wasn't
    feeling well ... I went to the medical clinic, but after waiting there for 45 minutes
    without being seen, I returned to my bunk.  A few hours later, I reported to staff
    on duty that I was feeling worse.  I was told to lie back down.  By early in the
    morning of March 27th, around 1 or 2am, I had such bad chest pain that I could

132.    FCI Danbury has further willfully refused to take temperatures or test for fever in order to avoid identifying cases of possible COVID infection.  [Almonte Decl. ¶ 15]

133.    When prisoners have presented with likely fever, Respondents have on occasion falsely discounted the readings of elevated temperatures in order to avoid taking appropriate follow-up action, including, in particular, isolating the prisoner from the general population and testing to confirm a coronavirus diagnosis.

134.    Methods employed by respondents to avoid appropriate follow-up in cases of likely fever include, (1) falsely attributing the reading to equipment error; (2) falsely attributing the reading to operator error; (3) falsely recording identical temperatures for every person tested on a given unit; (4) "resetting" the thermometer while pretending to take another reading; and (5) taking repeat temperature readings after first requiring the prisoner to drink a glass of ice water. [Cassidy Decl. ¶ 14; Mason Decl. ¶¶ 20, 21 (recorded temperatures are artificially low at between 96-97°F because temperature is taken with a remote scanner that is placed too remote from the body; prisoners made to drink cold water after registering elevated temperatures); Korbe Decl. ¶ 5; *see also* Hoisington Decl. ¶ 8 (reporting that she was transported to the hospital on an emergency basis after persistent symptoms consistent with COVID-19 and that she had a temperature of 102°F on admission after having been told by FCI Danbury staff that a

_____

not sleep. I told the officer on duty, who called the command center, and then called an ambulance. [Id. ¶ 5-7]
    Similarly, Ms. Korbe – who has been complaining of a headache, cough and lost sense of smell for over a week, has not been screened for COVID-19 and has been maintained in general population throughout. [Korbe Decl. ¶ 4].  Indeed, Ms. Korbe's cough was so extreme that one of the psychologist upon hearing the cough told Ms. Korbe that she should be tested because she could be infecting others. Notwithstanding that Ms. Korbe asked the one of the psychologists to assist her to obtain appropriate testing, she has not, to date, been tested for COVID-19. [*Id.* ¶ 6].

temperature taken within an hour prior to her leaving in the ambulance had purportedly

registered a reading of 97°F)].[59]

135.    Even where prisoners have presented with *confirmed* fever, respondents have

failed to isolate the prisoner from the general population. Rather, in many instances, respondents

have returned the prisoner to his or her unit with instruction to take two to three Tylenol and will

only proceed to isolate the prisoner if his or her fever does not respond after that time. [Cassidy

Decl. ¶ 12; Mason Decl. ¶ 20].

136.    When temperatures are taken, they are often not being recorded in the medical

records.  [Mason Decl. ¶ 21].

137.    Prison staff have further denigrated or dismissed prisoners exhibiting clear

symptoms of coronavirus, telling prisoners with headache, body ache, shortness of breath or even

---

[59] As Ms. Hoisington states, on April 17, after previously having tested positive for COVID-19, she started to get symptoms again, including weakness, fever, terrible body pains, sweating and dry heaving.  She was taken to the medical clinic where her temperature was recorded at 98 degrees (which she believed to be incorrect but which was not re-taken despite her presenting symptoms). Notwithstanding that her oxygenation only registered at 96 and her blood pressure was so high that the nurse took it three times, the nurse instructed her to take Tylenol and return to her unit. [Hoisington Decl. ¶ 15].

As Mr. Cassidy recounts:  "For the last couple weeks, prisoners with a fever are taken to medical. Sometimes, however, a prisoner has a fever and the associate warden attributes the temperature reading to equipment error.  When the temperature wand comes up with a low-grade fever, the associate warden will 'reset' it and pretend to take another reading.  He will announce another number, but he won't even aim the wand at the prisoner's forehead.  The associate warden does not show the prisoners the LCD screen on the wand that displays the temperature, so we have to go by whatever they tell us. … If the associate warden acknowledges that a prisoner has a temperature, then he will escort the prisoner to medical.  At medical, the prisoner is given two or three Tylenol and told that the device is not working properly and that they do not have a fever.  This has happened to more than 20 prisoners in my unit.  One of the prisoners has been vomiting blood all week.  When his temperature was taken in the unit, he was told he has a 101.2 degree fever.  When he got to medical, he was given Tylenol, told that his temperature is 98.7 degrees, and sent back to the unit.  When he got back to the unit, he told us that they never took his temperature in medical.  His forehead was hot.  [Cassidy Decl. ¶¶ 13-14].

According to Ms. Korbe, staff members have been taking all of the inmates' temperatures every day: "They have us line up in rows to do this.  I have noticed that everyone in the same row is told that they have the exact same temperature."  [Korbe Decl. ¶ 14].

chest pains that there is nothing that they can do, that the prisoner merely suffers from "overblown flu," that the prisoner "did the crime" and should "do the time," and/or that the coronavirus epidemic is not "going to get you out of prison." [Cassidy Decl. ¶¶ 9, 18; Korbe Decl. ¶ 16 (staff criticized prisoners' concern about medical emergency in FSL, telling women to "stay in our lane" because they weren't doctors)].

