# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**DECLARATION OF PROFESSOR JUDITH RESNIK REGARDING ENLARGEMENT AND THE USE OF PROVISIONAL REMEDIES FOR DETAINED INDIVIDUALS**

    I have been asked to make this declaration to explain my understanding of the remedies, both provisional and permanent, that federal judges can provide to people who are incarcerated and facing the threat of COVID-19. Because I have practiced in the District of Connecticut for decades and represented prisoners before the federal court here, I have had personal experience with the use of enlargement in habeas corpus cases. Given that this provisional remedy is not regularly discussed in reported decisions or in academic analyses, I believe that my experiences and knowledge can be useful to the Court. This opinion is mine and is not that of the institutions with which I am affiliated. I declare that the following is a true and accurate account of my own work as a lawyer, of the pertinent legal principles as I understand them, and of how these precepts can apply in this unprecedented context.

**My Background**

    1.   I have worked on occasion as a lawyer, including in the clinical programs at Yale Law School and at U.S.C. I have appeared before the United States Supreme Court and in federal district and appellate courts. I have also been appointed by federal judges to assist in issues arising in large-scale litigation. Below, I provide a few aspects of my work particularly relevant to this declaration. I attach my resume as Exhibit A to this Declaration.

    2.   From 1977 until 1980, I was a supervising attorney at Yale Law School's clinical program, which then provided legal services to federal prisoners housed at F.C.I. Danbury.

    3.   I am now the Arthur Liman Professor of Law at Yale Law School where I teach courses, including on federal and state

courts; procedure; large-scale litigation; federalism; and incarceration.

4. I have taught law for decades. Much of my focus has been on the role and function of courts, and the relationship of governments to their populations. I regularly teach the class entitled Federal and State Courts in the Federal System. Readings for students include materials on habeas corpus and on civil rights litigation.

5. In 2018, I was awarded an Andrew Carnegie Fellowship to work on a book, tentatively entitled *Impermissible Punishments*, which explores the impact of the 1960s civil rights revolution on the kinds of punishments that governments can impose on people convicted of crimes. Central to this book is the role that access to courts played for people held in detention.

6. I am the Founding Director of the Arthur Liman Center for Public Interest Law. The Liman Center teaches classes yearly, convenes colloquia, does research projects, supports graduates of Yale Law School to work for one year in public interest organizations, and is an umbrella for undergraduate fellowships at eight institutions of higher education.

7. I write about the federal courts; adjudication and alternatives such as arbitration; habeas corpus and incarceration; class actions and multi-district litigation; the judicial role and courts' remedies; gender and equality; and about transnational aspects of these issues. In recent years, I have spent a good deal of time doing research related to prisons. I have helped to develop a series of reports that provide information nation-wide on the use of solitary confinement.

8. In February of 2019, I testified before the U.S. Commission on Civil Rights at its hearing on women in prison and co-authored a statement related to the isolation of many facilities for women, their needs for education and work training, and the discipline to which they are subjected. *See* Statement submitted for the record, *Women in Prison: Seeking Justice Behind Bars*, before the U.S. Commission on Civil Rights, March 22, 2019. The report, published a few months ago, reference this testimony. See U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), available at https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf.

**Remedies Available in the Federal Courts:**
**Habeas Corpus, Civil Rights Litigation, and Enlargement**

9.  In light of my knowledge of the federal law of habeas corpus, state and federal court relations, procedure, and remedies, I have been asked by counsel for the petitioners/plaintiffs to address the range of responses available to judges presiding in cases that raise claims related to COVID-19.

10. As I understand from public materials on the health risks of this disease, COVID-19 poses a deadly threat to the well-being and lives of people who contract this disease. To reduce the risk and spread of this disease, our governments have instructed us to stay distant from others and to take measures that are extraordinary departures from our daily lives and routines.

11. Applying these urgent medical directives to prisons poses challenges in every jurisdiction. Governing legal principles about prisoners' access to courts were not framed to address COVID-19's reality: that being inside prisons that are densely populated can put large numbers of people (prisoners and staff) at risk of immediate serious illness and potential death.

