## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIANTHE MARTINEZ-BROOKS, | : | |
| REJEANNE COLLIER, | : | |
| JACKIE MADORE, and | : | |
| KENNETH CASSIDY, individually, | : | |
| and on behalf of all others similarly situated, | : | |
| | : | |
| Petitioners, | : | |
| | : | |
| v. | : | Civ. No. 3:20 cv 00569 (MPS) |
| | : | |
| D. EASTER, Warden of Federal | : | |
| Correctional Institution at Danbury, and | : | |
| MICHAEL CARVAJAL, Director of the | : | |
| Federal Bureau of Prisons, in their official | : | |
| capacities | : | |
| | : | |
| Respondents. | : | APRIL 30, 2020 |

### PETITIONERS' MEMORANDUM OF LAW
### IN SUPPORT OF EMERGENCY MOTION
### FOR TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    There is a Dangerous and Uncontrolled COVID-19 Outbreak at FCI
      Danbury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Federal Satellite Low facility ("FSL") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Women's Minimum Security Camp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Men's Prison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   FCI Danbury Has Not Implemented Essential Measures to Protect Prisoners
      and Mitigate the Spread of COVID-19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Correctional facilities are incubators and amplifiers for infectious
            diseases like COVID-19, and the CDC has issued guidance for
            managing the virus in correctional facilities . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    FCI Danbury has Failed to Implement the CDC's Guidance . . . . . . . . . . . . . 14

      C.    Public health officials, Congress and the Department of Justice have
            recognized that prisons such as FCI Danbury need to de-densify to
            protect the health and safety of prisoners and staff . . . . . . . . . . . . . . . . . . . . 15

      D.    FCI Danbury's failure to implement the CDC's Guidance and
            de-densify its facilities places incarcerated women and men at grave risk . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.   Petitioners and the Class and Subclass Face Irreparable Harm If They
      Continue to be Incarcerated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.  Petitioners, the Class and Subclass Are Substantially Likely to Succeed on
      the Merits of Their Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A.      The Class and Subclass are Likely to Succeed on their Claim that
        Respondents Have Violated the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . 28

B.      This Action is Properly Brought Pursuant to Section 2241 . . . . . . . . . . . . . . . . 33

IV.     The Equities and Public Interest Weigh in Favor of the Relief Petitioners Seek  . . . . . . 34

V.      This Court Has the Power to Grant a Preliminary Injunction and Issue a
        Provisional Order of Enlargement of Custody While This Habeas Action
        Is Pending  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.      The Enlargement Power of the Federal District Courts . . . . . . . . . . . . . . . . . . . 36

B.      Legal Standard for Enlargement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**TABLE OF AUTHORITIES**

Cases                                                                                                    Page

*AIM Int'l Trading LLC v. Valcucine SpA.*,
    188 F. Supp. 2d 384 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Andino v. Fischer*,
    555 F. Supp. 2d 418 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Austin v. Pa. Dep't of Corr.*,
    Civ. A. No. 90–7497, 1992 WL 277511 (E.D. Pa. Sept. 29, 1992) . . . . . . . . . . . . . . . . 27

*Barbecho v. Decker*,
    No. 20-CV-2821 (AJN), 2020 WL 1876328 (S.D.N.Y. Apr. 15, 2020) . . . . . . . . . . . . 39

*Basank v. Decker*,
    No. 20 Civ. 2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) . . . . . . . . . . . . . . . . . 28

*Basank v. Decker*,
    No. 20 Civ. 2518 (AT), 2020 WL 1953827 (S.D.N.Y. Apr. 23, 2020) . . . . . . . . . . . . . 39

*Beharry v. Ashcroft*,
    329 F.3d 51 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Boone v. Brown*,
    No. Civ. 05–750(AET), 2005 WL 2006997 (D.N.J. Aug. 22, 2005) . . . . . . . . . . . . . . 27

*Brown v. Plata*,
    563 U.S. 493 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Castillo v. Barr*,
    No. CV 20-00605 (C.D. Cal. Mar. 27, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Coronel v. Decker*,
    20-cv-2472 (AJN), 2020 WL 1487274 (S.D.N.Y March 27, 2020) . . . . . . . . . 28, 35, 39

*Conn. Dep't Envtl. Prot. v. OSHA*,
   356 F.3d 226 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*DeShaney v. Winnebago County Dep't Soc. Servs.*,
   489 U.S. 189 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Estelle v. Gamble*,
   429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 34

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Farmer v. Brennan*,
   511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Forbes v. Edgar*,
   112 F.3d 262 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gaymon v. Whidden*,
   No. 3:11-cv-805, 2011 WL 2078632 (D. Conn. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 37

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Greene v. Bowles*,
   361 F.3d 290 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Harris v. Bd. of Supervisors, Los Angeles Cty.*,
   366 F.3d 754 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Harrison v. Barkley*,
   219 F.3d 132 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hathaway v. Coughlin*,
   37 F.3d 63 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Helling v. McKinney*,
   509 U.S. 25 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29, 30

*Hernandez v. Decker*,
   2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

iv

*Hope v. Pelzer,*
    536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hutto v. Finney,*
    437 U.S. 678 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Innovative Health Sys., Inc. v. City of White Plains,*
    117 F.3d 37 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,*
    596 F.2d 70 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Jones'El v. Berge,*
    164 F. Supp. 2d 1096 (W.D. Wisc. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
    917 F.2d 75 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*L.V.M. v. Lloyd,*
    318 F. Supp. 3d 601 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Lareau v. Manson,*
    651 F.2d 96 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.,*
    965 F.2d 1224 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mapp v. Reno,*
    241 F.3d 221 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Maxum Petroleum, Inc. v. Hiatt,*
    No. 3:16-CV-01615 (VLB), 2016 WL 5496283 (D. Conn. 2016) . . . . . . . . . . . . . . . . 24

*McDonald v. Hardy,*
    821 F.3d 882 (7th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ostrer v. United States,*
    584 F.2d 594 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Planned Parenthood of New York City v. U.S. Dep't of Health & Human Servs.,*
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Powers v. Snyder,*
    484 F.3d 929 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Roba v. United States,*
    604 F.2d 215 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rado v. Meachum,*
    699 F. Supp. 25 (D. Conn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Rouster v. Cty. of Saginaw,*
    749 F.3d 437 (6th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ruffin v. Deperio,*
    97 F. Supp. 2d 346 (W.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sajous v. Decker,*
    2018 WL 2357266 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Savino v. Souza,*
    2020 WL 1703844 (D.Mass. Apr. 8, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Stagliano v. Herkimer Cent. Sch. Dist.,*
    151 F. Supp. 3d 264 (N.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Thompson v. Choinski,*
    525 F.3d 205 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Basciano,*
    369 F. Supp. 2d 344 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Collier,*
    6:12-cr-06003-CJS (N.D.N.Y. Apr. 16, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Nkanga,*
    No. 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) . . . . . . . . . . . . . 39

*United States v. Rodriguez,*
    No. 2:03-cr-0271, 2020 WL 1627331 (E.D. Pa., April 1, 2020) . . . . . . . . . . . . . . . . . 31

*United States v. Stahl,*
    No. 18-cr-694(RA) (S.D.N.Y. Apr. 21, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wilson v. Williams,*
     No. 20-cv-00794, 2020 WL 1940882 (N.D. Ohio, April 22, 2020) . . . . . . . . . 36, 37, 39

*Winter v. Nat. Res. Def. Council, Inc.,*
     555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

STATUTES:

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

28 U.S.C. § 2243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

OTHER AUTHORITIES:

5 J. Moore et al., *Moore's Federal Practice* § 23.50, p. 23–397 (2d ed.1990) . . . . . . . . . . . . . . 2

4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 24:83 (4th ed. 2002) . . . . . . 2

## INTRODUCTION

Respondents are currently confining over 1,000 people in conditions within FCI Danbury that threaten their lives. Although, as set forth in detail in the Petition for Writ of Habeas Corpus, there is ample evidence to indicate that FCI Danbury has been avoiding testing prisoners who present with symptoms of COVID-19 infection, Bureau of Prisons ("BOP") statistics reported earlier this month reflect that the prison had among the highest incidence of COVID-19 among both prisoners and staff anywhere in the BOP system. Those reported statistics also show that, far from containing the initial outbreak, Respondents' management of the prison has allowed a second wave of infections to sweep through the facility. One prisoner has already died and several others have recently been transported to the hospital on an emergency basis.

Quite simply, notwithstanding that Attorney General William Barr directed the BOP over a month ago to give priority to FCI Danbury in identifying medically vulnerable prisoners who could serve their sentences in home confinement as a means to address the infection in the facility, Respondents have failed to take sufficient and appropriate measures to halt the further spread of this deadly virus, putting the lives and health of prisoners and staff at FCI Danbury, and countless others in the community, at risk. And, the inadequate isolation practices that Respondents have implemented have resulted in grossly unhygienic conditions with women made to sleep on blankets on the floor in rooms never designed to serve for housing with patently insufficient bathroom and shower facilities.

The Eighth Amendment to the United States Constitution forbids this state of affairs.

Nor does it serve any necessary penal purpose. Approximately half of the women imprisoned at FCI Danbury are in the women's camp, which is a minimum security facility—the very lowest security level in the federal prison system. Consistent with Attorney General Barr's month-old directive, the women in the camp can be expeditiously released ("enlarged") to home confinement which will, in turn, permit substantial social distancing improvements throughout the prison.

1

Petitioners seek to represent the class[1] of all individuals who are currently or will in the future be imprisoned at FCI Danbury during the pendency of the COVID-19 pandemic as well as a subclass of prisoners who are aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19. Because of the grave risk to health and life at stake, Petitioners now bring this Emergency Motion for Temporary Restraining Order and Preliminary Injunction seeking Orders requiring Respondents immediately to: (1) enlarge to home confinement all women currently housed in the camp; (2) enlarge to home confinement all members of the medically vulnerable Subclass; and (3) implement appropriate measures to maximize social distancing and improve hygiene for the prisoners who remain at FCI Danbury for the duration of the COVID-19 pandemic.

As the supporting declarations attached to the Petition and to this Memorandum make clear, this is a matter of life and death. Each hour that passes risks the health and lives of Petitioners and the other prisoners and staff at FCI Danbury, as well as members of the community with whom FCI Danbury staff necessarily interact.

## FACTUAL BACKGROUND

### I. There is a Dangerous and Uncontrolled COVID-19 Outbreak at FCI Danbury

FCI Danbury consists of three facilities. The largest is a low-security main complex currently housing 719 men ("men's facility"). A second unit is an adjacent low-security satellite prison housing approximately 164 women ("FSL"). The third is a minimum-security satellite facility (called the "camp") which currently houses approximately 142 women.[2] All of the women live in crowded, dormitory-style housing, as do the vast majority of the men. With the current population levels in the three facilities, and the particular architecture of these structures, it is

---

[1] Although Petitioners have not yet moved for class certification, this Court need not rule on Plaintiffs' class certification motion or formally certify a class in order to issue the requested emergency relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit.").

