## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIANTHE MARTINEZ-BROOKS, | : | |
| REJEANNE COLLIER, | : | |
| JACKIE MADORE; and | : | |
| KENNETH CASSIDY, Individually, | : | |
| and on Behalf of All Others Similarly Situated, | : | |
| Petitioners, | : | |
| | : | |
| v. | : | C.A. No.:  3:20cv569 (MPS) |
| | : | |
| | : | |
| D. EASTER, Warden of Federal Correctional | : | |
| Institution at Danbury, and MICHAEL | : | |
| CARVAJAL, Director of the Federal Bureau | : | |
| of Prisons, in Their Official Capacities, | : | |
| Respondents. | : | May 5, 2020 |

### MEMORANDUM OF LAW IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS THE PETITION FOR WRIT OF HABEAS CORPUS AND OPPOSITION TO PETITIONERS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

JOHN H. DURHAM
United States Attorney
*Counsel for Respondents*
157 Church Street, 25th Floor
New Haven, CT 06510

John B. Hughes
Michelle L. McConaghy
David C. Nelson
Jillian R. Orticelli
Nathaniel M. Putnam
Assistant United States Attorneys

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL BACKGROUND ..................................................................................... 3

        A.      The Covid-19 Pandemic and the BOP's Response .................................... 3

        B.      Steps Being Taken at FCI Danbury to Prevent COVID-19 ...................... 7

                1.   Isolation and Quarantine procedures .............................................. 7

                2.   Hygiene and Safety Practices at FCI Danbury ............................... 11

                3.   The Availability of Soap and Other Personal Hygiene Products .... 13

                4.   Status of Personal Protective Equipment ....................................... 14

                5.   Staffing ............................................................................................ 15

                6.   Testing ............................................................................................. 17

                7.   Medical Services at FCI Danbury .................................................. 18

III.    COMPASSIONATE RELEASE AND HOME CONFINEMENT ................................ 20

        A.      Compassionate Release ............................................................................ 20

        B.      Home Confinement ................................................................................... 21

IV.     THE PETITION AND ALLEGED FACTS .............................................................. 26

        A.      Petitioner Kenneth Cassidy ...................................................................... 26

        B.      Petitioner Dianthe Martinez-Brooks ....................................................... 27

        C.      Petitioner Rejeanne Collier ...................................................................... 28

        D.      Petitioner Jackie Madore ......................................................................... 29

        E.      Petitioners' Requested Relief .................................................................. 29

V.      STANDARDS OF REVIEW ................................................................................... 30

        A.      Federal Rules of Civil Procedure Rule 12(b)(1) ..................................... 30

B.      Federal Rules of Civil Procedure Rule 12(b)(6) .................................. 31

VI.    ARGUMENT ......................................................................................... 31

A.      The Court Lacks Subject Matter Jurisdiction to Hear Petitioners' Claims as Petitioners have Failed to Exhaust Administrative Remedies ............ 31

B.      This Court Lacks Authority to Divest the BOP and Sentencing Courts of Their Jurisdiction to Place Inmates in Home Confinement or The Sentencing Judge's Authority to Amend a Term of Imprisonment ...................... 32

1. *Res Judicata* Bars Petitioners' Immediate Release .......................... 43

2. Section 3626 Precludes the Remedy Requested By Petitioners ..................... 44

C.      Petitioners Have Failed to Exhaust Administrative Remedies for All Remaining Remedies Sought in Their Petition ...................................... 47

D.      This Court Lacks Jurisdiction to Appoint a Special Master to Essentially Sit as an Article III Judge .................................. 54

VII.   EVEN IF THE COURT HAD JURISDICTION, PETITIONERS' CLAIMS ARE SUBJECT TO DISMISSAL ............................................................. 57

A.      Applicable "Deliberate Indifference" Standard .................................. 57

B.      Petitioners are not Subject to an Unreasonable Risk of Harm at FCI Danbury ............................................................................................. 60

C.      BOP has not Shown Deliberate Indifference and has Taken Appropriate Measures to Protect the Health of Inmates at FCI Danbury and the Public .................................................................................................. 63

VIII.  THE PETITIONERS' CONCLUSORY PUTATIVE CLASS ACTION ALLEGATIONS MUST BE STRICKEN .......................................................... 68

IX.    CONCLUSION.................................................................................... 74

## TABLE OF AUTHORITIES

**Cases**

*Acosta v. U.S. Marshals Serv.*, 445 F.3d 509 (1st Cir. 2006) ........................................ 49

*Ancona v. Lantz*, No. 3:05-CV-363 (MRK), 2005 WL 839655 (D. Conn. Apr. 8, 2005) ........... 42

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) ........................................................... 31

*Barber v. Perdue*, No. 9:11–CV–0127 (NAM/DEP), 2012 WL 5996342 (N.D.N.Y. Nov. 9, 2012) ............................................................................................................................. 48

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 31

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................................ 57

*Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999) ............................................. 45, 54

*Board of Governors of the Fed. Reserve System v. Pharaon*, 140 F.R.D. 642 (S.D.N.Y. 1991) . 55

*Brady v. Warden et al.*, No. 3:20-CV-510 (MPS) (D. Conn. Apr. 20, 2020) .............................. 38

*Bragdon v. Abbot*, 524 U.S. 624 (1998) ....................................................................... 66

*Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150 (2d Cir. 2017) ............................. 43

*Brown v. Felsen*, 442 U.S. 127 (1979) .......................................................................... 43

*Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) ........................................................ 72

*Brown v. Plata*, 563 U.S. 493 (2011) ...................................................................... 45, 46

*Cameron v. Tomes*, 990 F.2d 14 (1st Cir. 1993) ........................................................... 64

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ........................... 73

*Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629 (2d Cir. 2001) ............................ 31, 48

*Celotex v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 31

*Charette v. Town of Oyster Bay*, 159 F.3d 749 (2d Cir. 1998) ......................................... 1

*Charles v. Orange County*, 925 F.3d 73 (2d Cir. 2019) ............................................. 63, 67

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) ......................... 31

*Cook v. Hanberry*, 596 F.2d 658 (5th Cir. 1979) ........................................................ 34

*Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556 (1st Cir. 1988) ........................... 59

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l*, 790 F.3d 411 (2d Cir. 2015) .......... 30

*Crawford v. Bell*, 599 F.2d 890 (9th Cir. 1979) ................................................................ 34

*Dawson v. Asher*, No. C20-0409 (JRL-MAT), 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020) .. 64

*Dillon v. United States*, 560 U.S. 817 (2010) ................................................................ 32

*Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78 (2d Cir. 2013) ...................................... 30

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................................. 60, 61, 66

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................... passim

*Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394 (1981) ........................................ 42

*Ferranti v. Moran*, 618 F.2d 888 (1st Cir. 1980) .................................................... 66

*Freeman v. Sikorsky Aircraft Corp.*, 151 F. App'x. 91 (2d Cir. 2005) ......................... 42

*Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000) .............................................. 44, 45

*Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005) ............................................... 34

*Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990) .......................................... 34

*Gonzalez v. Perrill*, 919 F.2d 1 (2d Cir. 1990) .................................................... 51

*Grant v. Terrell*, No. 10-CV-2769 (MKB), 2014 WL 2440486 (E.D.N.Y. May 29, 2014) ......... 33

*Harvin v. Chapdelaine*, No. 3:16-CV-1616 (VAB), 2016 WL 7197363 (D. Conn. Dec. 9, 2016) ................................................................................................ 50

*Hathaway v. Coughlin*, 99 F.3d 550 (2d Cir. 1996) ............................................... 58, 59

*Helling v. McKinney*, 509 U.S. 25 (1993) ............................................................ 60, 63

*Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016) .......................................... 66

*Hill v. Curcione*, 657 F.3d 116 (2d Cir. 2011) ..................................................... 65

*Hines v. Youssef*, No. 1:13-CV-00357 (AWI-JL), 2015 WL 164215 (E.D. Cal. Jan. 13, 2015) .. 62

*Holleman v. Zatecky*, 951 F.3d 873 (7th Cir. 2020) ............................................. 55

*Idan Comput., Ltd. v. Intelepix, LLC*, No. CV-09-4849 (SJF)(ARL), 2010 WL 3516167 (E.D.N.Y. Aug. 27, 2010) ........................................................................... 55

*In re Bituminous Coal Operators' Ass'n*, 949 F.2d 1165 (D.C. Cir. 1991) ..................... 55

*In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90 (E.D.N.Y. 2012) .................................................. 70

*Ingraham v. Wright*, 430 U.S. 651 (1977) ................................................................................ 57

*Inmates of Occoquan v. Barry*, 844 F.2d 828 (D.C. Cir. 1988)................................................. 45

*Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 645 (1st Cir. 1997)..................................... 44

*Jacobson v. Comm. of Massachusetts*, 197 U.S. 11 (1905) ........................................................ 66

*John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443 (5th Cir. 2007) .......................................... 70

*Johnson v. Connecticut Dept. of Admin. Serv.*, No. 3:11-CV-1106 (VLB), 2012 WL 414996 (D. Conn. Feb. 9, 2012) ...................................................................................................... 74

*Jones v. Bock*, 549 U.S. 199, 211 (2007)................................................................................ 51

*Jones v. Smith*, 720 F.3d 142, 145 n.3 (2d Cir. 2013)..................................................... 41, 47, 74

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) ............................................................ 59, 65, 66

*Lia v. Saporito*, 909 F. Supp. 2d 149 (E.D.N.Y. 2012) ........................................................... 31

*Livas v. Myers*, No. 20-CV-422 (TAD)(KK), 2020 WL 1939583 (W.D. La. Apr. 22, 2020) .......................................................................................................................... 36, 37, 54

*Macias v. Zenk*, 495 F.3d 37 (2d. Cir. 2007) ......................................................................... 49

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ............................................................ 39, 40, 41, 42

*Marlowe v. LeBlanc*, - Fed. Appx. -, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) ..................... 37

*Mays v. Dart*, - F. Supp. 3d -, 2010 WL 1812381 (N.D. Ill. Apr. 9, 2020 ........................... 62, 74

*Medina-Rivera v. Terrell,* No. 11-CV-0734 (BMC), 2011 WL 3163199  (E.D.N.Y. July 26, 2011) .................................................................................................................................. 33

*Mell v. United States,* No. 3:20-CV-2277 (BRM), 2020 WL 1852384 (D.N.J. Apr. 13, 2020)... 60

*Money v. Pritzker*, Nos. 20-CV-2093 & 20-CV-2094, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020) ................................................................................................ 46, 64, 71, 72, 74, 75

*Moscato v. Federal Bureau of Prisons*, 98 F.3d 757 (3d Cir. 1996) ........................................... 51

*Muhammad v. City of New York Dept. of Corrections*, 126 F.3d 119 (2d Cir. 1997) ........... 4, 5, 6

*Neal v. Goord*, 267 F.3d 116 (2d Cir. 2001 ......................................................................... 50

*Nellson v. Barnhart*, 2020 WL 1890670 (D. Colo. Apr. 16, 2020) ...................................... 37, 50

*Nelson v. Campbell*, 541 U.S. 637 (2004) ............................................................ 23, 25

*Ostrer v. United States*, 584 F.2d 594 (2d Cir. 1978) ............................................ 39, 40

*Pagan v. Abbott Labs.*, 287 F.R.D. 139 (E.D.N.Y. 2012) ........................................ 72

*Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803 (10th Cir. 1999) ............................ 65, 66

*Porter v. Nussle*, 534 U.S. 516 (2002) .................................................................. 50, 51

*Pozo v. McCaughtry*, 286 F.3d 1022 (7th Cir. 2002) ............................................ 49

*Procunier v. Martinez*, 416 U.S. 396 (1974) ........................................................ 54

*Rado v. Meachum,* 699 F. Supp. 25 (D. Conn. 1988) ............................................ 41, 42

*Rhodes v. Chapman*, 452 U.S. 337 (1981) ............................................................ 58, 60

*Robinson v. Purcell Constr. Corp.*, 647 F. App'x 29 (2d Cir. 2016) ...................... 43

*Rogers v. United States*, 180 F.3d 349 (1st Cir. 1999) .......................................... 51

*Rosario v. Brown*, 670 F.3d 816 (7th Cir. 2012) .................................................. 65

*Ross v. Blake*, 136 S. Ct. 1850 (2016) .................................................................. 50, 51, 53

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) .............................................. 58, 59

*Sayyah v. Farquharson*, 382 F.3d 20 (1st Cir. 2004) ............................................ 51

*Scaggs v. New York State Dep't of Educ.*, No. 06-CV-0799 (RRM)(WDW), 2009 WL 890587 (E.D.N.Y. Mar. 31, 2009) .................................................................................. 70

*Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273 (1987) .............................. 67

*Scott v. Benson*, 742 F.3d 335 (8th Cir. 2014) .................................................... 65

*Serfass v. Warden*, No. 3:20-CV-513 (MPS) (D. Conn. Apr. 20, 2020) ................ 38

*Serra v. Terrell,* No. 10-CV-03044 (DLI), 2013 WL 5522850 (E.D.N.Y. Sept. 30, 2013) ......... 33

*Shepherd v. Lempke*, 2017 WL 1187859 (N.D.N.Y. March 30, 2017) .................. 50

*Skakel v. Murphy*, No. 3:07-CV-1625(PCD), 2009 WL 2253175 (D. Conn. July 27, 2009) ....... 42

*Staffer v. Bouchard Transp. Co., Inc.,* 878 F.2d 638 (2d Cir. 1989) .................... 42

*Stauble v. Warrob, Inc.*, 977 F.2d 690 (1st Cir. 1992) .......................................... 55, 56

*Stepney v. Lopes*, 597 F. Supp. 11 (D. Conn. 1984) ............................................ 40

*Stimpson v. Comm'r Correction Office*, No. 3:16-CV-520 (SRU), 2017 WL 326314 (D. Conn. Jan. 23, 2017)................................................................................................. 50

*Strong v. Lappin*, 2010 WL 276206 (E.D.N.Y. Jan. 15, 2010) ................................................ 49

*Sufasso v. Wilson*, No. 3:20-CV-513 (MPS) (D. Conn. Apr. 20, 2020) ...................................... 31

*Teague v. Lane*, 489 U.S. 288 (1989) ...................................................................................... 32

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ............................................................................ 54

*Turner v. Safley*, 482 U.S. 78 (1987) ................................................................................ 54, 55

*United States. ex rel. Schonbrun v. Commanding Officer, Armed Forces*, 403 F.2d 371 (2d Cir. 1968) ............................................................................................................................... 40

*United States ex rel. Sero v. Preiser*, 506 F.2d 1115 (2d Cir. 1974) ...................................... 68, 69

*United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789 (E.D.N.Y. 1963)............................... 66

*United States v. Addonizio*, 442 U.S. 178 (1979) ...................................................................... 32

*United States v. Almontes*, No. 3:05-CR-58 (SRU), 2020 WL 1812713 (D. Conn. Apr. 9, 2020) ............................................................................................................................... 37

*United States v. Amato*, No. 19 Cr. 442 (ILG) (E.D.N.Y. Mar. 27, 2020) .................................. 67

*United States v. Carpenter et al.*, No. 3:13-CR-226 (RNC) (D. Conn. Apr. 10, 2020)............... 39

*United States v. Carpenter*, No. 19-70, 2020 WL 1909098 (2d Cir. Mar. 25, 2020) .................. 67

*United States v. Cassidy*, No. 1:17-CR-00116-WMS-MJR (W.D.N.Y. Apr. 24, 2020) ............. 21

*United States v. Coston*, No. 3:16-CR-127 (SRU), Doc. 98 (D. Conn. Apr. 16, 2020) .............. 39

*United States v. Credidio*, 2020 WL 1644010 (S.D.N.Y. Apr. 2, 2020) ...................................... 31

*United States v. Crispin*, No. 3:19-CR-171 (VLB) (D. Conn. Apr. 21, 2020) ............................ 38

*United States v. Desage*, No. 2:13-CR-00039 (JAD-VCF), 2020 WL 1904584 (D. Nev. Apr. 17, 2020)................................................................................................................... 65

*United States v. Deutsch*, No. 18 Cr. 00502, 2020 WL 1694358 (E.D.N.Y. Apr. 7, 2020) ........ 67

*United States v. Filyaw et al.*, No. 3:18-CR-81 (SRU) (D. Conn. Apr. 6, 2020) ........................ 39

*United States v. Flanagan*, 868 F.2d 1544 (11th Cir. 1989)...................................................... 51

*United States v. Gagne*, No. 3:18-CR-242 (VLB), 2020 WL 1640152 (D. Conn. Apr. 2, 2020) 37

*United States v. Gileno*, No. 3:19-CR-161, 2020 WL 1307108 (D. Conn. Mar. 19, 2020) ......... 61

*United States v. Gilliam*, No. 3:15-CR-63 (JCH) (D. Conn. Apr. 27, 2020) ................................ 38

*United States v. Gotti*, No. 02-CR-743-07 (CM), 2020 WL 497987 (S.D.N.Y. Jan. 15, 2020) ................................................................................................................................... 33, 34, 36

*United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020) .... 61

*United States v. Hill*, No. 3:19-CR-38 (JAM) (D. Conn. Apr. 28, 2020) ..................................... 37

*United States v. Jefferson*, No. CCB 19-487, 2020 WL 1332011 (D. Md. Mar. 23, 2020) ......... 61

*United States v. Lipsky*, No. 19 Cr. 203 (NGG) (E.D.N.Y. Mar. 24, 2020) ................................. 67

*United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857 (D. Md. Mar. 17, 2020) ...... 61

*United States v. Passley,* 2020 WL 1815834 (E.D.N.Y. Apr. 9, 2020).................................. 61, 67

*United States v. Rabadi*, No. 13-CR-353, 2020 WL 1862640 (S.D.N.Y. Apr. 14, 2020)........... 27

*United States v. Rosado et al.*, No. 3:06-CR-18 (AVC) (D. Conn. Apr. 24, 2020).................... 38

*United States v. Rubiera-Herrera et al.*, No. 3:19-CR-123 (JAM) (D. Conn. Apr. 22, 2020)..... 38

*United States v. Sakelarakis*, No. 3:18-CR-248 (JCH) (D. Conn. Apr. 22, 2020) ...................... 38

*United States v. Salvagno et al.*, No. 5:02-CR-51 (LEK) (D. Conn. Apr. 23, 2020)................... 38

*United States v. Smalling*, 644 Fed. App'x 3 (2d Cir. 2016) ....................................................... 31

*United States v. Villegas,* 2020 WL 1649520 (C.D. Cal. Apr. 3, 2020) ...................................... 64