138.     Respondents' failure to de-densify the population at FCI Danbury and their inadequate manner of responding to suspected COVID-19 cases places the putative class at an unreasonable risk of contracting COVID-19.

**B.     Failure to Respond Adequately to Cases of Close Contact or Observe Appropriate Quarantine/Isolation**

139.     CDC Guidance directs prisons to implement 14-day quarantines/isolation of prisoners or staff who have had contact with people known to have tested positive for COVID-19, to monitor such Close Contact Cases for COVID-19 symptoms, and to keep staff members out of the facility unless they are asymptomatic 14 days after their exposure to COVID-19. Contrary to this Guidance, Respondents routinely fail to test or isolate prisoners with known close contact with individuals subsequently diagnosed with coronavirus. [Cassidy Decl. ¶¶ 31, 41; Hoisington Decl. ¶¶ 14, 17 (recounting failure to test prisoners in close contact with prisoner hospitalized with COVID-19 infection)].

140.     Prisoners who test positive for COVID-19 are frequently returned to the general population far earlier than appropriate pursuant to CDC Guidance.[60] [Declaration of Tamika Somerville, submitted herewith as Exhibit I ("Sommerville Decl.") ¶ 13 (women testing positive

for COVID-19 on Tuesday returned to the unit that same Friday); Madore Decl. ¶ 12; Cassidy Decl. ¶ 15 (reporting that two individuals returned to the unit within 5-6 days after testing positive for COVID-19, resulting in a substantial outbreak on the unit); Almonte Decl. ¶ 17; Mason Decl. ¶ 18].

141.    Due to staff shortages, prisoners are often required to respond to a medical emergency such as another prisoner collapsing on the unit. Notwithstanding that the collapse of a grown man in the context of a pervasive outbreak is highly suggestive of a COVID-19 infection, prisoners who respond in this fashion are not thereafter followed for possible infection or otherwise isolated from the rest of the population.  [Cassidy Decl. ¶ 31; Hoisington Decl. ¶ 13 (women had to bang front door to facility to get attention of someone in parking lot when there was no available officer to attend to women who was unconscious after hitting her head on concrete floor)].[61]

142.    Contrary to CDC Guidance, prison staff, including those working in food services, have not been allowed to call in and explain that they are sick or have returned to work at times when medical professionals advised that they were still potential carriers. [Martinez-Brooks Decl. ¶ 20; Mason Decl. ¶ 15 ("Officers have returned to work after being unable to get their FMLA papers signed, but remain symptomatic. One officer stated that they still feel ill and do not want to be at work, but were told to return.")].

143.    Working correctional officers who are sick or who were previously diagnosed as positive for COVID-19 have advised prisoners to keep their distance since they do not know

---

[60]  As set forth in the Declaration of Tamika Somerville, who is housed in the FSL, a woman in her unit who tested positive for COVID-19 on a Tuesday was returned to the general population on Friday, three days later. [Somerville Decl., ¶ 13].

[61]  Mr. Cassidy has observed at least three prisoner medical emergencies that were addressed only

whether they are sufficiently recovered to no longer present a risk of infection to people with whom they come in contact. [Mason Decl. ¶ 15].

144.    FCI Danbury has failed to observe appropriate isolation for new prisoners, and prisoners have been permitted into the facility without observance of proper quarantine pursuant to CDC Guidance.  [Martinez-Brooks Decl. ¶ 12].

145.    Respondents' failure to implement appropriate isolation procedures is reckless and places the putative class at an unreasonable risk of contracting COVID-19.

**C.    Failure to Remediate Adequately Spaces with Known Coronavirus Contact and to Inform Prisoners of the Extent of Infection**

146.    In the event a prisoner or staff member tests positive for COVID-19, CDC Guidance calls for the facility to close off the areas used by that person.  These areas are to be well ventilated for at least 24 hours before they are disinfected by people equipped with proper personal protective equipment ("PPE").  Respondents have failed to implement any of these measures.

147.    In addition, FCI Danbury has departed from CDC Guidance by not informing incarcerated prisoners that someone in their unit has tested positive for COVID-19, thereby depriving petitioners and the class members of the opportunity to exercise more vigilance in their hygiene and cleaning habits when extra vigilance is needed most. Petitioners and the putative class members have not been informed of the extent of the outbreak at FCI Danbury. [Mason Decl. ¶ 16 (FSL prisoners learned about COVID-19 outbreak in the facility because it was reported on the news)]; Declaration of Theresa Foreman, submitted herewith as Exhibit J

---

by other prisoners.

("Foreman Decl.") ¶ 19 (the Assistant Warden informed the women that they wouldn't be told if they were exposed to COVID-19)].

148.    Respondents know that these failures to adequately remediate spaces with known coronavirus contact or to advise petitioners and the putative class members of the extent of the outbreak at the facility unnecessarily heightens the risk that petitioners and the putative class members will contract COVID-19.