12. These unprecedented risks from and harms of COVID-19 in prison raise a new legal question: whether COVID-19 has turned sentences which, when imposed, were (or may have been) constitutional into unconstitutional sentences during the pendency of this crisis.

13. When sentencing people to a term of years of incarceration, judges had no authority to impose putting a person at grave risk of serious illness and death as part of the punishment for the offense. Now, such grave risks and harms can arise from the fact of incarceration.

14. A recent Supreme Court case, *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), provides an analogous situation - a constitutional-when-sentenced but unconstitutional-now sentence. The Court determined that, in light of new understandings of the limits of brain development in juveniles, sentences of life without parole (LWOP) imposed on individuals who had committed crimes when under the age of eighteen were lawful when issued but became unconstitutional. As a consequence, parole boards or courts had to reconsider whether LWOP remained appropriate. COVID-19 raises a parallel question, as it requires courts to address whether sentences lawful at imposition can (at least temporarily) no longer

be served in prisons because otherwise, the sentence would become an unconstitutional form of punishment. In normal times, using *Montgomery v. Louisiana* as a guide, federal judges could remit eligible individuals to state courts and parole boards. But in these abnormal times, the speed at which decisions are made is critical. Therefore, as I discuss below, provisional remedies (enabling enlargement and release for some individuals and de-densifying for others) are necessary.

15.  The classic and longstanding remedy for relief from unconstitutional detention, conviction, and sentences is habeas corpus. The Constitution enshrined the remedy of habeas corpus, which has a substantial common law history and is codified in federal statutes. *See generally* Paul D. Halliday, *Habeas Corpus* (Harvard U. Press, 2012); Amanda L. Tyler, *Habeas Corpus in Wartime* (Oxford U. Press, 2017); Randy Hertz and James Liebman, *Federal Habeas Corpus Practice and Procedure* (2 volumes, 2019); Hart & Wechsler, *The Federal Courts and the Federal System*, Chapter X1, 1193-1164 (Richard H. Fallon, Jr, John F. Manning, Daniel J. Meltzer & David Shapiro, 7th ed., 2015). These citations are the tip of a vast and substantial literature that aims to understand the history and law of habeas corpus.

### The Legal Thicket

16.  As is familiar, in federal courts, federal petitioners file under 28 U.S.C. §2255 (post-conviction motions) and under §2241 (the general habeas statute), both of which are civil actions.

17.  For example, when I worked at Yale Law School in its clinical program in the late 1970s, we filed lawsuits for federal prisoners predicated on 28 U.S.C. §2241 as well as (in appropriate situations) on 28 U.S.C. §1331 (general question jurisdiction) and 28 U.S.C. §1361 (mandamus), and in several instances, we filed cases as class actions. In the mid-1970s, the Supreme Court provided rules and forms for §2254 and §2255 filings. The Federal Rules of Civil Procedure supplement those rules.

18.  Congress has recognized that federal judges are authorized under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." *See* 28 U.S.C. §2243. In addition to this statutory authority, federal judicial power is predicated on the constitutional protection of the writ and on the common law.

19. Congress has channeled and circumscribed some of federal judicial authority through the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and, relatedly, under the Prison Litigation Reform Act (PLRA) of 1996. Moreover, the Supreme Court has issued many decisions interpreting the prior habeas statutes, the 1996 revisions in AEDPA, and the intersection of habeas and civil rights claims brought under 42 U.S.C. §1983. The result is a dense arena of law and doctrine that can be daunting for litigants and jurists alike.

20. Some Supreme Court decisions, written to address claims by state prisoners, have delineated litigation focused on the fact or duration of confinement, for which release is the remedy and habeas is the preferred route, from challenges to conditions of confinement, for which the Court has required use of 42 U.S.C. §1983. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475 (1978); *Heck v. Humphrey*, 512 U.S. 477 (1994). Yet that distinction is hard to apply, and many opinions have identified that the overlap, as exemplified by *Mohammad v. Close*, 540 U.S. 744 (2004), *Wilkinson v. Dotson*, 544 U.S. 74 (2005), and by other Supreme Court and lower court decisions.