[2] Federal Bureau of Prisons, FCI Danbury, https://www.bop.gov/locations/institutions/dan/

impossible to keep people safe from COVID-19, which is raging through the FCI complex. Yet the unique structure of FCI Danbury also presents an obvious first step for managing the crisis. The minimum security women's camp houses women who present the very lowest risk of any prisoners in the federal system. These women should be moved immediately to home confinement for the remainder of their sentences. Immediately clearing out the camp, and moving medically vulnerable people from the FSL and men's facility to home confinement, would create more space to address the safety of the prisoners who remain.

In late March, a woman in the FSL and a man in the men's facility tested positive for COVID-19. The woman had been exhibiting symptoms for weeks but was not tested until she was brought to the hospital. Ex. G, Declaration of Kimberly Hoisington ("Hoisington Dec.") ¶¶ 5, 9.[3] The man had symptoms for several days before he was able to access medical care at the prison and be tested. Ex. M, Declaration of Richard Johnson ("Johnson Dec.") ¶¶ 5, 6. Soon after, two more men in his unit tested positive, and several men in another unit had positive tests. Ex. H, Declaration of Rafael Almonte ("Almonte Dec.") ¶ 15; Ex. D, Declaration of Kenneth Cassidy ("Cassidy Dec.") ¶ 15. Two other women in the FSL tested positive at the hospital. Ex. F, Declaration of Marius Mason ("Mason Dec.") ¶ 17.

By April 15, BOP had reported 44 prisoners and 39 staff members were positive for COVID-19 at FCI Danbury.[4] Several days later, a prisoner from the facility died of the virus.[5] FCI Danbury's utter failure to implement effective COVID-19 testing has made it difficult to determine the total number of infected prisoners at the facility.[6] Indeed, BOP has provided no

---

[3] Exhibits referenced in this memorandum include exhibits attached to the Petition for Writ of Habeas Corpus (ECF No. 1) and supplemental exhibits attached hereto and are designated sequentially. Exhibits A through N are attached to the original petition. Exhibits O and following are attached to this memorandum

[4] *See* Laura Cassels, *COVID-19 deaths in federal prisons rise to 15; about 700 staff and inmates* sick, Phoenix, April 15, 2020, https://www.floridaphoenix.com/2020/04/15/covid-19-deaths-in-federal-prisons-rise-to-15-about-700-staff-and-inmates-sick/

[5] Federal Bureau of Prisons, Inmate Death at FCI Danbury, https://www.bop.gov/resources/news/pdfs/20200418_press_release_dan.pdf

[6] The BOP provides COVID-19 data each day on its website, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ The BOP's reported data on each facility does not include prisoners it deems "recovered," and by April 27 the agency was reporting only 5 positive cases among prisoners at

information about how many tests have been conducted at FCI Danbury in total. Numerous prisoners exhibiting serious symptoms at the facility have not been tested. Regardless, it is clear that BOP's data vastly understates the extent of the outbreak. Recent data from the BOP show that out of 2,700 tests conducted systemwide, nearly 2,000 have come back positive.[7] This rate of more than 70% positive tests suggests that widespread testing would confirm many additional cases of COVID-19 at FCI Danbury. COVID-19 is spreading aggressively through FCI Danbury and exposing the men and women incarcerated there to grave risk.

### A.     Federal Satellite Low facility ("FSL")

There is a severe outbreak of COVID-19 in the women's FSL, and the women in the facility are at grave risk. The outbreak, which started five weeks ago and has been utterly mishandled by BOP, shows no signs of abating. Since March 27, at least 4 women have been brought to the hospital and tested positive for the virus. Eleven more tested positive on April 25.  Ex. O, Declaration of Miranda McLaurin ("McLaurin Dec.") ¶ 8; Ex. P, Second Declaration of Kimberly Hoisington ("Hoisington Dec. 2") ¶ 7. This is likely a significant undercount as only a fraction of women in the facility have been tested.

As of April 30, 2020, there were 164 women in the FSL. Housing in the FSL is a single dormitory-style room that accommodates approximately 160-170 beds. Ex. E, Declaration of Christina Korbe ("Korbe Dec.") ¶ 8. The room is divided into cubicles, each containing two bunk beds, separated by approximately four feet. Ex. F, Declaration of Marius Mason ("Mason Dec.") ¶ 7; Hoisington Dec. ¶ 4. Beds in each cubicle are immediately adjacent to the cubicle wall, which does not reach to the ceiling so that women on the top bunk sleep with the head of the bed next to the woman on the top bunk in the adjacent cubicle. Mason Dec. ¶ 7; Korbe Dec. ¶ 10.

All of the women in the FSL share the same three bathrooms, each of which includes between 4-8 toilets, sinks, and showers. Mason Dec. ¶ 10; Korbe Dec. ¶ 8. Water in the unit will

---

FCI Danbury. As of April 29, the positive number for prisoners was up to 18, likely as a result new testing that followed a positive test at the hospital on April 25 of a woman from the FSL.

[7] *See* Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19,* Associated Press (Apr. 30, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

sometimes be shut off for a few hours or more than a day at a time, including for about 17 hours in early April. Mason Dec. ¶ 11. The FSL also includes a common area where the women have access to 6-12 shared phones (not all of which are working) and 6 shared computers (only 4 of which are working), which are located in close proximity to one another. Korbe Dec. ¶ 11; Mason Dec. ¶ 8. The phones and computers are not cleaned between each use. Mason Dec. ¶ 8.

The prisoners at FSL have not had access to hand sanitizer during the outbreak. *Id.* ¶ 12; Ex. I, Declaration of Tamika Somerville ("Somerville Dec.") ¶ 9. Hand sanitizer has been out of stock at the commissary since the beginning of the pandemic. Ex. Q, Declaration of Shannon Battle ("Battle Dec.") ¶ 6. They have one fabric washable mask each. Somerville Dec. ¶ 10. The soap dispensers in the bathrooms are empty, and there are not paper towels for the women to dry their hands. McLaurin Dec. ¶ 15.

On March 27, 2020 a woman at the FSL was brought to the hospital and tested positive for COVID-19. Hoisington Dec. ¶ 9.  She had been feeling sick for weeks and had reported her symptoms to medical staff. *Id.* ¶¶ 5, 6. When she returned to the facility a few days later, she was placed in a small, cold isolation room with a toilet that was flushed by staff only a few times a day. *Id.* ¶¶ 10, 11. After 24 hours, she was placed for five days in the FSL's visiting room with four other women. *Id.* ¶ 12. While there, one of the other woman slipped in the shower and was knocked unconscious. *Id.* ¶ 13. No staff responded to their calls for help, and the women had to bang on the window to get the attention of someone outside in the parking lot.  *Id.*

Soon after this initial positive test, at least two more women from the FSL were brought to the hospital and tested positive. Mason Dec. ¶ 17. They were returned to the dormitory area within a week of their positive tests. Hoisington Dec. ¶ 9, 10, 12; Mason Dec. ¶ 18; Somerville Dec. ¶ 11.

Meanwhile, women who were sick were not being treated or tested for COVID-19; nor were they being separated from the other women in the unit. Korbe Dec. ¶ 15; Mason Dec. ¶19, 22. One woman who was sick in bed for weeks with a horrible cough, body aches fever, lack of appetite, and vomiting was told by staff that nothing was wrong with her. McLaurin Dec. ¶ 6. Another woman experienced in early April a severe headache, body aches, fever, shortness of

breath, and a terrible cough, as well as a loss of appetite and sense of smell. Korbe Dec. ¶ 4. She was given no treatment and was not tested for COVID-19. *Id*. ¶¶ 5, 7. Before April 25, the only women tested for COVID-19 were the ones who ended up at the hospital. Mason Dec. ¶ 19.

Staff have been taking the women's temperatures, which are sometimes recorded as artificially low, Mason Dec. ¶ 20, or exactly the same for several women in a row, Korbe Dec. ¶ 14. Sometimes staff tell women with a high temperature to drink cold water before retaking their temperature. Mason Dec. ¶ 21. One women had a temperature of 102 degrees according to hospital staff. Hoisington Dec. ¶ 8. Her temperature, when taken at the facility about an hour earlier registered 97 degrees. *Id*.

Medical staff are available at the FSL only on certain days. McLaurin Dec. ¶ 4. A doctor and a physician's assistant rotate between FSL and the other FCI Danbury buildings and are there during limited hours on weekdays. *Id*. at ¶¶ 4, 5. To request medical care, a requester must go to "pill call," where a pharmacy tech passes out medicine, and fill out a sick call slip. McLaurin Dec. ¶¶ 3, 4. The requester must then wait until she is called to be seen, which can take weeks. *Id*. ¶ 3.

In addition to the prisoners who have been sick with COVID-19, some FSL staff have had the virus. Mason Dec. ¶ 15. More than one correctional officer has returned to work within a week of being out sick with COVID-19. *Id*. Some officers have stated while at the facility that they still feel ill and did not want to return to work, but were told to return. *Id*.

Late in the night on April 24, one of the women in the dormitory was violently ill. She was struggling to breath and throwing up, dry heaving and gagging for hours before she was taken to the hospital by ambulance. Battle Dec. ¶ 11; Hoisington Dec. ¶ 16; Ex. R, Declaration of Kimberly Kitts ("Kitts Dec."). After the woman was finally taken to the hospital, one of the other women in the unit got a disciplinary report for calling her lawyer about what happened. Hoisington Dec. 2 ¶ 3. The officer who wrote the report told the rest of the women that he would be listening to their calls and that anyone telling anyone on the outside about the incident would also get a disciplinary report. *Id.* ¶ 3; Korbe Dec. ¶ 16.

The next day, 43 women from the facility were tested for COVID-19. Hoisington Dec. at

¶ 17; Kitts Dec. ¶ 6; McLaurin Dec. ¶ 8. Eleven of them tested positive. Hoisington Dec. 2 ¶ 7; McLaurin Dec. ¶ 8. Not everyone who had contact with the sick woman or the women who tested positive was tested or isolated. Kitts Dec. ¶ 6; McLaurin Dec. ¶ 13. The women who tested positive were placed in the facility's visiting room. McLaurin Dec. ¶ 9. Because of a lack of beds, some women who have tested positive for COVID-19 sleep on the floor. Kitts Dec. ¶ 11. The women who tested negative were placed in the dining room. Hoisington Dec. 2 ¶ 7; McLaurin Dec. ¶ 9.