*United States v. Washington*, 549 F.3d 905 (3d Cir. 2008) ......................................................... 34

*United States v. Rollins*, Nos. 19-CR-34S & 11-CR-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) ................................................................................................................................. 60

*Victor v. Milicevic*, 361 F. App'x 212 (2d Cir. 2010)................................................................ 65

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..................................................... 71, 72, 73

*Wasley Prod., Inc. v. Bulakites*, No. 3:03-CV-1790 (MRK)(WIG), 2006 WL 3834240 (D. Conn. May 31, 2006 .............................................................................................................................. 56

*Webb v. Goord*, 340 F.3d 105 (2d Cir. 2003) ............................................................................. 54

*Whitley v. Albers*, 475 U.S. 312 (1986) ................................................................................. 57, 58

*Wilson v. Seiter*, 501 U.S. 294 (1991) ........................................................ 57, 58, 59, 60

*Wilson v. Wells*, No. 3:17CV40 (AWT), 2017 WL 6667515 (D. Conn. Sept. 6, 2017) .............. 32

*Wilson v. Williams*, No. 20-CV-00794, 2020 WL 1940882 (N.D. Ohio April 22, 2020) ........... 41

*Woodford v. Ngo*, 548 U.S. 81 (2006) ........................................................ 49

*Wright v. Terrell,* No. 10-CV-3492 (PGS), 2011 WL 5117851 (D.N.J. Oct. 26, 2011) ............. 34

## Statutes

18 U.S.C. § 3252 ........................................................................................ 52

18 U.S.C. § 3582 .................................................................................. passim

18 U.S.C. § 3621 ........................................................................................ 35

18 U.S.C. § 3624 .......................................................................... 22, 23, 24, 35

18 U.S.C. § 3626 .................................................................................. passim

28 U.S.C. § 2241 .................................................................................. passim

34 U.S.C. § 60541 .......................................................................... 22, 23, 35

Pub. L. No. 116-136, § 12003(b)(2) (2020) .......................................................... 24, 35

## Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................... i, 1, 30, 75

Fed. R. Civ. P. 12(b)(6) ..................................................................... ii, 1, 30, 57

Fed. R. Civ. P. 23 .................................................................................. passim

Fed. R. Civ. P. 53 .................................................................................. 53, 56

Fed. R. Civ. P. 56 .................................................................................. 1, 31

Fed. R. Civ. P. 63 ........................................................................................ 54

Fed. R. Evid. 706 ........................................................................................ 54

**<u>Regulations</u>**

28 C.F.R. § 542 ...................................................................................................... 48, 53

**<u>Constitutional Provisions</u>**

U.S. Const. amend. VIII ............................................................................ 57, 60, 66, 68

## I.   **PRELIMINARY STATEMENT**

Petitioners Dianthe Martinez-Brooks, Rejeanne Collier, Jackie Madore, and Kenneth Cassidy (collectively, "Petitioners"), and a putative class of potentially all inmates at the Federal Correctional Institution at Danbury in Danbury, Connecticut ("FCI Danbury"), request, pursuant to 28 U.S.C. § 2241, that this Court short-circuit the entire criminal justice process and direct the management of a prison by: (1) ordering, via a civil action, their immediate and unwarranted release from prison or placement in home confinement due to concerns related to the novel coronavirus ("COVID-19"); (2) declaring that FCI Danbury has committed an Eighth Amendment violation with respect to every single inmate at FCI Danbury; (3) implementing specific "safety" measures at FCI Danbury; and (4) appointing a Special Master "to make recommendations to the Court regarding the number of incarcerated people that FCI Danbury can house consistent with CDC Guidance on best social distancing and hygiene practices to prevent the spread of COVID-19," which essentially would result in a determination as to which convicted criminals (who have already been sentenced) may be released from prison—thereby divesting the judges of this Court and other courts of the authority to control their own criminal dockets.  Respondents respectfully submit this memorandum of law in support of their motion to dismiss this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Docket No. 1) and Petitioners' Motion for a Temporary Restraining Order and/or Preliminary Injunction[1] (Docket Nos. 13 and 14) pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), or, alternatively, for summary judgment pursuant to Fed. R. Civ.

---

[1] Petitioners' relief requested in their Motion for a Temporary Restraining Order and/or Preliminary Injunction is merely a subset of the relief requested in their Petition.  To obtain either a TRO or a PI, Petitioners would need to show either a likelihood of success on the merits or at least serious questions going to the merits.  *Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998).  As set forth herein, Petitioners' claims should be dismissed outright.  Thus, Petitioners cannot meet the standards for a TRO or PI and the Court should deny Petitioners' motion for such relief for the same reasons it should dismiss their Petition.

P. 56.  As demonstrated below, Petitioners' claims are subject to dismissal.

As a threshold matter, this Court does not have jurisdiction over Petitioners' claims. Although the Second Circuit has construed 28 U.S.C. § 2241 as permitting challenges to unconstitutional conditions of confinement, the relief Petitioners seek here—essentially the modification or reduction of their criminal sentences, as well as the criminal sentences of the entire population of inmates at FCI Danbury (which houses only sentenced offenders), or a subset thereof—has not been recognized as an available remedy to habeas petitioners challenging conditions of confinement in the Second Circuit.  Additionally, Petitioners have not alleged that they have properly exhausted administrative remedies as required by 28 U.S.C. § 2241.

The implications of such an extraordinary order would be staggering; under Petitioners' theory of appropriate habeas relief, a judge in a federal civil action would be permitted to commute the sentences of hundreds of post-conviction inmates.  Petitioners completely overlook 18 U.S.C. § 3626, which is the component of the Prison Litigation Reform Act ("PLRA") that establishes that courts are strictly limited in ordering the release of inmates "in any civil action in Federal court with respect to prison conditions" and that a single district judge is precluded from doing so. *See id.* § 3626(a)(3)(B).

Not only does the Petition suffer from these multiple legal defects that warrant dismissal, but it also presents a distorted picture of the efforts made at FCI Danbury to protect inmates from the threat to health and safety posed by COVID-19.  Petitioners make bold accusations based on hearsay from convicted offenders who sought, or are seeking, release from confinement, and from purported experts who have never been to FCI Danbury, or at least not recently.  To the contrary, as set out below, the Federal Bureau of Prisons ("BOP") has made significant efforts to respond to this novel infectious disease which, until approximately four months ago, most people had never

heard of and which expanded globally at an alarming and unprecedented rate.  These efforts belie any suggestion that the BOP, including FCI Danbury, is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates.  Instead, these efforts show that the BOP and FCI Danbury have taken the threat very seriously and have mitigated the spread of COVID-19.  Petitioners cannot establish any violation of their Eighth Amendment rights arising out of current conditions at FCI Danbury.

Lastly, this Court should strike the Petition's class action allegations.  Petitioners' request for a sweeping and indiscriminate order certifying a class of roughly 984 inmates—presumably every inmate at FCI Danbury—should be rejected.  Petitioners' request is fundamentally incompatible with class-wide relief, as the putative class is not ascertainable and has no commonality or typicality.  Indeed, the putative class would feature a hodgepodge of inmates, each of whom has his or her unique set of circumstances (including projected release dates, disciplinary histories, medical histories, bases for judicially imposed criminal sentences, and bases for judicial findings of dangerousness to the community and risk of flight) that would need to be considered by the judge presiding over their criminal proceeding, including any claim for bail or compassionate release.  Accordingly, the Court should dismiss the Petition in its entirety.

## II.    FACTUAL BACKGROUND

### A.    The Covid-19 Pandemic and the BOP's Response

Activated in 1940, FCI Danbury is a male low security level correctional institution ("Main Complex") with an adjacent female minimum security level federal prison camp ("Camp") and a female federal satellite low security level facility (FSL).  Declaration of Diane Easter, Warden of Federal Correctional Institution at Danbury ("Decl.") ¶ 3, attached hereto as Exhibit A.  FCI Danbury is an institution that houses only sentenced offenders.  *Id.* at ¶ 3.

The Main Complex is a low security facility with a double-fenced perimeter, mostly

dormitory or cubicle housing, and strong work and program components. *Id.* at ¶ 5. The staff-to-inmate ratio at the Main Complex is higher than in the minimum security facilities. *Id.* As of the date of the attached declaration, the Main Complex houses 719 male offenders. *Id.* The rated capacity of the Main Complex is 554. *Id.* The rated capacity is not a figure which represents the maximum number of inmates that can be designated to the respective sections FCI Danbury. *Id.*

The Camp is a minimum security institution which has dormitory housing, a relatively low staff-to-inmate ratio, and no perimeter fencing. *Id.* at ¶ 6. As of the date of the attached declaration, the Camp houses 134 female offenders. *Id.* The rated capacity of the Camp is 146. *Id.*

The FSL is a low security facility with a single-fenced perimeter, cubicle housing, and strong work and program components. *Id.* at ¶ 7. As of the date of the attached declaration, FSL houses 131 female offenders. *Id.* The rated capacity of FSL is 198. *Id.*

The main complex, the Camp, and the FSL are separate facilities, and, and under the current lockdown, the inmate populations do not interact. *Id.* at ¶ 5. There are currently 264 staff employed at the institution. *Id.* at ¶ 4.

In January 2020, the BOP became aware of the first identified COVID-19 cases in the United States and took steps to prevent its introduction and spread in BOP institutions, including FCI Danbury. *Id.* at ¶ 9. To date, the BOP's response to COVID-19 has occurred over six distinct "phases." *Id.* at ¶ 10.

In January 2020, the BOP began Phase One of its Action Plan for COVID-19. *Id.* at ¶ 11. Phase One activities included, among other things, seeking guidance from the BOP's Health Services Division and other stakeholders regarding the COVID-19 disease and its symptoms, where in the United States infections occurred, and the best practices to mitigate its transmission.

*Id.* In addition, an agency task force was established to begin strategic planning for COVID-19 Bureau-wide. *Id.* From January 2020 through the present, the Bureau has been coordinating its COVID-19 efforts with subject matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization ("WHO"), the Centers for Disease Control and Prevention ("CDC"), the Office of Personnel Management ("OPM"), the Department of Justice ("DOJ") and the Office of the Vice President. *Id.*

On March 13, 2020, the BOP implemented Phase Two of its Action Plan during which, for an initial period of 30 days, in order to reduce the spread of COVID-19 into or through FCI Danbury, the facility suspended, with certain limited exceptions: social visits; legal visits; inmate facility transfers; official staff travel; staff training; contractor access; volunteer visits; and tours. *Id.* at ¶ 12. During Phase Two, inmates were subjected to new screening requirements and newly arriving BOP inmates were screened for COVID-19 symptoms and "exposure risk factors," including, for example, if the inmate had traveled from or through any CDC-determined, high-risk COVID-19 locations, or had had close contact with anyone testing positive for COVID-19. *Id.* at ¶ 13. Asymptomatic inmates with exposure risk factors were quarantined, and symptomatic inmates with exposure risk factors were isolated and evaluated for possible COVID-19 testing by local BOP medical providers. *Id.* On March 25, 2020, FCI Danbury implemented advanced enhanced screening measures for staff and contractors. *Id.* at ¶ 14. These enhanced screening procedures required all staff and contractors to self-report any symptoms consistent with COVID-19, as well as any known or suspected COVID-19 exposure*,* and to have their temperature taken upon entry into any BOP facility. *Id.*

During Phase Two, the BOP implemented national "modified operations" in order to maximize social distancing within Bureau facilities. *Id.* at ¶ 15. These modifications included

staggering meal and recreation times to limit congregate gatherings.  *Id.*  The BOP also established

a set of quarantine and isolation procedures for known or potential cases of COVID-19.  *Id.*

On March 18, 2020, the BOP implemented Phase Three of the COVID-19 Action Plan to

maximize telework.  *Id.* at ¶ 16.  Additionally, as part of this phase, and in accordance with the

Pandemic Influenza contingency plan, all cleaning, sanitation, and medical supplies were

inventoried.  *Id.*  at ¶ 17.

On March 26, 2020, the BOP implemented Phase Four of the COVID-19 Action Plan and

revised its preventative measures for all institutions; the agency updated its quarantine and

isolation procedures to require all newly admitted inmates to be assessed using a screening tool

and temperature check.  *Id.* at ¶ 18.  Thus, all new arrivals to FCI Danbury—even those who were

asymptomatic—were placed in quarantine for a minimum of 14 days or until cleared by medical

staff.  *Id.*  Symptomatic inmates were placed in isolation until they tested negative for COVID-19,

or were cleared by medical staff as meeting CDC criteria for release from isolation.  *Id.*

FCI Danbury implemented Phase Five of the COVID-19 Action Plan on April 1, 2020.  *Id.*

at ¶ 19  Starting on that day, and for 14-days immediately thereafter: (i) all inmates were confined

to their living quarters for the majority of the day; (ii) meals, commissary items, laundry, recreation

materials, education materials, medical services and psychology services were delivered directly

to inmates' housing units; and (iii) inmates were released from their cells in small groups to engage

in activities such as showers, exercise, phone calls, and email access.  *Id.* at ¶¶ 19-20.  During these

time periods, inmates were directed to maintain appropriate physical distancing.  *Id.* at ¶ 20.

On April 13, 2020, the BOP ordered the implementation of Phase Six of its COVID-19

Action Plan.  *Id.* at ¶ 21.  In implementing Phase Six, FCI Danbury extended the measures enacted

in the nationwide actions in Phase Five, which includes continuing to perform rigorous medical

screening, limiting inmate gathering, daily rounds, limiting external movement, and fit testing, until May 18, 2020. *Id.*

FCI Danbury has taken a number of additional measures in response to the COVID-19 pandemic to prevent the introduction and spread of COVID-19 into its facility.

**B.     Steps Being Taken at FCI Danbury to Prevent COVID-19**

FCI Danbury has implemented the BOP's national action plan, in compliance with the BOP's national directives, and has also taken numerous other measures to fight the introduction and spread of COVID-19 within its facilities including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with the BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures. *Id.* at ¶ 22.

From the outset of the COVID-19 pandemic, FCI Danbury officials have provided updates to inmates and staff regarding the virus and the BOP's response, and have educated inmates and staff regarding measures that they should take to stay healthy. *Id.* at ¶¶ 20, 23-24, 51, 52.  The measures that FCI Danbury has taken to insure the health and safety of its staff and inmates includes, but is not limited to, the following:

**1.  Isolation and Quarantine procedures**

The implementation of the BOP's COVID-19 Action Plans at FCI Danbury can best be described as a "slowing down" of institutional operations, designed to limit the size of groups inmates can form and also the ability of these smaller groups to interact with each other at FCI Danbury. *Id.* at ¶ 23.  This minimizes the opportunity for inmates to come into contact with infected persons, and if they do, minimizes the possibility that any infection will spread beyond the smaller group. *Id.*

In general, smaller inmate groups were formed at FCI Danbury by dividing inmates by housing unit, and if applicable floor, so they can "shelter in place" with the fewest number of fellow inmates. *Id.* at ¶ 24. In order to reduce idle time and provide programs and activities, these groups are rotated through the recreation facility by themselves, and disinfection of the recreation facility is performed before the next group is rotated through it. *Id.* Programs are delivered on the units, including Education, Psychology, and Religious Services (especially in consideration of the Ramadan observance). *Id.* All meals are delivered to the units, with inmates receiving at least one hot meal per day. *Id.* Meal delivery to the units is performed by staff (instead of inmate food service workers) in order to maintain the integrity of the inmate group quarantine. *Id.* When inmates need to report to Health Services for activities that cannot be performed on the unit (medication administration, etc.), inmates only report to the clinic with other inmates from their group. *Id.* Once at the clinic they move throughout the space in accordance with markings on the floor to direct one-way travel, and wait in areas designed to facilitate social distancing. *Id.*

In addition, separate housing spaces have been established for "Isolation" (for inmates demonstrating symptoms) and "Quarantine" (asymptomatic) inmates. *Id.* at ¶ 25. These areas are distinct from the aforementioned housing unit groups and are identified with signs visible to anyone entering the unit. *Id.* Staff are required to utilize proper personal protective equipment ("PPE") prior to entering these units to minimize to potential for cross-contamination between units. *Id.*

Certain units have also been set up to quarantine inmates who, in light of guidance regarding eligibility for release to home confinement under the expanded consideration authority granted to the Attorney General under the CARES Act, may soon be released to the community. *Id.* at ¶ 26. In order to protect against the risk of transferring inmates to the community that will

contribute to the spread of COVID-19, any inmate granted home confinement is placed in a 14-day quarantine prior to discharge from the BOP facility. *Id.* These "home confinement quarantine" units are intended to minimize the amount of time an inmate might be required to stay in a pre-release quarantine should they become eligible for this benefit. *Id.*

The Camp was placed on modified operations on March 19, 2020. *Id.* at ¶ 27. This involved dividing the Camp into four separate dormitory groups, each of which moves throughout the facility so there is no opportunity to have contact with the other dormitory groups. *Id.* Each dormitory group has a designated shared bathroom and shower facility, eats in their assigned dormitory, and is allowed to use the recreation facilities only with inmates from their dormitory group. *Id.* Due to the fact there have been zero positive COVID-19 infections at the Camp, isolation and quarantine procedures have not been utilized at the Camp. *Id.* Nonetheless, space in the Unicor warehouse and at the Main Complex has been designated to perform these functions should the need to isolate or quarantine Camp inmates arise in the future. *Id.*

The FSL was placed into modified status on March 19, 2020. *Id.* at ¶ 28. Housing at the FSL is a large dormitory that is divided into sections, with inmates assigned to live in cubicles containing bunks. *Id.* There are two areas in the Main Complex that have communal showers and bathrooms. *Id.* at ¶ 7. There are tables in the front of the dormitory for watching television. *Id.* There is also an area in front of the dormitory that has exercise equipment, a law and leisure library, and offices. *Id.* Food services, psychology services, medical, education, and visiting is in a separate building. *Id.* Areas of the FSL not ordinarily used as housing have been repurposed in order to accommodate isolation and quarantine procedures. *Id.* at ¶ 28. Further, recent COVID-19 infections at the FSL have created a need to utilize the kitchen as a separate quarantine space. *Id.* The visiting room at the Main Complex has also been used as a quarantine space for at-risk

female inmates who were tested at the beginning of the emergency and are awaiting return to the FSL.  *Id.*  The number of temporary quarantine spaces needed should be reduced as the different groups of inmates complete their quarantine periods (each established by the date the quarantine began) and can be reintroduced to the main living space at the FSL dormitory.  *Id.*

The Main Complex was placed into modified operations on March 29, 2020.  *Id.* at ¶ 29. The Main Complex has seven units that are open dorm style, two television rooms, one area of TRULINCS stations and two rooms that can house ten to twelve inmates each.  *Id.* at ¶ 5.  The showers and bathrooms are communal.  *Id.*  Two of these units have two-man cells with a toilet and sink in the cell.  *Id.*  These cell units also have communal showers, an area for television, and an area for phones.  *Id.*  The Main Complex facility has standalone housing units for isolation, quarantine (such as for newly-committed inmates; these inmates do not go straight into the general population), and "home confinement quarantine."  *Id.* at ¶ 29.  Any Main Complex inmate who requires isolation is placed in a single-occupancy cell with a solid door that locks.  *Id.*  The auditorium has been set up for quarantine for home confinement inmates.  *Id.*  The FCI also has a unit dedicated to those who are released from isolation to continue to recover before they are returned to a general population unit.  *Id.*

Should the need arise, each facility retains the ability to create new isolation/quarantine space.  *Id.* at ¶ 30.  For example, the Main Complex has been able to repurpose auditorium space into a pre-release quarantine for inmates transferring to home confinement, and has preplanned turning the dormant Unicor (Federal Prison Industries) factory into temporary housing.  *Id.*  The Camp has already converted space in the Unicor warehouse into cubicle housing, and two temporary buildings on loan from the United States Penitentiary in Lewisburg (PA) have been raised should additional isolation/quarantine space be needed.  *Id.*  Finally, the FSL has been able

to repurpose classroom and activity space inside the facility into temporary living quarters in order to isolate/quarantine inmates.  *Id.*  Additional, temporary measures that have been taken include using the Main Complex visiting room as a quarantine facility for FSL inmates, and creating isolation cells inside the Main Complex for inmates from the FSL.  *Id.*

Any inmate at FCI Danbury presenting with symptoms consistent with COVID-19 is immediately evaluated by a medical provider to determine whether testing and/or isolation is appropriate, and whether other measures (such as quarantine) should be implemented for inmates with whom the symptomatic inmate has had contact.  *Id.* at ¶ 81.