#### D.    Failure to Implement Adequately Social Distancing Measures

149.    As set forth above, the very configuration of FCI Danbury precludes meaningful social distancing. The overwhelming majority of the facility's prisoners in each of the three facilities are housed dormitory-style and all prisoners in these configurations sleep within 3 to 4 feet of between 3 and 5 other prisoners. [Mason Decl. ¶ 7; Martinez-Brooks Decl. ¶ 7; Cassidy Decl. ¶ 31; Declaration of Ronald Harper, submitted herewith as Exhibit N (Harper Decl.) ¶ 4]. Prisoners use the same bathrooms and share a limited number of toilets, sinks and showers. [Mason Decl. ¶ 10; Martinez-Brooks Decl. ¶¶ 6, 10; Cassidy Decl. ¶ 32; Harper Decl. ¶ 4]. Prisoners further must share a limited number of telephones and computers which are located close together in a common area [Mason Decl. ¶ 8; Martinez-Brooks Decl. ¶ 9; Cassidy Decl. ¶¶ 35-36] and which are rarely cleaned or disinfected (and are not disinfected after each use). [Korbe Decl. ¶ 11; Cassidy Decl. ¶¶ 35-36].

150.    FCI Danbury has failed to implement adequate social distancing measures in other aspects of prison life.  For example, prisoners are regularly unnecessarily made to line up in close proximity to one another to receive their meals and when medications are dispensed. [Almonte Decl. ¶ 13; Cassidy Decl. ¶ 39 ("Staff give out medication twice a day. They shout

'medication' and stand outside the door. Prisoners form a pill line, standing right next to each other. If you don't hear 'medication' you don't get your medication for the day, so everyone comes up at the same time and crowds each other.")].

151.    Prisoners likewise mass together for commissary which, in the dorms in the men's units, is brought into the central dormitory hallway in a laundry bin. The men on the dorm then stand in the narrow hallway in close proximity to one another while waiting for their names to be called. [Cassidy Decl. ¶ 37].

152.    Prisoners further congregate in close proximity in unacceptably large numbers in recreation areas and in common areas to watch television, to use the telephones and computers, and for meals. [Declaration of Antrum Coston, submitted herewith as Exhibit K ("Coston Decl.") ¶ 4; Almonte Decl. ¶ 8; Mason Decl. ¶¶ 8-9].

153.    Staff move regularly between units, in contravention of proper social distancing practices, thereby exacerbating the spread of undiagnosed disease from one part of the facility to another. [Martinez-Brooks Decl. ¶ 19 (staff move between all four dorms in the camp for count, food delivery and commissary and staff at camp also work at the other two facilities at FCI Danbury)].

154.    Respondents have inappropriately moved prisoners from rooms where greater separation was possible into dorms in the women's camp, pushing the populations of A, B and C dorms to almost full capacity, thereby dramatically reducing the ability of occupants of those dorms to practice any form of social distancing. [Martinez-Brooks Decl. ¶ 5]. Despite the lockdown at the camp, women from one dorm out for recreation have been visiting friends in other dorms. [*Id.* ¶ 15].

155.     Respondents have further isolated prisoners nearing the end of their sentences and preparing for halfway house or other release, but subsequently rendered such isolation ineffective by moving other prisoners with unknown COVID-19 exposures onto those previously isolated units. [Martinez-Brooks Decl. ¶ 13].

156.     Respondents further initially isolated medically-vulnerable prisoners who were notified that they were going to be transferred to home confinement but, after reversing policy and putting such transfers on hold, have rendered those isolations ineffective—and have put medically-vulnerable prisoners at undue risk—by moving other prisoners with unknown COVID-19 exposures onto those previously isolated units. [*Id.*].

157.     Respondents' failure to implement adequate social distancing measures places petitioners and the putative class members at unnecessarily heightened risk of contracting COVID-19.

**E.     Failure to Implement Necessary Hygiene Measures**

158.     CDC Guidance requires heightened hygienic, cleaning and disinfecting practices in order to prevent and mitigate COVID-19 infection. FCI Danbury has failed adequately to implement these heightened hygienic and cleaning practices. Petitioners do not have access to the cleaning supplies necessary to sanitize themselves, their personal items, or their living areas.

159.     Prisoners at FCI Danbury are responsible for cleaning their own cubicles or dormitory spaces. Prisoners do not have adequate cleaning supplies, shared living spaces throughout the facility are not regularly or properly disinfected to prevent the spread of COVID-19. [Madore Decl. ¶ 6].

160.    Common spaces are cleaned by prisoners who are assigned jobs as cleaners, but many women have quit their jobs and cleaning has been sporadic. [Martinez-Brooks Decl. ¶ 9; Almonte Decl. ¶ 22]. The common toilets, sinks and showers are not regularly or properly disinfected to prevent the spread of COVID-19.

161.    Telephones, computers and video calling equipment and televisions shared by hundreds of prisoners are not cleaned or disinfected between uses and the common areas in which that equipment is located is not regularly or properly disinfected to prevent the spread of COVID-19. [Cassidy Decl. ¶¶ 36-37].