21. COVID-19 poses a new and painful context in which to undertake that analysis. Some reported decisions addressing the constitutional right of prisoners that officials not be "deliberately indifferent to serious medical needs" consider those Eighth Amendment claims to be appropriate for §1983 because they relate to conditions. But this deadly disease turns ordinary conditions into potentially lethal threats of illness for which the remedy to consider is release of at least some prisoners because density puts people at medical risk.

22. Because COVID-19 can end people's lives unexpectedly and abruptly, COVID-19 claims turn the condition of being incarcerated into a practice that affects the fact or duration of confinement. In my view, COVID-19 claims, therefore, collapse the utility and purpose of drawing distinctions between what once could more coherently be distinguished.

23. Courts need also to consider how COVID-19 fits (or not) with provisions of AEDPA and the parameters of the PLRA. Again, new problems have emerged. For example, in some contexts for state and federal prisoners, a question of exhaustion of remedies arises. Often one issue is the ability of the executive branch to respond quickly. In the COVID context, day by day, the risk of illness increases for prisoners and staff, which endanger health care resources. Exhaustion would be "futile" if other branches of

government are not prompt in response and if people become sick, risks skyrocket, and deaths occur.

24. "Futility" thus needs to be analyzed in terms not only of the capacity of institutions but in terms of the likelihood that the people seeking relief will be well enough to have the capacity to do so, and that the remedy provided will be effective given the alleged harm.

25. Other legal issues include when class actions are appropriate and the criteria of Rule 23 are met; the merits of arguments about unconstitutional sentences and conditions; and the range of remedies.

### The Availability of Provisional Remedies

26. The reason to flag some of the many issues that litigation of both habeas petitions and civil rights cases entail is to underscore the importance of considering provisional remedies when cases are pending. In general, time is required for lawyers to brief and for judges to interpret and apply the law. But waiting days in a world of COVID infections can result in the loss of life.

27. While courts have not faced COVID before, they have faced urgent situations, which is why provisional legal remedies exist. Courts have two ways to preserve the *status quo* – which here means protecting to the extent possible the health of prisoners, staff, and providers of medical services. One route is the use of temporary restraining orders and preliminary injunctions. These remedies require no explanation because they are familiar procedures. *See* Fed. R. Civ. Pro. 65.

28. Another option is an aspect of federal judicial power that is less well known. District courts have authority when habeas petitions are pending to "enlarge" the custody of petitioners. "Enlargement" is a term that, as far as I am aware, is used only in the context of habeas. (More familiar terms for individuals permitted to leave detention are "release" and "bail," and some decision that "enlarge" petitioners use those words rather than enlargement).

29. The distinction is that enlargement is not release. The person remains *in custody* - even as the place of custody is changed and thus "enlarged" from a particular prison to a hospital, half-way house, a person's home, or other setting. Enlargement is a

provisional remedy that modifies custody by expanding the site in which it takes place. In some ways, enlargement resembles a prison furlough.

30. Enlargement has special relevance when the PLRA has application. As I understand the PLRA's rules on the "release" of prisoners, enlargement would not apply, as enlargement is not a release order. And, of course, interpreting the many directives of the PLRA in light of COVID entails more elaboration that my comments here.

31. The need to work through that statute and case law is another reason why the availability of provisional remedies is so important. Enlargement provides an opportunity for increasing the safety of prisoners, staff, and their communities while judges consider a myriad of complex legal questions.

32. I first encountered the provisional remedy of enlargement in the 1970s, when I represented a prisoner – Robert Drayton – who was confined at F.C.I. Danbury and who filed a habeas petition alleging that the U.S. Parole Commission had unconstitutionally rescinded his parole.