This method of separating the prisoners has not effectively isolated the different populations. Before they were quarantined, the 43 women were in the dormitory gathering personal belongings, using the phone and computer, using the bathroom, and showering. Kitts Dec. ¶ 6; Second Declaration of Christina Korbe ("Korbe Dec. 2") ¶ 4. The spaces were not cleaned at that time. Kitts Dec. ¶ 6. Since they were first placed in quarantine, some women have come into the dormitory to use the phones and computers for email. Kitts Dec. ¶ 16. Laundry has been taken by staff and by prisoners from the rooms where people have been quarantining to the dormitory to be washed. Battle Dec. ¶ 21; Kitts Dec. ¶ 16. When women from the dormitory go to the pill line they have come into contact with women in the visiting room who tested positive for COVID-19. Battle Dec. ¶ 10. Staff, including officers, medical, and administrative personnel move among the various quarantine rooms and the dormitory. Kitts Dec. ¶ 17; Korbe Dec. ¶ 7; McLaurin Dec. ¶ 14.

The dining hall where some of the women are quarantined is connected to the kitchen, with tables in the front of the room, a counter for meals to be served dividing the room, and a kitchen in the back. Hoisington Dec. 2 ¶ 8; McLaurin Dec. ¶ 10. When the women were first placed in the dining room many people slept on the concrete floor because there were not enough cots. Kitts Dec. ¶ 12. The dining room has one bathroom with one toilet and sink. Hoisington Dec. 2 ¶ 9; McLaurin Dec. ¶ 10.  A trailer with showers and toilets is parked outside the dining hall for the women to use. Battle Dec. ¶ 18. Hoisington Dec. 2 ¶ 9. Meals are still being prepared in the kitchen while the women who tested negative are quarantined in the dining room. Korbe Dec. 2 ¶ 8. Prisoners who are currently working in the kitchen had been working side-by-side with a woman who tested positive for COVID-19 and is now in isolation. *Id.* ¶ 8.

In addition to the women in the FSL dormitory, visiting room, and dining room, some women were placed for several days in the classrooms, and one in the library. Hoisington Dec. 2 ¶ 11, 12; McLaurin Dec. ¶ 12. The library does not have heat. Hoisington Dec. 2 ¶ 11; Kitts Dec. ¶ 15. Neither the classrooms nor the library have bathrooms. Kitts Dec. ¶ 15. The woman who was placed in the library has had multiple surgeries for cancer, currently has two untreated cancerous growths, and has a chest tube. Kitts Dec. ¶ 15. She had to be brought by an officer to use the bathrooms that were being used also by the other women in quarantine. Kitts Dec. ¶ 15.

On April 28, the women at FSL had their temperature taken and were asked if they had any symptoms like a cough, sore throat, body aches, fatigue or diarrhea. Hoisington Dec. 2 ¶ 13; Kitts Dec. ¶ 19; Korbe Dec. 2 ¶ 11. No one else was tested for COVID-19 or removed from the unit at that time. Hoisington Dec. 2 ¶ 13; Kitts Dec. ¶ 20; Korbe Dec. 2 ¶ 11. On April 29, the women in quarantine in the classrooms and the library were taken to the special housing unit (SHU) at the men's facility to be housed there. Korbe Decl 2. ¶ 12.

**B.      Women's Minimum Security Camp**

The women's camp at FCI Danbury is a minimum security facility—the very lowest security level in the federal prison system. As of April 30, 2020, there were 142 women at the camp.[8] The women at the camp occupy a single building divided into four dormitories, each containing 25 cubicles with bunk beds sleeping two each, and nine rooms that can each hold 4 to 5 women. Martinez-Brooks Dec. ¶ 7; Ex. H, Declaration of Theresa Foreman ("Foreman Dec.") ¶ 7. The cubicles in the dormitories have no doors and their dividing walls do not extend to the ceilings; the bunk beds are less than 6 feet away from each other. Martinez-Brooks Dec. ¶ 7; Foreman Dec. ¶ 7. Each dorm has a common bathroom area containing sinks, 3-5 toilets, and 4-6 showers. Martinez-Brooks Dec. ¶ 6. All the women in housed at the camp share 4 phones, 7 computers for email, and 3 working video-visiting machines, which are clustered together in a single common area. The common area also contains hot water taps, sinks for washing dishes, and

---

[8] *See* Bureau of Prisons, Population Statistics, https://www.bop.gov/about/statistics/population_statistics.jsp  (last updated Apr. 30, 2020).

a recreation area with tables. Foreman Dec. ¶ 15.

Quarantine efforts in the camp have been disorganized and ineffective. Initially, some women were told that they are on a list for home confinement and would be quarantined before released. Martinez-Brooks Dec. ¶ 13. On April 6, 23 women were put in Dorm C for quarantine. Seven more were added the next day to Dorm C. On April 10, staff moved some women from Dorm C into Dorm D and then added an additional 28 women to both Dorm C and Dorm D—thus rendering the initial days of the quarantine for some women ineffective. Before April 15, there were around 43 women housed in the nine rooms. On April 15, they took all the women who were housed in the rooms and added them to Dorms A, B, and C—thus restarting the clock again for the women held previously in quarantine. *Id.* ¶¶ 5, 13.

April 15 was the start of a camp-wide lockdown. Martinez-Brooks Dec. ¶ 5. Under the lockdown, the women are confined to their dorm rooms for approximately 22 hours a day. *Id.* ¶ 11. As of April 26, A and B dorms each housed 48 women; C dorm housed 47 women and D Dorm houses 7. *Id.* ¶ 6. Women are being let out one dorm at a time for 45 minutes in the morning and an hour in the afternoon. *Id*. ¶ 11. During this time, they congregate in the camp's common area trying to access the phones, computers, and video machines during their limited window of time. *Id*. ¶ 9, 11. Recently, women who are out of their dorm during their designated recreation time have been going to visit friends in other dorms. *Id.* ¶ 15. In addition, some prisoners at the camp are continuing to assist in food preparation, cooking, and cleaning the kitchen. *Id.* ¶ 18. Women also move throughout the facility multiple times a week for laundry. Foreman Dec. ¶ 18.

Meanwhile, staff posted at the camp circulate through the dorms throughout the day for count, food delivery, and commissary. *Id.* ¶ 7; Martinez-Brooks Dec. ¶ 19. Staff at the camp have also been posted at other facilities at FCI Danbury, and medical staff see prisoners at all three facilities. Martinez-Brooks Dec. ¶ 19; Foreman Dec. ¶ 7. Three correctional officers who have been at the camp have said that they had COVID-19, including one who works in food service. Martinez-Brooks Dec. ¶ 20. Two staff members who worked at the camp have been out for several weeks, and their offices were thoroughly cleaned. Foreman Dec. ¶ 13. Otherwise, cleaning at the

camp has been sporadic, as some women have quit their ordinary cleaning jobs and women are responsible for cleaning their own sleeping areas. *Id.* ¶ 14.

There is no actual medical clinic in the camp and no medical staff permanently assigned to the camp or available 24 hours a day. Ex. C, Declaration of Dianthe Martinez-Brooks (Martinez-Brooks Dec.) ¶ 21. During this lockdown, a sick call request is made to physician's assistants when they come to the unit in the morning to dispense medications and the requester must wait until she is called in—often days later or not at all. Emergencies require a call from a correctional officer for a medical professional to come to the camp. *Id*. ¶ 21. Temperature checks have been sporadic. For example, temperatures were not taken of the women in the camp from April 26 to April 29. Ex. T, Second Declaration of Dianthe Martinez-Brooks ("Martinez-Brooks Dec. 2") ¶ 2.

There has been mass confusion at the camp about who will be moving to home confinement. A pregnant woman was told she would be leaving on April 28 but was then told she would not leave until May 11, 2020. She has been in quarantine in D dorm since April 6, 2020. *Id.* ¶ 3. Petitioner Martinez-Brooks was given paperwork to sign on April 19 relating to home confinement and/or a halfway house. She was then informed she was not eligible because new criteria were being used. Martinez-Brooks Dec. ¶ 26. Multiple women who were initially told they were going home and even given dates for their release were later told they were not be leaving after all. Martinez-Brooks Dec. 2 ¶ 4.

### C.     Men's Prison

The men's prison at FCI Danbury is a low-security facility containing 13 units, comprised of 10 units designed for dormitory-style housing and three units of individual cells. There is also a Special Housing Unit for solitary confinement. The dormitory units (designated C through L Units) house around 80 men and consist of rows of bunk beds lined in two rows three to four feet apart across a middle aisle, with no barriers between the beds. Cassidy Dec. ¶ 32; Ex. K, Declaration of Antrum Coston ("Coston Dec.") ¶ 3. The average dorm also contains a bathroom with 5 stalls and a urinal, 5-6 sinks, and a shower area with 3-4 showers. Cassidy Dec. ¶¶ 2, 33; Coston Dec. ¶ 4; Ex. L, Declaration of Shannon Benson ("Benson Dec.") ¶ 3. The dorms have 2

small television rooms that typically hold 15-20 people at a time, and small phone and computer rooms that are almost always in use with men waiting nearby in line. Cassidy Dec. ¶ 35; Coston Dec. ¶ 4. The three units of individual cells (A, B and M Units) consist of two floors of cells, containing a bunk bed for two men with a toilet/sink. Ex. H, Declaration of Rafael Almonte ("Almonte Dec.") ¶ 6; Coston Dec. ¶ 5. The cellblock units also contain small rooms for TV, phones, and computers—where men typically congregate. Coston Dec. ¶ 4. The cellblock units hold around 75 men. Almonte Dec. ¶ 7.

On or around March 27 2020, a man in the M Unit tested positive for COVID-19. Johnson Dec. ¶ 6. Soon after, two other men were removed from M Unit after they tested positive—one was a tutor and had been in contact with men in units throughout the facility. Almonte Dec. ¶ 15. All three men returned to M Unit in less than 14 days. *Id.* ¶ 17; Johnson Dec. ¶ 9. After the initial positive tests, M Unit was placed on lockdown. However, men in the other units continue to mix in the chow hall, pill line, and at recreation. Coston Dec. ¶¶ 10, 12, 16; Almonte Dec. ¶ 13. Also at the end of March, there was a positive test in the D Unit, and several men were removed. Cassidy Dec. ¶ 15. Eventually, all the units were placed on lockdown but staff continued to move in and out different units throughout the day.

Meanwhile, numerous men throughout the different units began experiencing serious symptoms of COVID-19 including fever, cough, and difficulty breathing. Johnson Dec. ¶ 9; Coston Dec. ¶ 13. Many were not tested and not placed in isolation. Coston Dec. ¶ 13; Ex. N, Declaration of Ronald Harper ("Harper Dec.") ¶¶ 5, 6. On April 9, a man from one of the units was transported to the hospital and later died of COVID-19.[9]

Before the outbreak, the medical clinic at Danbury was typically staffed by one physician and two physician assistants. Almonte Dec. ¶ 11. Men who wanted to be seen could go up to the clinic in the morning and get on a sick call list. Coston Dec. ¶ 14. Since the lockdown started, it has been near impossible to get a medical appointment. *Id.* ¶ 14. A social worker comes into the

---

[9] *See supra* note 5.

units to conduct sick call triage, at times with the dental hygienist. Cassidy Dec. ¶ 18. The social worker collects sick call requests and speaks to men about their symptoms the unit.