### 2. Hygiene and Safety Practices at FCI Danbury

Maintaining institutional and personal hygiene is always a priority in a correctional setting. Since the COVID-19 pandemic however, institutional and personal hygiene has been elevated to the utmost importance, especially since inmates have been largely restricted to their housing units since implementing Phase Five of the COVID-19 Action Plan. *Id.* at ¶ 31.  Maintaining the highest standards of institutional and personal hygiene during modified operations is not only important for purposes of infection control, but also to minimize the possibility of disturbances or other events that might compromise the security and good order of the institution.  *Id.*

The Safety Department at FCI Danbury is responsible for distributing cleaning supplies throughout the institutions.  *Id.* at ¶ 32.  These include but are not limited to cleaning chemicals, spray bottles, cleaning rags and applicators, and the equipment necessary to perform cleaning tasks.  *Id.*  The chemicals used for cleaning at FCI Danbury are distributed to all areas of the institution on a regular schedule, and if any particular area requires additional cleaning supplies, staff assigned to that area can make arrangements with the Safety Department to receive more.  *Id.* The Warden does not believe that the Safety Department has ever run out of cleaning supplies since the COVID-19 crisis began at FCI Danbury.  *Id.*

Currently, four specific cleaners are being used at FCI Danbury. *Id.* at 33. TriBase Multi-Purpose Cleaner, hdqC2 disinfectant cleaner, and Airlift Tropical 13 air freshener have been the ordinarily employed cleaning chemicals at FCI Danbury. *Id.* Since the beginning of the COVID emergency however, a broad spectrum disinfectant, "Virex II/256" has been added to specifically address the coronavirus threat. *Id.* Virex II/256 is now used throughout the institution. *Id.*

Prior to this pandemic, chemicals used for cleaning at FCI Danbury were distributed throughout the institutions on a regular weekly and monthly schedule. *Id.* at ¶ 34. In between the regularly-scheduled distribution, staff were always able to request additional cleaning supplies if they were needed. *Id.* Since the current emergency, however, FCI Danbury has gone to a daily distribution of cleaning supplies. *Id.* at ¶ 35. On weekdays, an institution-wide announcement is made for staff to place their cleaning bottles outside the doors of their housing units, and the Safety Department staff refills or replaces needed supplies. *Id.* While prior to the pandemic inmate orderlies would report to the Safety Department to retrieve these supplies, in order to maintain the integrity to the group quarantine, staff now perform these functions. *Id.* Of course, if additional supplies are needed during the day, staff can coordinate the delivery of these items with the Safety Department. *Id.*

Once in the housing units, cleaning supplies are maintained in small caddies or bins kept in staff offices or closets. *Id.* at ¶ 36. Inmates can then ask for a bin of cleaning supplies to bring back to their living areas. *Id.* Large area disinfection is being performed at both the FSL and the Main Complex through use of backpack cleaning chemical sprayers. *Id.* at ¶ 37. This work is performed by inmate orderlies or staff, depending on the location (inmates cannot perform this work in an area where they might come into contact with inmates not in their quarantine group). *Id.* At this time, five more backpack sprayers are being routed to FCI Danbury from the BOP's

Command Center, and this will greatly expand the ability to perform this task.   *Id.*  Whether by backpack unit or spray bottles, inmate orderlies (working only within their unit, to maintain the integrity of the group quarantine) are cleaning all high-touch areas such as doorknobs, railings, knobs, and handles multiple times per day.  *Id.*

As a final measure intended to ensure all inmate living and activity areas are maintained in the cleanest possible condition, the Warden has made each member of her Executive Staff individually responsible for overseeing the condition of specific housing units.  *Id.* at 38.

### 3.   The Availability of Soap and Other Personal Hygiene Products

Inmates at FCI Danbury are provided with basic soap and personal hygiene products (razors, toothbrushes, toothpaste, etc.) by the institution.   *Id.* at ¶ 39.   These toiletries are maintained by staff whose offices are located in the housing units, so there is never a reason an inmate should not have access to soap at FCI Danbury.  *Id.*

FCI Danbury also operates a centralized laundry, and inmates in this facility have their clothes (institution issued items as well as personal articles purchased from commissary) washed for them by the laundry department.   *Id.* at ¶ 40.   Inmates at both the Camp and FSL are provided with no-cost washers/dryers/laundry soap which they can use to clean clothes and linens.  *Id.*

Beyond that, the commissary at FCI Danbury allows inmates to purchase toiletries, medication, food, and other items not issued regularly as part of the institution administration.  *Id.* at ¶ 41.  Similar to the offerings at any convenience store, the commissary at FCI Danbury offers a selection of up to 13 different soaps, to include Irish Spring, Dove, Pure Antibacterial, Noxema, and Neutrogena. Inmates can also buy Ajax dish detergent and laundry detergent from the commissary.  *Id.*  A complete list of items FCI Danbury inmates can buy is available on the BOP's public website and can be seen at   https://www.bop.gov/locations/institutions/dan/dan_comlist.pdf.  *Id.*

A review of commissary records show that all four Petitioners have had regular access to the commissary throughout this time and regularly purchase soap and other personal hygiene products. *Id.* at ¶ 42. Since the beginning of the year, Petitioner Martinez-Brooks has spent approximately $391.10 at the commissary, including the purchase of Pure Antibacterial soap on three occasions (last purchased Pure Antibacterial Soap on April 2, 2020). *Id.* at ¶ 43. Since the beginning of the year, Petitioner Cassidy has spent approximately $567.20 at the commissary, including the purchase of various brands of soap on five occasions (last purchased Irish Spring Icy Blast on April 1, 2020). *Id.* at ¶ 44. Since the beginning of the year, Petitioner Collier has spent approximately $921.90 at the commissary, including the purchase of various brands of soap on ten occasions (last purchased Dove Soap on April 27, 2020). *Id.* at ¶ 45. Since the beginning of the year, Petitioner Madore has spent approximately $1,187.65 at the commissary, including the purchase of bar soap (last purchased three bars of Pure Antibacterial soap on March 24, 2020). *Id.* at ¶ 46.

### 4. <u>Status of Personal Protective Equipment</u>

Staff and inmates at FCI Danbury have, and will continue to have, access to appropriate PPE. *Id.* at ¶ 47. Upon reporting to work each day, staff at FCI Danbury are provided with new surgical masks at the staff screening site to wear throughout their shift. *Id.* at ¶ 48. Staff are required to wear these masks, and failure to do so may be cause for employee discipline under terms of Program Statement 3420.11 Standards of Employee Conduct. *Id.*

There are areas of the institution where staff might require additional PPE to perform their duties. *Id.* at ¶ 49. These areas include but are not limited to Health Services, Receiving & Discharge, and isolation housing units. *Id.* In these areas, kits have been assembled which contain the enhanced PPE to be used in that area (for example, gown, gloves, N-95 particulate respirators, face shields), and these kits are always available. *Id.* When the number of kits gets low, staff

contacts Health Services and additional kits are provided.  *Id.*   In addition, kits are maintained in other areas of the institution (Control Center, Lieutenant's Office) to ensure availability during all hours of the day.  *Id.*

Throughout the institution and while working posts at the outside hospital, Correctional Officers are provided with PPE appropriate for their assigned post.  *Id.* at ¶ 50.  Staff are instructed as to the proper use of PPE through various memoranda detailing the type of PPE required at a given post or for a specific duty.   *Id.* at ¶ 51.  Memoranda have also been circulated to instruct staff as to the proper donning/doffing of PPE, and video instruction is also available on the computer desktop of every FCI Danbury employee.  *Id.*

Inmates at FCI Danbury were initially provided with two of the same surgical masks which were provided to staff.  *Id.* at ¶ 52.  Once FCI Danbury was able to procure cloth masks, two cloth masks were issued to every inmate.  *Id.*  Inmates can still request, and will be provided with, the disposable surgical masks provided to staff.  *Id.*  Inmates are required to wear masks at all times except when they are eating or sleeping, and failure to do so may make the inmate subject to discipline under Program Statement 5270.09 Inmate Discipline Program.  *Id.*  Inmates performing cleaning or orderly duties have always had, and will continue to have, access to gloves or other PPE as may be necessary for them to perform their assigned duties.  *Id.* at ¶ 53.

## 5. Staffing

FCI Danbury staff work and live in an area of the country where there has been widespread community transmission of COVID-19.  *Id.* at ¶ 54.  Through communications from the BOP leadership, local Executive Staffs, and individual supervisors, staff have been informed how to perform regular self-monitoring for symptoms, practice social distancing, and to disinfect and clean their work spaces.  *Id.*  Anyone who develops signs or symptoms of illness is sent home.  *Id.*

Beginning on or about March 25, 2020, staff at FCI Danbury were subjected to enhanced health screening prior to the start of their shift. *Id.* at ¶ 55. These enhanced screening measures involve every staff member reporting to a screening site in the front lobby prior to the start of their shift, where they are required to self-report any symptoms consistent with COVID-19 as well as any known or suspected COVID-19 exposure and are further required to have their temperature taken. *Id.* at ¶¶ 55, 88. Staff are not permitted to report to their post without first reporting to the staff screening site. *Id.*

If a staff member reports symptoms consistent with COVID-19, has known or a suspected COVID-19 exposure, or registers a temperature of 100.4 degrees or higher, they are sent home. *Id.* at ¶ 56. A BOP medical officer will then contact the staff member to determine when it would be safe and appropriate for them to return to the institution. *Id.*

If a staff member has been determined to be positive for COVID-19 following a laboratory test, the following criteria is used to assess their suitability for returning to work: (a) at least 3 days (72 hours) need to have passed since recovery (defined as resolution of fever without the use of fever-reducing medications); and, (b) improvement in respiratory symptoms (e.g., cough, shortness of breath); and, (c) at least 7 days have passed since symptoms first appeared. *Id.* at ¶ 57. If a staff member has been identified as a prolonged close contact of a COVID-19 positive case, and did not have the appropriate PPE or had a breach in their PPE, as long as the staff member remains asymptomatic, they: (a) return to work for their regular shift; and (b) are required to undergo temperature monitoring and symptom checks upon arrival to work, and are also instructed to perform self-monitoring at home; and, (c) are instructed to immediately stop work, notify their supervisor, and isolate at home if symptoms consistent with COVID-19 (e.g., fever, cough, or shortness of breath) develop; and, (d) are directed to quarantine themselves when not at work for

a period of 14 days.  *Id.* at ¶ 58.  If a staff member at FCI Danbury is symptomatic or becomes

symptomatic, they: (a) are not allowed to report to work; and (b) are required to give notice to their

Supervisor; and (c) are directed to notify their local Health Department or their personal healthcare

provider  *Id.* at ¶ 59.

### 6. <u>Testing</u>

FCI Danbury is conducting testing in accordance with CDC guidelines.  *Id.* at ¶ 79.  The

CDC has explained that "[n]ot everyone needs to be tested for COVID-19," and "decisions about

testing are at the discretion of state and local health departments and/or individual clinicians."  *See*

cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html (last visited on May 2, 2020).  *Id.*

As of April 9, 2020, FCI Danbury began daily temperature checks of the entire inmate

population at the institution.  *Id.* at ¶ 80.  The Lieutenants at FCI Danbury have been provided with

infra-red no-touch thermometers to perform this task, and every day they visit each housing unit

to take the temperature of all inmates assigned to that unit.  *Id.*  If in the course of performing these

temperature checks any inmate is found to have a temperature of 99 degrees or higher, Health

Service staff are contacted and the inmate is sent for a follow-up assessment to be performed by a

licensed health care provider.  *Id.*

At FCI Danbury, the decision whether to test an inmate for COVID-19 is made by BOP

medical providers based on a number of criteria, including but not limited to: (1) the nature and

severity of the symptoms; (2) the inmate's potential exposure to COVID-19; and (3) whether the

inmate is considered "high-risk."  Decl. at ¶ 82.  On April 14, 2020, the Camp received an "ID

NOW Abbot Machine" that can deliver positive or negative test results for COVID-19 in

approximately fifteen minutes.  *Id.*  FCI Danbury has 150 COVID-19 testing kits in stock.  *Id.*

FCI Danbury also has the ability to order and quickly receive additional kits from a designated

vendor if the need arises.  *Id.*

During the week of April 25, 2020 the office of Senator Christopher Murphy reached out to FCI Danbury to discuss testing of inmates at FCI Danbury. *Id.* at ¶ 85. Between May 2 and 3, 2020, every FSL inmate was tested using these kits. *Id.* During this weekend, 143 tests were performed, and 20 inmates at FSL tested positive for COVID-19. *Id.* Since the advent of the emergency, which includes the testing conducted over the past weekend noted above, 205 inmates have been tested for COVID-19. *Id.* at ¶ 83. In total, 69 inmates and 56 staff have tested positive for COVID-19. *Id.* at ¶ 83.

### 7. <u>Medical Services at FCI Danbury</u>

The Health Services department at FCI Danbury is staffed with both civilian health care providers and uniformed officers from the Commissioned Corps of the United States Public Health Service ("USPHS"). *Id.* at ¶ 86. In total, the Health Services department at FCI Danbury consists of one Health Services Administrator, two physicians, one part-time Mid-Level Provider, one IOP/ID Registered Nurse, one Registered Nurse, three Emergency Medical Technician-Paramedics, one dentist, one dental hygienist, one licensed clinical social worker, one medical records technician, one health services administrative assistant, three contract medical assistants, one contract phlebotomist, and one contract x-ray technician. *Id.* Since the COVID-19 emergency began, three BOP and two contract Health Services staff were placed on leave due to testing positive for COVID-19. *Id.* at ¶ 87. Prior to the COVID-19 emergency two staff members were on medical leave status and one had been granted paternity leave. *Id.* Due to these absences, the BOP's Northeast Regional Office ("NERO") sent a Medical Asset Support Team ("MAST") to assist FCI Danbury with its COVID-19 response. *Id.* This MAST includes an Associate Warden, two Physician Assistants, and one pharmacist. *Id.*

Under the current state of emergency, instead of having inmates going to medical services for treatment for non COVID-19 related symptoms, a social worker and hygienist go to the units

to pass out and collect sick call forms. *Id.* at ¶ 90. The social worker and hygienist are not conducting sick call but, instead, are bringing the forms back to medical staff for review. *Id.* The forms are triaged by a Registered Nurse and/or a Physician Assistant for appropriate action. *Id.* Inmates are not being denied access to further medical follow-up. *Id.* at ¶¶ 84, 90. Sick calls are placed on the schedule, and staff round in all areas of the institution. *Id.* at ¶ 90. If an inmate presents with a more emergent case, the PA will call the inmate up to medical for an appointment. *Id.*

All inmates who present with COVID-19 symptoms are isolated and tested the same day, provided testing supplies are available. *Id.* at 91. Under no circumstances are inmates who have been placed in isolation released to the general population prior to meeting the CDC's symptom-based criteria for appropriateness, which includes (1) being fever-free for greater or equal to 72 hours without the use of fever-reducing medication, and (2) respiratory symptoms have improved, and (3) at least 7 days have passed since the first symptoms appeared. *Id.* When an FCI Danbury inmate is receiving treatment for COVID-19 at an outside hospital, Health Services staff engage in daily contact and consultation with the community based infectious disease specialists providing the treatment. *Id.*

The pharmacy at FCI Danbury has remained functioning throughout this period of modified operations. *Id.* at ¶ 92. Whenever possible inmates "self carry" their medications, meaning they are allowed to maintain their prescription medications in their property and are responsible for taking the medication themselves. *Id.* Otherwise, there are two scheduled "moves" per day when inmates can, within their quarantine group, proceed to the clinic for "pill line" or staff-assisted medication administration. *Id.*

19

### III. COMPASSIONATE RELEASE AND HOME CONFINEMENT

 A. Compassionate Release

  The BOP does not have the authority to provide inmates with "early release." A reduction of an inmate's federal sentence can only be accomplished by an Article III judge; specifically, the inmate's sentencing judge. However, upon an inmate's request, the Director of the BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A). This process is outlined in the United States Department of Justice Federal Bureau of Prisons, Compassionate Release/Reduction in Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), Program Statement 5050.50 (Jan. 17, 2019), http://www.bop.gov/policy/progstat/5050_050_EN.pdf.[2]

  Staff at FCI Danbury are receiving and processing requests for Compassionate Release as quickly as possible. *Id.* at ¶ 94. Indeed, since this emergency began (through May 4, 2020), the Reduction in Sentence ("RIS") Coordinator at FCI Danbury has received 241 requests for release. *Id.* As of May 4, 2020, 136 completed requests have been processed and denied; 18 have been returned to the inmate seeking further information; 70 are processing through the various staff who need to review the specific application, and 17 are awaiting the Warden's review. *Id.*

  Importantly, while the BOP is processing these requests as expeditiously as possible, the statute gives the BOP thirty (30) days to evaluate compassionate release requests before any motion may be presented in the sentencing court. 18 U.S.C. § 3582(c)(1)(A). Further, the ultimate decision lies with the sentencing judge.