162.    No professional or staff cleaners have sanitized the units where prisoners who tested positive have been housed, but instead those units are being cleaned by prisoner orderlies with the same cleaning supplies they regularly use and without provision of sufficient gloves and masks. [Martinez-Brooks Decl. ¶ 8; Mason Decl. ¶ 8; Almonte Decl. ¶ 22; Declaration of Shannon Benson, submitted herewith as Exhibit L (Benson Decl.") ¶ 8; Cassidy Decl. ¶ 33; Coston Decl. ¶¶ 7, 15).

163.    FCI Danbury has provided inadequate access to soap and sanitizers.  The prison has not created any hand-washing stations or provided prisoners with hand sanitizer. [Coston Decl. ¶ 15; Somerville Decl. ¶ 10; Mason Decl. ¶ 12].  Nor has hand sanitizer been available in the commissary for the duration of the current COVID-19 crisis. [Coston Decl. ¶ 15].  Liquid soap dispensers have only recently been installed in the men's prison, but they are not regularly restocked and the prisoners have to wait a day or two to get it refilled.  [Cassidy Decl. ¶ 34 (men's unit)].

164.    There are no paper towels or hand towels, so prisoners have to use toilet paper or their clothing to dry their hands.  [Cassidy Decl. ¶ 34; Martinez-Brooks Decl. ¶ 8].

165.     Soap must be purchased from the commissary and is unavailable to indigent prisoners. Prisoners are not provided with cleaning supplies either.[62] [Cassidy Decl. ¶ 34].

166.    The prison does not distribute shampoo, toothpaste or mouthwash which must be purchased from the commissary and are, therefore, unavailable to indigent prisoners. [*Id.*].

167.    Since the epidemic, laundry is done once a week (depending on the availability of hot water or staff to perform the function), leaving used clothing and bedding exposed to the virus. [Cassidy Decl. ¶ 20].

168.    Prisoners in the facility have further been assigned to handle laundry, mattresses and bedding of individuals isolated for COVID, exposing those prisoners in turn to possible infection.

169.    Isolation facilities are further inadequate and unhygienic. The isolation room at the FSL is cold and small, with just enough room for a bed and a toilet.  The bed has a one-inch thick mattress and no pillow.  The toilet's flush is controlled by the corrections officer and is only flushed a few times a day. [Hoisington Decl. ¶ 11].

170.    FSL subsequently required overflow isolation for individuals returning from hospital or with confirmed diagnosis positive for COVID-19 and was required to convert the visiting room at the facility. Four women were housed in the visiting room and were required to use the visiting room bathrooms and had to shower in a temporary stand-up stall built in the bathroom to enable them to bathe.  [*Id.* ¶ 13].

171.     Some prisoners who are in quarantine are held in a room with no running water.

172.     Men have been isolated in an observation cell where they do not have consistent access to meals and showers and often experience medication delays. Men isolated in observation cells were further unable to communicate with their families or other prisoners in the facility. [Declaration of Richard Johnson, submitted herewith as Exhibit M, ¶¶ 7-8].

173.     More than 40 women in the FSL are currently quarantined in the facility's dining hall/kitchen. [Hoisington Decl. ¶ 17].

174.     The FSL frequently has issues with water which is often shut off for a few hours or for as long as a day at a time, during which time nobody in FSL is able to wash their hands or flush the toilet. [Mason Decl. ¶ 11].

175.     Cleaning is now sporadic in many areas of the camp since prisoners who were previously assigned to clean different areas of the facility have either quit their jobs or have been isolated in different dorms from their assigned cleaning area. [Martinez-Brooks Decl. ¶ 8].

176.     These unsanitary conditions and inadequate levels of cleaning and disinfecting, which are in contravention of the CDC Guidance, place petitioners and the putative class members at an inexcusably higher risk of contracting COVID-19.

**F.     Failure to Plan Adequately to Prevent or Mitigate the Spread of COVID-19 Infection**

177.     CDC Guidance recommends that correctional facilities should develop contingency plans for reduced workforces due to staff absences. That Guidance also calls for the provision of PPE and contingency planning for shortages of PPE. FCI Danbury has failed to

---

[62]  During the early weeks of the crisis, respondents actively confiscated spray bottles that prisoners used for cleaning.  Those spray bottles are now only available to prisoners in the counselor's office.  [Almonte Decl. ¶ 21].

adequately plan for either inevitable staff shortages or the need for PPE, placing petitioners and the putative class members at heightened risk.

178.    As set forth above, respondents have required correctional staff who were ill—including correctional staff in close contact with individuals exposed to COVID-19 and correctional staff who were confirmed positive for COVID-19—to return to work before they were symptom-free and earlier than appropriate pursuant to applicable CDC Guidance. [Mason Decl., ¶ 15].