33. The Honorable T.F. Gilroy Daly, a federal judge sitting in the District of Connecticut, granted Mr. Drayton's request for enlargement while the decision on the merits was pending. Mr. Drayton returned to his home in Philadelphia and came back to Connecticut for the merits hearing. Judge Daly thereafter ruled in his favor; that decision was upheld in part and reversed in part. *See Drayton v. U.S. Parole Commission*, 445 F. Supp. 305 (D. Conn. 1978), *affirmed in part*, *Drayton v. McCall*, 584 F.2d 1208 (2d Cir. 1978).

34. Judge Daly did not write a decision explaining the enlargement. Given that I knew that the use of enlargement was not always recorded in published decisions and that enlargement had special relevance here, I decided I should learn more about other courts' discussion of this provisional remedy.

35. The provisional district court remedy of enlargement is not mentioned directly in in federal rules governing the lower federal courts. In contrast, at the appellate level, Federal Rule of Appellate Procedure (FRAP) 23 provides in part that:

> While a decision not to release a prisoner is under review, the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of

> either court, may order that the prisoner be: (1) detained in the custody from which release is sought; (2) detained in other appropriate custody; or (3) released on personal recognizance, with or without surety. While a decision ordering the release of a prisoner is under review, the prisoner must – unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court orders otherwise – be released on personal recognizance, with or without surety.

As that excerpt reflects, the Rule uses language familiar in the context of bail and provides that appellate courts may also determine that a petitioner be detained in "other appropriate custody."

36. Federal courts at all level are authorized by Congress to decide habeas cases "as law and justice requires." 28 U.S.C. §2243. The case law also references that, at the district court level, the authority to release a habeas petitioner pending a ruling on the merits stems from courts' inherent powers. *See, e.g., Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). And, as I noted, in these reported decisions, the terms "bail" or "release" are sometimes used instead of or in addition to "enlargement."

37. In the last weeks, the saliency of enlargement has prompted me to review more of the law surrounding it. To gather materials and opinions on enlargement, I asked two law students, Kelsey Stimson of Yale Law School and Ally Daniels of Stanford Law School, to help me research what judges have said about enlargement and what others have written. Below I detail some of the governing case law. The Hertz & Liebman *Treatise on Habeas* also has a section (§14.2) devoted to this issue.

38. Some of the decisions involve requests for release when habeas petitions were pending from state prisoners, and others from federal prisoners, or from people in immigration detention. Further, several appellate cases address the issue of whether a district court order on enlargement was appealable as of right or subject to mandamus.

39. My central point is that, amidst these various debates about appealability and the test for enlargement/release, most circuits have recognized that district courts have the authority to order release. *See e.g., Woodcock v. Donnelly*, 470 F.2d 93, 43 (1st Cir. 1972); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974); *Dotson v. Clark*, 900

F.2d 77, 79 (6th Cir. 1990); *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981): *Baker v. Sard*, 420 F.2d 1342, 1342-44 (D.C. Cir. 1969).

40. The Fourth and Eleventh Circuits appear, albeit less directly, to recognize enlargement authority. *See Gomez v. United States*, 899 F.2d 1124, 1125 (11th Cir. 1990); *United States v. Perkins*, 53 F. App'x 667, 669 (4th Cir. 2002). A Ninth Circuit opinion from 1989 likewise appears to recognize the power of district courts to grant release pending a habeas decision where there are "special circumstances or a high probability of success." *See Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989). Thereafter, another decision, *In re Roe*, described the Circuit as not having ruled on the issue in terms of state prisoners. *See* 257 F.3d 1077 (9th Cir. 2001).[1]

41. A discrete question is the standard for enlarging petitioners. To obtain an order for release pending the merits of habeas decision, the petitioner must demonstrate "extraordinary circumstances" and that the underlying claim raises "substantial claims." *See e.g. Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). Courts have also discussed that release is appropriate when "necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226*; see also Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992). As that Third Circuit decision explained, release was "available 'only when the petitioner has raised substantial constitutional claims upon which he has a high probability of success, and also when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective.'"