Staff take the temperatures of men each day using forehand wand thermometers.  Early on during the outbreak, even men with fevers were being kept in the units. More recently, some men with fevers have been taken up to the medical unit. Harper Dec. ¶ 6; Cassidy Dec. ¶ 13. But temperatures are not always reliably reported: sometimes, staff attribute high temperature readings to an equipment or operator error and take a second reading without putting the thermometer close to the man's forehead. Cassidy Dec. ¶ 14. And men who have gone to medical have come back down to the unit, saying they were told to just take Tylenol or cough syrup and see if their fever goes away. *Id.* ¶ 12; Harper Dec. ¶ 5. Many men who have COVID-19 symptoms other than a fever including coughs and difficulty breathing have not been able to see a medical professional at all.  Coston Dec. ¶ 13 ("[Y]ou had to be falling down to get any help."); Cassidy Dec. ¶ 12.

## II.   FCI Danbury Has Not Implemented Essential Measures to Protect Prisoners and Mitigate the Spread of COVID-19

In the face of a COVID-19 outbreak, Respondents have utterly failed to take the measures necessary to protect the women and men in its care.

### A.   Correctional facilities are incubators and amplifiers for infectious diseases like COVID-19, and the CDC has issued guidance for managing the virus in correctional facilities

The COVID-19 virus is highly infectious and can be spread "easily and sustainably" from person-to-person.[10] The virus spreads through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days.[11] Critically, people who are asymptomatic or pre-symptomatic can transmit the virus, making it

---

[10] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads* (accessed Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[11] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at https://doi.org/10.1056/NEJMc2004973 (accessed Apr 2, 2020); Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (accessed Apr 2, 2020).

particularly difficult to slow its spread. Ex. A, Declaration of Jaimie Meyer, M.D. ("Meyer Dec.")
¶ 20. There is no vaccine to protect against COVID-19 and there is no known medication to prevent
or treat infection from COVID-19. Social distancing (remaining physically separated from known
or potentially infected individuals) and vigilant hygiene (including washing hands with soap and
water and disinfecting surfaces) are the only known effective measures for protecting vulnerable
people from COVID-19.

COVID-19 poses particular risks to people in prison, because the activities of daily life
happen in close proximity, there is limited access to personal hygiene resources and medical care,
and, often, minimal levels of sanitation.[12] Prisoners and staff interact in close proximity under
cramped conditions that are designed to confine, rather than distance, people; as a result,
correctional facilities are highly susceptible to rapid transmission of the virus through contact,
including asymptomatic carriers who show no signs of illness, common surfaces, and movement
of staff between facilities and the community. Spaces within prisons are often poorly ventilated,
which promotes highly efficient spread of diseases through droplets. *Id*. ¶ 9.  And prisons often
lack adequate supplies of soap, sanitizers, disinfectants, paper towels, and the personal protective
equipment necessary to ensure proper hygiene and mitigate spread of the virus. *Id*. ¶¶ 9, 11, 39.

Recognizing the dangers that COVID-19 poses for prisons, the Center for Disease Control
and Prevention ("CDC") on March 23, 2020, issued "Interim Guidance on Management of
Coronavirus Disease (COVID-19) in Correctional and Detention Facilities" ("Interim Guidance"),
which describes measures necessary to prevent the spread of COVID-19 in correctional facilities.[13]

---

[12] *See* Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional
and Detention Facilities, CDC (Mar. 23, 2020), available at
https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf; Joseph A.
Bick, *Infection Control in Jails and Prisons*, 45:8 Clinical Infectious Diseases 1047 (Oct. 2007), available
at https://academic.oup.com/cid/article/45/8/1047/344842 (incarcerated people at increased risk for
transmission of blood-borne pathogens, sexually transmitted diseases, certain antibiotic resistant
infections, Staph. Infection, tuberculosis, influenza, and varicella-zoster); World Health Organization,
Prisons and Health, *Infectious diseases in prison* at 73 (2014), available at
http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1.
[13] See Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional
and Detention Facilities, CDC (Mar. 23, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf

These guidelines include: diagnosing, isolating, and caring for those with COVID-19; implementing quarantine of prisoners or staff who have had close contact with positive cases; remediating spaces with known coronavirus contact; enacting stricter sanitation policies that include cleaning and disinfecting shared areas and equipment; developing contingency plans to prevent or mitigate spread of the disease; providing education and training to inmates and staff; and implementing effective social distancing measures.[14]

### B.  FCI Danbury has Failed to Implement the CDC's Guidance

Respondents' failures to protect the health and safety of the incarcerated people in their care have been—and continue to be—profound and pervasive throughout Danbury's three facilities. The failures to follow CDC Guidance include:

- **Failures to triage cases, and diagnose, isolate, and care for those with the disease**: If an incarcerated person exhibits symptoms of COVID-19, the CDC Guidance calls for the individual to be immediately given a face mask, paced in isolation, provided a medical evaluation and treatment, and evaluated for possible testing. Contrary to this guidance, FCI Danbury avoids evaluating and testing prisoners with classic symptoms of COVID-19 including fever, cough, difficulty breathing, and loss of taste and smell. In many instances, individuals with these symptoms are denied access to medical evaluation and testing and instead left in crowded housing units. Without adequate medical attention, some prisoners have become gravely ill.

- **Failure to respond adequately to cases of close contact or observe appropriate quarantine/isolation:** CDC Guidance directs prisons to implement 14-day quarantines/isolation of prisoners or staff who have had contact with people known to have tested positive for COVID-19, to monitor such Close Contact Cases for COVID-19 symptoms, and to keep staff members out of the facility unless they are asymptomatic 14 days after their exposure to COVID-19. Contrary to this Guidance, Respondents routinely fail to test or isolate prisoners with known close contact with individuals subsequently diagnosed with the virus. Prisoners who test positive for COVID-19 are frequently returned to the general population far earlier than appropriate pursuant to CDC Guidance, and staff positive for COVID-19 who were still exhibiting symptoms have returned to work.

- **Failure to remediate adequately spaces with known coronavirus contact and to inform prisoners of the extent of infection:** In the event a prisoner or staff member tests positive for COVID-19, CDC Guidance calls for the facility to close off the areas used by that person. These areas are to be well ventilated for at least 24 hours before they are disinfected by people equipped with proper personal protective equipment ("PPE").

---

[14] *Id.*

Respondents have failed to implement any of these measures.

- **Failure to adequately implement social distancing measures:** The very configuration of FCI Danbury precludes meaningful social distancing. The overwhelming majority of the facility's prisoners in each of the three facilities are housed dormitory-style and all prisoners in these configurations sleep within 3 to 4 feet of between 3 and 5 other prisoners. Throughout the day, prisoners congregate closely together to access the pill line, commissary, and phones and computers. They share a limited number of toilets, sinks, and showers. Staff move throughout the units within facilities, and among all three facilities.

- **Failure to implement necessary hygiene measures:** CDC Guidance requires heightened hygienic, cleaning and disinfecting practices in order to prevent and mitigate COVID-19 infection. FCI Danbury has failed adequately to implement these heightened hygienic and cleaning practices. Petitioners do not have access to the cleaning supplies necessary to sanitize themselves, their personal items, or their living areas.

- **Failure to plan adequately to prevent or mitigate the spread of COVID-19 infection:** CDC Guidance recommends that correctional facilities should develop contingency plans for reduced workforces due to staff absences. That Guidance also calls for the provision of PPE and contingency planning for shortages of PPE. FCI Danbury has failed to adequately plan for either inevitable staff shortages or the need for PPE, placing petitioners and the putative class members at heightened risk.

- **Failure to implement the training and interventions necessary to prevent the spread of COVID-19:** CDC Guidance states that correctional staff and incarcerated people should be trained on donning, doffing and disposing of PPE. CDC Guidance further recommends that correctional facilities post signage informing staff and incarcerated people how to report COVID-19 symptoms and advising staff to stay at home when sick. FCI Danbury has failed adequately to implement either of these training and educational interventions.

- **Respondents' failures to respond to the COVID-19 epidemic have further put petitioners and putative class members at unacceptably heightened risk of injury and illness unrelated to COVID-19:** Respondents' failure to prepare adequately for the COVID-19 epidemic has also put incarcerated people at heightened risk of other injury and illness. Just as those with COVID-19 symptoms are unable to access medical care, prisoners with other urgent health needs have gone without treatment. The pharmacy at FCI Danbury has been closed, which has led to delays in access to medication as prescriptions are shipped from another facility. Staff have been absent from the units, requiring prisoners themselves to respond to medical emergencies in the units.

  **C.**  **Public health officials, Congress and the Department of Justice have recognized that prisons such as FCI Danbury need to de-densify to protect the health and safety of prisoners and staff**

  Even with effective hygiene practices, FCI Danbury remain too dangerous—especially for those most vulnerable to serious illness or death— absent significant de-densifying. There is

simply no way to keep the women and men housed in three facilities safe at current population levels. It is hard to imagine conditions more conducive to the spread of the virus than the FSL facility—with more than 150 women living all together in bunk beds in a single crowded room, sharing a limited number of bathrooms. The crowded housing conditions in the camp and the men's facility are hardly better.

Recognizing the reality of COVID-19 in a prison setting, correctional public health experts, Congress, and the U.S. Department of Justice have recommended the release from custody of people most vulnerable to COVID-19 so as to protect them and permit risk mitigation for all people still held or working in facilities. Calling for immediate and extensive "efforts to decarcerate" to protect both prisoners and the general public, the *New England Journal of Medicine* explained:

> The boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel. Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. . . .To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.[15]

In New York City, public officials, the jail oversight board, and doctors working at Rikers Island have acknowledged that the City's jails are unsafe and that releasing people is the medically appropriate and humane option. On March 20, 2020, Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues—those people are likely to die from a coronavirus infection."[16] Ross McDonald, the Chief Medical Officer for the agency that provides

---

[15] Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons*, NEW ENGLAND JOURNAL OF MEDICINE (Apr. 9, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

[16] Jen Ransom and Alan Feuer, *'A Storm Is Coming': Fears of a Prisoner Epidemic as the Virus Spreads in the Jails*, N.Y. Times (March 20, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html

healthcare to Rikers said the jail is a "public health disaster unfolding before our eyes." He stressed: "This is not a generational public health crisis, rather it is a crisis of a magnitude no generation living today has ever seen." He called for the release of "as many vulnerable people as possible"[17]

Congress recognized the need to move more federal prisoners to home confinement during this pandemic. On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act, P.L. 116-136), which authorizes the Director of the BOP to lengthen the maximum amount of time that a prisoner may be placed on home confinement when the Attorney General "finds that emergency conditions will materially affect the functioning" of BOP.

On March 26, 2020, Attorney General William Barr directed the BOP to prioritize the use of "various statutory authorities to grant home confinement for prisoners seeking transfer in connection with the COVID-19 pandemic" because "for some eligible prisoners, home confinement might be more effective in protecting their health."[18] The Attorney General specifically recognized that "there are some at-risk prisoners who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."[19] He identified as two of the critical, discretionary factors for consideration (1) "[t]he age and vulnerability of the prisoner to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and (2) "the security level of the facility," with "priority given" to prisoners incarcerated "in low and medium security facilities."