---

[2] This BOP Program Statement and all other program statements and operations memoranda cited herein are available at www.bop.gov via the Resources link.

Petitioners Martinez-Brooks, Collier, and Cassidy have submitted requests for compassionate release to the Warden, *see* Decl. at ¶ 95, and Petitioners Cassidy and Collier have even filed Motions for Compassionate Release with their respective sentencing judges. Petitioner Cassidy's Motion for Compassionate Release was denied without prejudice as the United States District Court for the Western District of New York found he had not exhausted administrative remedies. *See United States v. Cassidy*, No. 1:17-CR-00116-WMS-MJR, Doc. No. 61, at p. 2 (W.D.N.Y. Apr. 24, 2020), docket sheet attached hereto as Exhibit B. On May 4, 2020, Petitioner Cassidy refiled his Motion for Compassionate Release, and this motion has been set down for hearing on May 6, 2020. *Id.* Petitioner Collier's Motion for Compassionate Release is still pending in the United States District Court for the Western District of New York. *See United States v. Collier*, No. 6:12-CR-06003-CJS (W.D.N.Y.), docket sheet, attached hereto as Exhibit C. The Petitioners have not claimed that they filed administrative claims relating to all other condition of confinement remedies they seek, and FCI Danbury does not have a record of any such claims. Decl. at ¶ 97.

Additionally, to date, FCI Danbury inmates have filed numerous Motions for Compassionate Release in the United States District Courts nationwide, including the United States District Court for the District of Connecticut. *See* Section VI.B, *infra*. *See also* the United States Attorney's Office for the District of Connecticut's Spreadsheet tracking Motions for Compassionate Release and Decisions Rendered by the Article III Judges in this District, attached hereto as Exhibit F.

### B.     Home Confinement

At the Attorney General's direction, the BOP has also significantly increased the number of inmates on home confinement by over 40% and continues to screen all inmates to determine

whether they are appropriate for home confinement.[3]  By memoranda dated March 26, 2020, and April 3, 2020, the Attorney General directed the BOP to "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."  *See* Attorney General Memoranda dated March 26, 2020 (Exhibit D) and April 3, 2020 (Exhibit E), attached hereto.  In assessing which inmates should be granted home confinement, the Attorney General directed the BOP to consider the totality of the circumstances of each inmate, the statutory requirements for home confinement, and a series of factors including the age and vulnerability of the inmate, the security level of the facility holding the inmate, the inmate's conduct while incarcerated, the inmate's score under the Prisoner Assessment Tool Targeting Estimated Risk and Needs, whether the inmate has a demonstrated and verifiable reentry plan that will prevent recidivism and ensure public safety (including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face at their current facility), and the inmate's crime of conviction.  Exhibit E at pp. 1-2.

In addition to these factors, before granting an inmate release on home confinement, the Attorney General directed the BOP Medical Director, or his designee, "to make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement."  *Id*. at 2.  FCI Danbury is following this guidance.  Decl. at ¶ 60.

Although the BOP lacks the authority to release an inmate from his sentence, the BOP has the authority to transfer a prisoner to home confinement for the remainder of his or her sentence pursuant to provisions and limitations set forth 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  *See*

---

[3]  *See*  https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp  (last visited May 2, 2020).

*also* BOP Program Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home Confinement under the First Step Act*.   Decl. at ¶ 60.   Generally, the BOP may place a prisoner in home confinement only for the lesser of 10 percent of the term of imprisonment or 6 months.   18 U.S.C. § 3624(c)(2).   In order to appropriately evaluate an individual for home confinement, FCI Danbury staff assesses the risk of criminal activity in the community and determines whether there is an appropriate home where the inmate can be placed.   Decl. at ¶ 62.   This is a time and resource intensive process.   Upon receipt of the staff assessment, the BOP reviews the assessment and makes the final determination regarding home confinement.   *Id*. at ¶ 63.   If approved, absent any disciplinary infractions, the inmate would serve the remainder of his or her sentence on home confinement after being quarantined for 14 days.   *Id*. at ¶ 64.

Under 34 U.S.C. § 60541, the BOP may release some or all eligible elderly offenders and eligible terminally ill offenders from BOP facilities to home detention, upon written request from either BOP staff, or an eligible elderly offender[4] or eligible terminally ill offender[5].   Decl. at ¶ 60. In order to appropriately evaluate an elderly or terminally ill individual for home confinement, the BOP assesses the risk of criminal activity in the community and determines whether there is an appropriate home where the individual can be placed.   *Id.*   Inmates that do not meet the criteria for

---

[4] The statute defines "eligible elderly offender" to include an inmate who is not less than 60 years of age; who is serving a term of imprisonment that is not life imprisonment based on a conviction for an offense or offenses that do not include any crime of violence; has served two-thirds of the term of imprisonment to which the offender was sentenced; who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense referenced in the statute; who has not been determined by BOP to have a history of violence, or of engaging in conduct constituting a sex offense or other excluded offense; who has not escaped, or attempted to escape from a BOP institution; whose release to home detention will result in a substantial net reduction of costs to the Federal Government; and who has been determined by BOP to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.   34 U.S.C. § 60541.

[5] "Eligible terminally ill offender" is defined as an offender in the custody of BOP who meets all of the above-stated criteria except the age restriction, and has been determined by a medical doctor approved by BOP to be in need of care at a nursing home, intermediate care facility, or assisted living facility, or diagnosed with a terminal illness.   34 U.S.C. § 60541.

23

the elderly home confinement can be placed on home confinement under the BOP's general authority to do so.  18 U.S.C. § 3624(c)(2).

Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement."  Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020).  On April 3, 2020, the Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates where COVID-19 is materially affecting operations.  Exhibit E at 1; Decl. at ¶ 65.  In light of the COVID-19 pandemic, the BOP is maximizing its authority to place inmates on home confinement and is expediting the process as much as possible in furtherance of the Attorney General's memoranda dated March 26, 2020, and April 3, 2020.  Decl. at ¶ 71.  The BOP has increased home confinement by over 69.1% since March 2020, and is continuing to aggressively screen inmates for home confinement.  *Id.* at ¶ 73.

Inmates do not need to apply to be considered for home confinement under the CARES Act.  *Id.* at ¶ 74.  The BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  *Id.*  While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.  *Id.*

Pursuant to the Attorney's General's direction, the BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement.  *Id.* at 75.  The factors to be

considered when reviewing and referring inmates for home confinement are, in addition to the above: primary or prior offense is not violent; primary or prior offense is not a sex offense; primary or prior offense is not terrorism; no detainer for the inmate; the inmate's Mental Health Care Level is less than CARE-MH 4; the inmate's recidivism risk score is Minimum; the inmate has had no incident reports in the past 12 months (regardless of severity level); the inmate is a U.S. citizen; the inmate has a BRAVO score (custody classification) of Low or Minimum; the inmate has served 25% or more of their sentence and have 18 months or less remaining; and the inmate has a viable release plan. *Id*. at ¶¶ 75-76.

As part of this review, not only does a Unit Team review each inmate, a review is conducted by the Medical Director, or his designee, and the Medical Department ("Medical"). *Id*. at ¶ 63. Medical conducts multiple reviews. *Id*. Initially, Medical must determine the age and vulnerability of the inmate related to COVID-19 risk factors in accordance with CDC and prevention guidelines. *Id*. at ¶ 62. Additionally, Medical reviews the conditions under which the inmate would be confined upon release to determine whether those conditions would present a lower risk of contracting COVID-19 than the inmate would face at the BOP facility, and also determines whether frequent and on-going medical care is required within the next 90 days. *Id*. at ¶¶ 62-63.

Staff at FCI Danbury have been reviewing inmates for home confinement since the Attorney General's March 26 guidance issued. *Id.* at ¶ 78. Because this guidance has changed several times (in some cases causing inmates to be reviewed more than once), an exact number of inmates that have been reviewed is impossible to arrive at. *Id.* However, with the assistance the Case Management Coordinator, the Warden estimates that approximately 159 FCI Danbury inmates have been reviewed for home confinement since March 26, 2020. *Id.* These reviews have

led to 21 FCI Danbury inmates being released to home confinement, and another 2 inmates having been released on furlough.  *Id.*

## IV.    THE PETITION AND ALLEGED FACTS

The gravamen of Petitioners' allegation is that, because of their age and/or medical conditions, they have elevated risk of serious, adverse outcomes if they contract COVID-19 and must be released from custody or placed on home confinement because detention at FCI Danbury *per se* poses an increased risk of health complications or death from COVID-19.  *See* Petition.

### A.    Petitioner Kenneth Cassidy

Petitioner Cassidy is fifty-four year old inmate in the Main Complex at FCI Danbury. Petition, Exhibit D at ¶ 1.  Petitioner Cassidy is serving a sentence of five years arising from a conviction for conspiracy to commit wire fraud and willful failure to file an income tax return.  *Id.* ¶ 3.  Petitioner Cassidy's release date is March 31, 2021, and his projected home confinement release date is October 1, 2020.  *Id.*

According to the Petition, Petitioner Cassidy has significant cardiovascular issues, including ischemic heart disease (i.e., deficient blood supply from a narrowing of the blood vessels), unstable angina, and hypertension.  Petition ¶ 32.  Petitioner Cassidy claims he suffered three heart attacks, including two in his thirties and has chronic bronchial asthma.  *Id.*

On April 10, 2020, Petitioner Cassidy moved for release to home confinement or for a sentence reduction to time served under 18 U.S.C. § 3582(c)(1)(A) on the ground that he is heighted risk to develop COVID-19 given his asthma and cardiac conditions and the outbreak of the coronavirus at FCI Danbury.  *See Cassidy*, No. 1:17-CR-00116-WMS-MJR, Doc. 61, at p. 2; Exhibit B.  Petitioner Cassidy first applied for the same relief from the BOP on April 4, 2020.[6]  On

---

[6] "Cassidy twice submitted requests for compassionate release to the Bureau of Prisons. He submitted his first request on April 4, 2020, by way of an 'Inmate Request to Staff' form addressed to his

April 24, 2020, the court denied Petitioner Cassidy's motion without prejudice after determining that the court lacked authority to order the relief Petitioner Cassidy sought under the compassionate release statutory provision, 18 U.S.C. § 3582(c)(1)(A), because Petitioner Cassidy had failed to exhaust his administrative remedies.  Exhibit B, Docket No. 61, at p. 6.  The court invited Petitioner Cassidy to file an updated motion once exhaustion is complete.  *Id.* at p. 16, n. 9.  Petitioner Cassidy's administrative request for compassionate release was denied on April 22, 2010.  Decl. at ¶ 95.  Petitioner Cassidy renewed his motion on May 4, 2020, and it is set down for hearing on May 6, 2020.

### B.    Petitioner Dianthe Martinez-Brooks

Petitioner Martinez-Brooks is a 50-year old inmate in the Camp at FCI Danbury.  Petition ¶ 2 and Exhibit C, at ¶ 2.  Petitioner Martinez-Brooks is serving a 48 month sentence for wire fraud.[7]  *Id.*  Petitioner Martinez-Brooks' release date is June 25, 2022.  *Id.* at ¶ 3.

According to the Petition, Petitioner Martinez-Brooks suffers from asthma, hypertension, arthritis and systemic lupus erythematosus ("SLE").  Petition ¶ 26.  Petitioner Martinez-Brooks states she takes Atenolol for hypertension and has a Proventil emergency inhaler and Asmanex Twisthaler (mometasone furoate inhalation powder, 220 mg) for her asthma.  *Id.*  Since her incarceration, Petitioner Martinez-Brooks claims she was proscribed steroids once for the joint and muscle inflammation associated with her lupus.  *Id.*

---

case manager and through a contemporaneous email to the warden.  (*See* Doc. 57-1, pp. 3-5.)  He submitted his second request on April 15, 2020, by way of another 'Inmate Request to Staff' form addressed to his case manager.  (*See* Doc. No. 57-1, p. 2.)  While the government represents that Cassidy never sent his email to the warden and never submitted his first request to his case manager, it has submitted no affidavits in that regard and, in fact, it readily obtained and submitted copies of these documents that were reportedly never received. Accordingly, in the absence of evidence to the contrary, this Court finds that Cassidy first requested compassionate release from the Bureau of Prisons on April 4, 2020."  Exhibit B, Doc. 61 at n1.

[7] To date, there have not been any positive cases of COVID-19 at the Camp.  Decl. at ¶ 27.

Although the Petition is silent with respect to whether Petitioner Martinez-Brooks has filed a Motion for Compassionate Release, she claims that she asked the Warden for compassionate release on March 26, 2020.  Petition, Exhibit C at ¶ 25.  Petitioner Martinez-Brooks states she was given paperwork to sign on April 19, 2020 relating to home confinement and/or a halfway house. *Id.* at ¶ 26.  However, Petitioner Martinez-Brooks claims that a memorandum came out on April 21, 2020, stating that, if an inmate had not completed 50 percent of their sentence, they were ineligible for compassionate release.  *Id.*  Petitioner Martinez-Brooks then referenced the April 23, 2020, memorandum that amended this requirement to completion of 25 percent of the inmate's sentence with 18 months or less remaining to serve.  *Id.*  Petitioner Martinez-Brooks does not indicate the status of her compassionate release request and does not state whether she has filed a motion for compassionate release with her sentencing judge.  According to FCI Danbury records, Petitioner Martinez-Brooks filed a new administrative request for compassionate release on April 24, 2020.  Decl. at ¶ 95.

### C.   Petitioner Rejeanne Collier

Petitioner Collier is a 64-year old inmate in the Camp at FCI Danbury.  Petition ¶¶ 2, 30. On January 13, 2012, Collier pled guilty to conspiracy to possess with intent to distribute and to distribute one kilogram or more of heroin.  *See Collier*, No. 6:12-CR-06003-CJS, Doc. 13 (Exhibit C).  On October 12, 2012, the United States District Court for the Western District of New York sentenced her to a term of 19 years imprisonment and a term of supervised release of 10 years.  *Id.* at Doc. 34.  At sentencing, after reviewing Collier's lengthy criminal history, this Court told Collier, "you've been a criminal for most of your adult life."  Exhibit C, Doc. 66, at p. 7.  On June 4, 2015, Collier filed a motion for reduction of her sentence pursuant to 18 U.S.C. § 3582(c)(2). Exhibit C, Doc. 54.  The government opposed the motion.  Exhibit C, Doc. 57.  On September 14, 2015, this Court granted the Section 3582(c) motion and reduced her sentence to 14 years

imprisonment.  Exhibit C, Doc. 58.

On April 16, 2020, Petitioner Collier, through counsel, filed a Motion for Compassionate Release.  Exhibit C, Doc. 64.  The government opposed this motion.  Exhibit C, Doc. 66.  The motion remains pending.  On April 15, 2020, Petitioner Collier submitted an administrative request for compassionate release which was sent back to her on April 24, 2020 for corrections.  Decl. at ¶ 95.

### D.    Petitioner Jackie Madore

Jackie Madore is a 50-year-old inmate in FSL at FCI Danbury.  Petition ¶¶ 3, 31.  Although the Petition is silent as to Petitioner Madore's conviction, the Petition states that she has 20 months remaining on her sentence.  *Id.*  Petitioner Madore claims she suffers from hypertension, hypothyroidism, and Hepatitis C.  *Id.*

The Petition is also silent as to whether Petitioner Madore filed an administrative claim seeking release or filed a motion for compassionate release.  The Respondents did not find that an administrative claim had been submitted by Petitioner Madore or that a motion for compassionate release had been filed with a United Sates District Court.  *Id.* at ¶ 95.

### E.    Petitioners' Requested Relief

Petitioners request broad and extraordinary relief, including the immediate "release from custody or to home confinement members of the Subclass [identified by Petitioners as those at FCI Danbury who are 50 and over or those with serious medical conditions]";  requiring Respondents to provide "medically adequate social distancing and health care and sanitation" for the remaining 984[8] inmates at FCI Danbury; the appointment of a Special Master "to make recommendations to

---

[8]  The Petition claims there are approximately 1046 inmates at FCI Danbury.  This number is incorrect.  As of the date of this filing, there are 984 inmates at FCI Danbury.  Decl. at ¶¶  5-7.

the Court regarding the number of incarcerated people that FCI Danbury can house consistent with

CDC Guidance on best social distancing and hygiene practices to prevent the spread of COVID-

19"; and to order other safety measures such as the issuance of soap, towels, cleaning supplies;

quarantined access to phones, etc.  Petition, pp. 66-70.   Petitioners also ask the Court to order

Respondents "to identify within twenty-four (24) hours of the Court's order, and submit to the

Court a list of, all Subclass members, and requiring Respondents to answer as to why the habeas

petition and relief sought herein should not be granted"[9] and to certify the Petition as a Class

Action.  *Id.*

## V.    STANDARDS OF REVIEW

### A.    Federal Rules of Civil Procedure Rule 12(b)(1)

An action is properly dismissed under Rule 12(b)(1) "when the district court lacks the

statutory or constitutional power to adjudicate" the case.  *See Doyle v. Midland Credit Mgmt., Inc.*,

---

[9] On April 29, 2020, undersigned counsel advised Petitioners' counsel that the BOP would provide a list of all inmates at FCI Danbury whom the CDC has identified as being high-risk for severe illness from COVID-19.  This includes individuals who are 65 years of age or older or those who suffer from either:  (1) chronic lung disease or moderate to severe asthma;  (2) serious heart conditions;  (3) the immunocompromised, which can be caused by many conditions, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; (4) severe obesity (body mass index of 40 or higher);  (5) diabetes;  (6) chronic kidney disease undergoing dialysis;  (7) liver disease. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited 04/30/2020).  Due to Privacy Act concerns, the list would include the identity of the inmate, the inmate's sentencing court[,] and the case number of their underlying criminal conviction but would not include information about the specific medical condition suffered by each inmate.   Additionally, undersigned counsel advised that a request for a Protective Order would need to be submitted, and entered by the Court, before production of the list.

Petitioners' counsel indicated that he would have to discuss this with "the team" and would get back to undersigned counsel the next day, April 30, 2020.  To date, undersigned counsel have not received a response from Petitioners' counsel about this list.