179.    Prisoners at FCI Danbury were not provided with fabric masks until in or about mid-April. [Mason Decl. ¶ 13]. Prior to that time, prisoners were dependent on paper masks or had to fashion their own masks. [*Id.*]. However, in many parts of the facility, FCI Danbury only provides one mask per prisoner and, therefore, prisoners have no protection when their masks are being washed. [Somerville Decl. ¶ 11]. Several prisoners in the men's prison are dependent on paper disposable hospital masks that fall apart when they come in contact with water.  [Cassidy Decl. ¶ 40].

180.    Prisoners—including prisoners on cleaning duty—are not provided with gloves to protect their hands from exposed surfaces. [*Id.*; Foreman Decl. ¶ 16].

181.    Correctional officers and staff, likewise were not provided with fabric masks until approximately mid-April. [Mason Decl. ¶ 14].

182.    Moreover, usage of PPE is inconsistent and correctional staff does not enforce mask usage on prisoners who refuse to cover their faces, [Cassidy Decl. ¶40], nor does correctional staff consistently wear masks or gloves when they are on the units. [Martinez-Brooks Decl. ¶ 16; Cassidy Decl. ¶ 41].

### G.     Failure to Implement the Training and Interventions Necessary to Prevent the Spread of COVID-19

183.     CDC Guidance states that correctional staff and incarcerated people should be trained on donning, doffing and disposing of PPE. CDC Guidance further recommends that correctional facilities post signage informing staff and incarcerated people how to report COVID-19 symptoms and advising staff to stay at home when sick.  FCI Danbury has failed adequately to implement either of these training and educational interventions. [*See*, *e.g.*, Cassidy Decl. ¶ 42 (staff go into quarantine units and then return to units that are purportedly COVID-free without changing gloves and masks or will remove gloves without washing hands)]. FCI Danbury has further failed to provide prisoners or staff with clear guidance on what to do to protect themselves and prisoners are often reluctant to report symptoms because they have no expectation that they will receive effective treatment and fear being isolated away from their friends and property in quarantine units that are often insufficiently hygienic. [Mason Decl. ¶ 22].

### H.     Respondents' Failures to Respond to the COVID-19 Epidemic Have Further Put Petitioners and Putative Class Members at Unacceptably Heightened Risk of Injury and Illness Unrelated to COVID-19

184.     Respondents' failure to prepare adequately for the COVID-19 epidemic has also put petitioners and the putative class members at heightened risk of other injury and illness.

185.     FCI Danbury is experiencing significant staff shortages.  Many correctional officers are absent and those who are working are putting in significant overtime.

186.     The performance of the duties of correctional officers is being augmented by non-correctional staff (such as medical or educational staff) who cover units when there are insufficient correctional staff.  [Cassidy Decl. ¶ 30].

187.    As a result of staff shortages, correctional officers and other staff are often only available on the units for limited amounts of time, generally for count, resulting in significantly extended response times in the event of emergencies on the units. On at least one occasion, when a prisoner experienced chest pains on a unit in which no correctional officer was present, other prisoners on the unit were required to yell out the window in the hopes that a staff member could hear them and could respond to the medical emergency. [Cassidy Decl. ¶ 31; Hoisington Decl. ¶ 13 (on one occasion in isolation unit in FSL visiting room, one of the quarantined prisoners fell in the bathroom and hit her head on the concrete floor, rendering her unconscious. There was no nearby guard and the prisoners were required to bang on the locked front door to the facility; help only arrived because someone in the parking lot heard the prisoners and called control)].

188.    As a result of the increased attention to the COVID epidemic, non-virus medical needs have gone unattended.  The regular prison physicians have been absent or are no longer available to prisoners on the unit, prisoners who do not present with fever during sick call cannot be referred to a physician, and sick call requests for other than virus symptoms go unanswered for prolonged periods of time. [Cassidy Decl. ¶ 17; Martinez-Brooks Decl. ¶ 23].[63]

189.    Recently, the prison pharmacy has been closed. Medications must be shipped from another facility (USP Allenwood in Pennsylvania) resulting in delays in their delivery and disruption of medication regimens. [Cassidy Decl. ¶ 7 (two week delay in receipt of correct dosage of medication); Martinez-Brooks Decl. ¶ 23 (8 day delay in refill of hypertension medication)].

---

[63] Petitioner Kenneth Cassidy suffers from intestinal disease, including diverticulitis.  [Cassidy Decl. ¶ 5].  He has recently developed an abnormal growth in the rectum which has resulted on occasion in dark black blood in feces and obstruction of his bowel.  Although he has made at least three requests

190.    Special medical diets are not available to prisoners at FCI Danbury. As a result, on repeated occasions, special-diet prisoners have received meals containing ingredients dangerously harmful to their health, including, for example, delivery of meals containing peanut products to allergic patients at risk of anaphylaxis, or delivery of meals containing rice and beans to prisoners with diverticulosis. [Cassidy Decl. ¶¶ 20, 22; Martinez-Brooks Decl. ¶ 22 (peanut butter was served multiple times in a dorm housing a woman with severe peanut allergy)].