42. Some judges have interpreted the "substantial questions" prong to require the underlying claim to have a "high probability of success." *See Hall v. San Francisco Superior Court*, No. C 09-5299 PJH, 2010 WL 890044, *1 (N.D. Cal. Mar. 8, 2010); *In re Souels*, 688 F. App'x 134, 135 (3d Cir. 2017). That test resembles standards for preliminary injunctive relief and for stays, which

---

[1] Subsequent lower court cases debated whether district courts do possess such authority. *See, e.g.*, *Hall v. San Francisco Sup. Ct.*, 2010 WL 890044, at *2 (N.D. Cal. Mar. 8, 2010) ("Based on the overwhelming authority [of other circuit courts] in support, the court concludes for purposes of the instant motion that it has the authority to release Hall pending a decision on the merits."); *United States v. Carreira*, 2016 U.S. Dist. LEXIS 31210, at *4, (D. Haw. Mar. 10, 2016) ("[T]his Court declines to address the merits of Petitioner's bail requests in the absence of definitive guidance from the Ninth Circuit regarding the scope of this Court's bail authority.").

include an assessment of the likelihood of success on the merits and of whether the balance of hardships tips in favor of altering the status quo. (And, of course, more can be said about the nuances of these bodies of law as well.)

43. A few cases focus on the health of a petitioner as central to the conclusion that "extraordinary circumstances" exist. For example, in *Johnston v. Marsh*, the petitioner, Alfred Ackerman, brought a habeas claim alleging that he was convicted in Pennsylvania through a trial that lacked "due process." 227 F.2d 528 (3d Cir. 1955). Ackerman asked for release pending a decision on the merits of his habeas petition; he argued that he had advanced diabetes and was "rapidly progressing towards total blindness." *Id.* at 529. The district court authorized Ackerman to be released to a private hospital. The prison warden (Frank Johnston) went to the Third Circuit invoking sought writs of prohibition and mandamus to order the district court (Judge Marsh) to change his ruling. Rejecting the petitions, the Third Circuit affirmed that district courts possessed the authority to order relocation while the habeas petition was pending. *Johnson v. Marsh* has been cited in more recent cases to illustrate that findings of extraordinary circumstances may "be limited to situations involving poor health or the impending completion of the prisoner's sentence." *Landano*, 970 F.2d at 1239.

44. The court in *In re Souels* addressed what showing of health problems constituted extraordinary circumstances. *See* 688 F. App'x at 135-36. Sean Souels, who was serving a 46-month federal prison sentence, petitioned for a writ of mandamus directing the court to rule on his writ of habeas corpus and sought release pending the decision. *Id.* at 134. The court denied Souels bail because "he [did] not describe his medical conditions in any detail or explain how he cannot manage his health issues while he is in prison." *Id.*

45. Health is not the only extraordinary circumstance that has been the basis for enlargement. For example, in *United States v. Josiah*, William Josiah brought a writ of habeas corpus after the Supreme Court invalidated the residual clause of the Armed Career Criminal Act (ACCA) and altered the method for determining whether prior convictions qualify as violent felonies under the ACCA. 2016 WL 1328101, at *2 (D. Haw. Apr. 5, 2016). Josiah, who was serving a federal prison sentence argued that his prior convictions did not qualify as violent felonies and that he should not be subject to the fifteen-year mandatory minimum. The district court concluded that because the issue of retroactivity was pending before the Supreme Court and Josiah would have served his full

sentence if the Court held its prior ruling retroactive, release pending the higher court's ruling was appropriate. *Id.* at *4-6.

46. In circumstances similar to *Josiah*, a district judge sitting in the Central District of Illinois issued three orders granting release, termed bail, to petitioners pending resolution of their habeas claims. See *Zollicoffer v. United States*, No. 15-03337, 2017 WL 79636 (C.D. Ill. Jan. 9, 2017); *United States v. Jordan*, No. 04-20008, 2016 WL 6634852 (C.D. Ill. Nov. 9, 2016); *Swanson v. United States*, No. 15-03262, 2016 WL 5422048 (C.D. Ill. Sept. 28, 2016).