---

[17] Miranda Bryant, Coronavirus spread at Rikers is a 'public health disaster', says jail's top doctor, THE GUARDIAN (Apr. 1, 2020 10:36 am), Available at https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster; *see also* Statement of New York City Board of Correction, March 17, 2020 (calling on the City to release people from criminal custody, prioritizing people over 50, those with underlying health conditions, detained for administrative reasons, and those who have been convicted and sentenced to one year or less); *New York City Board of Correction Calls for the City to Begin Releasing People from Jail as Part of Public Health Response to COVID-19* (Mar. 17, 2020), https://www.nysenate.gov/newsroom/in-the-news/julia-salazar/nyc-board-correction-calls-city-begin-releasing-people-jail
[18] Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf
[19] *Id.*

In an April 3 memo to the BOP Director, the Attorney General affirmed the BOP's "profound obligation to protect the health and safety of all inmates" following the dramatic increases in confirmed COVID-19 cases at FCI Danbury and two other BOP facilities (FCI Oakdale in Louisiana, and FCI Elkton in Ohio).[20] Barr asked the BOP to give particular priority to those three institutions and others similar affected. Significantly he stated: "[T]he CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below." He further recognized that, despite "extensive precautions to prevent COVID-19 from entering [BOP] facilities and infecting our prisoners," those measures "have not been perfectly effective." Accordingly, he ordered the BOP to take more aggressive steps, immediately, to transfer prisoners to home confinement, even if electronic monitoring will not be available. Echoing the warnings of public health experts, Attorney General Barr stated: "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence."

### D.   FCI Danbury's failure to implement the CDC's Guidance and de-densify its facilities places incarcerated women and men at grave risk

Notwithstanding Attorney General Barr's statements and the recommendations of public health officials, Respondents have failed to use the BOP's available statutory authority to reduce the population of FCI Danbury to mitigate the severe risk posed by COVID-19. Instead, the facility has reversed course, refusing to follow through with transfers to home confinement for individuals previously identified for such home confinement based on their medical vulnerability, and failing to take other measures appropriate for a public health crisis.[21]

---

[20] Memorandum For Director of Bureau of Prisons re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, Office of the Attorney General, Washington, D.C. (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

[21] Memos from the Warden at FCI Danbury reveal the shifting criteria the facility has used for home confinement. *See* Ex. T (memo of April 16, 2020); Ex. U (memo of April 21, 2020).

Last week, one district court expressly criticized FCI Danbury's inexcusable failure to implement proper transfer procedures for medically vulnerable prisoners. In *United States v. Park*, No. 16-cr-473 (S.D.N.Y. Apr. 24, 2020), the court granted—over the government's objection—immediate compassionate release from FCI Danbury to Ms. Haena Park. As the Warden of FCI Danbury explained, within less than two weeks the BOP's Correctional Programs Division had twice "revised the criteria which must be met in order for an inmate to be referred to home confinement." *Park,* Declaration of Warden Diane Easter at ¶¶ 4-5 (Apr. 23, 2020) [D.E. 69-1]. Concluding that the "ever-changing guidelines" meant "the Court cannot be assured that Ms. Park will indeed be released on April 30, as is currently being represented," the court ordered her immediate release because "[w]e are living in novel and dangerous times" where "[e]very day—indeed, every minute—may count."[22]

The BOP has not disclosed the number of prisoners it typically released per day prior to Attorney General Barr's memos, nor has it disclosed how many new prisoners have entered BOP custody during the same time period. No information is available about how many prisoners FCI Danbury has released pursuant to Barr's memos.[23] The BOP does provide weekly updates on the

---

[22] The BOP's mismanagement of home confinement placements has occurred nationwide. *See* Letter from Kevin A. Ring, President, Families for Justice Reform to Attorney General Barr and Director Carvajal (April 21, 2020) (citing "reports from dozens of people around the country that their loved ones, quarantined with the explicit understanding that they would move to home confinement in two weeks, were instead returned to general population and told that the rules had changed and that they were no longer going home" and "numerous reports about case managers and counselors giving incorrect information and contradictory answers to people exploring early release options"), https://famm.org/wp-content/uploads/final-bop-letter-april-21-2020.pdf; Order, *United States v. Stahl*, No. 18-cr-694(RA), at *1 (S.D.N.Y. Apr. 21, 2020) (noting that the BOP had already approved the defendant's request for home confinement before deeming him likely no longer eligible in light of "new guidance;" directing the Government to, *inter alia*, provide an explanation from the BOP as to how new DOJ guidance could affect the prior approval).

[23] According to the BOP's website, from March 26 (the date of Attorney General Barr's first memo) through April 25, the agency placed 1576 prisoners nationwide into home confinement—which would constitute only 0.9 percent of the approximately 171,000 prisoners currently held in BOP custody. However, the real number of those released to home confinement nationwide may well be less. As the Wall Street Journal reported on April 23: "The bureau said it has started placing at least 1,440 of the roughly 175,000 prisoners it holds into home confinement, but didn't say how many of those people have actually been released." Sadie Gurman & Rebecca Davis O'Brien, *Confusion Hampers Coronavirus-Driven Inmate Releases*, Wall Street Journal, April 23, 2020;[23] *see also* Joseph Neff & Keri Blakinger, *Few Federal Prisoners Released Under COVID-19 Emergency Policies: A Federal Judge Called the*

number of people held at each facility. As of April 30, 2020, the BOP reports that 1,025 people are held at FCI Danbury. They are divided among the units as follows: 164 women are incarcerated at the satellite prison, 142 women are incarcerated at the camp, and 719 men are incarcerated at the men's prison.[24] At these population levels, FCI Danbury is simply unable to follow the CDC's recommendations regarding isolation and social distancing.

COVID-19 can lead to dangerous—and sometimes fatal—consequences for those infected by it. While the risks for severe or deadly symptoms are elevated for people over the age of 60 and people of any age who suffer from certain underlying medical conditions (including asthma, obesity, diabetes, lung disease, heart disease, chronic liver or kidney disease, and compromised immune systems), even individuals outside of these categories are at risk of contracting this potentially deadly disease. For example, 22 percent of individuals requiring admission to a hospital intensive care unit do not have any underlying health conditions.[25]

Each of the four (named) Petitioners faces a particularly high risk of complications from COVID-19. Petitioner Dianthe Martinez-Brooks is a 50-year-old woman who suffers from asthma, hypertension, arthritis and systemic lupus erythematosus (SLE). She takes Atenolol for hypertension and has a Proventil emergency inhaler and Asmanex Twisthaler (mometasone furoate inhalation powder, 220 mg) for her asthma. Since her incarceration, she has been proscribed steroids once for the joint and muscle inflammation associated with her lupus.   Martinez-Brooks Dec. ¶ 2. As a result of her hypertension, Ms. Martinez-Brooks is significantly more vulnerable to complications should she contract COVID-19. Indeed, the WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing

_Bureau of Prisons Release Process "Kafkaesque"_, The Marshall Project, Apr. 25, 2020 (only 1,027 more prisoners allowed to serve the rest of their sentence in home confinement since Attorney General Barr's April 3 urgent memo, "about half of 1 percent of the more than 174,000 people in the bureau's custody"), https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies

[24]  See BOP, "Population Statistics" (last updated Apr. 30, 2020), https://www.bop.gov/about/statistics/population_statistics.jsp

[25] Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12-March 28, 2020, CDC (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm

conditions. For those with hypertension, the mortality rate was 8.4%.[26] That same report indicates that the mortality rate for chronic respiratory disease such as asthma was 8.0%. *Id.* As a lupus patient, Ms. Martinez-Brooks is also at greater risk from COVID-19 in two respects. As with other lupus patients, Ms. Martinez-Brooks has been prescribed corticosteroids which weaken the immune system and render the patient immunocompromised. Both that compromised immune system and lupus itself are risk factors for an increased chance of infection and for the development of a more severe form of COVID-19.[27]

Petitioner Rejeanne Collier is a 64-year-old woman who suffers from systemic lupus erythematosus (SLE), hypertension and Hepatitis C. She has had surgery for intestinal cancer while in BOP custody and has been diagnosed with a spot on her lung. *See Motion to Reduce Sentence, United States v. Collier*, 6:12-cr-06003-CJS (N.D.N.Y. Apr. 16, 2020) (Doc. 64 at 13). As set forth above, these conditions condemn her to serve a sentence at substantial risk of serious illness or death. The mortality rate for COVID-19 with pre-existing hypertension is 8.4%; for cancer, the mortality rate is 7.6%.[28] She is also at significantly greater risk as a result of her lupus. To the extent that the as yet incompletely diagnosed spot on her lung represents either lung cancer or some other form of respiratory compromise, that condition will also place her at substantially elevated risk of significant illness or death in the event she contracts coronavirus.

Petitioner Jackie Madore is a 50-year-old woman who suffers from hypertension, hypothyroidism, and Hepatitis C. As a result of her hypertension alone, without consideration of

---

[26] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf (hereinafter "WHO-China Joint Mission Report").

[27] *See People who are at higher risk*, *Centers for Disease Control and Prevention: Coronavirus Disease 2019 (COVID-19)* (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html; Amr H. Sawalha et al, *Epigenetic dysregulation of ACE2 and interferon-regulated genes might suggest increased COVID-19 susceptibility and severity in lupus patients*, Clinical Immunology (2020): 108410, https://www.sciencedirect.com/science/article/pii/S1521661620302394 ("propos[ing] that lupus patients might be at an increased risk for infection by SARS-CoV-2 and for developing a more severe form of COVID-19, independent of the possible effect of immunosuppressive medications").

[28] *See* WHO-China Joint Mission Report at 12.

the complicating effects of her other conditions, she has a substantially elevated risk of severe illness or mortality in the event she contracts COVID-19 while confined at FCI Danbury.[29]

Petitioner Kenneth Cassidy is a 54-year-old man with a significant number of risk factors putting him at high risk of severe illness or death in the event he contracts COVID-19. Mr. Cassidy has significant cardiovascular issues, including ischemic heart disease (i.e., deficient blood supply from a narrowing of the blood vessels), unstable angina, and hypertension. He has suffered three heart attacks, including two in his thirties. He has chronic bronchial asthma and other respiratory problems which have resulted in his having contracted pneumonia at least 21 times in his life. He also has chronic gastrointestinal and gastroesophageal disease including diverticulosis and he is morbidly obese. He suffers significant food allergies and is on a restricted diet as a result of his diverticulosis. He is on numerous different medications/interventions for these conditions. Pursuant to the above-cited WHO-China Joint Mission Report, each of these conditions puts Mr. Cassidy at significantly elevated risk of mortality in the event he should contract COVID-19: The mortality rate for hypertension is 8.4%; the mortality rate for chronic respiratory disease is 8.0%, the mortality rate for cardiovascular disease is 13.2%.[30] Moreover, a recent study found that obesity was the single biggest chronic risk factor for hospitalization for COVID-19.[31] COVID-19 infection in a patient presenting with all four medical conditions will undoubtedly be deadly.[32] As a result of his medical condition, there is a grave risk that he will not make it out of FCI Danbury alive or will become terribly ill.