If the Court agrees with Respondents that this Petition, as well as the Motion for a Temporary Restraining Order and/or Preliminary Injunction, should be denied, this request becomes moot.

722 F.3d 78, 80 (2d Cir. 2013) (citation omitted).  When "deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint," including competent affidavits.  *See Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l*, 790 F.3d 411, 417 (2d Cir. 2015).

### B.      Federal Rules of Civil Procedure Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) should be granted where a complaint fails to plead facts to state a claim that is plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In deciding a Rule 12(b)(6) motion, the court may consider, in addition to the factual allegations of the complaint, "documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken."  *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016) (internal quotation marks omitted).   "Agency determinations and administrative findings are public records of which a court may properly take judicial notice."  *Lia v. Saporito*, 909 F. Supp. 2d 149, 161 (E.D.N.Y. 2012).[10]

## VI.   ARGUMENT

Petitioners bear the burden of establishing the Court's jurisdiction.  Petitioners have failed to allege a sufficient basis to invoke the Court's jurisdiction over the subject matter.

### A.      The Court Lacks Subject Matter Jurisdiction to Hear Petitioners' Claims as Petitioners have Failed to Exhaust Administrative Remedies

Before the Court can properly consider a petition for habeas corpus pursuant to Section 2241, the Petitioners must exhaust all administrative remedies.  *Sufasso v. Wilson*, No. 3:20-CV-513 (MPS), Doc. 5 (D. Conn. Apr. 20, 2020) ("As an initial matter, the Second Circuit has held

---

[10] Alternatively, should the Court construe the present motion as one for summary judgment, summary judgment is appropriate where, as here, "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).

that an inmate must exhaust administrative remedies prior to filing a habeas petitions under 28 U.S.C. § 2241." (quoting *United States v. Credidio*, 2020 WL 1644010, at *2 (S.D.N.Y. Apr. 2, 2020) (citing *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001))). "The failure to exhaust constitutes a procedural default that bars judicial review unless the petitioner makes a showing of cause and prejudice." *Sufasso*, No. 3:20-CV-513 (MPS) (quoting *Credidio*, 2020 WL 1644010, at *2 (citation omitted)). *See also United States v. Smalling*, 644 Fed. App'x 3, 4-5 (2d Cir. 2016) (challenge to execution of sentence must be brought in a Section 2241 proceeding, but only "after exhaustion of administrative remedies"); *Wilson v. Wells*, No. 3:17CV40 (AWT), 2017 WL 6667515, at *2 (D. Conn. Sept. 6, 2017) ("a prisoner must exhaust his or her administrative remedies prior to filing a section 2241 petition or exhaust state court remedies prior to filing a section 2254 petition.").

As the Petitioners make various claims seeking multiple remedies, the Respondents have divided the exhaustion argument into two segments. First, have the Petitioners exhausted administrative remedies with respect to their request for release from custody or to home confinement. As release from custody or placement in home confinement is not a remedy available under a 28 U.S.C. § 2241 conditions of confinement habeas, an exhaustion analysis is not essential with respect to these claims. Second, have Petitioners exhausted administrative remedies with respect to their specific requests for additional "safety" measures (i.e. soap, towels, access to quarantined telephone, etc.) at FCI Danbury. The answer to this question is no. Petitioners have not filed any administrative claims with respect to their requests for additional "safety" measures at FCI Danbury.

**B.** **This Court Lacks Authority to Divest the BOP and Sentencing Courts of Their Jurisdiction to Place Inmates in Home Confinement or The Sentencing Judge's Authority to Amend a Term of Imprisonment**

Petitioners seek to change the terms of their sentence in light of the pandemic. However,

"'[a] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 US.C. § 3582(b)).  As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion).  Accordingly, it is well-established that once a district court has pronounced a sentence and the sentence becomes final, even that district court has no inherent authority to reconsider or alter that sentence.  Rather, it may do so only pursuant to statutory authorization.  *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979).  Consistent with this principle of finality, 18 U.S.C. § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (1) upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A); (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); and (3) where the defendant was sentenced "based on" a retroactively lowered sentencing range. 18 U.S.C. § 3582(c)(2); *United States v. Gotti*, No. 02-CR-743-07 (CM), 2020 WL 497987, at *1-*6 (S.D.N.Y. Jan. 15, 2020) (noting that "[a] court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition").

Although the Second Circuit has construed Section 2241 as permitting habeas petitioners to raise challenges to prison conditions, "Section 2241 does not provide an avenue for challenging the length of a sentence" based on poor conditions of confinement.  *See Grant v. Terrell*, No. 10-CV-2769 (MKB), 2014 WL 2440486, at *3 (E.D.N.Y. May 29, 2014) (reasoning that "Section 2241 permits habeas petitioners to challenge the post-conviction administration of a sentence, but

33

it does not provide an avenue for challenging the length of a sentence" and denying petitioner's request for "a two-level sentence reduction and an order of immediate release, based on the conditions of confinement" of petitioner's prison); *Medina-Rivera v. Terrell,* No. 11-CV-0734 (BMC), 2011 WL 3163199, at *2 (E.D.N.Y. July 26, 2011) (noting that the petitioner's "desired remedy—a sentence reduction—is not of the type that can be granted in response to [Section 2241] claims regarding conditions of confinement"); *Serra v. Terrell,* No. 10-CV-03044 (DLI), 2013 WL 5522850, at * 1 (E.D.N.Y. Sept. 30, 2013) (same).

Courts in other circuits also have held that Section 2241 does not permit release based on conditions of confinement. *See, e.g., United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008) (holding that a court has jurisdiction to alter a sentence only as specifically permitted by statute); *Wright v. Terrell,* No. 10-CV-3492 (PGS), 2011 WL 5117851, at *2 (D.N.J. Oct. 26, 2011) (rejecting Section 2241 petition by a petitioner who claimed not to challenge the imposition of his sentence upon finding that "[p]etitioner is actually seeking a modification of his sentence based on the conditions of his confinement at the MDC, which is not cognizable in a habeas petition under § 2241"); *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005) (holding that "[i]f an inmate establishe[s] that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option" (citation omitted)); *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990) (same); *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979) (same); *Cook v. Hanberry*, 596 F.2d 658, 660 (5th Cir. 1979) (same).  Indeed, "[a] court may not modify a term of imprisonment once it has been imposed except pursuant to statute."  *Gotti*, 2020 WL 497987, at *6  (noting that "[a] court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition").

34

Therefore, this Court should not permit Petitioners to improperly seek a reduction in their criminal sentences via a Section 2241 petition, based on the allegedly unconstitutional conditions of confinement at the FCI Danbury.  Further, Petitioners are not entitled to have this Court release or transfer to home confinement more than 984 inmates, or any subset thereof, from FCI Danbury.  There are specific legal avenues for consideration of the release or transfer of these inmates.  Those include home confinement and compassionate release.

Regarding home confinement, the BOP may place a prisoner in home confinement only for the lesser of 10 percent of the term of imprisonment or 6 months.[11]  *See* 18 U.S.C. § 3624(c)(2).  Under the CARES Act, "if the Attorney General finds that emergency conditions will materially affect" the BOP's functioning, the BOP Director may "lengthen the maximum amount of time for which [he] is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2).  Pub. L. No. 116-136, § 12003(b)(2) (2020).  On April 3, 2020, the Attorney General authorized the Director of the Bureau to immediately maximize appropriate transfers to home confinement of all appropriate inmates held in BOP facilities.  *See* April 3, 2020 Memo from the Attorney General, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-19".

The determination of whether to place a prisoner in home confinement is solely in the discretion of the BOP and "not reviewable by any court."  18 U.S.C. § 3621(b); 18 U.S.C. § 3624(c)(4).  The factors to be considered are: the inmate's age and vulnerability to COVID-19 per CDC guidelines, the inmate's conduct in prison including violence and gang activity, the inmate's recidivism risk, the inmate's reentry plan, the inmate's danger to the community.  18 U.S.C. §

---

[11] The BOP's policy and procedures regarding home confinement are outlined in BOP Program Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home Confinement under the First Step Act*, both of which are available on www.bop.gov via the Resources tab.  *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.

3621(b).   Some offenses, such as sex offenses, will render an inmate ineligible for home confinement.  *Id.*  Notably, regarding compassionate release, neither the BOP nor this Court has the authority to provide inmates with "early release."  A reduction of an inmate's federal sentence can only be accomplished by the inmate's sentencing judge.  However, upon an inmate's request, the Director of the BOP may make a motion to an inmate's sentencing judge to reduce a term of imprisonment under 18 U.S.C. § 3582(c)(1)(A).[12]

Importantly, while the BOP is processing these compassionate release requests as expeditiously as possible, the statute gives the BOP 30 days to evaluate them before any motion may be presented in the sentencing court.  18 U.S.C. § 3582(c)(1)(A).  Further, the ultimate decision lies with the sentencing judge.  *Id.*  Here, as noted above, Judge Skretny denied Petitioner Cassidy's motion for compassionate release for failure to exhaust, and Petitioner Collier's motion for compassionate release is still pending before her sentencing judge.  Petitioners Martinez-Brooks and Madore have both chosen not to file motions seeking compassionate release.

By filing this action, the Petitioners are not only trying to circumvent the process, but are also trying to create a mechanism through which any unfavorable ruling from a sentencing judge can be challenged in another district court.  Petitioners' efforts to forum shop or create new forums would have the result of depriving sentencing judges from the ability to maintain control over the inmate sentences they have issued.

By seeking release to home confinement through this civil action, Petitioners also are essentially seeking to divest the BOP of its statutory and regulatory discretion as to which inmates should be placed in home confinement.  Recently, a Louisiana district court dismissed a Section

---

[12] This process is outlined in the U.S. Dep't of Justice Fed. Bureau of Prisons, Compassionate Release/Reduction in Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), Program Statement 5050 (Jan. 17, 2019) (http://www.bop.gov/policy/progstat/5050_050_EN.pdf).

2241 habeas petition with prejudice brought by six petitioners in a federal prison, who also sought class certification on behalf of a prospective class and sub-class of inmates vulnerable to the COVID-19 threat, ruling that the Court lacked subject matter jurisdiction "to order BOP" to release inmates to a "lesser form of detention" because "[s]uch a designation and/or classification falls squarely within BOP's authority and outside the purview of this Court." *See Livas v. Myers*, No. 20-CV-422 (TAD)(KK), 2020 WL 1939583, at *8 (W.D. La. Apr. 22, 2020). The Court succinctly added, "[t]o rule otherwise would make this Court "a de facto 'super warden'" of the BOP facility. *Id.* at *8. *See also, Marlowe v. LeBlanc*, --- Fed. Appx. ---, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (staying an injunction issued by the United States District Court for the Middle District of Louisiana requiring Defendants to comply with their own internal policies and submit a plan to ensure proper social distancing and hygiene practices); *Nellson v. Barnhart*, 2020 WL 1890670 (D. Colo. Apr. 16, 2020) (denying a TRO motion as Petitioner failed to exhaust administrative remedies and, finding that, even if he had, the BOP has already implemented the relief for safety measures that he requested).

Petitioners should not be granted such sweeping and unprecedented relief when existing administrative and statutory proceedings can afford them the relief they seek, if appropriate, as evidenced by the numerous motions for compassionate release filed with, and adjudicated by, the United States District Court for the District of Connecticut, as well as the number of administrative reviews completed by the BOP with respect to inmates at FCI Danbury. *See e.g., United States v. Almontes*, No. 3:05-CR-58 (SRU), 2020 WL 1812713 (D. Conn. Apr. 9, 2020) (granting motion for compassionate release by FCI Danbury inmate in need of spinal surgery, concluding "extraordinary and compelling reasons warrant a reduction in Almonte's sentence"); *United States v. Gagne*, No. 3:18-CR-242 (VLB), 2020 WL 1640152 (D. Conn. Apr. 2, 2020) (denying motion

for compassionate relief by FCI Danbury inmate with multiple sclerosis and increased risk of complications posed by COVID-19, concluding that her medical condition is not extraordinary and compelling); *United States v. Hill*, No. 3:19-CR-38 (JAM), Doc. 48 (D. Conn. Apr. 28, 2020) (denying motion for compassionate release by FCI Danbury inmate for failure to exhaust administrative remedies); *United States v. Gilliam*, No. 3:15-CR-63 (JCH), Doc. 119 (D. Conn. Apr. 27, 2020) (denying motion for compassionate release by USP Hazelton inmate for failure to exhaust administrative remedies, failure to present extraordinary and compelling reasons for release, and because petitioner poses a danger to society); *United States v. Rosado et al.*, No. 3:06-CR-18 (AVC), Doc. 376 (D. Conn. Apr. 24, 2020) (granting motion for compassionate release by Wyatt inmate with asthma who had served term above the statutory maximum); *United States v. Salvagno et al.*, No. 5:02-CR-51 (LEK), Doc. 1166 (D. Conn. Apr. 23, 2020) (granting motion for compassionate release by FCI Danbury inmate with hypertension and need to care for son with multiple serious medical conditions); *United States v. Rubiera-Herrera et al.*, No. 3:19-CR-123 (JAM), Doc. 446 (D. Conn. Apr. 22, 2020) (denying motion for compassionate release by Wyatt inmate for failure to exhaust administrative remedies, "the exhaustion requirement of section 3582(c)(1)(A) is mandatory and that a court does not have authority to make equitable exceptions"); *United States v. Sakelarakis*, No. 3:18-CR-248 (JCH), Doc. 76 (D. Conn. Apr. 22, 2020) (denying motion for compassionate release by FCI Danbury inmate for failure to exhaust administrative remedies and failure to present extraordinary and compelling reason for release); *United States v. Crispin*, No. 3:19-CR-171 (VLB), Doc. 56 (D. Conn. Apr. 21, 2020) (denying motion for compassionate release by FMC Devens inmate with cardiovascular disease and a blood clotting disorder maintained on blood thinners, and a shunt in his brain creating an elevated risk of infection, severe complications, and death from COVID-19); *Brady v. Warden et al.*, No. 3:20-

CV-510 (MPS), Doc. 7 (D. Conn. Apr. 20, 2020) (denying motion for compassionate release by FCI Danbury inmate for, *inter alia*, failure to exhaust administrative remedies); *Serfass v. Warden*, No. 3:20-CV-513 (MPS), Doc. 5 (D. Conn. Apr. 20, 2020) (denying motion for compassionate relief for failure to exhaust administrative remedies and failure to demonstrate that "she faces a heightened risk of serious illness from COVID-19 and that the measures taken by the Bureau of Prisons are inadequate to alleviate this risk"); *United States v. Coston*, No. 3:16-CR-127 (SRU), Doc. 98 (D. Conn. Apr. 16, 2020) (granting motion for compassionate release by FCI Danbury inmate with chronic asthma, history of pneumonia, and risk of developing Chronic Obstructive Pulmonary Disease); *United States v. Carpenter et al.*, No. 3:13-CR-226 (RNC), Doc. 525 (D. Conn. Apr. 10, 2020) (denying motion for compassionate release by MDC Brooklyn inmate with diabetes, noting "the Second Circuit recently declined to release the defendant to home confinement finding that his age and medical condition do not distinguish him from other prisoners in terms of the risk posed by the coronavirus"); *United States v. Filyaw et al.*, No. 3:18-CR-81 (SRU), Doc. 1029 (D. Conn. Apr. 6, 2020) (granting motion for compassionate release by MDC Brooklyn inmate with numerous health problems serving six month sentence and scheduled to be released May 3, 2020, "The granting of this motion reflects the extraordinary circumstances presented by the coronavirus pandemic as well as Brito's weakened health condition. The Court appreciates the government's recognition that Brito is a fully qualified candidate for release."). *See also* Exhibit F.

Petitioners try to circumvent this established law and process by relying on the concept of "enlargement" of a sentence to construe the relief requested here as falling within Section 2241. But "enlargement" is not a cognizable remedy in this Court. Petitioners and their declarant Professor Judith Resnik cite to inapposite cases holding that federal courts have "inherent

authority" to grant bail as interim relief pending habeas litigation. *See, e.g.*, *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978); *Mapp v. Reno,* 241 F.3d 221, 226 (2d Cir. 2001) (explicitly reaffirming *Ostrer* and its progeny). But this line of cases only applies to prisoners whose habeas petitions allege a defect in their convictions or sentences that, if granted, would entitle them to a release from custody. *See Ostrer*, 584 F.2d at 596 n.1 (interim bail may be available to a habeas petitioner "contesting the *legality of his custody*," emphasis added); *U.S. ex rel. Schonbrun v. Commanding Officer, Armed Forces*, 403 F.2d 371, 374 (2d Cir. 1968) ("Generally habeas corpus is available only to a petitioner who is entitled to release from unlawful restraint . . . ."); *Stepney v. Lopes*, 597 F. Supp. 11, 13 (D. Conn. 1984) (interim bail in the post-conviction context may be granted for habeas petitions challenging "the illegality of the petitioner's custodial status, presumably from its inception").

Here, Petitioners' theory of relief is not that there is a defect in their convictions or sentences or that they are entitled to release from the BOP custody, but rather that they should be allowed to complete their terms of custody in a different setting because they believe the conditions at the facility where they are currently being held are unconstitutional. Therefore, this not a case in which bail is appropriate under *Ostrer*/*Mapp*; and there is simply no authority for this Court to craft a new provisional remedy to "enlarge" the custody of convicts serving sentences to which no collateral challenge is pending before it. *See also Gomez*, 899 F.2d at 1125-27 (bail pending Eighth Amendment habeas challenge to conditions of confinement was improper because "even if Gomez prevails on his habeas petition, he would not be entitled to be released from prison" and he was not allowed "more relief on a preliminary basis than he would be entitled to if he ultimately prevail[ed] on his constitutional claims").

Moreover, any authority this Court might have to "enlarge" Petitioners' custody would be circumscribed by 18 U.S.C. § 3626(a)(2) of the PLRA, which provides that, in civil action challenging conditions of confinement, any preliminary injunction must "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2); *see also Jones v. Smith*, 720 F.3d 142, 145 n. 3 (2d Cir. 2013) (assuming that the PLRA applies to conditions of confinement claims brought under Section 2241).   Clearly, a mass release of all FCI Danbury inmates, or a subclass thereof including Petitioners, to home confinement is one of the least narrowly drawn and most intrusive means imaginable.   Petitioners have not demonstrated, as they must, that such a mass release is necessary to curtail any heightened risk of COVID-19 unique to FCI Danbury.   Indeed, even in the one case the government is aware of that–we submit incorrectly– endorsed Professor Resnick's "enlargement" theory, *Wilson v. Williams*, No. 20-CV-00794, 2020 WL 1940882, *4 (N.D. Ohio April 22, 2020) (appeal pending), the court declined to order a mass release of inmates to home confinement, and instead ordered only that the **BOP, not the Court and not a Special Master**, evaluate each member of a medically vulnerable subclass's eligibility for release or transfer to another BOP facility.   *Id.* at *10-11 (emphasis added).