191.    As a result of the epidemic, food service has been reduced below BOP guidelines for caloric intake and nutritional value; food reductions put petitioners and putative class members at heightened risk of adverse health effects. [Cassidy Decl. ¶ 21].[64]

192.    Respondents' failures to respond appropriately to the coronavirus outbreak in FCI Danbury has, likewise, endangered prison staff.  In an "Imminent Danger Report" filed with the Occupational Safety and Health Administration ("OSHA") on March 31, 2020, the President of the union that represents many BOP staff reported health and safety hazards across many BOP facilities – including FCI Danbury – related to COVID-19, including:

       a.    Contrary to CDC guidelines, officials have directed staff throughout the BOP who have come into contact with, or been in close proximity to, individuals who show or have shown symptoms of COVID-19, to report to work and not self-quarantine for 14 days;

---

for a medical visit to assess and diagnose his condition, he has been advised that his condition is not an emergency and that the medical team is currently unavailable to evaluate him. [*Id.* ¶ 17].

   [64] The COVID-19 pandemic has also resulted in worrisome curtailment of prisoners' legal rights. The prison law library has been closed and locked and the administrative remedy process has been suspended indefinitely.  Legal mail is being delayed and at times not picked up due to staff shortages. Legal calls are being denied  and legal requests from attorneys are often going unanswered, including for open and pending cases that require access to attorneys such as the development of pleadings in connection with motions for compassionate release. [Cassidy Decl. ¶¶ 25-27].

b. The BOP has violated CDC Guidelines by continuously moving prisoners by bus and/or airlift to various prison sites across the nation, including infected prisoners, prisoners suspected of being infected, and prisoners who have been in close contact with, or proximity to, infected prisoners;

c. The BOP has failed to introduce workplace controls to mitigate exposure or further exposure to the virus, such as high efficiency air filters to minimize the airborne nature of the virus or otherwise improve ventilation;

d. The BOP has failed to minimize contact within recreation areas, education areas, counseling/treatment rooms, resulting in prisoners and staff coming in dangerously close contact with each other; and

e. The BOP has failed to comply with OSHA Personal Protective Equipment Standards.[65]

## VII.   FCI Danbury Is Not Prepared to Treat Individuals Who Contract Coronavirus

193.    Prisoners who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because FCI Danbury lacks the medical resources to care for symptomatic prisoners, creating a continuing unacceptable danger to petitioners and putative class members.

194.    Now that COVID-19 is inside the facility, FCI Danbury will be unable to stop the spread of the virus throughout the facility given long-documented inadequacies in BOP's medical care and in light of how these facilities function.

---

[65] *Available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf .

195.     There is no separate medical unit or facility for ill prisoners at the men's facility

or either facility for women. Unlike many Federal Correctional Institutions, FCI Danbury has no

physical space in which an ill prisoner can convalesce that is separate from other prisoners,

warm, clean and has access to fresh water and regular hand-washing.

196.     On information and belief, FCI Danbury has woefully inadequate numbers of

nasal swab COVID-19 test kits, requiring correctional staff to ration those few available kits and

to refuse testing to prisoners clearly exhibiting symptoms of COVID-19 infection. As a result of

the lack of testing and confirmation of actual infections in the facility, FCI Danbury is failing to

implement appropriate isolation practices thus accelerating the spread of the infection within the

institution.[66]

197.     FCI Danbury currently has no ventilators and cannot intubate prisoners on-site.

FCI Danbury does not have any specialized equipment or medical providers.

198.     On information and belief there are only 2 (and possibly fewer) doctors available

at FCI Danbury to care for all 1,046 prisoners. Even this highly limited number is likely to

decrease as doctors themselves go into quarantine. None of these doctors specializes in infectious

diseases.

---

[66] Earlier in April 2020  the warden at Metropolitan Correctional Center in Manhattan, a BOP
facility, advised in a letter to United States District Judge Paul Engelmayer that MCC could not test a
defendant in a matter pending before that court exhibiting COVID-19 symptoms because "MCC New
York does not have COVID-19 tests."  *See No COVID-19 tests available for prisoners at center of New
York outbreak, court documents show*, ABCNews (April 4, 2020, 6:00 am), available at
https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077.
At the same time, Bureau of Prisons officials confirmed to ABC news that FCI Oakdale prisoners
showing symptoms in the middle of an outbreak at that facility wouldn't be tested because tests were too
scarce.  *Id.*  At the same time, another federal facility in New York, the Metropolitan Detention Center in
Brooklyn, court filings before U.S. District Judge Rachel Kovner revealed that only seven of 1,700
prisoners in that facility had been tested.  *Id.*

199.    People who contract COVID-19 can deteriorate rapidly, even before a test result

can be received. They need constant monitoring. Most people in the higher risk categories will

require more advanced support: positive pressure ventilation, and in extreme cases,

extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited

supply as well as an entire team of specialized care providers. FCI Danbury does not have that

specialized equipment or specialized providers.

200.    FCI Danbury is short-staffed. As of April 25, 2020, 38 staff members have tested

positive and several more are symptomatic; correctional officers are understandably hesitant to

come to work. This staffing shortage will only increase as employees need to stay home to care

for children whose schools are closed, elderly family members, and other personal health

situations. With fewer staff, correctional officers are less able to monitor prisoners' health.