47. Another case involved enlargement in the context of the military. *See Gengler v. U.S. through its Dep't of Def. & Navy*, 2006 WL 3210020, at *6 (E.D. Cal. Nov. 3, 2006). As that court explained, a "district court has the inherent power to enlarge a petitioner on bond pending hearing and decision on his petition for writ of habeas corpus." *Id.* at *5. The judge also noted that a "greater showing must be made by a petitioner seeking bail in a criminal conviction habeas 'than would be required in a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt.'" The court used the test of "exceptional circumstances and, at a minimum, substantial questions as to the merits." *Id.* at 13. The court found exceptional circumstances" based on the fact that the petitioner had been admitted to business school, had been granted permission by his commanding officer to attend, and would be forced to drop out if his custody were not enlarged. The court also ruled that "substantial questions as to the merits" existed because of alleged government's errors in drafting the petitioner's service agreement. *Id.* at *6.

48. As of this writing, I have located three reported cases on COVID. (Given the pace of litigation, I assume that more may have been filed and some decided.)

49. On April 7, the Honorable Jesse Furman, sitting in the Southern District of New York, granted on consent a motion styled "for bail" (the term used in the Second Circuit *Mapp* decision). Judge Furman ordered immediate release under specified conditions, pending the adjudication of the Section 2255 Motion. *See United States v. Nkanga,* No. 18-CR-00730 (S.D.N.Y., Apr. 7, 2020).

50. A second case involves a class action filed by Craig Wilson and others. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020). Seeking to represent a class of all current and future prisoners of the Elkton

Federal Correctional Institution (FCI) and a subclass of the medically vulnerable population, they sought relief because their continued incarceration subjected all FCI prisoners to substantial risk of harm in violation of the Eighth Amendment.

51. On April 22, 2020, the federal district court granted in part the request by the *Wilson* class for emergency relief, which included enlargement of a subclass of prisoners challenging the manner in which the sentence was served and hence cognizable as a habeas petition. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020)

52. The third case has less relevance as it was brought by an unrepresented litigant, Richard Peterson, who had originally sought habeas corpus relief on a claim about education credits and then filed an emergency request for release from a California state prison due to COVID-19. No. 2:19-CV-01480, 2020 WL 1640008, at *1 (E.D. Cal. Apr. 2, 2020). The district court noted that a class action raising COVID claims was pending in another federal court in California and that, while the court had the authority to release a person while a habeas petition was pending, Mr. Peterson had not provided evidence sufficient to meet the test to do so.

**Conclusion**

53. In sum, COVID-19 is an unprecedented event that, in my view, raises the legal question of whether, in light of the government mandates for social distancing, sentences (that had been lawful when they were imposed) cannot lawfully be served when the setting puts an individual in a position of untenable risk. Thus, habeas corpus – which addresses the constitutionality of sentences and offers the possibility of release and enlargement – properly provides a jurisdictional basis and remedies for this situation.

54. I need also to note that, in recent years, the Supreme Court has raised questions in many contexts about the remedial powers of federal judges. Whether the topic is nationwide injunctions or commercial contracts, debates have occurred within the Court about the authority of federal judges.

55. Those cases do not address the extraordinary and painful moment in which we are all living. Ordinary life has been up-ended in an effort to keep as many people as possible alive and not debilitated by serious illness. Moreover, Supreme Court opinions have not focused on the relevance of remedial debates to the situation were confinement can put entire staffs and detained

populations at mortal risk. Therefore, judges have the obligation and the authority to interpret statutes and the Constitution to preserve the lives of people living in and working in prisons. It is my hope that this account of earlier uses of enlargement in this District and the dense account of case law and doctrine will be of service to this Court and to the parties in understanding the meaning and import of American law.


Dated:    April 23, 2020


_____
Judith Resnik