---

[29] *See id.*

[30] *See id.*

[31] Christopher M. Petrilli et. al., Factors Associated With Hospitalization and Critical Illness Among 4,103 Patients with COVID-1 Disease in New York City (Apr. 11, 2020), https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1.full.pdf; *see also* Tiernan Ray, *NYU scientists - Largest US study of COVID-19 finds obesity the single biggest 'chronic' factor in New York City's hospitalizations* (April 12, 2020), https://www.zdnet.com/article/nyu-scientists-largest-u-s-study-of-covid-19-finds-the-single-biggest-factor-in-new-york-critical-cases/

[32] Safiya Richardson, et al., Presenting Characteristics, Comorbidies, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area, J. AM. MED. ASS'N (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184 (in study of 5,700 patients, finding that the most common comorbidities with COVID-19 were hypertension (56.6%), obesity (41.7%), and diabetes (33.8%)).

Petitioners and other prisoners at FCI Danbury face risks not only from COVID-19, but from the inadequate health care the facility is providing for other conditions during this crisis. As a result of the increased attention to the COVID epidemic, non-virus medical needs have gone unattended. The regular prison physicians have been absent or are no longer available to prisoners on the unit, prisoners who do not present with fever during sick call cannot be referred to a physician, and sick call requests for other than virus symptoms go unanswered for prolonged periods of time. Cassidy Dec. ¶ 17; Martinez-Brooks Dec. ¶ 23; Benson Dec. ¶¶ 5, 7.[33] Recently, the prison pharmacy has been closed. Medications must be shipped from another facility (USP Allenwood in Pennsylvania) resulting in delays in their delivery and disruption of medication regimens. Cassidy Dec. ¶ 7 (two week delay in receipt of correct dosage of medication); Martinez-Brooks Dec. ¶ 23 (8 day delay in refill of hypertension medication).

In addition, special medical diets are not available to prisoners at FCI Danbury. As a result, on repeated occasions, special-diet prisoners have received meals containing ingredients dangerously harmful to their health, including, for example, delivery of meals containing peanut products to allergic patients at risk of anaphylaxis, or delivery of meals containing rice and beans to prisoners with diverticulosis. Cassidy Dec. ¶¶ 20, 22; Martinez-Brooks Dec. ¶ 22 (peanut butter was served multiple times in a dorm housing a woman with severe peanut allergy). As a result of the epidemic, food service has been reduced below BOP guidelines for caloric intake and nutritional value; food reductions put petitioners and putative class members at heightened risk of adverse health effects. Cassidy Dec. ¶ 21.[34]

---

[33] Petitioner Kenneth Cassidy suffers from intestinal disease, including diverticulitis. Cassidy Dec. ¶ 5. He has recently developed an abnormal growth in the rectum which has resulted on occasion in dark black blood in feces and obstruction of his bowel. Although he has made at least three requests for a medical visit to assess and diagnose his condition, he has been advised that his condition is not an emergency and that the medical team is currently unavailable to evaluate him. *Id.* ¶ 17.

[34] The COVID-19 pandemic has also resulted in worrisome curtailment of prisoners' legal rights. The prison law library has been closed, Coston Dec. ¶ 10, and locked and the administrative remedy process has been suspended indefinitely, Cassidy Dec. ¶ 25. Legal mail is being delayed and at times not picked up due to staff shortages. *Id.* ¶ 26. Legal calls are being denied and legal requests from attorneys are often going unanswered, including for open and pending cases that require access to attorneys such as the development of pleadings in connection with motions for compassionate release. Cassidy Dec. ¶¶ 25-27.

# ARGUMENT

## I.    Standard of Review

In this case, Petitioners seek two forms of immediate relief.  The Subclass, consisting of medically vulnerable individuals, seeks immediate release from the chaotic and infectious environment at FCI Danbury to home confinement through an order of enlargement.  Their health and possibly their lives depend on how quickly they are released from that environment.

The Class as a whole seeks orders requiring Respondents to enlarge to home confinement all women currently housed in the satellite camp as a means to achieve necessary social distancing among the female population of FCI Danbury.  The Class further seeks orders requiring Respondents (a) to establish a medically safe environment at FCI Danbury through implementation of necessary and appropriate measures to maximize social distancing and to improve hygiene for the prisoners who remain at FCI Danbury for the duration of the COVID-19 pandemic and/or (b) to transfer such Class members to other BOP facilities that can provide such medically safe environment.

The standards for granting a temporary restraining order ("TRO") are the same standards that govern preliminary injunctions. *See Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc*., 965 F.2d 1224, 1228 (2d Cir. 1992); *Maxum Petroleum, Inc. v. Hiatt*, No. 3:16-CV-01615 (VLB), 2016 WL 5496283, at *1 (D. Conn. 2016); *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008).  For a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). The Second Circuit has long held that the Winter factors are properly balanced with a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v.*

*H.P. Hood & Sons, Inc*., 596 F.2d 70, 72 (2d Cir. 1979)). Petitioners meet all four Winter factors, and therefore more than satisfy the Second Circuit alternative of "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.*

Once a plaintiff demonstrates entitlement to preliminary relief, courts have broad power to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). And although courts must "be sensitive to the State's interest[s]" in imprisonment, courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners [and] . . . may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

Action by this Court is necessary here. There is no vaccine or cure for COVID-19. And the conditions at FCI Danbury inherently make social distancing and other imperative protective measures impossible. As such, the only way to protect against the imminent risk of substantial harm and possible death for the subclass of prisoners who are most vulnerable to the virus is to immediately remove them from the prison *before* they contract the virus. Injunctive relief is necessary because the danger here, vulnerable people condemned to prolonged illness and potential death, is the quintessential irreparable harm. *See, e.g.*, *Jones'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wisc. 2001) ("[P]ain, suffering and the risk of death constitute 'irreparable harm' sufficient to support a preliminary injunction in prison cases."). There is also an overwhelming public interest in limiting the spread of COVID-19, both to minimize further infections and to reduce strain on overwhelmed health systems. And, in light of the global COVID-19 pandemic, the balance of equities weighs heavily in favor of the vulnerable prisoners, who must be transferred to home confinement to self-isolate, and against Respondents' interest in indefinitely confining Petitioners, the Class and the Subclass, in life-threatening conditions. This Court should order that the Subclass be immediately released to home confinement.  The Court should further order that Respondents release to home confinement all members of the Class currently housed in the satellite camp as a means to achieve necessary social distancing and that Respondents implement all

25

necessary and appropriate measures  (a) to establish a medically safe environment at FCI Danbury for the population that remains there and/or (b) to transfer such Class members to other BOP facilities as necessary to create such medically safe environment.

## II. Petitioners and the Class and Subclass Face Irreparable Harm If They Continue to be Incarcerated.

Each of the named Petitioners and the members of the Class and Subclass face an immense threat of irreparable harm that they will contract and may suffer severe illness or death from COVID-19 if they continue to be incarcerated under existing conditions of inadequate social distancing measures and inadequate hygiene.

Irreparable harm is the threshold requirement for the granting of a TRO. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Furthermore, "the Second Circuit has deemed the threshold showing of 'irreparable harm' to be of particular significance under Rule 65, regardless of the strength of the movant's case on the merits." *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002).

The Supreme Court has determined that substantially increased risk of serious illness and death always constitutes irreparable injury. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life threatening condition in their prison on the ground that nothing yet had happened to them."). *See also Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir. 1997) (finding the burden of showing irreparable injury satisfied where evidence showed that closing of treatment program would lead to plaintiffs' continued abuse of alcohol and drugs, "resulting in death, illness, or disability"); *see also Harris v. Bd. of Supervisors, Los Angeles Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (finding likelihood of "pain, infection, amputation, medical complications, and death" constituted irreparable harm); *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) ("[T]he obvious potential for such issues as developing chronic health issues or spreading contagious diseases underscores the need for equitable relief . . . .").

Even the failure to *test* for a disease has been sufficient to support a finding of irreparable harm. *See Boone v. Brown*, No. Civ. 05–750(AET), 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate irreparable harm); *Austin v. Pa. Dep't of Corr.*, Civ. A. No. 90–7497, 1992 WL 277511, at *7 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing and protocol for Tuberculosis); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (state officials have an affirmative obligation to protect prisoners from infectious disease).

Harm is irreparable when money damages after the matter is resolved will not be adequate redress. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Here, no amount of damages could make Petitioners or the members of the Class or Subclass whole if they suffer illness or die a preventable death while in custody. Furthermore, alleged violations of constitutional rights, such as those made here, amount to irreparable injury. *See, e.g.*, *Conn. Dep't Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

A likelihood of irreparable harm is clearly present here. Petitioners and the members of the Class and Subclass face severe illness, pain, and potentially death if the conditions of their incarceration are not addressed and changed now. COVID-19 has already gained an initial foothold at the FCI Danbury, has already spawned secondary outbreaks, and its continued spread is inevitable.  Once infected, Petitioners and other prisoners will be at serious risk of grave or life-threatening complications due not only to the FCI Danbury's patently inadequate sanitary conditions, health protections, and housing practices, but also (for the medically vulnerable Subclass) because of their ages and pre-existing medical conditions.

Indeed, numerous federal courts around the country have found the threat posed by the COVID-19 pandemic to constitute irreparable injury for the purposes of temporary restraining orders and preliminary injunctions. *See, e.g., Castillo v. Barr*, No. CV 20-00605, at *5-6 (C.D. Cal. Mar. 27, 2020) (finding that petitioners should be released from immigration custody because

they established irreparable harm stemming from risk of exposure to COVID-19); *Coronel v. Decker*, 20-cv-2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, [COVID-19] infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.").

## III. Petitioners, the Class and Subclass Are Substantially Likely to Succeed on the Merits of Their Claims.

Petitioners, and the Class and Subclass they seek to represent have suffered violations of their constitutional rights. Respondents have acted with deliberate indifference to the medical needs of people incarcerated at FCI Danbury, placing all Class and Subclass members in danger as a result of Respondents' inadequate response to the risk to Class and Subclass members from COVID-19.

### A. The Class and Subclass are Likely to Succeed on their Claim that Respondents Have Violated the Eighth Amendment.

The Eighth Amendment's ban on cruel and unusual punishment safeguards the rights of prisoners while in state custody. Under the Eighth Amendment, the Government has an affirmative duty to provide conditions of reasonable health and safety to those in its custody. *DeShaney v. Winnebago County Dep't Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). This affirmative duty includes the obligation to provide adequate care to inmates with acute medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

All incarcerated people have a right to be housed safely. That right is violated if they are "incarcerated under conditions posing a substantial risk of serious harm," and their jailers' "state of mind," at least for convicted detainees, "is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The law is clear that when prison

28

authorities "strip [prisoners] of virtually every means of self-protection and foreclose[] their access to outside aid, [they] are not free to let the state of nature take its course." *Id*. at 833.  Instead, prison officials have a responsibility under the Eight Amendment to "take reasonable measures to guarantee the safety of the inmates." *Id.* at 832.  Prison authorities are liable if they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling*, 509 U.S. at 33.