Even if the Court determines that it has the inherent authority to grant mass "enlargement" of custody during the pendency of this action pursuant to *Ostrer/Mapp*—notwithstanding Section 3626(a)(2)'s restrictions on provisional relief—Petitioners have not met the stringent standard for such relief.   The Second Circuit has explained that "a habeas petitioner should be granted bail only in unusual cases," and the "standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[] that make the grant of bail necessary to make the habeas

remedy effective." *Mapp*, 241 F.3d at 226 (internal citations and quotation marks omitted); *see also Rado v. Meachum,* 699 F. Supp. 25, 26-27 (D. Conn. 1988) (holding that the relevant factors are whether (1) "substantial claims" are set forth in the petition; (2) there is a "demonstrated likelihood the petition will prevail"; and (3) there are "extraordinary circumstances" attending the petitioner's situation which would "require" the grant in order to make the writ of habeas corpus "effective," presumably if granted) (citations omitted).

Petitioners have not demonstrated that this is a "special case" warranting the extraordinary relief of interim release. *Mapp*, 241 F.3d at 226. First, for all the reasons discussed in Section VII, *supra*, Petitioners fail to meet the first requirement because they have not demonstrated that they raise "substantial claims" in their habeas petition, that is, that they have "a substantial likelihood . . . of succeeding on the merits of" their petition. *See Ancona v. Lantz*, No. 3:05-CV-363 (MRK), 2005 WL 839655 (D. Conn. April 8, 2005) (quoting *Mapp*, 241 F.3d at 230 n.13). Petitioners also cannot meet the second, independent requirement that they demonstrate "that extraordinary circumstances exist[] that make the grant of bail *necessary to make the habeas remedy effective.*" *Mapp*, 241 F.3d at 226 (emphasis added); *see also Skakel v. Murphy*, No. 3:07-CV-1625 (PCD), 2009 WL 2253175, *5 (D. Conn. July 27, 2009). The relief Petitioners seek is either release to home confinement or changes in the conditions at FCI Danbury. Petitioners have not demonstrated why a grant of interim release to home confinement (essentially, the ultimate relief they hope to obtain in their petition) is necessary to make the remedy—release to home confinement or changes of conditions at FCI Danbury—effective. *See e.g., Rosemond v. Decker*, No. 19-cv-9657 (NSR-LMS), 2020 WL 1876318, at *2 (S.D.N.Y. Apr. 14, 2020) (denying emergency relief from custody under *Mapp* based on a serious medical condition in the face of the COVID-19 pandemic because interim release was not necessary to make the habeas remedy–a

constitutionally adequate bond hearing–effective).

### 1. *Res Judicata* **Bars Petitioners' Immediate Release**

*Res judicata* also bars a plaintiff from relitigating the same issues that *were* or *could have been* raised in a prior action. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *Freeman v. Sikorsky Aircraft Corp.*, 151 F. App'x. 91, 92 (2d Cir. 2005) (affirming dismissal of an action as barred by *res judicata* because claim had already been decided on the merits and action was raising the precise issues, arising from same events, as raised in petitioner's first complaint); *Staffer v. Bouchard Transp. Co., Inc.*, 878 F.2d 638, 643 (2d Cir. 1989) (explaining that "[*r*]*es judicata*, or claim preclusion, bars the revival of claims that already have been litigated" and adding that "[*r*]*es judicata* can also operate to bar claims that were not originally asserted.")). "The doctrine of *res judicata*, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017). The purpose of the *res judicata* bar "is based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event." *Robinson v. Purcell Constr. Corp.*, 647 F. App'x 29, 30 (2d Cir. 2016) (quotation marks omitted).

Petitioners Cassidy and Collier filed motions for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), citing the same allegedly unconstitutional conditions of confinement in their Section 3582 motions as set forth in the Petition. *See* Exhibits B and C. Petitioner Cassidy's sentencing judge denied his Section 3582 motion without prejudice and invited him to refile the motion once he properly exhausted administrative remedies. Exhibit B at Docket No. 61. To the extent Petitioner Cassidy seeks immediate release from FCI Danbury, Judge Skretny's ruling precludes Petitioner Cassidy's claim here for immediate release. Petitioner Cassidy does not simply get a "do-over" in the District of Connecticut after his same claim was rejected by Judge

Skretny in the Western District of New York.  Instead, as indicated by Judge Skretny, Petitioner

Cassidy can refile his motion for compassionate release after exhausting administrative remedies.

In fact, on May 4, 2020, Petitioner Cassidy did exactly as instructed.  *Id.* at Docket No. 62.  A

hearing on this motion is set for May 6, 2020 in the Western District of New York.  *Id.* at Docket

No. 63.

Further, Petitioner Collier's compassionate release application remains pending in the

Western District of New York, before her sentencing judge, who has the statutory authority to

grant her release.  *See* Exhibit C at Docket No. 65.  This Court has no analogous authority.

### 2. <u>Section 3626 Precludes the Remedy Requested By Petitioners</u>

Petitioners request habeas relief and the release of thousands, if not hundreds, of inmates

from FCI Danbury.  However, the PLRA, 18 U.S.C. § 3626, titled "Appropriate remedies with

respect to prison conditions," places strict limits on Courts' ability to order the release of inmates

"in any civil action with respect to prison conditions," and precludes a single district judge from

doing so.  *Id.* § 3626(a)(3)(A)-(B).  That law applies to "any civil proceeding arising under Federal

law with respect to the conditions of confinement or the effects of actions by government officials

on the lives of persons confined in prison, but does not include habeas corpus proceedings

challenging the fact or duration of confinement in prison."  *Id.* § 3626(g)(2).  In such a suit, the

Court "may enter a temporary restraining order or an order for preliminary injunctive relief," but

such injunctive relief "must be narrowly drawn, extend no further than necessary to correct the

harm the court finds requires preliminary relief, and be the least intrusive means necessary to

correct that harm."  18 U.S.C. § 3626(a)(2).  Under Section 3626, a "prisoner release order"—

which "includes any order, including a temporary restraining order or preliminary injunctive relief,

that has the purpose or effect of reducing or limiting the prison population, or that directs the

release from or nonadmission of prisoners to a prison," 18 U.S.C. § 3626(g)(4)—may "be entered

44

only by a three-judge court," *id.* § 3626(a)(3)(B), and then only if certain conditions have been met.  Among other requirements, "no court shall enter a prisoner release order unless—(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders."  *Id.* § 3626(a)(3)(A).

Congress enacted the PLRA "to oust the federal judiciary from day-to-day prison management."  *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997); *see also Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (*en banc*) (Calabresi, J., concurring) ("The *in banc* majority argues at length that Congress meant to get the federal courts out of the business of running jails, and it cites any number of congressional statements to that effect.").  "Congress intended the PLRA to revive the hands-off doctrine," which was "a rule of judicial quiescence derived from federalism and separation of powers concerns."  *Gilmore v. California*, 220 F.3d 987, 991, 997 (9th Cir. 2000).   "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).  Section 3626 thus "restrict[s] the equity jurisdiction of federal courts," *Gilmore*, 220 F.3d at 999, and, "[b]y its terms . . . restricts the circumstances in which a court may enter an order 'that has the purpose or effect of reducing or limiting the prison population.'"  *Plata*, 563 U.S. at 511 (quoting 18 U.S.C. § 3626(g)).  The PLRA's "requirements ensure that the 'last resort remedy' of a population limit is not imposed 'as a first step.'"  *Plata*, 563 U.S. at 514 (quoting *Inmates of Occoquan v. Barry*, 844 F.2d 828, 843 (D.C. Cir. 1988)).  "The release of prisoners in large numbers . . . is a matter of undoubted, grave

concern."  *Plata*, 563 U.S. at 501.

Insofar as the Petitioners in this case are seeking release as a remedy for the allegedly unconstitutional conditions at FCI Danbury—either for themselves or for their putative class members—Section 3626 prevents this Court from granting that relief.  Under Section 3626, "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court." *Plata*, 563 U.S. at 500 (citing 18 U.S.C. § 3626(a)); 18 U.S.C. § 3626(a)(3)(B) ("In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court.").

Moreover, such an order may not be entered unless "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(3)(A).  And even a three-judge court may order prisoners released to remedy unconstitutional prison conditions "only if the court finds by clear and convincing evidence" that "crowding is the primary cause of the violation" and "no other relief will remedy [it]."  *Id.* § 3626(a)(3)(E)(i)-(ii).

Here, there can be no dispute that the instant lawsuit is a "civil action with respect to prison conditions" governed by Section 3626, which defines "civil action with respect to prison conditions" broadly to mean "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but [that term] does not include habeas corpus proceedings challenging the fact or duration of confinement in prison."  18 U.S.C. § 3626(g)(2).[13]

---

[13] One court recently reached this conclusion in an identical case.  In *Money v. Pritzker*, Nos. 20-CV-2093 & 20-CV-2094, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), inmates from various Illinois

Section 3626 strictly limits the relief that this Court may grant and precludes the Court from releasing inmates from FCI Danbury as requested by Petitioners. *Id.* § 3626(a)(3)(B).

**C.** **Petitioners Have Failed to Exhaust Administrative Remedies for All Remaining Remedies Sought in Their Petition**

In addition to seeking release from custody or home confinement, Petitioners requested the Court to order additional remedies ("safety requests") which include:

- Ensure that incarcerated individuals can remain six feet apart to practice social distancing in compliance with CDC Guidance;

- Ensure that each incarcerated individual receives a free and adequate personal supply of: hand soap sufficient to permit frequent hand washing, paper towels, facial tissues, cleaning implements such as sponges or brushes, and disinfectant products that are effective against COVID-19;

- Ensure that all individuals have access to hand sanitizer containing at least 60% alcohol;

- Provide daily access to showers and clean laundry, including clean towels after each shower;

- Require that all FCI Danbury staff wear PPE consistent with the CDC Guidance, including masks and gloves, when interacting with visitors and incarcerated individuals or when touching surfaces in common areas;

- Provide an anonymous mechanism for incarcerated individuals to report staff who violate these guidelines so that appropriate corrective action may be taken;

- Take each incarcerated person's temperature daily (with a properly disinfected and accurate thermometer) to identify potential COVID-19 infections;

- Assess each incarcerated individual daily through questioning to identify potential COVID-19 infections;

- Conduct immediate testing for anyone displaying known symptoms of COVID-19;

---

Department of Correction facilities brought purported class action lawsuits seeking release of prisoners over 12,000 prisoners in light of the COVID-19 pandemic. The Court held that the PLRA prevented it from entering the relief requested by Petitioners for the release of inmates. *Id.* at *14. *See also Jones v. Smith*, 720 F.3d at 145, n. 3 (assuming that the PLRA applies to conditions of confinement habeas claims brought under Section 2241).

- Immediately provide clean masks for all individuals who display or report potential COVID-19 symptoms until they can be evaluated by a qualified medical professional or placed in non-punitive quarantine and ensure the masks are properly laundered with replacements as necessary;

- Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

- Clean and disinfect frequently touched surfaces with disinfectant products effective against the virus that causes COVID-19 (at the manufacturer's recommended concentration), as well as surfaces in common areas, every two hours during waking hours, and at least once during the night;

- Ensure incarcerated people are provided guidance on how to protect themselves from COVID-19 and reduce COVID-19 transmission;

- Assure incarcerated people are told that they will not be retaliated against for reporting COVID-19 symptoms;

- Respond to all emergency (as defined by the medical community)requests for medical attention within an hour;

- Provide incarcerated individuals with sufficient and effective cleaning supplies free of charge so that they may clean frequently touched items, such as phones, before use;

- Provide frequent communication to all incarcerated individuals regarding COVID-19, measures taken to reduce the risk of infection, best practices for incarcerated people to avoid infection, and any changes in policies or practices;

- Craft a mechanism to ensure compliance through the appointment of an independent monitor with medical expertise to ensure compliance with these conditions, and provide the monitor with unfettered access to medical units, confidential communication with detained individuals in and out of quarantine, and surveillance video of public areas of the facilities.

Petition, pp. 67-70. The Petitioners have made no effort to present their conditions of confinement

safety request claims in accordance with the Prisoner Litigation Reform Act.   Decl.  ¶ 97.

    "[F]ederal prisoners must exhaust their administrative remedies prior to filing a petition for

habeas relief."  *Carmona*, 243 F.3d at 634.  Only when "legitimate circumstances beyond the

prisoner's control preclude him from fully pursuing his administrative remedies" can failure to exhaust be forgiven.  *Id.*  In other words, Petitioners can only bring a habeas corpus motion without having exhausted his administrative remedies if he can demonstrate that there was an external cause of his failure and that this cause resulted in prejudice.  *Id.*

In order to exhaust their administrative remedies, federal inmates must proceed through the BOP's four-step administrative remedy procedure.  *See* 28 C.F.R. § 542, Subpart B;[14] *see also Barber v. Perdue*, No. 9:11–CV–0127 (NAM/DEP), 2012 WL 5996342, at *4 (N.D.N.Y. Nov. 9, 2012) *report and recommendation adopted by* 2012 WL 5996866 (N.D.N.Y. Nov. 30, 2012).  To complete the first step, inmates must present any issue regarding their confinement informally to staff, who must then attempt to resolve the issue.  28 C.F.R. § 542.13(a).  Second, if the informal resolution is unsuccessful, the inmate must submit a formal Administrative Remedy Request to the Warden, on a designated form, within twenty days of the event that triggered the complaint. 28 C.F.R. § 542.14(a).  Third, the inmate must appeal any dissatisfactory Warden response by filing an appeal with the Regional Director, in this case the NERO and SERO, of the BOP within twenty days of the Warden's signature of the response.  28 C.F.R. § 542.15(a).  Finally, the inmate must appeal the Northeast Regional Director's negative decision to the Office of General Counsel within thirty calendar days of the NERO or SERO's signature of the initial appeal.  *Id.*  Only upon completion of all four of these steps can the inmate have successfully exhausted his administrative remedies.  28 C.F.R. §§ 542.14–542.15.  No complaint raised through the administrative remedy process is considered fully exhausted until considered by the Bureau of Prisons' Office of General Counsel.  *See*, 28 C.F.R. §§ 542.14 - 542.15; *Strong v. Lappin*, 2010 WL 276206 at * 4 (E.D.N.Y.

---

[14] Federal inmates are required to comply with the procedural rules set forth in BOP Program Statement 1330.18, "Administrative Remedy Program", and as codified at 28 C.F.R. § 542, Subpart B, in order to exhaust the administrative remedy process.

Jan. 15, 2010) ("Until the BOP's Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

"[T]he Prison Litigation Reform Act (PLRA) exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion, in turn, demands compliance with [a penal institution]'s deadlines and other critical procedural rules." *Id.* at 90. Thus, to meet the requirement of proper exhaustion, "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Acosta v. U.S. Marshals Serv.*, 445 F.3d 509, 512 (1st Cir. 2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *Macias v. Zenk*, 495 F.3d 37, 43 (2d. Cir. 2007) (holding proper exhaustion requires a plaintiff to procedurally exhaust his claims by "complying with the system's critical procedural rules"). Exhaustion must be accomplished prior to filing suit, and an inmate who exhausts administrative remedies after a petition is filed cannot save it from dismissal. *Stimpson v. Comm'r Correction Office*, No. 3:16-CV-520 (SRU), 2017 WL 326314, at *2 (D. Conn. Jan. 23, 2017) ("[c]ompletion of the exhaustion process after a federal action has been filed does not satisfy the exhaustion requirement."); *Harvin v. Chapdelaine*, No. 3:16-CV-1616 (VAB), 2016 WL 7197363, at *1 (D. Conn. Dec. 9, 2016) ("Meeting the exhaustion process after a federal action has been filed does not, therefore satisfy the exhaustion requirement."); *Shepherd v. Lempke*, 2017 WL 1187859 at *3 (N.D.N.Y. March 30, 2017) (citing *Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001), abrogated in part on other grounds by *Porter v. Nussle*, 534 U.S. 516 (2002)); *Nellson*, 2020 WL 1890670, at *5 ("The Court finds that plaintiff has failed to exhaust his administrative remedies before seeking judicial relief. In reaching this conclusion, the Court does not overlook the risks of COVID-19 at [the BOP facility at issue] or in the prison system generally. But the

Court may not alter the mandatory requirements of the PLRA for COVID-19 or any other special circumstance." (citing *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016))).

The Supreme Court has made clear that the exhaustion requirement applies to all suits regarding prison life, *Porter* 534 U.S. at 532, including when a prisoner seeks injunctive relief, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (in cases seeking injunctive relief to address "current" prison conditions, inmates are not "free to bypass adequate internal prison procedures and bring their health and safety concerns directly to court").   And, it is explicitly mandatory.  *See Ross*, 136 S. Ct. at 1856; see also *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA.")

The only exception to the exhaustion requirement is when the administrative remedy process is "unavailable."  *Ross*, 136 S. Ct. at 1858.  In *Ross*, the Supreme Court outlined just three situations in which a prisoner can show that the administrative remedy process is "unavailable": (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," such as in the hypothetical situation in which "a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions"; (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1859-60.

The PLRA's exhaustion requirement applies to habeas corpus proceedings.  *Gonzalez v. Perrill*, 919 F.2d 1 (2d Cir. 1990) ("[i]t is well settled that an appellant must exhaust his administrative remedies before seeking habeas corpus relief in the federal courts"); *see Rogers v.*

*United States*, 180 F.3d 349, 357-58 (1st Cir. 1999) ("[o]nce the administrative remedies under the Bureau of Prison's Administrative Remedies Program are exhausted . . . prisoners may then seek judicial review of the request for designation by filing a habeas petition under 28 U.S.C. § 2241."); *Moscato v. Federal Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996) (failure to pursue administrative remedies barred judicial review of loss of inmate's good time credits); *United States v. Flanagan*, 868 F.2d 1544, 1545 (11th Cir. 1989) (shortening of sentence is in the first instance an administrative, not a judicial function); *Sayyah v. Farquharson*, 382 F.3d 20, 24 (1st Cir. 2004) (common law exhaustion doctrine "almost universally" premises judicial review upon the prior exhaustion of administrative remedies).