## VIII.    The Situation at FCI Danbury Imposes Undue Risks on the Surrounding Community that result in further harm to the Petitioner Class

201.    FCI Danbury is located in Fairfield County, Connecticut—the hardest hit area of

the State with over 10,500 confirmed cases of COVID-19 infection and 707 deaths as of April

27, 2020.[67]

202.    Diseases in prison put staff and surrounding community at risk. When the

COVID-19 virus is introduced to a prison, all persons within the facility – whether they are staff

or incarcerated people – are at heightened risk of contracting the virus and, in turn, spreading the

virus to others with whom they live or come into contact with in their own homes and

neighborhoods.[68]  The harm caused by a COVID-19 outbreak in a correctional facility, therefore,

---

[67] COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://www.arcgis.com/apps/opsdashboard/index.html
[68] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case*

is not confined to those who are incarcerated or work in that facility. Instead, this harm poses a

serious health risk to the surrounding community on which Petitioner class needs to rely for

health care as well as for general services through staffing of FCI.

203.    For example, scarce community health resources like emergency departments,

hospital beds, and ventilators would inevitably become more scarce in the event of a COVID-19

outbreak in a detention facility, because incarcerated people are more likely to have underlying

medical conditions that carry a significantly increased risk of severe complications from

COVID-19.

204.    A COVID-19 outbreak would exceed the capacity of the local health

infrastructure because treatment for serious cases requires significant medical intervention,

including ventilator assistance and intensive care support.  If the need for ICU beds and life-

saving medical equipment exceeds supply, the death rate will increase for the entire population

of Connecticut.

## CLAIM FOR RELIEF

### (Declaratory and Injunctive Relief for
### Violation of the Eighth Amendments)

205.    Petitioners reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein

206.    Respondents are holding Petitioners and all putative class members in violation of

the Constitution by detaining them in the face of significant threats to their health and safety

without taking sufficient steps to prevent that harm.

---

*for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020),
https://www.prisonpolicy.org/blog/2020/03/06/pandemic/

207.     Respondents' failure to provide adequate medical care in response to a widespread outbreak of a contagious disease constitutes deliberate indifference to the serious, known medical needs of detainees, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

208.     Because of the conditions at FCI Danbury, Petitioners are not able to take steps to protect themselves—such as social distancing, using hand sanitizer, washing their hands regularly, and disinfecting their surroundings—and the government has not provided adequate protections. As COVID-19 rapidly spreads at FCI Danbury in a matter of days, as experts predict, the already deplorable conditions at FCI Danbury will be exacerbated, and the ability to protect oneself will become even more impossible.

209.     Respondents' failure adequately to protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes deliberate indifference to the serious known medical needs of Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

210.     Respondents were aware of the medical needs of the population and the pervasiveness of prisoners and staff exhibiting COVID-19 symptoms throughout the prison.

211.     Respondents knew of and disregarded an excessive risk to health and safety.

212.     Respondents failed to act with reasonable care to mitigate these risks.

213.     Because Respondents failed to act to remedy Petitioners' and the Class's degrading and inhuman conditions of confinement in violation of their Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

214.   Because of the unlawful conduct of Respondents, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

215.   Petitioners have no adequate remedy at law and will suffer irreparable harm unless the court acts immediately to grant the relief requested herein.

### THE NEED FOR ENLARGEMENT AS A PROVISIONAL REMEDY

216.   Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is not release. Rather, it is a provisional remedy that modifies custody by expanding the site at which it takes place, upon order of the court, from a particular prison to another setting; as requested here, to home confinement. *See* Exhibit B, Declaration of Professor Judith Resnik Regarding Enlargement and the Use of Provisional Remedies for Detained Individuals ¶¶ 28-29. The enlargement power stems from Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require" as well as the courts' inherent powers. *See* 28 U.S.C. § 2243.

217.   To qualify for the enlargement remedy, an individual must show "extraordinary circumstances" and that the underlying claim raises "substantial claims." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).

218.   Petitioners and the putative Subclass members meet these requirements because of the extreme risk that COVID-19 poses, especially in light of their ages and medical conditions, and because of the particular conditions of confinement at FCI Danbury. If petitioners and putative Subclass members remain incarcerated, there is a high risk that they will

contract COVID-19 and, as a result, suffer severe illness or death. Immediate release to permit petitioners and putative Subclass members to serve their sentences on home confinement during the pendency of this action is thus the only way to effectuate the eventual habeas remedy.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners and proposed class members respectfully request that this Court:

a.  Certify the proposed Class and Subclass pursuant to Fed. R. Civ. Pro. 23(B)(1) and (B)(2);

b.  Pursuant to 28 U.S.C. § 2243 and this Court's inherent powers, enlarge petitioners and Subclass members pending disposition of the underlying petition;

c.  Pursuant to 28 U.S.C. § 2243 and issued "forthwith," issue an Order to Show Cause requiring Respondents to identify within twenty-four (24) hours of the Court's order, and submit to the Court a list of, all Subclass members, and requiring Respondents to answer as to why the habeas petition and relief sought herein should not be granted;