An Eighth Amendment claim based on conditions of confinement has two prongs: an objective prong and subjective prong.  Under the objective prong, Eighth Amendment jurisprudence specifically holds that incarcerated individuals may not constitutionally be exposed to a severe risk of contracting a communicable disease. *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease."); *Lareau v. Manson*, 651 F.2d 96, 109–11 (2d Cir. 1981)*; Gates v. Collier*, 501 F.2d 1291, 1300-02 (5th Cir. 1974) (cited with approval in *Helling*, 509 U.S. at 34).

The Eighth Amendment's "deliberate indifference" inquiry specifically encompasses the risk of *future harm* in its analysis. In *Helling v. McKinney*, the Supreme Court held that a prisoner's exposure to second-hand smoke constituted a viable Eighth Amendment claim, even before contracting any second-hand-smoke related illness. 509 U.S. at 35. "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life threatening condition in their prison on the ground that nothing yet had happened to them," the Court observed. *Id.* at 33-34. Similarly, the *Helling* Court explained that prison officials cannot "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33; *see also Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (noting that "exposure of inmates to a serious, communicable disease . . . can qualify [as a] deprivation . . . [that is] sufficiently serious).  Where continuing confinement in an environment that puts a prisoner at risk of known exposure to serious disease, the prison must "choose between removing the prisoner from the unhealthy environment and protecting him from its consequences ... provided, of course, that the protection is efficacious." *Powers v. Snyder*, 484 F.3d 929, 931 (7th Cir. 2007); *see also*

*McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (explaining that the Eighth Amendment does not excuse deliberate indifference simply because harms "have not yet reached the point of causing acute or life-threatening injuries").

Under the second, or subjective, prong of a "deliberate indifference" claim, an individual must next show that prison officials "acted with deliberate indifference to [the plaintiff's] medical needs." *Brock*, 315 F.3d at 162; *see also Estelle*, 429 U.S. at 104. To meet this second prong, the individual is required to prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998)). A prisoner need not show that an official acted "for the very purpose of causing harm," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), but must show that an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it," *Farmer*, 511 U.S. at 847. A "fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842; *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."). The Supreme Court has directed lower courts to consider "prison authorities' current attitude and conduct" and preventative policies put in place in determining whether officials are deliberately indifferent to medical needs. *Helling*, 509 U.S. at 36 (directing the court of appeals, on remand, to evaluate the plaintiff's Eighth Amendment claim in light of a new smoking policy put in place in the course of the litigation).

Both of these standards are easily met in this case. The conditions at FCI Danbury clearly violate Respondents' obligation not to house the prisoners in their care under conditions posing a substantial risk of serious harm.   Petitioners and the Class and Subclass they represent are being exposed to extreme and unprecedented risk of infection and death because of the failure of FCI Danbury to meet the most minimal public health standards. Every person detained at FCI Danbury under the chaotic conditions that prevail and where the applicable CDC Guidance is being ignored and disregarded—including every member of the medically vulnerable Subclass—is rendered at

30

heightened risk of infection that can cause severe and debilitating injury and death and will likely succeed on the merits of their Eighth Amendment claim.

Respondents are aware of and recklessly indifferent to the grave threat COVID-19 presents to petitioners and the members of the Class and Subclass who are incarcerated at FCI Danbury. By failing to abate the risks that these individuals face from COVID-19, Respondents are deliberately indifferent to their serious medical needs in contravention of the Eighth Amendment. "A prisoner is not required to show that he was literally ignored by the staff to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014). Custodians are still deliberately indifferent if they took some action, observed that it was failing, but choose not to adjust. *See, e.g*, *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (putting prisoner into protective custody but failing to protect her from a risk that persisted even in protective custody was unconstitutional); *Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation."); *Ruffin v. Deperio*, 97 F. Supp. 2d 346, 353 (W.D.N.Y. 2000) (deliberate indifference could be found where "defendants' treatment' of plaintiff consisted of little more than documenting his worsening condition, and continuing the provision of ineffective medications"); *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331 (E.D. Pa., April 1, 2020) ("The government's assurances that the BOP's 'extraordinary actions' can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease[.]").

Most saliently, although Respondents were directed by Attorney General Barr more than 30 days ago to give priority to FCI Danbury in identifying medically vulnerable prisoners who could serve their sentences in home confinement, Respondents have failed to transfer such medically vulnerable prisoners from FCI Danbury in any meaningful numbers, thus continuing to endanger not only those medically vulnerable individuals but also the prison population at large that would otherwise benefit from de-densification measures.

And, as set forth above, Respondents have carelessly failed to address the COVID-19 pandemic sweeping through FCI Danbury.  They have failed to triage cases or to diagnose and isolate disease – including by knowingly refusing to take temperatures (and therefore diagnose with COVID-19) prisoners presenting with symptoms consistent with coronavirus infection, knowingly distorting temperature readings, and deliberately returning prisoners with confirmed fever to the general population – instructing those individuals to take Tylenol and lie down. Respondents have further failed to observe appropriate quarantine/isolation policies, failing to test and isolate prisoners in close contact with individuals subsequently diagnosed with cornonavirus, and returning individuals who test positive for COVID-19 (whether prisoners, correctional staff, or food service personnel) to the general population far earlier than appropriate pursuant to CDC Guidance and failing to observe appropriate observation requirements for new prisoners.

Respondents have also deliberately failed to implement adequate social distancing measures with full knowledge that, pursuant to relevant CDC Guidance, such social distancing is critical to reducing the spread of disease.  The prison layout is incompatible with social distancing in the best of circumstances, but Respondents have undertaken actions that exacerbate the problem. Thus, correctional staff continue to move regularly between units, in contravention of proper social distancing and Respondents have deliberately moved prisoners from rooms where greater separation was possible into dorms where such separation is not possible.  Respondents have further taken patently insufficient action to reduce close contact between prisoners in multiple aspects of prison life, including lines for phone and computer use, and lines for commissary, medication and recreation.   And, Respondents have violated basic isolation protocols, intermingling prisoners with unknown COVID-19 exposures into units previously isolated for individuals nearing release or for individuals at heightened medical risk.

Respondents have further failed to observe mandated hygiene measures.  Frequently used surfaces are not regularly sanitized, and cleaning throughout the facility – much of which depends on prisoner labor – is sporadic at best.  The prison has not made available adequate supplies of personal protective equipment, soap and sanitizers to either prisoners or staff.   Isolation wards are

32

established in unhygienic makeshift spaces, including in visiting rooms or recreation areas with insufficient running water.

Finally, Respondents' health care system is grossly inadequate. Aside from the deliberate indifference reflected in Respondents' purposeful efforts to avoid testing for and diagnosing COVID-19 infection in prisoners presenting with symptoms of the disease, non-virus medical needs are being completely neglected: regular physicians are absent, prisoners who do not present with fever during sick call are not being referred for physician follow-up and sick call requests for other than virus symptoms – however serious or urgent – go unanswered for prolonged periods of time. Moreover, the prison pharmacy has been closed and medically vulnerable prisoners are being subject to extreme delays and disruption of their medication regimens.

Petitioners and the Class and Subclass members remain incarcerated at FCI Danbury while a pandemic sweeps through it like wildfire and every lull is followed by a new eruption. The unconstitutionally dangerous conditions at FCI Danbury will inevitably lead to the illness—and death—of prisoners and corrections officers alike. The Eighth Amendment bars this imminent, deadly exposure to COVID-19 and petitioners are therefore highly likely to succeed on the merits of their claims.

### B.    This Action is Properly Brought Pursuant to Section 2241.

Section 2241(c)(3) authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the United States." The Second Circuit has "long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as . . . prison conditions." *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (internal quotation marks omitted). This includes challenges to detention where conditions pose a threat to Petitioners' medical wellbeing. *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (approving the use of § 2241 to challenge a prisoner's transfer where that transfer created a risk of fatal heart failure).

The Second Circuit's decision in *Roba* is instructive. In that case, Petitioner alleged that an imminent transfer from New York to face charges in California would create a substantial risk of

death because of his precarious heart condition. The Second Circuit held that there was Section 2241 jurisdiction to challenge his contemplated transfer, where such custody would threaten his life, *citing Estelle v. Gamble*, the Supreme Court's seminal case establishing the Eighth Amendment's deliberate indifference standard. 604 F.2d at 218–19. Critically, the court held that habeas jurisdiction was appropriate even though the transfer, and hence custody, was imminent: "Petitioner need not wait until the marshals physically lay hands on him; he is entitled now to challenge the allegedly unlawful conditions of his imminent custody." *Id*. at 219.

In addition, Petitioners are excused from § 2241's prudential exhaustion requirements. An exhaustion requirement does not apply where the petitioner is likely to suffer an irreparable injury without immediate judicial relief or where the administrative remedy would be futile. *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), as amended (July 24, 2003); *see also   United States v. Basciano*, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2005) (excusing exhaustion in considering a § 2241 petition brought by a prisoner held in SHU, noting that "the court may excuse exhaustion if it appears that an administrative appeal would be futile, or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant"). Here, both exceptions are met. The BOP's Administrative Remedy Program is a lengthy process that would not provide the immediate relief necessary to avoid irreparable injury and does not provide for all measures of relief sought by Petitioners on behalf of themselves and other proposed Class members. Moreover, staff at FCI Danbury have informed prisoners that, due to the state of emergency under which the facility is operating, staff are unavailable to review, investigate, and respond to grievances and the administrative remedy process is suspended. Cassidy Dec. ¶¶ 25, 43.

## IV.   The Equities and Public Interest Weigh in Favor of the Relief Petitioners Seek.

The equities and public interest factors, which "merge" when the government is the opposing party, *Coronel*, 2020 WL 1487274, at *7 (citing *Planned Parenthood of New York City v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)), favor injunctive relief here.

First, "the public interest is best served by ensuring the constitutional rights of persons

within the United States are upheld." *Coronel*, 2020 WL 1487274, at *7 (quoting *Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. 2018)); *see also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018). This is especially true in this case, where the constitutional rights at stake go to the very physical well-being of the aggrieved individuals.

Second, ensuring public health and safety is also in the public's interest. Courts have recognized the overwhelming "public interest" in releasing vulnerable individuals "in light of the rapidly-evolving public health crisis engendered by the spread of COVID-19." *Coronel*, 2020 WL 1487274, at *8; *see Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest").  Moreover, the relief requested here would also protect FCI Danbury staff members, as well as the community at large— as staff members who come into contact with COVID-19-positive inmates may spread the disease to their families and communities.[35] Sick prisoners or staff members will frequently need to be transported to local hospitals, which are already overwhelmed. Any action to ease the burden on hospitals and healthcare systems – or, at a minimum, to prevent making the situation worse – is undeniably in the public interest.