Although Petitioners in this habeas make an unsupported allegation that the administrative process at FCI Danbury was suspended, *see* Petition ¶ 49, this is untrue.  The fact that the all Petitioners, except for Petitioner Madore, have filed administrative claims for compassionate release under 18 U.S.C. § 3252 belies their current claims of unavailability of the administrative process.  Likewise, the fact that Petitioner Cassidy's request was denied on April 22, 2020 and Petitioner Collier's request was sent back to her to be corrected, evidences that the administrative process is operational. Additionally, a review of SENTRY (the BOP's computerized inmate management program which contains, among other things, a record of every grievance filed by any inmate throughout the agency) shows that inmates at FCI Danbury have filed 48 formal written Administrative Remedy Requests with the Warden's office between the dates March 1, 2020, and May 2, 2020.  Decl. at ¶ 96.  13 of these Administrative Remedy Requests were requesting compassionate release or home confinement.  *Id.*  As a matter of comparison, SENTRY shows the Warden's office received 61 formal written Administrative Remedy Requests during this same time period in 2019; 37 formal written Administrative Remedy Requests during this same time

period in 2018; and 33 formal written Administrative Remedy Requests during this same time period in 2017. *Id.* Petitioners are also very aware of how to properly submit an Administrative Remedy Request. A review of SENTRY shows that Petitioner Collier's most recent grievance was a filing made with the BOP's Northeast Regional Office on March 9, 2020, appealing an access to exercise equipment complaint she filed with the Warden on January 10, 2020. *Id.* at ¶ 97. Petitioner Martinez-Brooks' most recent grievance was filed in August, 2019, at which time she was appealing the denial of a lower bunk pass. *Id.* Petitioner Cassidy's most recent grievance was filed during a prior term of incarceration, when on September 7, 2007 while incarcerated at FCI Fort Dix New Jersey, he requested a transfer to a different institution. *Id.* Inmate Madore has never filed a grievance regarding any matter whatsoever while in the BOP custody. *Id.* An additional review of SENTRY shows that Petitioners have not filed any grievances since the COVID emergency began. *Id.*

While Petitioners might attempt to argue that seeking safety measures through the administrative process would be futile, there is also no evidence that is true. Additionally, such an argument would ignore that the Supreme Court defines "available" relief through the administrative process as some—not all—relief that the inmate seeks. Total and immediate relief is not the standard for exhaustion; "the possibility of some relief" is. *Ross*, 136 S. Ct. at 1859.

Likewise, Petitioners do not, and cannot, argue that requiring them to exhaust administrative remedies with respect to these safety requests would jeopardize their well-being. Doing so, would completely overlook the fact that the BOP regulations provide for an expedited response to administrative requests "determined to be of an emergency nature which threatens the inmate's immediate health or welfare." 28 C.F.R. § 542.18.

Petitioners do not assert that they engaged in the administrative process with respect to the safety requests sought as a remedy in this Petition.  Nor do Petitioners assert that the process could not potentially provide any relevant relief whatsoever.   In this case, the COVID-19 pandemic has rapidly evolved over the course of just the past few weeks, and the BOP's response has evolved with it.  Most of the allegations in the Petition do not reflect the current conditions at FCI Danbury.  Had Petitioners raised their concerns directly with the institution, the BOP could have corrected Petitioners' mistaken impressions regarding the actions FCI Danbury is taking to address COVID-19, and this litigation may have been avoided.  The rapidly changing nature of this pandemic thus favors adherence to the administrative framework, and Petitioners' request for an order with respect to the safety measures outlined above, and contained on pages 67-70 of the Petition, should be denied and dismissed.

### D.       This Court Lacks Jurisdiction to Appoint a Special Master to Essentially Sit as an Article III Judge

Petitioners ask this Court to "[a]ppoint[] a special master pursuant to Fed. R. Civ. P. 63 [sic] or an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding the number of incarcerated people that FCI Danbury can house consistent with CDC Guidance on best social distancing and hygiene practices to prevent the spread of COVID-19." Petition (Prayer for Relief) ¶ f.[15]  Petitioners' request must be soundly rejected.

First, the Court cannot give a Special Master powers that even it does not have.  *See Livas*, 2020 WL 1939583, at *8 (denying habeas petition seeking release of inmates due to COVID-19 as the Court cannot serve as "a de facto 'super' warden" of the BOP facility).  It is well-established that federal courts are "ill equipped" to deal with problems of prison administration.  *See Turner*

---

[15] Respondents assume Petitioners actually meant appointment of a Special Master pursuant to Fed. R. Civ. P. Rule 53, not 63 as alleged.

*v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989)); *Benjamin*, 172 F.3d at 182 (en banc) (Calabresi, J., concurring) ("The *in banc* majority argues at length that Congress meant to get the federal courts out of the business of running jails, and it cites any number of congressional statements to that effect.  I agree."); "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 84-85 ("Prison administration is [] a task that has been committed to the responsibility of [the legislative and executive branches], and separation of powers concerns counsel a policy of judicial restraint.").  Moreover, the PLRA restricts the Court's ability to appoint a Special Master for the purposes of compliance with the Eighth Amendment.  *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003) ("The PLRA has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment.").  Finally, given the fluid nature this medical crisis, the official guidance, and the conditions at FCI Danbury, BOP is in a better position to respond and modify conditions as necessary; any report by a Special Master risks being outdated by the time the parties dispute it and the Court makes findings.

Even if the Court had the authority to appoint a Special Master, no Special Master would have the powers conjured up by the Petitioners.  In short, a Special Master does not, and indeed, cannot, possess the attributes that Article III of the Constitution demand here.  "The role of the Special Master is not meant to supplant the role of the court." *Board of Governors of the Federal Reserve System v. Pharaon*, 140 F.R.D. 642, 649 (S.D.N.Y. 1991); *Idan Comput., Ltd. v. Intelepix, LLC*, No. CV-09-4849 (SJF) (ARL), 2010 WL 3516167, at *3 (E.D.N.Y. Aug. 27, 2010)

(appointment of a special master is the exception, not the rule) (citations omitted).  The Petitioners ask the Court to appoint a Special Master to make suggestions about how FCI Danbury should be run in light of the pandemic, which would inevitably place the Court, should it wish to act on those suggestions, in the position of a "super warden."  *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (declining to interfere with prison transfer because "[w]e are not super-wardens who sit to critique the efficacy or wisdom of prison management choices.").

Indeed, a Special Master would be ill-equipped to take over the authority (let alone have the collective depth of knowledge and experience) of BOP officials to determine how best to manage their facilities in light of an evolving national pandemic.  *See In re Bituminous Coal Operators' Ass'n*, 949 F.2d 1165, 1168 (D.C. Cir. 1991) (granting writ of mandamus against a district judge because the judge "has no discretion to impose on parties against their will 'a surrogate judge,' a substitute from the private bar charged with responsibility for adjudication of the case."); *Stauble v. Warrob, Inc.*, 977 F.2d 690, 695 (1st Cir. 1992) ("Because Rule 53 cannot retreat from what Article III requires, a master cannot supplant the district judge.").  Indeed, it is long established that "Article III bars a district court 'of its own motion, or upon the request of one party' from 'abdicat[ing] its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers.'"  *Stauble*, 977 F.2d at 695 (quotation omitted).

Finally, Petitioners fail to address Rule 53(a)'s restrictions on the appointment of a Special Master.  *See* Fed. R. Civ. P. 53.  For example, Petitioners make no attempt to explain why criminal defendants cannot "effectively and timely" have their claims addressed by the "available district judge or magistrate judge of the district."  Fed. R. Civ. P. 53(a)(1)(C).  Indeed, incarcerated criminal defendants have already raised their COVID-19 concerns in other cases in this district. *See* Section VI.B., *infra*.  The variation in the results of these cases demonstrates that there is a

functioning system in place to review and make individualized determinations based on specific facts. The Petitioners fail to point to any decision (and undersigned counsel are unaware of any) where a district court has held that it was unable to address a defendant's motion in an effective or timely manner, which establishes that a Special Master is not warranted.

Additionally, as Respondents do not consent to the appointment of a Special Master, the Court should not take the unusual step of appointing one absent such consent. *See Wasley Prod., Inc. v. Bulakites*, No. 3:03-CV-383 (MRK)(WIG), No. 3:03-CV-1790 (MRK)(WIG), 2006 WL 3834240, at *11 (D. Conn. May 31, 2006) (it is "impermissible to refer fundamental issues of liability to a special master over the objection of one or more parties"). Accordingly, Petitioners' request for appointment of a Special Master should be denied.

## VII.   EVEN IF THE COURT HAD JURISDICTION, PETITIONERS' CLAIMS ARE SUBJECT TO DISMISSAL

Even if the Court had jurisdiction (which Respondents submit it does not, as explained above), Petitioners' claims are subject to dismissal under Fed. R. Civ. P. 12(b)(6).

### A.   Applicable "Deliberate Indifference" Standard

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. To satisfy the Eighth Amendment standards, prison officials "must provide humane conditions of confinement," specifically they "must ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832.

Inmates alleging Eighth Amendment violations based on unsafe prison conditions must demonstrate that prison officials were deliberately indifferent to their health or safety by subjecting them to a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834. Prison officials display a deliberate indifference to an inmate's well-being when they consciously disregard an excessive risk of harm to the inmate's health or safety. *Id.* at 838-40. It is "only 'the unnecessary and wanton

infliction of pain' . . . [which] constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)).

"[I]f a particular condition or restriction . . . is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). "[T]he effective management of the detention facility . . . is a valid objective that may justify imposition of conditions" that are discomforting and restrictive, without the inference that such restrictions are intended as punishment. *See Bell*, 441 U.S. at 540. Moreover, "[it] is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991).

"[A] prison official violates the Eighth Amendment only when two requirements are met"—both an objective and a subjective component. *See Farmer*, 511 U.S. at 834. First, the objective component of an Eighth Amendment claim requires that the deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 833. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In claims like this, an inmate must show that he is incarcerated under conditions posing a substantial risk of harm. *See Farmer*, 511 U.S. at 834. "[T]he alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks and citation omitted).

Second, the subjective component relates to the defendant's state of mind, and requires deliberate indifference.  *See Farmer*, 511 U.S. at 834.  "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment."  *Id.* (quotation omitted).  The subjective prong or second requirement that must be shown before an Eighth Amendment violation can be found is that the prison official must have a "sufficiently culpable state of mind."  *Id.* at 833; *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (requiring "a sufficiently culpable state of mind.") (citing *Wilson*, 501 U.S. at 300).  "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."  *Whitley*, 475 U.S. at 319.  As the Supreme Court explained "[i]n prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety."  *Farmer*, 511 U.S. at 834 (quotation omitted).  Thus, to establish a violation of the Eighth Amendment, the inmate must show that prison officials "know[s] of and ***disregard[s]*** an excessive risk to inmate health or safety."  *Id*. at 837 (emphasis added).

To prove the second element, Petitioners must show that "the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result. . . . The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof of awareness of a substantial risk of the harm suffices."  *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37, 842).

A showing of the subjective "deliberate indifference" element "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm."  *Hathaway*, 37 F.3d at 66 (citing *Farmer*, 511 U.S. at 835).  That is, the "deliberate indifference" prong requires Petitioners to show that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway*, 37 F.3d at 66 (quoting *Farmer*, 511 U.S. at 837). As discussed below, Petitioners here cannot establish a constitutional violation.

This Court should assess FCI Danbury's actions in light of Petitioners' constitutional claims, but it must not substitute its judgment for that of the BOP. "[I]t is not the district court's own belief about medical necessity that controls, but what was known and understood by prison officials in crafting their policy." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (citing *Wilson*, 501 U.S. at 298). As such, although this Court cannot abdicate its responsibility to ensure that the limits imposed by the Constitution are not ignored, the court does not "sit to substitute its own judgment for that of prison administrators." *Id.* at 92.

### B. Petitioners are not Subject to an Unreasonable Risk of Harm at FCI Danbury

Deliberate indifference does not cover all medical care or all harms, but rather "constitute[s] an unnecessary and wanton infliction of pain or [is] repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). "[O]nly such indifference that can offend 'evolving standards of decency'" can establish a violation of the Eighth Amendment. *See Estelle*, 429 U.S. at 105-06. In the context of exposing prisoners to risk of communicable disease, a claim must be dismissed if it does not reach the law's threshold of a threat that is so severe that it would be "contrary to current standards of decency for anyone to be so exposed." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Rhodes*, 452 U.S. at 347. "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844-45.

Here, Petitioners cannot establish that they have suffered a "sufficiently serious"

deprivation.  *See Wilson*, 501 U.S. at 297.  To be sure, the spread of COVID-19 within the United States puts everyone at some degree of risk of getting sick, but the BOP has taken appropriate steps to mitigate those risks throughout its inmate population.[16]  Since first learning of COVID-19, BOP has instituted a multi-step action plan and taken extensive measures to mitigate the risks COVID-19 poses throughout its inmate population, including with respect to the inmate population at FCI Danbury.   As set forth above, those measures include providing inmate and staff education; strict limitations of movement within FCI Danbury;  suspension of most visits to FCI Danbury; conducting inmate and staff screening;  putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.  Additionally, FCI Danbury implemented the "modified operations" directive in a number of ways to reduce the spread of COVID-19 among inmates, including: (1) meals are brought to inmates in their respective housing dormitories; (2) providing health services within unit for routine medical issues, and allowing only inmates from the same units, who are sheltering in place together, to be in the same area for medical visits and pill lines; (3) inmates are all provided masks and are required to wear them, or be subject to discipline; and (4) extensive cleaning and sanitizing measures are taking place within FCI Danbury.  *See* Decl. for the extensive list of measures taken by BOP and FCI Danbury.

---

[16] Courts around the country have recently received challenges to detention on the grounds of COVID-19 in the criminal bail context and have recognized the government's public health efforts, particularly the efforts of the Bureau of Prisons, to address the COVID-19 crisis.  *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020); *United States v. Gileno*, No. 3:19-CR-161, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020); *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *United States v. Jefferson*, No. CCB 19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020); *United States, v. Rollins*, No. 19-CR-34S, No. 11-CR-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) (denying motion for release from custody pending sentencing and explaining that "[a]s serious as it is, the outbreak of COVID-19 simply does not override the statutory detention provisions above"); *United States v. Passley,* 2020 WL 1815834, at *4 (E.D.N.Y. Apr. 9, 2020) (balancing defendant's risk of flight and health concerns and concluding COVID-19 is not a sufficiently compelling circumstance to justify release); *Mell v. United States,* No. 3:20-CV-2277 (BRM), 2020 WL 1852384, at *1 (D.N.J. Apr. 13, 2020).

One of the Petitioners' primary arguments is that inmates cannot effectively "socially distance" within FCI Danbury.  *See e.g.*, Pet. Section II, pp. 12-17. What Petitioners fail to recognize is that this situation is also true of many, if not all, of the correctional institutions, both state and federal, nationwide.  FCI Danbury has attempted to achieve social distancing by locking down each dormitory so that members of each dormitory only have contact with other members of that dormitory, akin to family units in the general population.  While recognizing that these family units are bigger than what one would find in similar family units in the community, this practice has substantially limited exposure.  *See Hines v. Youssef*, No. 1:13-CV-00357 (AWI-JL), 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate.").  At FCI Danbury, each dormitory is essentially a closed family unit and the BOP separates each unit from other units, visitors, and sick inmates.  BOP staff also wear masks and/or PPE and give inmates masks to wear.  During movement, which occurs only with their unit, inmates are able to, and are encouraged to, maintain social distancing while in line.  And while Petitioners reiterate that they are unable to effectively maintain social distancing in contravention of CDC guidance, although six-foot distancing would "ideally" be followed, the CDC guidance published specifically for prison institutions acknowledges that complete social distancing may not be feasible in jail. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 2, 2020); *Mays v. Dart*, –- F. Supp. 3d –-, 2010 WL 1812381, at *10 (N.D. Ill. Apr. 9, 2020).

For these reasons, Petitioners have failed to establish that they are subject to an unreasonable risk of harm, and their constitutional claims must fail.

**C.**     **BOP has not Shown Deliberate Indifference and has Taken Appropriate Measures to Protect the Health of Inmates at FCI Danbury and the Public**

Petitioners likewise cannot prove that any officer at FCI Danbury "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  The test is subjective, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Id.*  To support a claim for deliberate indifference to *future* health problems, the condition of confinement complained about must be "sure or very likely to cause serious illness." *Helling*, 509 U.S. at 33 (regarding exposure to environmental tobacco smoke).  The Second Circuit has delineated the requirements of a conditions-of-confinement claim brought by inmates alleging inadequate medical care.  In *Charles v. Orange County*, the Second Circuit held that "[i]n order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Charles*, 925 F.3d 73, 85 (2d Cir. 2019) (citation and quotation marks omitted).  In particular, an inmate raising a constitutional challenge to the medical care provided in detention must establish "(1) that [the inmate] had a serious medical need . . . and (2) that the Defendants acted with deliberate indifference to such needs." *Id.* at 86.  To establish deliberate indifference in the context of an inmate's medical needs, the inmate had to prove that the defendant failed to provide treatment while having actual or constructive knowledge that doing so would pose a substantial risk to the detainee's health. *Id*. at 87.

BOP's significant efforts to mitigate infections at FCI Danbury do not "shock the contemporary conscience" as required for the Petitioners to succeed on their constitutional claims. *Id.* at 85.  "To the contrary, the Bureau of Prison is by all objective accounts responding to the COVID-19 pandemic as any reasonable observer could expect under the circumstances to prevent

infectious outbreak, protect inmate health, and preserve internal order – all legitimate government aims." *United States v. Villegas,* 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020) (slip op).

The condition complained of here is not the existence of COVID-19, which is not under the control of the BOP, or of FCI Danbury.  Rather, the condition complained of is the precautions BOP and FCI Danbury have taken to reduce exposure to or the spread of COVID-19.   The BOP and FCI Danbury are acutely aware of the risk that COVID-19 poses to its inmate population and to the public at large, and Respondents can hardly be said to be indifferent, as shown by their actions as set forth above.