d.  Issue a Writ of Habeas Corpus and/or pursuant to Fed. R. Civ. Pro. 65, enter a temporary restraining order, preliminary injunction, and permanent injunction requiring Respondents to release from custody or to home confinement members of the Subclass and requiring Respondents to provide medically adequate social distancing and health care and sanitation for members of the Class who remain;

e.  Enter an order pursuant to 28 U.S.C. § 2201-2202, declaring that Respondents' policies and practices regarding COVID-19 violate the Eighth Amendment to the United States Constitution;

f.   Appoint a special master pursuant to Fed. R. Civ. Pro. 63 or an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding the number of incarcerated people that FCI Danbury can house consistent with CDC Guidance on best social distancing and hygiene practices to prevent the spread of COVID-19.

g.   Issue a Writ of Habeas Corpus and/or pursuant to Fed. R. Civ. P. 65 enter an injunction requiring Respondents to:

1.   Ensure that incarcerated individuals can remain six feet apart to practice social distancing in compliance with CDC Guidance;

2.   Ensure that each incarcerated individual receives a free and adequate personal supply of: hand soap sufficient to permit frequent hand washing, paper towels, facial tissues, cleaning implements such as sponges or brushes, and disinfectant products that are effective against COVID-19;

3.   Ensure that all individuals have access to hand sanitizer containing at least 60% alcohol;

4.   Provide daily access to showers and clean laundry, including clean towels after each shower;

5.   Require that all FCI Danbury staff wear PPE consistent with the CDC Guidance, including masks and gloves, when interacting with visitors and incarcerated individuals or when touching surfaces in common areas;

67

6.     Provide an anonymous mechanism for incarcerated individuals to report staff who violate these guidelines so that appropriate corrective action may be taken;

7.     Take each incarcerated person's temperature daily (with a properly disinfected and accurate thermometer) to identify potential COVID-19 infections;

8.     Assess each incarcerated individual daily through questioning to identify potential COVID-19 infections;

9.     Conduct immediate testing for anyone displaying known symptoms of COVID-19;

10.     Immediately provide clean masks for all individuals who display or report potential COVID-19 symptoms until they can be evaluated by a qualified medical professional or placed in non-punitive quarantine and ensure the masks are properly laundered with replacements as necessary;

11.     Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

12.     Clean and disinfect frequently touched surfaces with disinfectant products effective against the virus that causes COVID-19 (at the

68

manufacturer's recommended concentration), as well as surfaces in

common areas, every two hours during waking hours, and at least once

during the night;

13.     Ensure incarcerated people are provided guidance on how to

protect themselves from COVID-19 and reduce COVID-19

transmission;

14.     Assure incarcerated people are told that they will not be retaliated

against for reporting COVID-19 symptoms;

15.     Respond to all emergency (as defined by the medical

community)requests for medical attention within an hour;

16.     Provide incarcerated individuals with sufficient and effective

cleaning supplies free of charge so that they may clean frequently

touched items, such as phones, before use;

17.     Provide frequent communication to all incarcerated individuals

regarding COVID-19, measures taken to reduce the risk of infection,

best practices for incarcerated people to avoid infection, and any

changes in policies or practices;

18.     Craft a mechanism to ensure compliance through the appointment

of an independent monitor with medical expertise to ensure

compliance with these conditions, and provide the monitor with

unfettered access to medical units, confidential communication with

detained individuals in and out of quarantine, and surveillance video of

public areas of the facilities;

h.    Retain jurisdiction over this case until Defendants/Respondents have fully

complied with the orders of this Court, and there is a reasonable assurance that

they will continue to comply in the future, absent continuing jurisdiction;

i.    Award appropriate attorneys' fees; and

j.    Grant such further relief as the Court deems just and proper.

Dated April 27, 2020                    Respectfully Submitted,

            _____*/s/  David S. Golub*_____
            David S. Golub, ct00145
            Jonathan M. Levine, ct 07584
            Silver, Golub & Teitell LLP
            184 Atlantic Street
            Stamford, CT 06901
            Phone: (203) 325-4491
            Email:  dgolub@sgtlaw.com
                    jlevine@sgtlaw.com

            Sarah French Russell, ct26604
            Tessa Bialek ct30582
            Legal Clinic, Quinnipiac University School of Law
            275 Mt. Carmel Avenue
            Hamden, CT 06518
            Phone: (203) 582-5258
            Email:  sarah.russell@quinnipiac.edu
                    tessa.bialek@quinnipiac.edu

            Marisol Orihuela, ct30543
            Jerome N. Frank Legal Services Organization
            P.O. Box 209090
            New Haven, CT 06520
            Phone: (203) 432-4800
            Email:  marisol.orihuela@ylsclinics.org

70

Alexandra Harrington*
127 Wall Street
New Haven, CT 06511
Phone: 203-436-3532
alexandra.harrington@yale.edu

*Counsel for the Petitioners Dianthe Martinez-Brooks,
Rejeanne Collier, Jackie Madore, and Kenneth Cassidy*

\*Application for Admission Pending