## V.     This Court Has the Power to Grant a Preliminary Injunction and Issue a Provisional Order of Enlargement of Custody While this Habeas Action is Pending.

In light of the emergency nature of Petitioners' circumstances and the issues raised by their petition, they request that the Court act immediately to safeguard their wellbeing and the wellbeing of the other prisoners at FCI Danbury and enter an Order enlarging their custody to place them and other medically vulnerable members of the Subclass on home confinement during the pendency of this habeas action.

Provisional relief is required here in order to preserve Petitioners' current state of health and wellbeing and to make the remedy of release effective if they prevail in this action. Petitioners have demonstrated "extraordinary circumstances" and presented "substantial claims" supporting

---

[35] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, THE APPEAL (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

enlargement relief in light of the rampant spread of COVID-19 at FCI Danbury, the particular threat to their health, and Respondents' failure to ensure necessary social distancing, effective testing and quarantine procedures, and adequate sanitation. Enlargement is, thus, both appropriate and necessary here.

A.    The Enlargement Power of the Federal District Courts

Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is not release. Rather, it is a provisional remedy that modifies custody by expanding the site at which it takes place. That is, the petitioner remains in custody, but the place of custody is changed, or "enlarged," upon order of the court, from a particular prison to a hospital, halfway house, a person's home, or another setting. *See* Ex. B, Declaration of Professor Judith Resnik Regarding Enlargement and the Use of Provisional Remedies for Detained Individuals ("Resnik Dec.") ¶¶ 28-29; *see also Wilson v. Williams*, No. 20-cv-00794, 2020 WL 1940882, *4 (N.D. Ohio, April 22, 2020) (describing the authority of the district court to grant enlargement pending a ruling on the merits of a habeas petition, noting that "[w]hen a court exercises its power to 'enlarge' the custody of a defendant pending the outcome of a habeas action, the BOP maintains custody over the defendant, but the place of custody is altered by the court").

Enlargement is part and parcel of Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." *See* 28 U.S.C. § 2243.

Judges in this District have long recognized and utilized enlargement as a provisional remedy in habeas actions. *See* Resnik Dec. ¶¶ 32-34 (describing Judge T.F Gilroy Daly's use of enlargement in the 1970s); *see also Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (describing the authority of district courts to release habeas petitioners pending a ruling on the merits, using the term "bail" instead of "enlargement"); *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978); *Gaymon v. Whidden*, No. 3:11-cv-805, 2011 WL 2078632 (D. Conn. 2011) (recognizing the existence of such power with respect to a petitioner seeking relief under 28 U.S.C. § 2254); *Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988) ("A federal court has the inherent power

36

to release a state prisoner on bail pending resolution of his habeas petition.").[36]

Enlargement is appropriate when, as here, a court must work through novel and complex legal issues in the context of an urgent crisis. Enlargement provides the court a provisional mechanism by which to increase the safety of the Petitioners, fellow prisoners, and correctional staff during the course of the legal proceedings and thus ensure that eventual habeas relief is effective and meaningful. *See* Resnik Dec. ¶ 9.

### B.    Legal Standard for Enlargement

An order of enlargement pending the merits of a habeas decision is appropriate if a petitioner demonstrates "extraordinary circumstances" and that the underlying claim raises "substantial claims." *See Mapp*, 241 F.3d at 226 (concluding that to obtain an order for release pending the merits of habeas decision, the petitioner must demonstrate "extraordinary circumstances" and that the underlying claim raises "substantial claims").

In *Wilson v. Williams*, No. 20-cv-00794, 2020 WL 1940882, *4 (N.D. Ohio, April 22, 2020), the court considered an emergency habeas action brought by prisoners related to the spread of COVID-19 at Elkton Federal Correctional Institution. The petitioners sued on behalf of themselves and a class of all current and future Elkton prisoners, as well as a subclass of medically vulnerable prisoners. They sought immediate relief for the subclass, pending resolution of the action, in the form of discharge from the physical confines of the Elkron prison.

In considering the request, the court observed that district courts have authority "to grant enlargement to a defendant pending a ruling on the merits of that defendant's habeas petition," and concluded that "the exceptional circumstances at Elkton and the Petitioners' substantial claims, that are likely to succeed at the merits stage, necessitate the exercise of that authority and that such relief is proper for members of the subclass defined infra." The court defined the subclass as those

---

[36] Federal Rule of Appellate Procedure 23 provides in part that while a decision to release or not release a prisoner is under review, the prisoner may be "(1) detained in the custody from which release is sought; (2) detained in other appropriate custody; or (3) released on personal recognizance, with or without surety." Thus, the appellate rule uses language familiar in the context of bail, while also authorizing the prisoner to be detained in "other appropriate custody." *See* Resnik Dec. ¶ 35.

people "identified by the CDC as being at higher risk" from COVID-19. Because of the class action nature of the habeas proceeding, the Court was "unable to determine the specific type of enlargement most suitable for each subclass member." Thus, the court granted "a preliminary injunction, in aid of its authority to grant enlargements, ordering Respondents to determine the appropriate means of transferring medically vulnerable subclass members out of Elkton." Finding that the standard for a preliminary injunction was met, the court entered an order as follows:

> The Court orders the Respondents to identify, within one (1) day all members of the subclass as defined in this Order. Respondents must identify in the list each subclass member's sentencing court and the case number of their underlying criminal conviction.
>
> Following identification, the Court orders Respondents to evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two (2) weeks.
>
> In undertaking this evaluation, Respondents will prioritize the review by the medical threat level. For example, older inmates with heart, pulmonary, diabetes or immunity risks should receive review priority over subclass members who are younger.
>
> Subclass members who are ineligible for compassionate release, home release, or parole or community supervision must be transferred to another BOP facility where appropriate measures, such as testing and single-cell placement, or social distancing, may be accomplished. In transferring subclass members, Respondents must continue to comply with BOP policy of quarantining inmates for 14 days prior to transfer out of Elkton.
>
> Any subclass members transferred out of Elkton may not be returned to the facility until the threat of the virus is abated or until a vaccine is available and Elkton obtains sufficient vaccine supplies to vaccinate its population, whichever occurs first. (*Id.* at *10-11).

Numerous federal district courts have already determined that enlargement (or relief styled as "bail") is an appropriate provisional remedy in the context of a habeas petition related to the spread of COVID-19 in detention facilities, citing the "exceptional circumstances" at the facility and the petitioners' likelihood of success on the merits of their claims. *See, e.g.*, *Wilson*, 2020 WL 1940882, at *4; *Coronel*, 2020 WL 1487274, at *9 (noting that "[s]evere health issues have been

the prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas" and "[i]n order to secure a meaningful bond hearing and therefore preserve the effectiveness of the remedy sought on habeas, Petitioners must be released until they receive their bond hearings"); *Avendano Hernandez v. Decker*, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020) ("continued risk of exposure to COVID-19" constituting "extraordinary circumstances"); *Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1953827, at *13 (S.D.N.Y. Apr. 23, 2020) (granting release where claims of deliberate indifference to serious medical needs and risk from COVID-19 are "plainly substantial" and "[d]etention of Petitioners pending final adjudication of this action could cause severe illness or death—precisely the harm their petition seeks to avert"); *Barbecho v. Decker*, No. 20-CV-2821 (AJN), 2020 WL 1876328, *8 (S.D.N.Y. Apr. 15, 2020) (noting that "[s]evere health issues have been the prototypical but rare case of extraordinary circumstances" and that, were petitioners to remain in detention, they would face significant risk of contracting COVID-19); *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 1703844, *8-9 (D. Mass. Apr. 8, 2020) (bail for detainees in habeas class, citing the "exceptional circumstances of this nightmarish pandemic"); *United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1695417, *3 (S.D.N.Y. Apr. 7, 2020) (ordering release on bail pending determination of § 2255 motion alleging counsel was ineffective in not requesting delay of self-surrender date in the midst of COVID-19 pandemic).

## CONCLUSION

Enlargement is an appropriate and necessary form of provisional relief here in light of the exceptional circumstances, Petitioners' substantial claims, and the urgent risk that COVID-19 poses to health and life of all persons incarcerated at FCI Danbury without immediate implementation of appropriate social distancing measures.

The country faces a public health crisis of epic proportions. COVID-19 presents risks to all of us, and has forced us to come together to make tough decisions that are necessary to reduce the number of fatalities caused by the virus. We must allow everyone to engage in practices that flatten the curve, including social distancing and rigorous hygiene—particularly for those among

39

us who are most vulnerable. Both the United States Department of Justice and the federal Bureau of Prisons have acknowledged the obligation to de-densify federal correctional institutions— including FCI Danbury in particular—by transferring the most medically vulnerable prisoners to home confinement in order to protect not just the health and welfare of these more medically vulnerable individuals but the health and welfare of the entire prison population and the staff.

But Respondents have not acted on their admitted obligations. They have left highly vulnerable prisoners to languish in a highly contagious environment and wait for this disease to rip through their prison, leaving severe illness and death in its wake. The Constitution demands better. This Court should grant Petitioners' Motions for Temporary Restraining Order and for Preliminary Injunction, preliminarily certify the proposed medically vulnerable Subclasses, and issue provisional remedies, including enlargement, in aid of its habeas jurisdiction, ordering Respondents to:

     (1) enlarge to home confinement all women currently housed in the camp;

     (2) enlarge to home confinement all members of the medically vulnerable Subclass; and

     (3) implement appropriate measures to maximize social distancing and improve hygiene for the prisoners who remain at FCI Danbury for the duration of the COVID-19 pandemic.

Dated April 30, 2020                    Respectfully Submitted,


/s/  David S. Golub
David S. Golub, ct00145
Jonathan M. Levine, ct 07584
Silver Golub & Teitell LLP
184 Atlantic Street
Stamford, CT 06901
Telephone: (203) 325-4491
Email: dgolub@sgtlaw.com
jlevine@sgtlaw.com

Sarah French Russell, ct26604
Tessa Bialek ct30582
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
Telephone: (203) 582-5258
Email: sarah.russell@quinnipiac.edu
tessa.bialek@quinnpiac.edu

Marisol Orihuela, ct30543
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520
Telephone: (203) 432-4800
Email: marisol.orihuela@ylsclinics.org

Alexandra Harrington*
127 Wall Street
New Haven, CT 06511
Telephone: 203-436-3532
alexandra.harrington@yale.edu

*Counsel for the Petitioners Dianthe Martinez-Brooks, Rejeanne Collier, Jackie Madore, and Kenneth Cassidy*

*Application for Admission Pending

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on April 30, 2020, a copy of the foregoing Memorandum of Law in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.  A copy of this Motion has also been served electronically this day on John B. Hughes and Michelle McConaghy of the Office of the United States Attorney for the District of Connecticut.

*/s/ David S. Golub*
DAVID S. GOLUB