In March, when Seattle, Washington was the epicenter of the COVID-19 outbreak, the court noted that "[p]laintiffs do not cite to authority, and the court is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak—even one as serious as COVID-19." *Dawson v. Asher*, No. C20-0409 (JRL-MAT), 2020 WL 1304557, at *2 (W.D. Wa. Mar. 19, 2020).  Similarly, Petitioners cannot establish that the precautions and care at FCI Danbury are "sure or very likely" to lead to exposure or that that Respondents have been deliberately indifferent to this novel infectious disease which took the nation by storm.  The district court in *Money*, 2020 WL 1820660, reached the same conclusion on similar facts.  After finding that prison officials came forward "with a lengthy list of the actions they have taken to protect . . . inmates," *id.* at *18, the court recognized that prison officials in that case (like FCI Danbury staff here) "are trying, very hard, to protect inmates against the virus and to treat those who have contracted it."  *Id.*  There is no evidence to "support any suggestion that [prison officials] have turned a kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare."  *Id.* (quoting *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012)).  Similarly, in *United States v. Desage*, No. 2:13-CR-00039

64

(JAD-VCF), 2020 WL 1904584, at *3 (D. Nev. Apr. 17, 2020), defendant alleged that the BOP's COVID-19 protections for inmates were insufficient, and that he was at risk of being exposed to the life-threatening virus.  In denying his release, the court found such claims to be "hyperbole," and found that the information the government provided about its plan, procedures and practices in general, and for the defendant in particular, demonstrated a lack of deliberate indifference, and denied defendant's emergency motion for compassionate release.  *Id*.

In reviewing Petitioners claims, and considering the actions that Respondents have taken, and continue to take, to combat COVID-19 and to keep inmates and staff alike from contracting the virus, this Court should find that Petitioners have failed to demonstrate deliberate indifference, and that Respondents' actions, in fact, demonstrate a lack of deliberate indifference.

While Petitioners may ultimately disagree with the measures taken by the BOP to protect and treat inmate health and safety while also carrying out its mission to effectuate criminal sentences imposed by federal courts, deliberate indifference is not shown simply by a difference of medical judgment.  *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment."); *Victor v. Milicevic,* 361 F. App'x 212, 215 (2d Cir. 2010) (fact that a prisoner might prefer different treatment does not give rise to Constitutional violation) (internal quotation marks and citations omitted); *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (holding that a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation"); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.").   Indeed, a prisoner must prove more than "an inadvertent failure to provide adequate medical care," *Estelle*, 429 U.S. at 105, or a mere

"disagreement[ ] between [himself] and [his] doctors about the proper course of [his] medical treatment," *Kosilek*, 774 F.3d at 83.  Regarding the latter, it is well established that the Eighth Amendment "does not impose upon prison administrators a duty to provide care . . . of the prisoner's choosing." *Id*. at 82 (citing *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir. 1980)).

In the midst of this extraordinary emergency, "[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." *Jacobson v. Comm. of Massachusetts*, 197 U.S. 11, 30 (1905).  Rather, public health officials are entitled to heightened deference when exercising science-based public health judgment during a public health emergency.  *See, e.g.*, *United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 791 (E.D.N.Y. 1963) (explaining in a habeas matter that "the judgment required is that of a public health officer and not of a lawyer used to insist on positive evidence to support action; their task is to measure risk to the public.  They deal in a terrible context and the consequences of mistaken indulgence can be irretrievably tragic."); *Hickox v. Christie*, 205 F. Supp. 3d 579, 594 (D.N.J. 2016) ("To permit these constitutional claims to go forward . . . would be a judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not [the court's]) expertise."); *see also Jacobson,* 197 U.S. at 31 (upholding mandatory vaccination law and explaining that such a measure, enacted to protect public health, will not be struck down unless it "has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights . . ." secured by the Constitution); *Bragdon v. Abbot*, 524 U.S. 624, 650 (1998) (noting that "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) (recognizing that "courts normally should defer to the reasonable medical judgments of public health officials").

66

Petitioners ask that this Court second-guess the experts at the BOP during an ongoing and uncertain public health crisis, and immediately release a number of inmates into the general public or to home confinement.  But Petitioners have failed to show that the BOP's efforts to prevent the Petitioners' infections with COVID-19, and its provision of medical care to Petitioners should they become ill, amounts to deliberate indifference to their medical needs.[17]   Petitioners' assertions are overly generalized and fail to recognize many of the implemented policies and procedures discussed above.  The BOP has taken steps to provide all FCI Danbury inmates with adequate medical care, both with respect to the prevention of infection with COVID-19 as well as the treatment should they become infected with COVID-19.  Petitioners must show that FCI Danbury is deliberately indifferent to their medical needs as a result of the COVID-19 pandemic.  *See e.g.*, Charles, 925 F.3d at 85-97.  But to the contrary, FCI Danbury has actively responded to the pandemic and taken steps to prevent its spread and isolate infected inmates.  The BOP and FCI Danbury have not been deliberately indifferent to the needs of FCI Danbury inmates.

---

[17] Multiple courts in this circuit agree and have denied requests for compassionate release and bail applications by inmates housed by the BOP with medical concerns complaining of their conditions of confinement as grounds for release.  *See, e.g., United States v. Carpenter*, No. 19-70, 2020 WL 1909098, at *1 (2d Cir. Mar. 25, 2020) (affirming denial of inmate's motion for bail so that he can stay isolated at home until the risk of COVID-19 in prison decreases, finding that his "medical situation is not significantly different from that of most inmates."); *United States v. Passley*, No. 19 Cr. 534, 2020 WL 1815834, at *1, *4 (E.D.N.Y. Apr. 9, 2020) (denying defendant's motion seeking a temporary order of pre-trial release on a secured bond, finding that his compromised immune system does not merit release); *United States v. Deutsch*, No. 18 Cr. 00502, 2020 WL 1694358, at *1 (E.D.N.Y. Apr. 7, 2020) (denying defendant's motion for temporary release, explaining that defendant "does *not* have Type 1 or Type 2 diabetes, he does not suffer from any pre-existing respiratory issues, he is young, and his medical condition [-- diabetes --] appears well managed throughout his pretrial detention."); *United States v. Amato*, No. 19 Cr. 442 (ILG), Doc. 254 (E.D.N.Y. Mar. 27, 2020) (Court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and family history); *United States v. Lipsky*, No. 19 Cr. 203 (NGG) (E.D.N.Y. Mar. 24, 2020), Dkt. Entry dated Apr. 21, 2020 (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic).

For the reasons set forth above, Respondents respectfully submit that it is beyond the purview of this Court to second-guess BOP officials' judgment, and the medical judgments made within the BOP, or for this Court to delve within the daily operation of the BOP or FCI Danbury. In light of all of the measure taken by the BOP, and by FCI Danbury, Petitioners' claims fail to state an Eighth Amendment claim of deliberate indifference to Petitioners' medical needs. Without an adequate constitutional violation supported by the pleadings, Petitioners' claims cannot withstand judgment. Thus, this Court should deny the Petition, and dismiss Petitioners' claims in their entirety.

## VIII. THE PETITIONERS' CONCLUSORY PUTATIVE CLASS ACTION ALLEGATIONS MUST BE STRICKEN

The Second Circuit has recognized that Rule 23 of the Federal Rules of Civil Procedure does not apply to habeas corpus proceedings. *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974), *cert. denied*, 421 U.S. 921 (1975) (concluding that "the class action device should not be imported into collateral actions, at least in its full vigor as contemplated by Rule 23"). In *Presier*, the Second Circuit held that "multi-party [habeas] actions" may nevertheless be appropriate in "unusual" cases where there is a "compelling justification" for such an action. *Id.* Representative habeas actions must meet the requirements of Rule 23 and be "uncluttered by subsidiary issues," and even then, "more stringent standards may be appropriate in deciding whether a habeas action presents substantial and common questions of law or fact." *Id.* at 1126-27. For instance, in *Presier*, the Court considered a proposed habeas corpus class action brought by young adult misdemeanants (ages 16 to 21), on behalf of themselves and all others similarly situated, who were serving a reformatory sentence in excess of the adult penalty for the same misdemeanor. *Id.* at 1119. The petitioners in *Presier* alleged this correctional scheme violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* The Second Circuit found a habeas

representative action was appropriate in those unique circumstances because the alleged facts were "relatively uncomplicated" and "the complaint of the representative parties in this suit states a clear and unitary allegation on behalf of all young adult misdemeanants." *Id.* 1120. The *Presier* court also found "persuasive justifications" for the class action device, including that the individual petitions of the class would "present[] the identical issue" and that it was "not improbable that more than a few [of the more than 500 members of the class] would otherwise never receive the relief here sought on their behalf" because many of them were "likely to be illiterate or poorly educated" and would not have the benefit of counsel. *Id.* at 1126.

This case is unlike *Presier* and unsuited to proceed as a representative habeas action. The habeas petitions of all the inmates in Petitioners' various classes would not present one "identical," "clear and unitary allegation" that is "uncluttered by subsidiary issues" and "relatively uncomplicated." *See id.* at 1120, 1125-27. To the contrary, the decision to release or transfer an inmate from FCI Danbury is an inherently individualized determination that must be made by the judge presiding over the detainee's criminal proceeding. These determinations turn not on a single legal issue common to all inmates, but on each inmate's unique circumstances, including projected release dates, disciplinary histories, medical histories, bases for judicially imposed criminal sentences, and bases for judicial findings of dangerousness to the community and risk of flight. Moreover, Petitioners have not shown "compelling justifications" for a multi-party representative action, or that the existing procedures in place for inmates to seek release or transfer are not available or working or will not work in the future.

Nor do Petitioners' putative class or subclasses meet the requirements of Rule 23, including ascertainability, commonality, or typicality, which they must for a *Presier*-like representative action to be appropriate. First, the proposed class is not ascertainable. The key to

class certification is defining the class in a way that makes administrative sense.  *See Scaggs v. New York State Dep't of Educ.*, No. 06-CV-0799 (RRM)(WDW), 2009 WL 890587, at *2 (E.D.N.Y. Mar. 31, 2009).   Although Rule 23 "contains no express requirement regarding ascertainability, the rule impliedly prohibits certification of a class that is not identifiable by reference to objective criteria."  *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012).

Here, Petitioners seek to represent a class consisting of all current and future inmates at FCI Danbury during the course of the COVID-19 pandemic," which may exceed well over 984 individuals.  Petition ¶ 11.  Petitioners' putative class is inherently ill-defined, as the putative class becomes a constant moving target.  Because Petitioners have provided no evidence to show that they can meet the requirement of ascertainability, their putative class fails.  *See John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (where apparent from pleadings that there is no ascertainable class, court may dismiss the class allegation on the pleadings).

Petitioners also seek to represent a subclass of inmates defined by Petitioners as consisting of

> all individuals in custody at FCI Danbury or who will become in custody at FCI Danbury during the course of the COVID-19 pandemic who are aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of stroke; and people with any condition specifically identified by CDC, currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19.

Petition ¶ 12.  While the subclass certainly has more proposed parameters than that of the putative

70

class, it is still inherently ill-defined and is a moving target.  Additionally, it clearly goes beyond the "at risk" population defined by the CDC.

Next, there are no questions of law or fact common to the putative class that are capable of class-wide resolution.  To show commonality, "[w]hat matters . . . is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (to satisfy Rule 23(a)(2) each class member's claim must depend upon a common contention "of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

In *Money*, 2020 WL 1820660, the district court denied class action certification in nearly identical circumstances to the case *sub judice*.  The district court explained that public interest "mandates individualized consideration of any inmate's suitability for release and on what conditions, for the safety of the inmate, the inmate's family, and the public at large."  *Id.* at *14. This is because "[e]ach putative class member comes with a unique situation – different crimes, sentences, outdates, disciplinary histories, age, medical history, places of incarceration, proximity to infected inmates, availability of a home landing spot, likelihood of transmitting the virus to someone at home detention, likelihood of violation or recidivism, and danger to the community." *Id.* at *15.  The district court ruled that this resulted in a lack of commonality because the only matter "apt to drive the resolution of the litigation" was which inmates should be released.  *Id.* at *14 (quoting *Wal-mart*, 564 U.S. at 350.)

Here the identical problem exists.  Petitioners' putative class, and subclass, are incapable of classwide resolution, as they do not account for any of the myriad factors that are left to the

discretion of both Article III judges and the BOP in making determinations that are central to whether a particular inmate should be released. Petitioners' putative class and subclass seek to blend post-sentencing inmates, despite the fact that these inmates have different criminal charges or convictions, have different lengths of remaining periods of imprisonment, feature different disciplinary histories, pose different dangers to the community and risks of flight, have different ages and medical histories, and rely on different resources should they be released from custody. Petitioners even lump together inmates currently sick with COVID-19 with asymptomatic inmates and inmates who might have previously been sick and made a full recovery. There simply is no commonality and typicality among the proposed class member other than the fact or their incarceration at FCI Danbury.

Moreover, typicality requires that the named Petitioners' claims be typical of *each other* and overlap factually and legally in a manner indicative of the claims of unnamed class members. *See Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010). Petitioners have no basis to allege the unity or alignment of interests, either among themselves or with the other members of the proposed class, necessary to meet this requirement. Simply stated, in light of their widely-varying factual circumstances and procedural postures, Petitioners cannot represent "typical" claims of *any* single class. Petitioners' claims of typicality are, in any event, self-defeating. For if the claims of the named Petitioners are typical of the rest of the class, then the defenses to those claims also apply class-wide. *See Pagan v. Abbott Labs.*, 287 F.R.D. 139, 146 (E.D.N.Y. 2012) (typicality requirement "ensure[s] that the class representative is not subject to a unique defense which could potentially become the focus of litigation."). For example, Petitioners Cassidy have already filed motions for compassionate release, and either have been denied or the motion is still pending. Petitioner Martinez-Brooks has submitted an administrative claim seeking compassionate release,

but has not yet filed a motion seeking the same.  Petitioner Madore has not filed either an administrative claim seeking compassionate release or a motion for compassionate release. Petitioners are inadequate class representatives for these reasons.  *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).

Finally, even assuming Petitioners' proposed classes satisfied all four requirements of Rule 23(a), Rule 23(b)(2) would be a sticking point for class certification.  Rule 23(b)(2) allows for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  But Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class," not "when each individual class member would be entitled to a *different* injunction."  *Wal-Mart*, 564 U.S. at 360.   Here, the decision to release or transfer a detainee from FCI Danbury is an inherently individualized process that is not amenable to class-wide resolution in a single injunction, as this Court appears to have recognized in its May 3, 2020 Order.  *See* Docket No. 20 (noting that Petitioners' "requested relief includes 'bail,' 'enlargement,' or 'release' and [] such relief ordinarily requires the assessment of the individual circumstances of the applicant").

Individualized proceedings are required for the writs of habeas corpus that the Petitioners seek because, among other reasons, the PLRA applies in this case.  *See* 18 U.S.C. § 3626(g)(2) (the PLRA applies to any "civil action with respect to prison conditions" including any action "with respect to the conditions of confinement"); *see also Jones*, 720 F.3d at 145, n. 3 (the PLRA does not apply to "habeas petition[s] seeking to overturn a criminal conviction or sentence" but presumably applies to conditions of confinement habeas claims brought under Section 2241). Under the PLRA, in tailoring any prospective or preliminary injunctive relief "in any civil action

73

with respect to prison conditions," a court must "give substantial weight to any adverse impact on public safety," among other considerations. 18 U.S.C. § 3626(a)(1)(A), (a)(2). This mandate precludes any class-wide injunctive relief in the form of bail, enlargement or release. *Mays* is instructive. –- F. 3d –-, 2020 WL 1987007, at *20. The district court in *Mays* denied certification of a subclass of medically vulnerable to COVID-19 prisoners under nearly identical circumstances, holding that Sections 3626(a)(1)(A) and (a)(2) of the PLRA precluded class-wide under Rule 23(b)(2). The *Mays* court correctly explained that, to fulfill the "PLRA's mandate that a court 'give substantial weight to any adverse impact on public safety' before issuing preliminary injunctive or prospective relief," under 18 U.S.C. §§ 3626(a)(1)(A), (a)(2), "the Court would need to consider the circumstances of the detained persons and any threat they pose to public safety, which plainly would vary from one person to another. This is a process that would render the [Petitioners' 28 U.S.C. § 2241 habeas claims based on conditions of confinement] unsuitable to certification under Rule 23(b)(2) or its analogy for representative actions." *Id.* at *20.[18]

For the foregoing reasons, the Court should strike the class action allegations because it is clear from the Petition itself that the requirements for maintaining a class action cannot be met.

*See Johnson v. Connecticut Dept. of Admin. Serv.*, No. 3:11-cv-1106 (VLB), 2012 WL 414996, at *2 (D. Conn. Feb. 9, 2012).

## IX.   <u>CONCLUSION</u>

The BOP is taking significant and ongoing steps to prevent the spread of COVID-19 at FCI Danbury and to provide medical care and treatment for inmates who do become infected. The

---

[18] Even if the PLRA did not apply to petitioners' habeas corpus claims, the public interest—which must be taken into account when considering a TRO or preliminary injunction—mandates individualized consideration of any inmate's suitability for release and on what conditions, for the safety of the inmate, the inmate's family, and the public at large. *See Money*, 2020 WL 1820660, at *14.

BOP and FCI Danbury have taken the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to staff members and the inmate population.  The various phases of the BOP's Action Plan have been designed and implemented in a systemic manner both nationally and at FCI Danbury in order to mitigate the spread of COVID-19.  *Id.*  The BOP and FCI Danbury remain flexible in their ability to receive guidance from the CDC and other health organizations and to modify their actions to best respond to this pandemic, according to the quickly shifting needs on the ground.

For these reasons, Petitioners cannot demonstrate that the BOP, or FCI Danbury, has acted with deliberate indifference and their constitutional claims under the Eighth Amendment must fail. Moreover, the release of thousands or hundreds of prisoners by this Court is neither permitted by law, nor would it serve the health and safety of the inmates or the general public.  Therefore, this Court must deny the Petition for Writ of Habeas Corpus, deny class certification in this case, and deny Petitioners' motions for a temporary restraining order, injunctive relief and declaratory judgment.

Respondents request that the Court dismiss the Petition in its entirety pursuant to Fed. R. Civ. P. 12(b)(1) or, alternatively, 12(b)(6).

Respectfully Submitted

Respondents
By Their Attorneys

John H. Durham
United States Attorney


_____/s/_____
John B. Hughes, ct05289
Michelle L. McConaghy, ct27157
David C. Nelson, ct25640
Nathaniel M. Putnam, phv10463
Jillian R. Orticelli, ct28591
Assistant U.S. Attorneys
203-821-3700
john.hughes@usdoj.gov
Michelle.mcconaghy@usdoj.gov
David.C.Nelson@usdoj.gov
nathaniel.putnam@usdoj.gov
jillian.orticelli@usdoj.gov

## <u>CERTIFICATION</u>

I hereby certify that on May 5, 2020, a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


<u>                /s/                                </u>
Michelle L. McConaghy (ct27157)
Assistant U.S. Attorney