## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DIANTHE MARTINEZ-BROOKS et al.,

    *Plaintiffs*,

    v.

D. EASTER & MICHAEL CARVAJAL,

    *Defendants*.

No. 3:20-cv-00569 (MPS)

## RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION TO DISMISS

### I.    INTRODUCTION

On March 27, 2020, Congress gave federal prison officials an extraordinary tool to confront the extraordinary threat posed by the novel coronavirus within prison walls: the authority to transfer any federal inmate from prison to confinement in his or her home.  A week later, the Attorney General of the United States urged the Director of the Bureau of Prisons ("BOP") to "maximize" the use of that tool as soon as possible, stating in an April 3 memorandum that "[g]iven the speed with which this disease has spread through the general public," and the Bureau's "profound obligation to protect the health and safety of all inmates," "it is clear that time is of the essence."  ECF No. 24-2 at 48-49.  The Attorney General's memo was triggered by an outbreak of COVID-19, the disease caused by the novel coronavirus, at the Danbury Federal Correctional Institution ("FCI Danbury"), a low security prison in Danbury, Connecticut, and two other federal prisons; the memo directed the BOP to "immediately review all inmates who have COVID-19 risk factors" for  potential placement in home confinement, "starting with inmates incarcerated at … FCI Danbury" and the other two facilities.  *Id.* at 49.  This case – brought by four inmates at FCI Danbury – involves an apparent failure of the Warden and staff at FCI Danbury to take these exhortations seriously.  The four inmates, all of

1

whom have COVID-19 risk factors, have made a preliminary showing that officials at FCI Danbury are making only limited use of their home confinement authority, as well as other tools at their disposal to protect inmates during the outbreak, and that these failures amount to deliberate indifference to a substantial risk of serious harm to inmates in violation of the Eighth Amendment.  Accordingly, I grant in part the inmates' motion for a temporary restraining order and issue an order that requires the Warden at FCI Danbury to adopt a process for evaluating inmates with COVID-19 risk factors for home confinement and other forms of release that is both far more accelerated and more clearly focused on the critical issues of inmate and public safety than the current process.  Factual disputes as to other issues the inmates raise preclude me from granting further relief at this time, but I also order an expedited period of discovery and schedule a hearing for June 11, 2020, to adjudicate the inmates' motion for preliminary injunction.

## II.   PROCEDURAL HISTORY

On April 27, the inmates (the "Petitioners") filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 against the Warden of FCI Danbury and the Director of the Bureau of Prisons (the "Respondents").  They sought to represent a class consisting of all inmates in the men's prison and the two women's prisons making up FCI Danbury, as well as a "medically vulnerable" subclass consisting of those inmates with COVID-19 risk factors.  They alleged that "[t]he only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally and FCI Danbury in particular is to downsize immediately the incarcerated population and, for the prisoners who remain at the institution, to undertake aggressively the detection, prevention, and treatment measures that public health and medical experts have recommended, including effective social distancing."  ECF No. 1 at 34.  They further alleged that Respondents were violating the Eighth Amendment by "fail[ing] to use the BOP's available statutory

2

authority to reduce the population of FCI Danbury to mitigate the severe risk posed by COVID-19," ECF No. 1 at 41, and by failing to take adequate safety measures—including distancing, hygiene, testing, and medical treatment—to protect inmates during the outbreak.

The Petition seeks a wide range of relief, including an order "requiring Respondents to release from custody or to home confinement members of the [medically vulnerable] Subclass and requiring Respondents to provide medically adequate social distancing and health care and sanitation for members of the Class who remain."  ECF No. 1 at 66.

On April 30, the Petitioners filed an "emergency motion for temporary restraining order and preliminary injunction," seeking an order requiring Respondents to "enlarge [*i.e.*, transfer] to home confinement all women currently housed in the satellite camp at FCI Danbury," "enlarge to home confinement all members of the medically vulnerable Subclass,"[1] and "implement appropriate measures to maximize social distancing and improve hygiene" for the remaining inmates or transfer them to safer BOP facilities.  ECF No. 14 at 1.  Together with their Petition and motion, Petitioners filed declarations from inmates housed at each of the three prisons within FCI Danbury, as well as declarations from experts and other evidence.

On May 5, the Respondents filed a joint motion to dismiss the habeas petition under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and an opposition to the motion for temporary restraining order and preliminary injunction.  The Respondents argued that the Court lacked jurisdiction over the habeas petition, that it failed state a claim, and that the Petitioners' motion should be denied. With regard to jurisdiction, the Respondents argued, among other things, that the Court was

---

[1] During oral argument on the motion for temporary restraining order and preliminary injunction, Petitioners' counsel stated that, by asking for an order of "enlarge[ment]," Petitioners were *not* seeking the immediate, indiscriminate release of inmates, but instead asking for a process by which inmates would be evaluated promptly for transfer to home confinement, with the urgency reflected in the Attorney General's April 3 memo.  The order I issue today requires the implementation of such a process.

prohibited from entertaining the Petitioners' requests for "enlargement", because doing so would exceed the limited authority of district courts to modify sentences once they are imposed; that the Prison Litigation Reform Act, 18 U.S.C. § 3626, foreclosed such relief; and that the Petitioners had failed to exhaust administrative remedies. The Respondents also submitted a lengthy declaration by the Warden and defended her efforts to combat the COVID-19 crisis on the merits, detailing safety measures the Warden had imposed at FCI Danbury, including enhanced sanitation, quarantine of inmates, isolation of groups of inmates, the provision of masks and other protective equipment to inmates and staff, and delivery of food and programming directly to the living units. Finally, the Respondents argued that this habeas petition cannot be maintained as a class action.

I held oral argument on May 6, 2020, and now issue this ruling.

## III.    FACTUAL BACKGROUND

The factual background is taken from the Petition, the declarations submitted by Petitioners, and the Warden's declaration.

### A.    The Petitioners

Petitioners are four inmates currently serving terms of imprisonment at FCI Danbury. Petitioners suffer from medical conditions that place them at higher risk for serious illness or death from the disease caused by the SARS-CoV-2 virus ("COVID-19"). They bring this habeas petition on behalf of themselves and a putative class of all inmates currently in custody at FCI Danbury, or who will be in custody at FCI Danbury during the course of the COVID-19 pandemic ("the Class"), as well as a subclass consisting of all such individuals who are also at heightened risk for serious illness or death from COVID-19 ("the Medically Vulnerable Subclass").

Petitioner Dianthe Martinez-Brooks is a 50-year-old woman currently housed in FCI Danbury's women's minimum-security camp. ECF No. 1 ("Petition") ¶ 1. Ms. Martinez-Brooks suffers from systematic lupus erythematosus, an inflammatory autoimmune disease of the connective tissue, for which she takes corticosteroids. *Id.* The prolonged use of corticosteroids can cause a person to be immunocompromised.[2] Ms. Martinez-Brooks also suffers from asthma and hypertension. *Id.* She is serving a 48-month sentence for wire fraud, and her projected release date is June 25, 2022. ECF No. 1-3 at 2.

Petitioner Kenneth Cassidy is a 54-year-old man currently housed at FCI Danbury's men's prison, a low-security facility. ECF No. 1-4 at 2. He has had three heart attacks, has had pneumonia in his right lung more than 20 times, and suffers from multiple chronic medical conditions, including asthma, coronary artery disease, and hypertension. *Id.* He is morbidly obese. *Id.* at 3. Mr. Cassidy is serving a 5 year sentence for conspiracy to commit wire fraud and willful failure to file an income tax return. *Id.* His projected release date is March 31, 2021 and his projected home confinement release date is October 1, 2020. *Id.*

Petitioner Rejeanne Collier is a 64-year-old woman currently housed in the Women's Camp. Petition ¶ 2. She suffers from lupus, hypertension, and hepatitis C and has been treated for cancer while in custody. *Id.* She is serving a 15 ½ year term of imprisonment for conspiracy to possess with intent to distribute and to distribute one kilogram or more of heroin. ECF No. 24-2 at 38-39.

---

[2] *People Who Are at Higher Risk for Severe Illness*, CDC (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Petitioner Jackie Madore is a 50-year-old woman currently housed in the low security satellite prison.  Petition ¶ 3.  She suffers from hypertension, hypothyroidism, and hepatitis C. *Id.*

**B.      The COVID-19 Pandemic**

The COVID-19 pandemic is an ongoing, once-in-a-century public health crisis to which no reader will need much introduction.  As of May 11, 2020, there have been a whopping 1.3 million confirmed cases and roughly 80,000 deaths from COVID-19 in the United States alone. *Cases in the U.S.*, CDC.gov (last updated May 11, 2020).[3]  Shops, restaurants, and offices remain shuttered in many states, and unemployment has reached levels unseen since the Great Depression.

Not all Americans, however, are equally at risk.  It is well established that the elderly and those suffering from certain preexisting medical conditions are at significantly higher risk of serious illness or death from COVID-19.  According to the Centers for Disease Control and Prevention ("CDC"), those at high risk for severe illness from COVID-19 include people who are 65 years and older, have chronic lung disease or moderate to severe asthma, have serious heart conditions, are immunocompromised, are severely obese, have diabetes, have chronic kidney disease and are undergoing dialysis, or have liver disease.[4]  High-risk individuals face significantly higher mortality rates should they contract COVID-19 than the general population. According to one report, for example, the mortality rate from COVID-19 is 8.4% for individuals with hypertension, 8.0% for individuals with chronic respiratory disease, 7.6% for individuals with cancer, and 13.2% for individuals with cardiovascular disease.  ECF No. 1 at 9-11 (citing

---

[3] URL: https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[4] *People Who Are at Higher Risk for Severe Illness*, CDC (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Report of WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health

Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-

china-joint-mission-on-covid-19-final-report.pdf (last visited May 7, 2020)).

  Petitioners' medical conditions place them in this high-risk group.  And Petitioners face

an additional risk that even most of those in the high-risk group do not:  They are incarcerated.

According to Petitioners' expert, "[t]he risk posed by infectious diseases in jails and prisons is

significantly higher than in the community, both in terms of risk of transmission, exposure, and

harm to individuals who become infected."  ECF No. 1-1 at 3.  And it is not difficult to imagine

why.  The vast majority of the inmates at FCI Danbury live in large dormitory halls lined with

bunk beds, each housing roughly 50 or more inmates, with shared bathrooms and common

spaces.  This arrangement makes effective social distancing virtually impossible.

  Thus, not surprisingly, numerous federal and state prisons are contending with significant

COVID-19 outbreaks, and FCI Danbury is no exception.  Since the pandemic began, sixty-nine

inmates at FCI Danbury have tested positive, out of an inmate population of approximately

1,000.  ECF No. 24-2 at 25.  But this figure may well understate the true number of COVID-19

cases at FCI Danbury, in light of the limited testing that has been conducted.  One inmate has

died since the crisis began.  In fact, FCI Danbury was one of only three federal prisons

specifically identified by Attorney General William Barr in an April 3, 2020 memo to the

Director of the Bureau Prisons ordering immediate action to place vulnerable inmates on home

confinement.  ECF No. 24-2 at 48.  In the memo, Attorney General Barr noted the "significant

levels of infection" at FCI Danbury, along with FCI Oakdale and FCI Elkton.  *Id.*

**C.      The Warden's Efforts To Contain the Outbreak**

The extent to which the Warden has implemented adequate measures to control the

COVID-19 outbreak at FCI Danbury and protect inmates is hotly disputed in this case.  The

Warden's efforts and the Petitioners' allegations regarding their insufficiency are described in

the sections that follow.

**1.      Social Distancing**

According to the CDC, social distancing is "the best way to reduce the spread of

coronavirus disease 2019 (COVID-19)."  *Social Distancing*, CDC (May 6, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.

Practicing social distancing requires individuals to stay at least 6 feet from other people, to avoid

gathering in large groups, and to stay out of crowded places and avoid mass gatherings.  *Id.*

These measures are virtually impossible to observe in a prison setting, particularly at facilities

like FCI Danbury.  FCI Danbury consists of three facilities—a low-security men's prison, a

minimum-security women's camp, and a low-security women's satellite prison.  ECF No. 24-2 at

4-5.

In the men's prison, there are seven units of open, dorm-style housing, two smaller rooms

that can house ten to twelve inmates each, and three units of individual cells.  ECF No. 24-2 at 4.

Thus, the majority of the inmates at the men's prison live in large, open dormitories, with shared

common spaces and bathrooms.  For example, Petitioner Kenneth Cassidy sleeps in a room with

65 other prisoners.  ECF No. 1-4 at 9.  He sleeps within one foot of the prisoner on the bunk

above him, and within three to four feet of the four prisoners in the two bunks on either side of

him.  *Id.*  There are no barriers between the beds.  *Id.*  As of May 4, 2020, the men's prison

housed 719 inmates.  ECF No. 24-2 at 4.

8

In the women's satellite prison, all of the women are housed in a single dormitory-style room that accommodates approximately 160-170 beds.  Petition ¶ 36.  The room is divided into cubicles, each containing two bunk beds, separated by approximately four feet.  *Id.*  Beds in each cubicle are immediately adjacent to the cubicle wall, which does not reach to the ceiling.  *Id.*  In some instances the wall does not even reach the top of the bunk bed, and the woman on the top bunk sleeps right next to the woman on the top bunk in the adjacent cubicle.  *Id.*  The women in the satellite prison share three bathrooms, each of which includes between 4-8 toilets, sinks, and showers.  *Id.*  As of May 4, 2020, the women's satellite prison housed 131 inmates.  ECF No. 24-2 at 5.

The women's prison camp is a large building divided into four dormitories, each consisting of cubicles and bunk beds.  *Id.* at 4.  The cubicles have no doors and their dividing walls do not extend to the ceilings.  Petition ¶ 37.  The bunk beds are less than six feet apart.  *Id.* Each of the four dormitories has a common shower and bathroom area.  *Id.*  Three of the dorms house 47 women each, and the fourth houses 7.  *Id.*  As of May 4, 2020, the women's camp housed 134 inmates.  ECF No. 24-2 at 4.[5]

The Petitioners complain that social distancing—arguably the most effective measure for preventing the spread of COVID-19—is impossible at FCI Danbury.  Most of the inmates at FCI Danbury live in large, open dormitories with 50 or more other inmates, where they sleep within 3 to 4 feet of between 3 and 5 other prisoners.  Petition ¶ 149.  Prisoners use the same bathrooms and share a limited number of toilets, sinks, and showers, as well as a limited number of telephones and computers, which are located close together in common areas.  *Id.*  Moreover,

---

[5] As these two sentences show, the figures estimated by Petitioners differ somewhat, but not materially, from those estimated by Respondents; these differences may be a function of the different times at which they filed their submissions.

according to Petitioners, prisoners are unnecessarily made to line up in close proximity to one another to receive their meals and medications.  *Id.* ¶ 150.

The Warden contends that she has taken substantial steps toward implementing social distancing.  In general, smaller inmate groups at FCI Danbury have been formed by separating inmates by housing unit so they can "shelter in place" with the fewest number of fellow inmates.  ECF No. 24-2 at 9.  These groups are rotated through the recreation facility by themselves, and the facility is disinfected between groups.  *Id.*  Programs, including "Education, Psychology, and Religious Services" are delivered in each unit, and meals are delivered directly to the units by staff (rather than inmate food service workers) in order to maintain the integrity of the inmate group quarantine.  *Id.*  While the Respondents compare this arrangement to "family units in the general population," and note that an inability to full socially distance is typical of many, if not all, correctional institutions, ECF No. 24-1 at 73, the fact remains that true social distancing appears to be unachievable at FCI Danbury, creating an environment where the risk of transmission is significantly heightened.

## 2.    Screening and Testing

Petitioners contend that the Warden has failed to adequately screen inmates for COVID-19 symptoms and test and isolate inmates exhibiting symptoms.  According to Petitioners, inmates who complain to staff of symptoms consistent with COVID-19—including coughing, congestion, and shortness of breath—are routinely unable to obtain immediate medical examination, are not tested for COVID-19, and are returned to the general population until their symptoms worsen.  Petition ¶ 131.  For example, Kimberly Hoisington, an inmate at the satellite prison, indicates that on March 26, she reported being ill to staff on two separate occasions, but was told to lie down.  ECF No. 1-7 at 2.  By early morning on March 27, she developed severe

chest pain and was eventually taken to the hospital, where she tested positive for COVID-19. *Id.* Similarly, Christina Korbe, an inmate at the satellite prison, submitted testimony indicating that, in early April, she began experiencing symptoms consistent with COVID-19, including a severe headache, body aches, fever, shortness of breath, and "a terrible cough"—the "worst cough I have ever had." ECF No. 1-5 at 2. She spoke to the medical department multiple times about her symptoms but was never offered a test for COVID-19. *Id.* Despite her symptoms, she was not quarantined but was instead kept with the general population. *Id.* She further claims that she has personally observed many other prisoners with symptoms similar to hers, but that the majority of these women were not placed into quarantine. *Id.* at 3. Petitioner Cassidy, an inmate at the men's prison, indicates that "[a]pproximately 80% of prisoners in my unit show flu-like symptoms, including fever, coughing, body aches, shortness of breath, chest pressure, and headaches." ECF No. 1-4 at 3.

Inmate Christina Korbe also relates that, on April 24, a woman at the satellite prison became extremely sick, vomiting and struggling for air. ECF No. 1-5 at 3. Other inmates were around her, trying to help her, without wearing any gloves or masks. *Id.* She was sick for hours and throughout the night, and the inmates did not understand why the staff did not take her to the hospital. *Id.* In response to concern among the inmates, a correctional officer (a lieutenant) came into the dormitory and announced that anyone who used the phone to contact people on the outside about the incident would get a disciplinary violation, and that the inmates needed to "stay in [their] lane" because they "are not doctors." *Id.* The sick woman was eventually taken to the hospital early on April 25. *Id.* At oral argument, the Respondents indicated that she was taken to the hospital because she was aspirating—choking on her own vomit—and that she was intubated for this reason, although she also tested positive for COVID-19. The Respondents

further indicated that she was taken off the ventilator the very next day and sent back to FCI Danbury after only two nights in the hospital. According to Christina Korbe, many of the women who had been in contact with the woman who was taken to the hospital were tested for COVID-19, and at least ten of them tested positive. These women have been quarantined, but were first allowed to come back to the dormitory to get their personal belongings and take showers. *Id.* at 3-4.

The Warden contends that inmates are screened daily for COVID-19 symptoms. For example, beginning on April 9, 2020, the Lieutenants at FCI Danbury began visiting each housing unit daily to take the temperature of all inmates assigned to that unit. ECF No. 24-2 at 24. Any inmate found to have a temperature of 99 degrees or higher is sent to Health Services for a follow-up assessment by a licensed health care provider. *Id.* Petitioners contend, however, that these readings are sometimes manipulated to avoid appropriate follow-up by requiring prisoners to drink a glass of cold water, attributing high readings to equipment error, or holding the temperature wand too far from inmates' foreheads. Petition ¶ 134. According to inmate Kimberly Hoisington, for example, when she was taken to the hospital, her temperature was 102 degrees upon arrival, while an hour earlier, FCI Danbury staff had told her that her temperature was 97 degrees. ECF No. 1-7 at 2.

In general, the Warden claims that any inmate at FCI Danbury presenting with symptoms consistent with COVID-19 is immediately evaluated by a medical provider to determine whether testing and/or isolation is appropriate, whether contact tracing might be necessary, and whether inmates with whom the symptomatic inmate had contact might need to be quarantined. ECF No. 24-2 at 24. The decision whether to test an inmate for COVID-19 is made by BOP medical providers based on a number of criteria, including but not limited to: (1) the nature and severity

of the symptoms; (2) the inmate's potential exposure to COVID-19; and (3) whether the inmate is considered "high-risk." *Id.* On April 14, 2020, FCI Danbury received an Abbott "ID NOW" machine that can deliver test results within approximately 15 minutes. *Id.* at 24-25. As of May 4, 2020, FCI Danbury had 150 COVID-19 testing kits in stock, and the facility has the ability to order and quickly receive additional kits from a designated vendor if needed. *Id.* at 25. Since the advent of the emergency, 205 inmates have been tested for COVID-19; sixty-nine inmates and fifty-six staff have tested positive. *Id.* This includes testing of every woman at the satellite prison, performed at the behest of U.S. Senator Christopher Murphy between May 2nd and 3rd, during which 20 of 143 women tested positive. *Id.*

### 3.    Isolation and Quarantine

The Petitioners claim that the Warden has further failed to adequately isolate individuals testing positive for COVID-19 and to quarantine individuals who have had contact with inmates infected with COVID-19. According to the CDC's "Interim Guidance on Management of [COVID-19] in Correction and Detention Facilities," "as soon as an individual develops symptoms of COVID-19, . . . they . . . should be immediately placed under medical isolation in a separate environment form other individuals," and "persons who are close contacts of a confirmed or suspected COVID-19 case . . . should be placed under quarantine for 14 days." CDC (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html [hereinafter CDC, Interim Guidance]. For medically isolated individuals, the CDC provides the following criteria for how long an individual testing positive must be isolated:

- **For individuals who will be tested to determine if they are still contagious:**
  - The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- o  The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**
- o  The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart
- **For individuals who will NOT be tested to determine if they are still contagious:**
  - o  The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**
  - o  The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**
  - o  At least 10 days have passed since the first symptoms appeared
- **For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**
  - o  At least 10 days have passed since the date of the individual's first positive COVID-19 test **AND**
  - o  The individual has had no subsequent illness

*Id.*

According to Petitioners, in spite of this guidance, prisoners who test positive for COVID-19 are returned to the general population far earlier than appropriate.  Petition ¶ 140. For example, Tamika Somerville, an inmate at the satellite prison, indicates that a woman in her unit, who sleeps in the adjacent cubicle, was removed from the unit because she had a fever, tested positive for COVID-19 on a Tuesday, and was returned to the unit that same Friday.  ECF No. 1-9 at 3.  The Petitioners also indicate that staff members who test positive for COVID-19 return to work while still symptomatic. For example, inmate Marius Mason indicates that one officer told her she still felt ill and did not want to be at work, but was nonetheless told to return. ECF No. 1-6 at 3.

The Warden, on the other hand, indicates that separate housing spaces have been established for "isolation" (for inmates demonstrating symptoms) and "quarantine" (for asymptomatic inmates) in each of the three facilities, and each facility has the ability to create additional isolation/quarantine space should the need arise.  ECF No. 24-2 at 10-11.  She indicates that all inmates who present with COVID-19 symptoms are isolated and tested the

same day, "provided testing supplies are available." *Id.* at 26.  According to the warden, under

no circumstance are inmates who have been placed in isolation released to the general population

prior to meeting the CDC's symptom-based criteria.[6]  *Id.* at 27.  Staff are subjected to screening,

including having their temperature taken, prior to the start of every shift.  *Id.* at 16.  If a staff

member reports symptoms consistent with COVID-19, he or she is sent home.  *Id.* at 17.  If a

staff member tests positive, his or her suitability for returning to work is evaluated under the

CDC's symptom-based criteria (as described in footnote 4).  *Id.*

**4.      Sanitation and Hygiene**

Petitioners claim that they do not have adequate cleaning supplies to clean their personal

areas, and that shared living spaces throughout the facility are not regularly or properly

disinfected to prevent the spread of COVID-19.  Petition ¶ 159.  Telephones, computers and

video calling equipment, and televisions shared by hundreds of prisoners are not cleaned or

disinfected between uses, and the common areas in which the equipment is located is not

regularly or properly disinfected.  *Id.* ¶ 161.  CDC Guidance further recommends thoroughly

cleaning and disinfecting all areas where confirmed or suspected COVID-19 cases spent time.

CDC, Interim Guidance.  According to Petitioners, however, units where prisoners who test

positive were housed are not being subjected to any heightened cleaning.  Petition ¶ 162.

Petitioners also indicate that prisoners have no access to hand sanitizer, which has been out of

stock at the commissary for the duration of the present crisis, and that liquid soap dispensers

were only recently installed in the men's prison but are not regularly restocked.  *Id.* ¶ 163.

According to the Petitioners, soap is unavailable to indigent prisoners.  *Id.* ¶ 165.

---

[6] The Warden describes these criteria as follows: "(1) being fever-free for greater or equal to 72 hours without the use of fever-reducing medication, and (2) respiratory symptoms have improved, and (3) at least 7 days have passed since the first symptoms appeared."  ECF No. 24-2 at 27.

The Warden, by contrast, indicates that cleaning supplies are distributed throughout the facility on a daily basis, including a broad-spectrum disinfectant ("Virex II/256"), which was added specifically to address the coronavirus threat. ECF No. 24-2 at 12-13. Once in the housing units, cleaning supplies are maintained in small caddies or bins kept in staff offices or closes, which inmates can then ask to bring back to their living areas. *Id.* at 13. Large area disinfection is being performed at both the satellite prison and the men's prison through the use of backpack cleaning chemical sprayers. *Id.* While the Warden indicates that recreational areas are disinfected between uses, she does not indicate whether items such as phones and computers are disinfected between uses. As for soap and other personal hygiene products, the Warden maintains that inmates at FCI Danbury are provided with basic soap and personal hygiene products by the institution, and that "there is never a reason an inmate should not have access to soap at FCI Danbury." *Id.* at 14. In addition, prisoners can purchase up to 13 different kinds of soap, as well as other personal hygiene products, from the commissary. *Id.* The Warden does not indicate whether inmates have access to hand sanitizer.

## 5. Personal Protective Equipment

According to the Warden, staff at FCI Danbury have, and will continue to have, access to appropriate personal protective equipment ("PPE"). ECF No. 24-2 at 15. Upon reporting to work each day, staff at FCI Danbury are provided with new surgical masks, which they are required to wear throughout their shift. *Id.* Additional PPE, including gowns, gloves, N-95 particulate respirators, and face shields, are available for staff working in Health Services, Receiving & Discharge, and isolation housing units. *Id.* Staff are instructed as to the proper use of PPE. *Id.* Inmates at FCI Danbury were initially provided with two of the same surgical masks provided to staff. *Id.* at 16. Once FCI Danbury was able to procure cloth masks, two of these

masks were issued to every inmate.  *Id.*  Upon request, inmates are still provided with the same surgical masks provided to staff.  *Id.*  Inmates are required to wear these masks at all times, except when they are eating or sleeping, and failure to do so can result in disciplinary action.  *Id.*

Petitioners contend that the usage of PPE is inconsistent, and correctional staff do not enforce mask usage against prisoners who refuse to cover their faces, nor do correctional staff consistently wear masks or gloves when they are in the units.  Petition ¶ 182.  Prisoners—including prisoners on cleaning duty—are not provided with gloves to protect their hands from exposed surfaces.  *Id.* ¶ 180.  And in many parts of the facility, FCI Danbury only provides one mask per prisoner and, therefore, prisoners have no protection when their masks are being washed.  *Id.* ¶ 179.

**6.      Medical Treatment for Other Conditions**

Petitioners allege that, since the onset of the COVID-19 crisis, non-virus medical needs have sometimes gone unattended.  Petition ¶ 188.  Prisoners who do not present with a fever during sick call cannot gain access to a physician, and sick call requests unrelated to the virus go unanswered for prolonged periods of time.  *Id.*  Petitioners indicate that medical triage in the men's prison is conducted by a social worker without medical training, who is openly contemptuous of the men's needs.  Petition ¶ 129.  Petitioner Cassidy represents, for example, that the social worker told the men in his unit, "You are all fucking children with nothing more than a flu so stop your shit you're not going home early."  ECF No. 1-4 at 5-6.  She has also told the men, "I don't need medical training to tell you you're not sick so go lay the fuck down."  *Id.*

Petitioners further indicate the prison pharmacy has been closed, and medications must be shipped from another facility, resulting in delays in their delivery and disruption of medication regimens.  *Id.* ¶ 189.  Petitioner Cassidy, for example, indicates that he did not

receive the correct dose of his medication for two weeks in April, ECF No. 1-4 at 3, and

Petitioner Martinez-Brooks indicates that her blood pressure medicine ran out on April 2 and

additional medicine did not reach her until April 10.  ECF No. 1-3 at 4.  Similarly, inmates with

special medical diets or allergies have received meals containing ingredients harmful to their

health.  Prisoners with peanut allergies have received meals containing peanut products, and

Petitioner Cassidy, who suffers from diverticulosis, has received meals containing rice and

beans.  Petition ¶ 190.  Petitioners further indicate that, as a result of staff shortages, officers and

staff are sometimes not available to respond to medical emergencies.  *Id.* ¶ 187.

The Warden, while acknowledging that several medical staff are on leave, for reasons

both related and unrelated to COVID-19, indicates that a BOP Medical Asset Support Team,

including an Associate Warden, two physician assistants, and one pharmacist, has been

dispatched to FCI Danbury to assist with its COVID-19 response.  ECF No. 24-2 at 25-26.  The

Warden maintains that inmates continue to have access to Health Services, but that, in order to

maintain the integrity of the group quarantines, Health Services staff (including the social worker

and the dental hygienist) go to the individual housing units to pass out and collect "sick call

forms," which are written requests to Health Services.  *Id.* at 26.  These staff do not perform any

assessments at that time.  *Id.*  The "sick call" forms are then triaged by a registered nurse or a

physician assistant for appropriate action.  *Id.*  If it is determined that inmates need to be seen in

the clinic, they are set for an appointment at a time they can move to the clinic with other

members of their quarantine group or unit.  *Id.*  For emergent medical needs, an inmate can

always be specifically called up to the clinic outside the scheduled time for his or her unit.  *Id.*

The Warden also indicates that the pharmacy at FCI Danbury has remained functioning

throughout the course of the current crisis, and that there are two scheduled times per day when

18

inmates can, with their quarantine group, proceed to the clinic for "pill line" or for staff-assisted medication administration.  *Id.* at 27.

### D.    Home Confinement and Compassionate Release

By contrast to the abundant factual disputes regarding the Warden's implementation of safety measures, the facts regarding the Warden's use of home confinement and compassionate release are largely undisputed.

### 1.    Home Confinement

The Bureau of Prisons has statutory authority to transfer prisoners to home confinement under 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  ECF No. 24-2 at 18.  Under 18 U.S.C. § 3624(c)(2), the Bureau of Prisons may "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."   Under 34 U.S.C. § 60541, the BOP may release some or all eligible elderly offenders[7] and eligible terminally ill offenders[8] from BOP facilities to home detention, upon written request from either BOP staff or an eligible offender.

---

[7] The statute defines "eligible elderly offender" to mean an offender in the custody of the Bureau of Prisons (i) "who is not less than 60 years of age"; (ii) "who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offense that do not include any crime of violence . . . , sex offense . . . , or offense under chapter 37 of title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced"; (iii) "who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii)"; (iv) "who has not been determined by the Bureau of Prisons, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause"; (v) "who has not escaped or attempted to escape"; (vi) whose release "will result in a substantial net reduction of costs to the Federal Government"; and (vii) "who has been determined by the Bureau of Prisons to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention."  34 U.S.C. § 60541(g)(5)(A).

[8] The statute defines "eligible terminally ill offender" to mean an offender who (i) "is serving a term of imprisonment based on a conviction for an offense or offenses that do not include any crime of violence . . . , sex offense . . . , offense described in section 2332b(g)(5)(B) of title 18, or offense under chapter 37 of title 18"; (ii) "satisfied the criteria specified in clauses (ii) through (vii) of subparagraph (A) [defining eligible elderly offender]"; and (iii) "has been determined by a medical doctor approved b the Bureau of Prisons to be . . . (I) in need of care at a nursing home, intermediate care facility, or assisted living facility . . . or . . . (II) diagnosed with a terminal illness." 34 U.S.C. § 60541(g)(5)(D).

On March 26, 2020, Attorney General Barr issued a memorandum to the Director of the Bureau of Prisons, titled "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic." ECF No. 24-2 at 45. In the memo, Attorney General Barr stated that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP Facilities." *Id.* He directed the Bureau to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." *Id.* The memo provides a non-exhaustive list of discretionary factors for evaluating inmates for confinement. First and foremost among these is the "age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines." *Id.* The other factors in the memo include:

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

*Id.* at 46.

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which authorized the Director of the Bureau of Prisons to lengthen

the amount of time prisoners can be placed on home confinement under Section 3624(c)(2)—previously capped at the shorter of 10% of their sentence or 6 months—provided that the Attorney General makes a finding that "emergency conditions will materially affect the functioning of the Bureau."[9]  CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020).

Attorney General Barr made quick use of his authority under the CARES Act, issuing a memo on April 3, 2020, in which he made the requisite finding that "emergency conditions are materially affecting the functioning of the Bureau."  ECF No. 24-1 at 48.  The memo indicated that the Bureau of Prisons was "experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton."  *Id.*  Noting the Bureau's "profound obligation to protect the health and safety of all inmates," Attorney General Barr directed the Bureau to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions."  *Id.*

Reflecting the urgency of the situation, Attorney General Barr's memo directed immediate action.  He directed the Bureau to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC," to "immediately maximize appropriate transfers," and to "begin implementing this directive immediately."  *Id.* at 49.  He noted that, "[g]iven the speed with which this disease has spread through the general public, it is clear that time is of the essence," and directed the Bureau to "implement this Memorandum as quickly as possible . . . ."  *Id.*

---

[9] Section 12003(b)(2) provides that "[d]uring the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."  CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020).

Attorney General Barr's memorandum specifically named FCI Danbury—out of over one hundred BOP facilities--as one of three experiencing significant outbreaks and with respect to which the Bureau was to move "as quickly as possible." *Id.* 48-49. Moreover, the Attorney General made clear that the Bureau's review was to include "all at-risk inmates—not only those who were previously eligible for transfer" and "starting with the inmates incarcerated FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where [the Director] determine[s] that COVID-19 is materially affecting operations." *Id.* at 49. The Attorney General went further, stating that although the BOP has limited resources to monitor inmates on home confinement, he was authorizing it to transfer inmates to home confinement "even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety." Id. Noting, however, the Bureau's responsibility to protect the public, Attorney General Barr directed the Bureau to continue to make "individualized determinations" and cautioned against the "indiscriminate" release of prisoners. *Id.* at 50.

Despite the explicit statutory authority under the CARES Act to place any inmate on home confinement, and despite Attorney General Barr's urgent memorandum calling out FCI Danbury and directing immediate action, the Warden's use of her home confinement authority has been limited. Since March 26, the Warden indicates that of the nearly 1,000 inmates at FCI Danbury, only 159 inmates have been reviewed for home confinement, and only 21 of these have been released to home confinement. ECF No. 24-2 at 23.[10]

---

[10] The Warden indicates that another 2 inmates have been released on furlough until the beginning of a previously established home confinement date. ECF No. 24-2 at 23-24.

In her description of the Bureau's—and FCI Danbury's—implementation of Attorney General Barr's memoranda and the Bureau's expanded home confinement authority under the CARES Act, the Warden indicates that BOP Case Management staff are reviewing inmates for suitability for home confinement, and that inmates do not need to apply to be considered, although any inmate who believes he or she is eligible may submit a request. *Id.* at 22.  The Warden indicates that BOP is currently assessing "a number of factors to ensure an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional disciplinary history for the last twelve months; ensuring the inmate has a verifiable release plan; verifying the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer." *Id.* at 23.  In addition, the Warden indicates that, at this time, BOP is "prioritizing for consideration those inmates who either (1) have served 50% or more of their sentence, or (2) have 18 months or less remaining in their sentence and have served 25% or more of their sentence." *Id.*  The Warden does not provide any indication regarding the extent to which inmates' COVID-19 risk factors—such as their age and preexisting medical conditions—are weighed in evaluating inmates for home confinement.

A Danbury Inmate Bulletin from the Warden dated April 16, 2020 and titled "Criteria for Home Confinement based on COVID-19 Guidelines," apparently distributed to inmates, indicates that the criteria for home confinement include: "No incident reports in the past 12 months (regardless of severity level)"; "U.S. Citizen"; "PATTERN risk score is MINIMUM"; and "Mental Health Care Level is less than CARE-MH 4."  ECF No. 15-7 at 2.  The April 16 Bulletin further indicates that "Other considerations" include age, projected release date, percentage of time served, medical care level, issues related to victims, date of arrival to FCI Danbury, gang-related activity, health concerns of residents in the proposed release plan, and

medical needs/concerns in the community.  *Id.*  A more recent Danbury Inmate Bulletin, dated

April 21, 2020 and titled "Updated criteria for Home Confinement based on COVID-19

guidelines," lists eight criteria that "must" be met to be eligible for home confinement:

1. Primary Offense is not violent;
2. Primary Offense is not sex offense;
3. Primary Offense is not terrorism;
4. No detainer;
5. Mental Health Care Level is less than IV;
6. PATTERN risk score is MIN;
7. No Incident Reports in the past 12 months;
8. **Inmate must have served at least 50% of their sentence** [bolded in original]

ECF No. 15-8 at 1.  The April 21 Bulletin gives no indication whether and how inmates'

COVID-19 risk factors are factored into the analysis.

## 2.    Compassionate Release

Under 18 U.S.C. § 3582(c)(1)(A), a sentencing court may, upon motion of the Director of

the Bureau of Prisons or upon motion of the defendant, reduce a defendant's term of

imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction."[11]

This authority is often referred to as "compassionate release."  Importantly, if the Bureau of

Prisons does not bring a motion for compassionate release on behalf of a defendant, the

defendant may only bring a motion on his or her own behalf after either "fully exhaust[ing] all

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf" or "the lapse of 30 days from the receipt of such a request by the warden of

the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

Since the COVID-19 crisis began, it does not appear that the BOP has issued any updated

internal guidance as to the standards to be used in assessing whether there are "extraordinary and

---

[11] The statute further requires the sentencing court to consider the factors set forth in Section 3553(a) to the extent
that they are applicable.  18 U.S.C. § 3582(c)(1)(A).

compelling reasons" warranting a reduction in a defendant's term of imprisonment. Respondents' brief points to a BOP program statement that was last updated in January 2019. ECF No. 24-1 at 31 (citing Program Statement 5050.50, available at http://www.bop.gov/policy/ progstat/5050_050_EN.pdf).  That document, of course, makes no mention of the current pandemic; nor does it mention the risk of infection inside prisons in general.  Instead, it identifies a few extreme situations that might make "compassionate release" appropriate.  These extreme cases include: "inmates who have been diagnosed with a terminal, incurable disease" or "an incurable, progressive illness" or "debilitating injury" that has left them "completely disabled" or "capable of only limited self care and . . . confined to a bed or chair more than 50% of waking hours"; inmates who are 65 or older, suffer from "chronic or serious medical conditions related to the aging process," experience "deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility," have no prospect of "substantial improvement" in their condition from "conventional treatment," and have served at least half their sentence; inmates age 65 or older who have served the greater of 10 years or 75% of their sentence; and inmates whose minor children "are suddenly without a family member caregiver due to that caregiver's death or incapacitation."  *Id.*  Even in these cases, "compassionate release" is far from guaranteed.  Instead, the inmate must satisfy a host of criteria, some of which are focused on public safety but others of which include the age at which the inmate committed the offense, whether the inmate lived with the caregiver (in cases of deceased caregivers), and whether the inmate received public funding or had a job prior to incarceration.  *Id.*

For the Bureau of Prisons to bring a motion for compassionate release on behalf of a defendant, a lengthy, multi-tiered administrative process must first play out.  First, the Warden must determine that the request warrants approval.  Requests do not reach the Warden's desk,

however, until "various staff" at the prison have reviewed the request first.  ECF No. 24-2 at 27.

Next, even if the Warden approves the request, BOP regulations provide that the Director will

make a motion under Section 3582(c) only after further review by both the General Counsel and

either the Medical Director or the Assistant Director, Correctional Programs Division.  28 C.F.R.

§ 571.62.  Since the beginning of the COVID-19 crisis, however, the Warden has not approved a

single request for compassionate release for referral to the General Counsel, and consequently no

inmate at FCI Danbury has reached the latter stages of the Bureau's administrative process.  *See*

ECF No. 24-2 at 27 (indicating that, from the beginning of the COVID-19 crisis through May 4,

2020, prison officials have received 241 requests for compassionate release and that, of these,

136 have been processed and denied, 18 have been returned to the inmate seeking further

information, 70 are being reviewed by "various staff who need to review the application," and 17

are awaiting the Warden's review).

In the event that the Warden denies a request, a defendant may bring a motion on his or

her own behalf only after either "fully exhaust[ing] all administrative rights to appeal," including

appeals to the appropriate Regional Director and then to the General Counsel, or else waiting for

the 30-day statutory period to expire.  28 C.F.R. §. 571.63; 28 C.F.R. § 542.15.

Where inmates from across the country have managed to bring COVID-19 related

motions for compassionate release on their own behalf, they have enjoyed significant success

before courts in this District.  *See* ECF No. 24-2 at 52-54 (indicating that approximately 25 out

of 48 COVID-19 related motions for compassionate release have been granted in this District

alone since the crisis began).

**IV.    DISCUSSION**

As noted, Respondents have filed both a motion to dismiss under Fed. R. Civ. P. 12(b)(1)

and 12(b)(6) and a response to the Petitioners motion for a temporary restraining order and

26

preliminary injunction.  In the discussion below, I deny the Rule 12(b)(1) motion because I find that the Warden's jurisdictional challenges lack merit; I grant in part and deny in part the motion for temporary restraining order and order expedited discovery and an evidentiary hearing to adjudicate the motion for preliminary injunction; and I deny the Rule 12(b)(6) motion because I find that the Petition states a claim under 28 U.S.C. § 2241.

## A.    The Warden's Jurisdictional Arguments

## 1.    Rule 12(b)(1) Standard

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citations and internal quotation marks omitted).  "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.  In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citations, quotation marks, and alterations omitted).  "A case is properly dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Gonzalez v. Option One Mortgage Corp.*, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014).

## 2.    Sentencing Finality, the Court's Authority under Section 2241, and the BOP's Statutory Discretion

Respondents argue that "[t]his Court lacks authority to divest the BOP and sentencing courts of their jurisdiction to place inmates in home confinement or the sentencing judge's authority to amend a term of imprisonment."  ECF No. 24-1.  This argument is not an obstacle to the temporary restraining order I issue today, because the order does not divest the BOP of any

authority or infringe on the sentencing judge's authority to amend a term of imprisonment.  It merely directs the Respondents to exercise the authority already conferred on them to place inmates in home confinement and consider requests for compassionate release in a manner that does not violate the Eighth Amendment.

First, Respondents point to well-established law regarding the finality of sentences and the limited, statutory authority of sentencing courts to modify them after they are imposed.  *See, e.g., Dillon v. United States*, 560 U.S. 817, 824 (2010) ("A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances." (internal quotation marks and alterations omitted)); 18 U.S.C. § 3582(c) ("The court may not modify a term of imprisonment once it has been imposed except that … [listing specific exceptions for "compassionate release" and subsequent lowering of applicable Guideline ranges]").  But it is clear from context that these restrictions apply to *sentencing courts*.  *See* 18 U.S.C. 3582(a) (referring to the factors that "[t]he court" must consider "in determining whether to impose a term of imprisonment); *id.* 3582(c) (again referring to the "the court" when stating "[t]he court may not modify a term of imprisonment"); *id.* 3582(c)(1)(B) (allowing "the court" to modify a term of imprisonment to the extent allowed by statute or by Rule 35); Fed. R. Civ. Crim. P. 35(a) ("Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error.").  It is less clear whether they apply to a judge presiding over a 2241 petition who did not sentence the petitioner—a common situation, because 2241 petitions must be filed in the jurisdiction of the place of confinement rather than the jurisdiction of the sentencing court.  *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) ("[T]he general rule [is] that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement.")

I need not decide whether I have authority to modify the Petitioners' sentences, however, because the order I impose today does not modify any sentences. What it does do is ensure that inmates who face an imminent risk of serious illness or death from the rapid spread of the coronavirus within the facility receive prompt review of either a request for compassionate release or consideration for home confinement, both of which are within the statutory authority of the BOP.

Respondents also argue that "release" is not an available remedy to a Section 2241 petitioner who challenges the conditions of his or her confinement, citing cases from courts outside the Second Circuit that have so held. *See, e.g., Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005) ("Glaus's [2241] habeas corpus petition would be proper if release were among the possible remedies for an Eighth Amendment deliberate indifference claim. Unfortunately for Glaus, it is not. If an inmate established that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option."). But in their motion for a temporary restraining order, Petitioners do not seek "release from custody." Instead, they seek (among other relief) "enlarge[ment] to home confinement," ECF No. 14 at 1[12]; in home confinement, they would remain within the "custody" of the BOP. *See* 18 U.S.C. 3624(c)(2) (authorizing the BOP to make home confinement placements under a subsection entitled "[p]release custody"); *see also United States v. Hope*, 2018 WL 358490, at *4 (D. Mont. Jan. 10, 2018) ("When a defendant is transferred pursuant to Section 3624(c), he remains under BOP custody until his prescribed term of imprisonment expires."). In any event, Respondents cite no Supreme Court or

---

[12] It is true that one of the forms of relief sought in the habeas petition itself is "release from custody." ECF No. 1 at 66 (praying for the issuance of a writ of habeas corpus or injunctive relief "requiring Respondents to release from custody or to home confinement members of the [medically vulnerable] Subclass ….").

Second Circuit decision suggesting that release is categorically unavailable to a Section 2241 petitioner asserting an Eighth Amendment claim.  To the contrary, the Second Circuit affords habeas petitioners bail, albeit "in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective."  *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).

   Although *Mapp* does not mention Section 2241, it involved a habeas petition brought on behalf of immigration detainees, who commonly rely on Section 2241.  *See, e.g., Basank v. Decker*, 2020 WL 1953847 (S.D.N.Y Apr. 23, 2020) (2241 petition filed by ICE detainees seeking release because of the public health crisis posed by COVID-19); *Ferreyra v. Decker*, 2020 WL 1989417 (S.D.N.Y. Apr. 27, 2020) (same).  Further, the *Mapp* court's statement of its holding makes clear that a federal court's bail authority sweeps broadly across the habeas spectrum: "We hold that the federal courts have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in criminal habeas cases."  *Mapp*, 241 F.3d at 223.  During the ongoing pandemic, district courts within the Circuit have relied on the authority of *Mapp* to issue bail or temporary release orders to 2241 petitioners who have argued that their conditions of confinement and medical histories make them especially vulnerable to serious illness from COVID-19.  *See, e.g., Basank*, 2020 WL 1953847, at *13 ("Even if [ICE detainees petitioning under Section 2241] had not met the requirements for a preliminary injunction, the Court would release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)."); *Ferreyra*, 2020 WL 1989417, at *12 (same); *Coronel v. Decker*, 2020 WL 1487274, at *8-9 (S.D.N.Y. March 27, 2020) (finding that "Petitioners have raised substantial claims" and that "[r]elease is . . . necessary to make the habeas remedy effective" because "[i]f Petitioners were to

remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid.").

Respondents also argue that "Petitioners . . . are seeking to divest the BOP of its statutory and regulatory discretion as to which inmates should be placed on home confinement."  ECF No. 24-1 at 47.  Here, Respondents invoke the language of Section 3621(b), which states, in part, that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."  18 U.S.C. § 3621(b).   But this provision is not an obstacle to the order I impose today either, for several reasons.  First, Petitioners' argument that Respondents are not adequately exercising their authority under Section 3624, as expanded by the CARES Act and the Attorney General's memo, does not require the Court to "review[]" "a designation of a place of imprisonment under this subsection," *i.e.*, under subsection 3621(b). Petitioners are not challenging their designation to FCI Danbury.  Rather, they are challenging Respondents' failure adequately to exercise their separate, recently expanded statutory authority under subsection 3624(c)(2) to place inmates on home confinement.  While subsection 3621(b) gives the BOP broad, general authority over designations of and transfers to "places of imprisonment," a term that some courts have construed to cover halfway houses as well as prisons, *see, e.g., Goldings v. Winn*, 383 F.3d 17, 26 (1st Cir. 2004), subsection 3624(c)(2) provides specific, independent authority to place inmates in home confinement.[13]  So in finding preliminarily that Respondents are not exercising their authority under subsection 3624(c)(2) in a

---

[13] To be sure, the two are not unrelated, and the Second Circuit has suggested, in dicta, that, while the broad authority in subsection 3621(b) is discretionary, the "prerelease" provisions of Section 3624, which includes the home confinement authority of subsection 3624(c)(2), "impose[] an affirmative, discretion less obligation on the BOP, where practicable, to send an offender to a less-restrictive facility during a transitional period prior to final release." *Levine v. Apker*, 455 F.3d 71, 75 (2d Cir. 2006) (citing cases, including *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004) (noting the "shall" language in Section 3624(c)(1))).

constitutionally adequate manner, I am not "review[ing]" the BOP's "designation of a place of imprisonment" under subsection 3621(b).[14]  Second, to the extent there is any ambiguity about whether Section 3621(b) or any other statute bars judicial review of the Respondents' failures to exercise their authority under Section 3624, I would construe it not to do so to avoid the constitutional question that would arise from a wholesale bar on judicial review in the circumstances of this case.  *Triestman v. United States*, 124 F.3d 361, 378 (2d Cir. 1997) ("[W]e must construe a federal statute to avoid constitutional questions where such a construction is reasonably possible.  By construing the habeas-preserving paragraph of Section 2255 to provide that habeas corpus remains available to federal prisoners when Section 2255 is not available and when the failure to allow for some form of collateral review would raise serious constitutional questions, we do just that."); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear . . . .  We require this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." (internal citations and quotation marks omitted)).[15]

---

[14] 18 U.S.C. § 3625, which makes the provisions of the Administrative Procedure Act inapplicable to designation, transfer, and placement decisions by the BOP, also is not a bar to Petitioners' challenge, which is brought under the habeas statute, 28 U.S.C. § 2241, not the Administrative Procedure Act.

[15] During oral argument, Respondents also cited two decisions by another judge on this court, *Fournier v. Zickefoose*, 620 F. Supp.2d 313 (D. Conn. 2009) and *United States v. Ford*, 2009 WL 3059129 (D. Conn. Sept. 21, 2009).  But neither decision suggests that the Court is foreclosed from reviewing whether Respondents are exercising their authority under Sections 3624(c)(2) or 3582(c)(1)(A) in conformity with the Eighth Amendment.  In *Fournier*, the Court reviewed the petitioner's Section 2241 claim regarding the BOP's refusal to allow her to serve the remainder of her sentence in a halfway house or home confinement but found that it failed on the merits. *Fournier*, 620 F. Supp. 2d at 317-18 (noting that "[t]he general rule is that the Fifth Amendment's Due Process Clause does not confer any right upon an inmate to any particular custody or security classification," that the BOP had acted "within its authority to place Fournier" in a halfway house for a shorter period than she desired, and that her Eighth Amendment claim failed because she "neither claims that she has been deprived of the minimal civilized measure of life's necessities" nor asserts that the Warden acted with a sufficiently culpable state of mind).  Similarly, in *Ford*, the court found that the defendant's challenge to his designation to FCI Fairton failed on the merits, concluding that "the BOP [] act[ed] well within its authority under section 3621" in making the designation. 2009 WL 3059129, at * 1.

**3.     The Prison Litigation Reform Act and Res Judicata**

Respondents also raise objections based on the Prison Litigation Reform Act, 18 U.S.C. §

3626 (the "PLRA"), and res judicata, or claim preclusion.  ECF No. 24-1 at 54-58.  For the

reasons set forth below, I find that neither objection precludes the order I enter today.

**a.     The PLRA**

The provisions of the PLRA set forth in 18 U.S.C. § 3626 impose restrictions on the

types of relief federal courts can award in "any civil action with respect to prison conditions."  18

U.S.C. § 3626(a).  Among other things, the statute requires that prospective relief—the type

Petitioners seek in this case—be "narrowly drawn, extend[] no further than necessary to correct

the violation of the Federal right, and [be] the least intrusive means necessary to correct the

violation of the Federal right."  18 U.S.C. § 3626(a).  In addition, the statute imposes strict

prerequisites before a federal court may issue a "prisoner release order," which is broadly

defined as "any order, including a temporary restraining order or preliminary injunctive relief,

that has the purpose or effect of reducing or limiting the prison population, or that directs the

release from or non-admission of prisoners to a prison."  18 U.S.C. § 3626(g)(4).  Those

prerequisites include the failure of some other, earlier-imposed remedy to address the deprivation

of the federal right and the convening of a three-judge court.  *Id.* § 3626(a)(3).  None of these

provisions apply, however, unless the proceeding is a "civil action with respect to prison

conditions," a term that "means any civil proceeding arising under Federal law with respect to

the conditions of confinement or the effects of actions by government officials on the lives of

persons confined in prison, *but does not include habeas corpus proceedings challenging the fact*

*or duration of confinement in prison*."  *Id.* § 3626(g)(2) (emphasis added).  Whether the

requirements of Section 3626 apply here turns on whether the italicized language in the

preceding sentence describes this case.  For the reasons set forth below, I find that it does, and thus that Section 3626 is inapplicable.

The Petitioners in this case are challenging the conditions of their confinement but they are also challenging the "fact . . . of confinement in prison."  Specifically, they contend that their medical histories and the outbreak at FCI Danbury combine to place them in grave danger from COVID-19; that at current facility population levels, they and other FCI Danbury inmates cannot comply with CDC guidelines for physical distancing; and that "[a]s long as prisoners are unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections at FCI Danbury."  ECF No. 1 at 21.  The Petition seeks an order either releasing them from custody altogether or releasing them to home confinement, *id.* at 66, because, "[a]bsent significant de-densifying, people who are confined in prisons, jails, and detention centers, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission."  *Id.* at 26; *see also id.* at 34 ("The only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally and at FCI Danbury in particular is to downsize immediately the incarcerated population….").  In short, Petitioners contend that the fact of their confinement in prison itself amounts to an Eighth Amendment violation under these circumstances, and nothing short of an order ending their confinement at FCI Danbury will alleviate that violation.[16]

These allegations show that, under the plain language of the definition quoted above, this is a habeas proceeding challenging "the fact . . . of confinement in prison."  A "fact," when used

---

[16] This contention distinguishes this case from the situation in *Alvarez v. Larose*, 20cv782-DMS(AHG) (S.D. Cal. May 9, 2020) (attached to Respondents' Notice of Additional Authority, ECF No. 29 at 16), where the court recently reached a different conclusion about the applicability of Section 3626 based in part on the fact that "Plaintiffs fail to argue there are no set of conditions of confinement that would be constitutionally sufficient."  ECF No. 29 at 16. Here, Petitioners are making precisely that argument as to the medically vulnerable subclass.

with "the", refers to, among other things, the "actual occurrence *of* an event" or the "real existence *of* a situation or state of affairs." Oxford English Dictionary (3d ed., Sept. 2014), https://www.oed.com/view/Entry/67478 (emphasis original); *see also* Webster's Third New International Dictionary (defining a "fact" as, among other things, "something that has actual existence," "an occurrence, quality, or relation the reality of which is manifest in experience or may be inferred with certainty," and "an actual happening in time and space.").  "Confinement" in turn, is defined as "the act or state of being confined," *i.e.*, "imprison[ed," Webster's Third New International Dictionary,—a status that plainly applies to each of the Petitioners and those they seek to represent in this case.  "[T]he fact . . . of confinement," then, refers generally to the existence of the state of being imprisoned.  Because Petitioners contend that the Eighth Amendment violation inheres in their incarceration at Danbury FCI and cannot be remedied unless they are removed from that setting, Petitioners are challenging the fact—or "existence"— of their confinement.  *See also Wilson v. Williams*, 2020 WL 1940882, at *5, 10 (N.D. Ohio Apr. 22, 2020) (concluding that a similar habeas petition brought by inmates at FCI Elkton "ultimately seek[s] to challenge the fact or duration of confinement," as well as the conditions of confinement, and that the petition is not subject to the PLRA, 18 U.S.C. § 3626); *Wilson v. Williams*, 20-3447, ECF No. 23-1 (6th Cir. May 4, 2020) (denying the Government's motion to stay, holding that, "[w]here a petitioner claims no set of conditions would be constitutionally sufficient, we construe the petitioner's claim as challenging the fact of the confinement," and concluding that the PLRA does not apply.).

The above construction of the statutory language accords meaning to all parts of the definition of "civil action with respect to prison conditions"—following a well-established canon of statutory construction.  *See, e.g.*, *U.S. v. Bernier*, 954 F.2d 818, 819-20 (2d Cir. 1992)

("[C]ourts must give effect to every word of a statute where possible. . . .  The sole exception to this rule of construction applies where the statute groups words together in a list, in which case the words should be given a related meaning. . . .  No 'list' appears in section 924(c), which contains only two words.  Accordingly, each word should be given separate effect according to its plain meaning.").  Because the first part of the definition already limits its scope to proceedings "with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison," habeas petitions unrelated to conditions of confinement—such as challenges to the validity of a conviction or the length of the sentence imposed by the court—are already excluded from the scope of the PLRA.  Thus, to interpret the habeas clause of the definition to refer only to these types of petitions would make the clause superfluous.  By contrast, interpreting the clause to refer to a subset of habeas petitions "with respect to the conditions of confinement . . . "—namely, those that challenge the "fact or duration of confinement" by claiming, for example, that no constitutional conditions of confinement are possible under the circumstances—gives effect to all parts of the definition.  Put differently, read as a whole, *see U.S. v. Lockhart*, 749 F.3d 148, 154 ("[I]t is well established that statutory phrase should not be construed in isolation; we read statutes as a whole." (internal quotation marks and citations omitted), the definition in subsection (g)(2) strongly suggests that there are habeas proceedings that challenge both the conditions of confinement *and* the "fact or duration of confinement," and that such petitions are exempt from the statute.  The present case presents just such a petition.[17]

---

[17] To the extent that its meaning is unclear, there is little law that further illuminates the phrase "but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g)(2).  I could find no legislative history that shed real light on the phrase, nor any case law within the Second Circuit that explicates it.  As Respondents note, the Second Circuit has suggested, in dicta, that the PLRA applies to at least some habeas petitions challenging conditions of confinement.  *Jones v. Smith*, 720 F.3d 142, 145 n.3 (2d Cir. 2013)

b.    **Res Judicata**

Respondents' res judicata argument points out that two of the petitioners have filed

motions for "compassionate release" under 18 U.S.C. § 3582(c)(1)(A), and that one of those

motions—filed by Petitioner Cassidy—was denied without prejudice by the sentencing judge.

(The motion has since been renewed, reportedly following Mr. Cassidy's efforts to exhaust his

administrative remedies under Section 3582(c)(1)(A), and is pending before that judge.)

Respondents assert that "Petitioner Cassidy does not simply get a 'do-over' in the District of

Connecticut after his same claim was rejected by" his sentencing judge.  ECF No. 24-1 at 54-55.

During oral argument, Petitioners' counsel argued that Section 3582(c)(1)(A) and the Eighth

Amendment consist of different elements and apply different legal standards, and so there would

be no preclusive effect on this case from a ruling by a sentencing judge denying a Section 3582

motion.

---

(after noting that an earlier decision had held that a habeas petition was not a "civil action" for purposes of the fee requirements of the PLRA, stating as follows: "We recognize that [the earlier decision] spoke in general terms to the effect that 'habeas corpus petitions' are not civil actions covered by the PLRA.  We nonetheless assume without deciding that, in so saying, the court meant habeas corpus petitions that challenge criminal convictions and sentences, and not petitions, sometimes brought under 28 U.S.C. § 2241, that complain of conditions of confinement, which are analogous to suits under 42 U.S.C. § 1983 complaining of conditions of confinement.  The logic of our [earlier decision] was to distinguish between civil actions covered by the PLRA and others based on the type of relief sought, rather than the statute under which relief was sought.").  But, for one, neither *Jones* nor the earlier decision it cites interpreted Section 3626(g)(2), as Section 3626 was not at issue in those cases, and it is unclear whether its definition of "civil action with respect to prison conditions" applies to other provisions of the PLRA.  Moreover, given the state of the law in the Second Circuit, the *Jones* dicta does not clearly address whether the PLRA applies to habeas petitions that challenge *both* conditions of confinement *and* the fact or duration of confinement.  Before and after *Jones*, district courts within the Second Circuit have entertained cases that challenged conditions but did not seek release from confinement.   *See, e.g.*, *Ilina v. Zickefoose*, 591 F. Supp.2d 145, 150 (D. Conn. 2008) (denying motion to dismiss 2241 petition challenging conditions of confinement where prisoner sought "restoration of needed medical care at FCI Danbury"); *Anderson v. Williams*, 2016 WL 7217588, at *2 (evaluating on the merits  Section 2241 petition challenging conditions of confinement and motion for preliminary injunction to ensure that petitioner received certain medical tests and treatment).   The *Jones* dicta is best read to suggest that it is these types of petitions that fall within the ambit of the PLRA (though not necessarily Section 3626).  To the extent that Respondents read *Jones* to equate "habeas corpus petitions that challenge criminal convictions and sentences" with the term "habeas corpus proceedings challenging the fact or duration of confinement in prison" in subsection (g)(2)—a statutory  provision that, again, the *Jones* court did not address— such a reading is inconsistent with the plain language of subsection (g)(2) for the reasons set forth above.

This argument raises novel issues—including whether an inmate could raise an Eighth Amendment claim in a motion brought under Section 3582(c)(1)(A) and whether a ruling on the merits of such a motion (as opposed to a mere denial without prejudice) should be treated as a judgment having claim preclusive effect. *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 366 (2d Cir. 1995) ("The doctrine of res judicata, or claim preclusion, holds that following entry of a valid final judgment, the parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." (internal quotation marks omitted)).  For the moment, however, I need not decide these issues, because Respondents have not suggested that there are inmates falling in the medically vulnerable subclass whose Section 3582 motions have been denied *on the merits* by their sentencing judges.  Should there be, the Respondents may file a motion asking that those persons be excluded from the group being prioritized for home confinement review under the order I issue today, in which case I will likely need to decide the issues set forth above.  Any such motion should attach a copy of the judge's ruling denying the Section 3582(c)(1)(A) motion.

4.      **Exhaustion**[18]

Respondents argue that the Petitioners have failed to exhaust administrative remedies. ECF No. 24-1 at 42-43, 58-65.  They make this argument with respect to both Petitioners'

---

[18]It is debatable whether the exhaustion requirement for a Section 2241 habeas petition should be treated as a "jurisdictional" issue rather than as an affirmative defense.  As discussed below, the requirement is judge-made, rather than statutory, and is subject to various exceptions.  Nonetheless, because Respondents classify it as a "jurisdictional" flaw and because some district courts within the Second Circuit have as well, *see e.g.*, *United States v. Grajales*, 2019 WL 2617027, at *2 (E.D.N.Y. June 26, 2019); *but see Oliva v. INS*, 1999 WL 61918, at *3 (S.D.N.Y. Feb. 10, 1999), I treat it under the heading of jurisdictional issues.

requests for release to home confinement and their requests for "additional 'safety' measures." *Id.* at 43. Here, I address the exhaustion issue only with respect to the Petitioners' requests for release to home confinement, as I grant the TRO only so that the medically vulnerable class can be properly considered for that type of relief and for compassionate release.

Exhaustion in the context of Section 2241 habeas petitions is a judge-made rule subject to judge-made exceptions. *U.S. ex rel. Scranton v. State of New York*, 532 F.2d 292, 294 (2d Cir. 1976) ("While 28 U.S.C. [] Section 2241 does not by its own terms require the exhaustion of state remedies as a prerequisite to the grant of federal habeas relief, decisional law has superimposed such a requirement in order to accommodate principles of federalism."); *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001) ("[O]ur decision today [applying the cause and prejudice standard for a Section 2241 habeas petitioner who had defaulted on his administrative remedies] rests solely on the requirement of administrative exhaustion *as spelled out in our decisional law* . . . ." (emphasis added)); *McPherson v. Lamont*, 2020 WL 2198279, at *6 (D. Conn. May 6, 2020) ("Because Sec. 2241's exhaustion requirement is a judicial invention, it is amenable to judge-made exceptions.").[19] Those exceptions include futility ("exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue"); incapability ("exhaustion may be

---

[19] At one point, Respondents assert that the exhaustion requirement of the Prison Litigation Reform Act—42 U.S.C. § 1997e—applies to habeas proceedings. ECF No. 24-1 at 62. This is an inaccurate statement of the law in the Second Circuit. *Carmona*, 243 F.3d at 634 (noting Second Circuit's earlier holding that Section 1997e does not apply to habeas proceedings brought under 28 U.S.C. § 2254 and stating that, "[d]oubtless the same rule should obtain in Section 2241 cases as in Section 2254 petitions," and that "[a] number of other circuits—relying primarily on the ground that habeas proceedings are not civil actions—have ruled the [Prison] Litigation Reform Act inapplicable to habeas actions brought by federal prisoners under Section 2241."); *United States v. McGriff*, 468 F. Supp.2d 445, 447 (E.D.N.Y. 2007 )("A habeas petition [brought under Section 2241] is not subject to the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a); instead it is subject to the judicially-created requirement that federal prisoners must exhaust their administrative remedies prior to filing a petition for habeas relief." (internal quotation marks and citations omitted)).

unnecessary where the administrative process would be incapable of granting adequate relief");
and undue prejudice ("an unreasonable or indefinite timeframe for administrative action may
sufficiently prejudice [petitioners] to justify a federal court in taking a case prior to the complete
exhaustion of administrative remedies"). *Washington v. Barr*, 925 F.3d 109, 118-19 (2d Cir.
2019); *see also Gonzalez v. Perrill*, 919 F.2d 1, 2 (1990) (In Section 2241 case, noting that "[t]he
controlling standard is unambiguous: an appellant must exhaust his administrative remedies
before seeking federal review of his conviction unless administrative procedures are unavailable
or are incompetent to provide adequate redress.").

The Petitioners have set forth sufficient facts to support a finding that at least the final
exception—undue prejudice from delay—applies here.   As noted above, the Warden has
considered only 159 inmates for home confinement[20] to date and has not yet even addressed 44%
of the compassionate release requests.  Further, even after the Warden makes a decision, the
BOP's administrative remedy process involves two additional layers of review (by the Regional
Director and General Counsel), and each layer involves a new form and a new mailing.   *See* 28
C.F.R. § 542.15.  Given the rapid spread of COVID-19 at FCI Danbury, as evidenced by the
number of positive tests among inmates and staff to date, Petitioners have shown that that they
would likely suffer irreparable harm if they were required to exhaust the administrative remedy
process before seeking relief in court.  Accordingly, I find that the Petitioners are excused from
exhaustion with respect to their claims seeking release to home confinement.[21]

---

[20] In her declaration, the Warden states that "[i]nmates do not need to apply to be considered for home
confinement," although they may do so.  ECF No. 24-2 at 22.
[21] Respondents also assert that "[a]s release from custody or placement in home confinement is not a remedy
available under a 28 U.S.C. § 2241 conditions of confinement habeas, an exhaustion analysis is not essential with
respect to those claims."  ECF No. 24-1 at 43.  They cite no authority for the notion that "release from custody or
placement in home confinement is not a remedy" for Section 2241 claims challenging conditions of confinement,
however, and, as discussed above, several district courts within the Second Circuit have released Section 2241

**B.**     **The Petitioners' Request for a Temporary Restraining Order**[22]

**1.**     **Legal Standard**

"It is well established that in this Circuit the standard for an entry of a TRO is the same as

for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008)

(collecting cases).  In general, a party seeking a preliminary injunction or temporary restraining

order "must . . . show a likelihood of success on the merits, a likelihood of irreparable harm in

the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an

injunction is in the public interest." *American Civil Liberties Union v. Clapper*, 804 F.3d 617,

622 (2d Cir. 2015) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).   "A showing

of irreparable harm is the single most important prerequisite for the issuance of a preliminary

injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)

(internal quotation marks and citation omitted).  The burden on the moving party is higher

where, as here, that party seeks a mandatory injunction—that is, an injunction commanding a

positive act, as opposed to one that merely maintains the status quo.  The Second Circuit has

instructed that a mandatory injunction "should issue 'only upon a clear showing that the moving

party is entitled to the relief requested, or where extreme or very serious damage will result from

a denial of preliminary relief.'"  *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34

(2d Cir. 1995) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

---

petitioners challenging their conditions of confinement in light of COVID-19, relying on the broad authority to grant
bail in habeas cases set forth in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001).

[22] The rules governing habeas proceedings allow for application of the Federal Rules of Civil Procedure, including
Rule 65 governing temporary restraining orders and preliminary injunctions, "to the extent that they are not
inconsistent with any statutory provisions or these rules."  Rule 12 of the Rules Governing Section 2254 Cases in the
United States District Court; *see also* Rule 1(b) ("The district court may apply any or all of these rules to a habeas
corpus petition not covered by [28 U.S.C. § 2254].").

The Petitioners seek a temporary restraining order to vindicate two somewhat distinct constitutional claims.  As to the subclass of medically vulnerable inmates at high risk of serious illness or death from COVID-19, the Petitioners' chief complaint is the Warden's failure to make prompt, meaningful use of her authority to place inmates on home confinement and to grant compassionate release —the only measures they contend are capable of offering such inmates adequate protection from COVID-19.  With respect to the broader class consisting of all inmates at FCI Danbury, the Petitioners claim that the Warden has failed to implement adequate safety measures to contain the spread of the virus and mitigate the risks of infection, including adequate screening, testing, isolation, quarantine, sanitation, hygiene, and personal protective equipment. I address each of these claims in turn.

**2.      The Medically Vulnerable Subclass and the Warden's Home Confinement and Compassionate Release Authority**

**a.      Likelihood of Success on the Merits – Eighth Amendment**

Under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, clothing shelter, and medical care, and must take reasonable measure to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Prisoners have a right, in other words, to "humane conditions of confinement."  *Id.*  "[H]aving stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833.

Prison officials violate a prisoner's Eighth Amendment right to humane conditions of confinement when two conditions are met.  First, under the "objective" component of the analysis, "the alleged deprivation must be, 'objectively,' sufficiently serious."  *Id.* at 834.

Second, under the "subjective" component, prison officials must have acted with a "sufficiently culpable state of mind," namely, "'deliberate indifference' to inmate health or safety." *Id.*

### i.    Objective Component

To satisfy the objective component, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Here, this requirement is easily satisfied. Courts have long recognized that prison officials have an Eighth Amendment duty to protect inmates from exposure to communicable disease. *See, e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease."); *Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981) ("[F]ailure to adequately screen newly arrived inmates for communicable disease" represents an "(omission) sufficiently harmful to evidence deliberate indifference to serious medical needs" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))); *id.* ("[I]t is unnecessary to require evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy.").

It is undisputed that there is an active and serious outbreak of COVID-19 at FCI Danbury. Attorney General Barr's April 3rd memorandum specifically identifies FCI Danbury as one of three federal prisons experiencing "significant levels of infection." ECF No. 24-2 at 48. A recent test of the inmates at the satellite prison—conducted following the intervention of Senator Chris Murphy—revealed that 20 of the 143 women at the facility had active infections. ECF No. 24-2 at 25. In addition, 62 other inmates have been tested for COVID-19, and 49 of these have tested positive, for a total of 69 positive tests. ECF No. 24-2 at 25. The high rate of positive tests outside of the satellite prison, and significant questions raised by the Petitioners as to the adequacy of testing, suggest this number may underrepresent the true number of COVID-

19 infections at FCI Danbury.  But even if that were not the case, the undisputed evidence leaves

no doubt that FCI Danbury is experiencing an active outbreak of COVID-19.

Further, the structure of the three facilities at FCI Danbury—even assuming that all

reasonable precautions and safety measures are being fastidiously observed (which the

Petitioners dispute)—heightens the risk of transmission.  The cornerstone of the public health

response to COVID-19 is to practice "social distancing."   In the State of Connecticut, for

example, social gatherings of more than 5 people continue to be prohibited, and members of the

public are directed to wear face coverings wherever a six-foot distance cannot be maintained.

*Coronavirus Disease 2019 (COVID-19)*, CT.gov, https://portal.ct.gov/Coronavirus (last visited

May 7, 2020); *see also Social Distancing*, Centers for Disease Control and Prevention (April 15,

2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

("Limiting face-to-face contact with others is the best way to reduce the spread of [COVID-19],"

including staying at least 6 feet from other people and avoiding group gatherings.).  In the

meantime, the vast majority of the 140 inmates at the satellite prison live and sleep in a perpetual

large gathering—a single dormitory hall with bunk beds separated by four feet or less, with

shared common spaces such as bathrooms and showers.  *See* ECF No. 1 at 12-13.  The inmates at

the camp and the men's prison fare little better in terms of social distancing.  Most of the inmates

at the camp and the men's prison live in dorms that house roughly 50 people each.  ECF No. 1 at

14.  Put differently, at a time when public health officials are counseling strict adherence to

social distancing practice, most inmates at FCI Danbury live in close contact with between 50

and 140 other inmates, in a facility with a serious, active COVID-19 outbreak.

It is also undisputed—and, indeed, by now common knowledge—that COVID-19 is a

highly dangerous disease that poses a significant risk of severe illness and death, particularly for

members of the Medically Vulnerable Subclass.  *See* ECF No. 1-1 at 6 ("Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age."); *see also Wilson v. Williams*, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020) ("For infected inmates, the virus can lead to pneumonia.  In the wors[t] pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure leading to death.").  According to one report, the mortality rate from COVID-19 is 8.4% for individuals with hypertension, 8.0% for individuals with chronic respiratory disease, 7.6% for individuals with cancer, and 13.2% for individuals with cardiovascular disease.  ECF No. 1 at 9-11 (citing Report of WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (last visited May 7, 2020)).

In short, with respect to Petitioners and other members of the Medically Vulnerable Subclass, Petitioners have demonstrated a likelihood of success on the merits on their claim that they are "incarcerated under conditions posing a substantial risk of serious harm."

**ii.    Subjective Component**

Under the subjective prong, a prison official may be held liable for inhumane conditions of confinement "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847; *see also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("In order to prove deliberate indifference in a challenge to [a] prison inmate's conditions of confinement, the prisoner must show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" (quoting *Farmer*, 511 U.S. at 837)).  In the context of threats to an inmate's health, a

plaintiff must show that the defendant "acted with deliberate indifference to [the plaintiff's] medical needs." *Brock*, 315 F.3d at 162 (citing *Estelle*, 429 U.S. at 104). In other words, the Petitioners must show that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).*

Here, it cannot be disputed that the Respondent Warden knew of the substantial risk of serious harm posed by the COVID-19 outbreak at FCI Danbury. On April 3—more than one month ago—Attorney General Barr issued an urgent memo to the Bureau of Prisons regarding COVID-19, noting the "significant levels of infection at several of our facilities, including . . . FCI Danbury." ECF No. 24-2 at 48. The Warden and her staff at FCI Danbury understood the threat posed by COVID-19 at least as early as March 19, 2020, when they began modifying the operations at all three FCI Danbury facilities in response. ECF No. 24-2 at 9-11. Further, given the pervasive daily media coverage of the pandemic, the seriousness of the threat posed by COVID-19—and the particular vulnerability of elderly individuals as well as those with certain preexisting medical conditions—are so well known that it would be implausible to suggest that prison officials are unaware of this risk. *See Farmer*, 511 U.S. at 842 ("[A] fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

The parties vigorously dispute, however, whether prison officials have acted with deliberate indifference to the risk posed by COVID-19. The Petitioners contend that the Warden's failure to transfer medically vulnerable prisoners from FCI Danbury to home

confinement "in any meaningful numbers" constitutes deliberate indifference.  ECF No. 15 at 39.

I find that they have shown a likelihood of success on the merits with respect to this contention.

I also find that Warden's handling of "compassionate release" requests under Section

3582(c)(1)(A) bolsters the finding of deliberate indifference.

**Home Confinement**

As discussed above, the CARES Act has given the Bureau of Prisons explicit authority to

place *any* inmate on home confinement, and the Attorney General has made the emergency

findings triggering that authority.  He has also directed the Bureau of Prisons in urgent terms to

"immediately review *all* inmates who have COVID-19 risk factors, as established by the CDC,

starting with the inmates incarcerated at FCI Oakdale, *FCI Danbury*, FCI Elkton, and similarly

situated facilities . . . ."  ECF No. 24-2 at 48-49 (emphases added).  His April 3, 2020

memorandum could not have conveyed a greater sense of urgency, instructing the Bureau to

"begin implementing this directive immediately at the facilities I have specifically identified,"

noting that "time is of the essence," and asking for implementation "as quickly as possible."  *Id.*

at 49.

In spite of the explicit statutory authorization in the CARES Act to make widespread use

of home confinement in response to the threat posed by COVID-19, and the exhortations of the

head of the government department in which the Bureau of Prison sits, the implementation of

this directive at FCI Danbury has been slow and inflexible.  The Warden indicates that only 159

inmates have been reviewed since March 26, and a mere 21 inmates have actually been placed

on home confinement, out of a population of roughly 1,000.  ECF No. 23-24.  Moreover, the

criteria apparently being used by the Respondents to evaluate inmates for home confinement

evidence a disregard for the seriousness of the health risk faced by vulnerable inmates.  Indeed,

the most recent inmate bulletin regarding home confinement criteria does not even expressly mention health risks or how they will be evaluated. ECF No. 15-8 (noting "updated criteria for Home Confinement based on COVID-19 guidelines" but not specifying any guidelines and listing only non-health-related criteria)). And the Warden's description of the home confinement review process suggests that, rather than prioritizing review based on age, medical history, and COVID-19 risk factors, FCI Danbury is focusing on those who have served the larger portions of their sentences. ECF No. 24-2 at 23.) In fact, the inmate bulletins make clear that those who have not served a specified percentage of their sentences are categorically disqualified: any inmate who has not served at least 50% of his or her sentence is deemed ineligible for home confinement, irrespective of vulnerability to COVID-19. ECF Nos. 15-7, 15-8.[23] Other criteria in the inmate bulletins are similarly unrelated to medical vulnerability and, at best, only tangentially related to public safety. For example, any inmate with an incident report in the past 12 months—no matter the seriousness—is deemed ineligible for home confinement, regardless of any health condition he or she might have. ECF Nos. 15-7, 15-8. At oral argument, the Government suggested that such an inmate could seek compassionate release as an alternative. But that is a dead end at FCI Danbury: Of the 241 requests for compassionate release filed since the COVID-19 crisis began, the Warden has signed off on exactly 0.[24] ECF No. 24-2 at 28.

Especially in light of the Barr memos, it is unimaginable that the Respondents would not be taking COVID-19 medical risk factors—some of which, by some estimates, give an inmate a

---

[23] The Warden's declaration puts it slightly differently: "BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentence, or (2) have 18 months or less remaining in their sentence and have served 25% or more of their sentence." ECF No. 24-2 at 23.

[24] This is particularly troubling in light of the fact that numerous judges, including the undersigned, have denied motions for compassionate release because the inmate has not first waded through the statutorily mandated administrative process for requesting compassionate release from the Warden—a process that now appears to be the definition of futile.

better than 10% chance of dying should the inmate contract COVID-19—into consideration in reviewing inmates for home confinement.  But, at the very least, the lack of any express mention of such factors in both the inmate bulletins and the Warden's declaration suggests that prison officials are not giving these risk factors the weight they plainly deserve.

The Warden argues that the measures taken at FCI Danbury to protect inmates from COVID-19, including screening, testing, quarantining, isolation of COVID-19 positive inmates, enhanced sanitation, and widespread use of personal protective equipment, show that she has not disregarded, or acted with deliberate indifference toward, the threat posed by COVID-19.  But even accepting the Warden's account of the scope, consistency, and effectiveness of these measures—an account the Petitioners vigorously dispute—Petitioners have shown a likelihood of success on the merits of their claim that the Warden's inadequate implementation of the home confinement authority in the CARES Act constitutes "deliberate indifference" under the Eighth Amendment.  The Warden does not dispute the impossibility of instituting effective social distancing measures in facilities, like FCI Danbury, where the vast majority of the population lives and sleeps in large dormitory halls lined with bunk beds, sharing bathroom and shower facilities.  *See* ECF No. 24-1 at 73.  But without social distancing measures, reliable containment of a highly contagious disease is nearly impossible.  This makes transfer to home confinement (or compassionate release, discussed below) the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured.  While the Warden is free to exercise discretion in choosing among equally effective measures to protect inmates from serious risks, choosing inevitably inadequate measures to the exclusion of a plainly superior one constitutes deliberate indifference.  *See, e.g.*, *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("[M]ere disagreement over the proper treatment . . . does not create a constitutional claim . . .

[s]o long as the treatment given is adequate."); *id.* ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." (internal quotation marks and citations omitted)); *see also Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (reasonable jury could find that putting prisoner into protective custody but failing to protect her from a risk that persisted even in protective custody was unconstitutional).

Put somewhat differently, even with the measures that the Warden has put in place, due to the impossibility of adequate social distancing, confinement at FCI Danbury—due to the very structure of the facility—continues to pose a grave risk to vulnerable inmates' health.  For this reason, Congress has provided statutory authority for, and the Attorney General has directed the warden to "immediately" implement, the broad use of home confinement for vulnerable inmates. Under the circumstances of the present crisis, the Warden's failure to make prompter, broader use of this authority to protect the lives of vulnerable inmates is likely to constitute deliberate indifference.

In short, by failing to make meaningful use of her home confinement authority, the Warden has failed to implement what appears to be the sole measure capable of adequately protecting vulnerable inmates—a measure the Attorney General directed the BOP to implement "immediately" and with "dispatch"—in favor of measures that, even if they were fully and painstakingly implemented, would still leave vulnerable inmates subject to a grave risk to their health.  Petitioners have thus shown a likelihood of success on the merits on their claim that, with respect to the Medically Vulnerable Subclass, the Warden has disregarded a "substantial

risk of serious harm" by "failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.[25]

**Compassionate Release under Section 3582(c)(1)(A)**

The Warden has another source of authority she may use to remove medically vulnerable inmates from the dangerous environment at FCI Danbury, and at the same time reduce the density within the prison for all inmates.  Unfortunately, the record in this case makes clear she is not making adequate use of that authority either.  Specifically, neither the Warden nor the BOP as a whole is implementing Section 3582(c)(1)(A) in the way Congress intended when it adopted the First Step Act, and neither has made any noticeable effort to update the process for evaluating "compassionate release" requests to take account of the COVID-19 pandemic.  For the medically vulnerable inmates at FCI Danbury, this failure bolsters my conclusion that Petitioners have shown a likelihood of success on the merits on their claim that the Respondents are displaying deliberate indifference in violation of the Eighth Amendment.

First, some history is in order.  Before the First Step Act was enacted in 2018, only the Director of the Bureau of Prisons could file a motion with the sentencing court seeking "compassionate release" under Section 3582(c)(1)(A).  "The BOP rarely did so . . . .  From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions."

---

[25]Respondents do not argue that the Warden's hands were tied by BOP policy set by the BOP Director in setting the criteria for home confinement at FCI Danbury—an argument that would easily have been available in this case given that Petitioners have named both the Warden and the Director as Respondents.  In any event, such an argument would not be dispositive, as a prison official does not comply with the Eighth Amendment when he or she knows of a serious risk to inmate safety but fails to address it due to mechanical reliance on prison policy.  *See Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (reasonable jury could find that "the defendants here acted with a sufficiently culpable state of mind in mechanically following [hepatitis C Guideline regarding substance abuse] and refusing to prescribe him [hepatitis C drug]"; "[t]he operative question in this case is not whether the Guideline's substance abuse policy is generally justifiable, but whether a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs"; "there is no evidence suggesting that the defendants took any step whatsoever to investigate—let alone verify—whether it would be medically appropriate to ignore the unanimous advice of [plaintiff's] treating physicians . . . and apply the Guideline's substance abuse policy in [plaintiff's] case.").

*United States v. Rodriguez*, 2020 WL 1627331, at *2 (E.D. Pa. April 1, 2020).  According to a 2013 report of the Department of Justice's Inspector General, these low numbers stemmed in part from poor management, a lack of clear standards, and inconsistent implementation of the compassionate release program.  *Id.*  "In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive 'gatekeeper' role."  *Id.*  The current version of the statute allows defendants to bring motions for release themselves at the earlier of two occurrences: (1) the defendant's "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [2] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A).

The First Step Act left the BOP an important role in the process, as the defendant must still exhaust his administrative remedies with the BOP before filing a motion in court.[26]  And given the statute's specification of the timing for exhaustion—either the time needed for full exhaustion or the lapse of 30 days from receipt of the request by the warden, whichever is earlier—it appears that Congress assumed that sometimes the BOP would act on the request within 30 days of the Warden's receipt of the request, and sometimes it would not.  Further, one

---

[26] There is a split among district courts within the Second Circuit as to whether the statute's exhaustion requirement is mandatory, or whether it can be "waived" or excused by the district judge for reasons such as futility, irreparable harm, and similar equitable doctrines.  *Compare United States v. Roberts*, 2020 WL 1700032, at *2 (S.D.N.Y. April 8, 2020) ("[T]he Court must abide by Congress's choice, given Section 3582(c)'s clear command that the Court "may not" grant compassionate release except under the conditions Congress prescribed.") *with United States v. Colvin*, 2020 WL 1613943, at *2 (D. Conn. April 2, 2020) ("[I]n light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A).").  I have adopted the former position, finding that a defendant may not file a motion with the sentencing court until either he or she has exhausted the available administrative remedies or 30 days have lapsed from receipt of the request by the warden.  *United States v. Nathaniel Smith*, 2020 WL 1903160 (D. Conn. April 17, 2020).

might assume that, after the 2013 Inspector General's report and Congress's reaction to it, the BOP would have built a better system for processing compassionate release requests administratively.  Finally, one might assume that the BOP would have modified its internal "compassionate release" guidance to take account of the serious risk of severe illness or death faced by medically vulnerable inmates housed in prisons with COVID-19 outbreaks. Unfortunately, the record in this case belies all of these assumptions.  According to the Warden's declaration, "since this emergency began" through May 4, 2020—a period that spans more than 6 weeks since the Warden placed the prison on "modified operations" on March 19, ECF No. 24-2 at 10—the Reduction in Sentence Coordinator at FCI Danbury has received 241 requests for compassionate release; of these, 136 have been processed and denied, 18 have been returned to the inmate seeking further information, 70 are being reviewed by staff, and 17 "are awaiting" the Warden's review.  ECF No. 24-2 at 27.

These figures are striking for two reasons.  First, the figures make clear that the FCI Danbury staff has, to date, not granted a single request for compassionate release—a batting average that is dramatically less favorable to inmates than the frequency with which courts in this District are granting Section 3582 motions.  ECF No. 24-2 at 52-54 (Government's listing of rulings by District of Connecticut judges on COVID-based Section 3582(c)(1)(A) motions showing that approximately 25 out of 48 have been granted, some with the Government's consent).[27]  This suggests that the Warden is setting an impossible high bar for these requests.[28]

---

[27] Out of the 48, 7 involved inmates at Wyatt, which is a detention facility, albeit one that also houses sentenced prisoners immediately after sentencing.  Only two of the Wyatt detainees were released, according to the Government's spreadsheet. ECF 24-2 at 52-54. The Bail Reform Act, rather than Section 3582(c)(1)(A), governs release as to detainees.

[28] Apparently, she is not the only one.  Information Petitioners filed on the docket concerning the handling of Section 3582 requests at BOP Elkton—which is under a court injunction in light of a COVID-19 outbreak there, *see Wilson v. Williams*, 2020 WL 1940882 (N.D. Ohio April 22, 2020)—only confirms what appears to be the near-impossible standard the BOP is applying to these requests.  According to a filing by the Government in the *Wilson*

Alternatively, it suggest that the Warden has not set a new standard for compassionate release in light of the pandemic, but is applying an obsolete one that takes no account of the risk of illness or death to medically vulnerable inmates from COVID-19: As discussed above, the BOP's January 2019 policy statement makes no mention of COVID-19 or the risk posed by infectious diseases inside prisons in general, and restricts use of "compassionate release" authority to a few, extreme situations that have little to do with susceptibility to COVID-19.  Respondents have not suggested they have made any attempt to adjust the January 2019 standards for compassionate release to account for new "extraordinary and compelling" circumstances presented by COVID-19 in the prison setting.

Second, the figures suggest that the Warden is processing request for compassionate release based on COVID-19 at a pace that disregards the seriousness of the risk faced by medically vulnerable inmates.  The figures show that over more than six weeks, FCI Danbury has not made even an *initial* response to some 44% of compassionate release requests, justifying the Petitioners' assertion that the staff at the facility are "failing to timely respond to requests for emergency compassionate relief."  Petition ¶ 119.  Further, an initial response from the Warden—when it arrives—is only the first step in a multi-tiered administrative remedy process the inmate must follow to "fully exhaust[]" administrative remedies.  That process requires each inmate to appeal the denial by the Warden to a BOP Regional Director, followed by an appeal to the BOP General Counsel.  28 C.F.R. § 571.63; 28 C.F.R. § 542.15.  For each level of appeal, the inmate must use a different form and mail it to a different reviewing official.  *Id.*  Even if the inmate's request to the Warden is approved—something that has not happened at Danbury since

---

case, of 243 medically vulnerable inmates who have submitted a request for compassionate release to the warden at FCI Elkton, "[o]nly one inmate . . . met the criteria for compassionate release."  ECF No. 26-4 at 4.

the outset of the pandemic—that approval must go through at least three more layers of review involving the BOP General Counsel, the Medical Director or an Assistant Director, and, finally, the Director.  28 C.F.R.§ 571.62.  It does not appear that the BOP has updated these regulations since the First Step Act was passed, let alone made any attempt to suspend them or otherwise accelerate the process during the pandemic.

From all this it should be obvious that the BOP, from the Warden at FCI Danbury up through the Director, is not allowing—and, indeed, under its current regulations cannot allow—a defendant to "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons" to bring a motion for compassionate release before the expiration of the 30 days specified in the statute.  18 U.S.C. § 3582(c)(1)(A).  So, as far as the record at FCI Danbury shows, it is practically impossible for a defendant to "fully exhaust" a compassionate release request within the BOP before expiration of the 30-day period, despite Congress's apparent intent.  Further, it is, at least during the COVID-19 crisis at FCI Danbury, impossible to find any success within the existing administrative remedy process; the applicable standards appear to make no allowance for the grave risks posed by COVID-19, even for members of the Medically Vulnerable Subclass, and the Warden indicates she has not approved for referral a single request. The 30-day period under the statute is simply dead time during which there is no prospect the BOP will come to the defendant's aid.

All of these circumstances support the order I issue today, which requires the Warden to process Section 3582 requests more promptly and requires her to explain why, apparently, no consideration is being given in this process to the serious risk of illness or death posed to the medically vulnerable subclass.

While these circumstances might also support broader relief against the Director, the Director is not a proper party in this case because he is not the immediate custodian of the Petitioners. *Rumsfeld*, 542 U.S. at 434-35 ("The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].' 28 U.S.C. § 2242 . . . . The consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition . . . . In accord with the statutory language . . . , longstanding practice confirms that in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." (alteration in original)). Thus, unless the Petitioners can provide a reason not to do so within 7 days of this order, I will dismiss the 2241 Petition against the Director.

\* \* \*

To be clear, I am not suggesting that the Eighth Amendment requires the Warden to place on home confinement or recommend for compassionate release every inmate who has a COVID-19 risk factor. In *Farmer*, the Supreme Court held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm *and disregards that risk by failing to take reasonable measures to abate it*." 511 U.S. at 847 (emphasis added). Whether it is a "reasonable measure" to place an inmate on home confinement or grant compassionate release in a particular case will depend on the severity of the risk faced by the inmate from COVID-19 in light of his or her age and medical history, the danger the inmate presents to the residents of the home environment under consideration, and the danger to the public at large. The determination

56

must be individualized, as the Petitioners acknowledged at oral argument, ECF No. 28 at 9, and, in some cases, such as where the inmate has a recent record of violence, may properly result in denying home confinement or compassionate release even to inmates whose age or medical histories place them at risk of serious injury or death from COVID-19.  But difficult as this determination may be, Petitioners have made a preliminary showing that, in these circumstances, the Eighth Amendment requires that it be made promptly and that it focus on the critical issues of inmate and public safety.

**b.    Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite" for the issuance of a temporary restraining order.  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted).  To satisfy the irreparable harm requirement, the Petitioners must demonstrate that, absent a temporary restraining order, "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Id.* (internal quotation marks and citations omitted).

A substantial risk of serious illness or death has often been found to constitute irreparable harm.  *See, e.g.*, *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 43-44 (2d Cir. 1997) (finding irreparable harm where the closure of a treatment program would pose serious risk of harm to plaintiffs, including "death, illness or disability"); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995) (upholding District Court's irreparable harm finding based on the "risk of injury, infection, and humiliation").

More specifically, Courts across the country have concluded that the risk of contracting COVID-19 as a result of unsafe conditions of confinement constitutes irreparable harm.  *See,*

*e.g.*, *Wilson v. Williams*, 2020 WL 1940882, at *9 (N.D. Ohio Apr. 22, 2020) (finding that the risk of exposure to COVID-19 at FCI Elkton—one of two other facilities that, like FCI Danbury, were specifically identified by Attorney General Barr's April 3 memo as experiencing significant outbreaks—constituted irreparable harm); *Mays v. Dart*, 2020 WL 1812381, at *13 (N.D. Ill. Apr. 9, 2020) (The risk of "severe health consequences, including death, if they contract coronavirus disease" constituted "irreparable harm."); *Basank v. Decker*, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.").

FCI Danbury is experiencing an active COVID-19 outbreak—one of the worst in the federal prison system.  One inmate at the prison has already died as a result of contracting the virus, and it is undisputed that members of the vulnerable subclass face a serious risk of meeting the same fate should they contract the virus.  In light of the impossibility of instituting effective social distancing in the setting of a prison, like FCI Danbury, where inmates live and sleep in large dormitories lined with bunk beds, the grave risk to Petitioners persists despite the measures prison officials have taken to combat the virus.

In addition to the imminent prospect of serious physical harm, medically vulnerable inmates have alleged a violation of an important constitutional right—the right to be free from cruel and unusual punishment.  "In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm."  *Basank v. Decker*, 2020 WL 1481503, at *4 (citing cases); *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Jolly v. Coughlin*, 76 F.3d

468, 482 (2d Cir. 1996) ("[T]he *alleged* violation of a constitutional right . . . triggers a finding of irreparable harm." (emphasis original)).  Thus, the alleged violation of subclass members' constitutional right to be free from cruel and unusual punishment itself constitutes "irreparable harm."

In short, Subclass Members easily satisfy the irreparable harm prerequisite for issuing a temporary restraining order.

### c.    Balance of the Equities and the Public Interest

"Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Coronel v. Decker*, 2020 WL 1487274, at *7 (S.D.N.Y. Mar. 27, 2020) (citing *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)).

As an initial matter, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld."  *Coronel*, 2020 WL 1487274, at *7 (quoting *Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. 2018)); *see also Doe v. University of Connecticut*, 2020 WL 406356, at *6 (D. Conn. Jan. 23, 2020) (noting the "public interest in avoiding violations of constitutional rights"); *Barbecho v. Decker*, 2020 WL 1876328, at *7 (S.D.N.Y. Apr. 15, 2020); *G & V Lounge, Inc. v. Michigan Liquor Control Com'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

Moreover, the Petitioners' interest in avoiding serious illness or death must weigh heavily on the scales.  While I am not unmindful of the unprecedented challenges faced by the Warden in combatting the COVID-19 pandemic, not to mention the challenges of operating a prison—

including maintaining order and discipline, maintaining health and safety, and achieving the prison's penological and rehabilitative objectives—under even the best of circumstances, and while I approach imposing additional duties on her at this time with great hesitation, the burdens faced by the Warden must yield to medically vulnerable inmates' interest in avoiding serious illness or death, as well as the public's interest in seeing those inmates' constitutional rights vindicated.

Respondents argue that an assessment of the public interest also requires individualized consideration of an inmate's suitability for release, taking into account the safety of the inmate, his or her family, and the public. I agree, and the order I issue today mandates such individualized consideration, albeit on a basis more accelerated and more focused on the critical factors of inmate and public safety than the current home confinement review process at FCI Danbury.

**3.      Safety Measures**

With respect to the broader putative class, the Petitioners argue that the Warden has failed to institute the measures necessary to prevent the continued spread of COVID-19 at FCI Danbury and to protect inmates from infection. Aside from the Warden's use of home confinement and compassionate release to protect medically vulnerable patients and reduce the population at FCI Danbury, which is addressed above, the Petitioners argue that the Warden has further failed to (1) adequately screen inmates for COVID-19 symptoms, (2) test symptomatic inmates, (3) isolate infected patients, (4) quarantine patients thought to have been exposed, (5) implement adequate social distancing, (6) observe proper sanitation measures, (7) provide staff and inmates with adequate personal protective equipment, soap, and sanitizers, and (8) provide adequate medical care to inmates with COVID-19 as well as other medical conditions. But while

the salient facts regarding the Warden's use of her home confinement and compassionate release authority are generally undisputed, factual disputes abound with respect to the Petitioners' other allegations.  For example, while Petitioners contend that prison officials "willfully refused to take temperatures or test for fever in order to avoid identifying cases of possible COVID infection," ECF No. 1 ¶ 132, the Warden claims that "[t]his could not be further from the truth," and that, since April 9, 2020, FCI Danbury has conducted daily temperature checks for all inmates.  ECF No. 24-2 at 24.  Similarly, while Petitioners contend that symptomatic patients are not being tested appropriately, the Warden maintains that "[a]ny inmate at FCI Danbury presenting with symptoms consistent with COVID-19 is immediately evaluated by a medical provider to determine whether testing and/or isolation is appropriate."  ECF No. 24-2 at 2.  And while Petitioners claim that the use of personal protective equipment such as masks has been inconsistent and is not enforced, the Warden indicates that both staff and inmates are required to wear face masks and are provided with personal protective equipment as appropriate.  *Id.* at 15.

These factual disputes preclude me from concluding at this stage that the Warden's implementation of measures to protect against the spread of COVID-19 exhibits deliberate indifference to the serious risks posed by the virus, and thus that the Petitioners are likely to succeed on the merits of this portion of their claim.  It is well established that "[t]he existence of factual disputes necessitates an evidentiary hearing . . . before a motion for preliminary injunction may be decided." *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) (internal quotation marks and citations omitted).  Perhaps recognizing the conflicting factual record on mitigation and safety measures, the Petitioners submitted a proposed order following oral argument, ECF No. 26-1, that does not include an order directing the Warden to implement the various measures at issue (again, most of which the Warden contends she is already implementing).  I thus deny

the Petitioner's request for a temporary restraining order to the extent that it asks the Court to direct the Warden to implement safety measures and report to the Court on the status of those measures.

## C.    The Propriety of Multi-Party Treatment

Although the Second Circuit has "conclude[d] that the class action device should not be imported into collateral actions, at least in its full vigor as contemplated by Rule 23," it has recognized "the power of the judiciary . . . to fashion for habeas actions appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage."  *U.S. ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974).  In *Preiser*, the court allowed "a multi-party proceeding similar to the class action" on behalf of young adults serving misdemeanor sentences, largely because the petitioners' claims were "applicable on behalf of the entire class" and "uncluttered by subsidiary issues."  *Id.* at 1126.  The Court noted several other "persuasive justifications" for affording class action treatment, including that "many of those serving reformatory sentences are likely to be illiterate or poorly educated," "most would not have the benefit of counsel to prepare habeas corpus petitions," and "considerable expenditure of judicial time and energy in hearing and deciding numerous individual petitions presenting the identical issue is thereby avoided."  *Id.*  Noting that "the precise provisions of Rule 23 are not applicable to these proceedings," the Court nonetheless found that consideration of the four Rule 23(a) prerequisites further bolstered its conclusion that class treatment was appropriate. *Id.*  The approach laid out by the *Preiser* court is, in short, both flexible and sensitive to the particular circumstances of a given case.

In any event, I need not make a formal determination as to class certification—or, more precisely, as to whether a multi-party proceeding analogous to a class action is appropriate.  "It is

62

well established that '[c]ertain circumstances give rise to the need for prompt injunctive relief for

a named plaintiff or on behalf of a class' and that the 'court may conditionally certify the class

or otherwise award a broad preliminary injunction, without a formal class ruling, under its

general equity powers.'" *Strouchler v. Shah*, 891 F. Supp. 2d 504, 517 (S.D.N.Y. 2012) (quoting

Alba Conte & Herbert Newberg, Newberg on Class Actions § 9:45 (4th Ed.2002)). Thus, in

*Strouchler*, the court "[p]reliminarily examin[ed] plaintiffs' entitlement to class status,"

concluded that "it is likely that plaintiffs will be able to meet the Rule 23 prerequisites of

numerosity, commonality, typicality, and adequacy" as well as the requirements of Rule

23(b)(2), and granted in part plaintiffs' motion for preliminary injunction. *Id.* at 518-19; *see also*

*LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 58 (2d Cir. 2004) (finding that the

District Court did not abuse its discretion in issuing a preliminary injunction prior to class

certification and in reliance on representative evidence of irreparable harm). By analogy to this

established practice in the class action context, I need only determine at this stage whether multi-

party treatment is *likely* to be appropriate.

Moreover, the scope of my inquiry as to multi-party treatment need not extend beyond

the scope of the claim addressed by this ruling and the temporary restraining order I issue. I

have concluded above that the Petitioners, as medically vulnerable inmates, have shown that they

are likely to succeed on the merits of their claim that the Warden's implementation of her home

confinement and compassionate release authority violates their constitutional rights. I have

further found that they face irreparable harm should preliminary relief not be granted, and that

issuing a temporary restraining order is in the public interest. The injunction I issue below

directs the Warden to make prompt, meaningful use of her home confinement and compassionate

release authority; expeditiously to consider all medically vulnerable inmates for home

confinement and compassionate release; and to discontinue the use of unduly burdensome eligibility criteria that are divorced from the interests of vulnerable inmates as well as the public and that preclude otherwise eligible inmates from consideration.  At this stage, I need only consider, on a provisional basis, whether multi-party treatment is likely appropriate as to this claim and the associated relief.[29]

I find that, as in *Preiser*, the claim as to which I now grant preliminary relief—that the Warden's implementation of her home confinement and compassionate release authority violates the constitutional rights of medically vulnerable inmates—is plainly "applicable on behalf of the entire [subclass]" and "uncluttered by subsidiary issues."  *Id.*  It is the Warden's existing process as applied to medically vulnerable inmates that amounts to deliberate indifference—a process that applies to the entire subclass, as evidenced, for example, by the single set of home confinement criteria published by the Warden.  *See* ECF Nos. 15-7, 15-8.  I do not rule on the propriety of the Warden's determination as to any particular inmate; thus, the fact that these determinations will likely require at least some degree of individualized inquiry does not destroy the common questions inherent in the claims under consideration.

Other considerations also counsel in favor of a multi-party proceeding at this stage.  As in *Preiser*, the majority of the vulnerable inmates would be unlikely to have the benefit of counsel in pursuing individual habeas petitions absent a multi-party proceeding.  Similarly, multi-party treatment avoids the "considerable expenditure of judicial time and energy in hearing and deciding numerous individual petitions presenting the identical issue," *Preiser*, 506 F.2d at 1126.

---

[29] Should I later find that other claims, issues, or forms of relief the Petitioners are pursuing are inappropriate for multi-party, representative treatment, I see no reason why, for example, I could not employ an analogue to issue certification under Rule 23(c)(4).  Thus, I need not determine whether all claims, issues, and forms of relief in this case are appropriate for multi-party treatment in this ruling.

Furthermore, because the present ruling addresses the constitutionality of the processes employed by the Warden—processes that, in the interest of fairness, efficiency, and accuracy, must be uniform—individual adjudication, and the conflicting directives it would likely generate, would unduly burden the Warden and interfere with the fair and efficient operation of the home confinement and compassionate release programs, thus undermining the very constitutional interests Petitioners seek to vindicate.

Consideration of the Rule 23(a) prerequisites further bolsters my conclusion that multi-party treatment is likely appropriate. According to the Government, there are 984 inmates at FCI Danbury. ECF No. 2401 at 14. At FCI Elton, a facility with 2,368 inmates,[30] Petitioners indicate that the BOP identified 837 medically vulnerable prisoners. ECF No. 26 at 3. If a similar proportion of inmates at FCI Danbury are medically vulnerable, that would mean the putative Medically Vulnerable Subclass consists of roughly 350 inmates. This would easily satisfy Rule 23's numerosity requirement.[31] I also find that, even applying the "more stringent standards" alluded to by the *Preiser* court, 506 F.2d at 1127, commonality is likewise satisfied. Facts regarding the process employed by the Warden in considering inmates for home confinement and compassionate release are common to the entire putative subclass, as are the legal questions regarding whether the Warden's handling of those processes in these circumstances is constitutional. And while members of the putative class may vary in terms of the severity of their COVID-19 risk factors, all are recognized as falling in the high-risk group as to which heightened precautions are justified.[32] Typicality is similarly satisfied; because the

---

[30] *FCI Elton*, BOP.gov, https://www.bop.gov/locations/institutions/elk (last visited May 10, 2020).

[31] *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (holding that "numerosity is presumed at a level of 40 members") and *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993) (courts do not require "evidence of exact class size or identity of class members to satisfy the numerosity requirement").

[32] Petitioners and Respondents jointly propose that the Medically Vulnerable Subclass be defined as follows:

process at issue is applicable to all inmates, "each member's claim arises from the same course

of events,"—the establishment and operation of this process—"and each class member makes

similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd.*

*Securities Litigation*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citations

omitted); *see also Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("Evidence indicating

the employer discriminated *in the same general fashion* against the class representatives and

against other members of the class was held sufficient to satisfy the typicality requirement."

(citing *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 596-98 (2d Cir. 1986))).  Finally,

Petitioners are represented by experienced and qualified counsel, and there is no reason to think

that the named petitioners are inadequate representatives of the class, thus satisfying the

adequacy requirement.

 In short, I conclude that the Petitioners are likely to show that proceeding on a multi-

party basis with respect to the claim at issue is appropriate, and thus that injunctive relief as to

the medically vulnerable subclass is appropriate at this stage.

**D. The Government's Rule 12(b)(6) Motion**

 In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether

the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell*

---

All individuals in custody at FCI Danbury, while the threat of COVID-19 at the facility remains, who are aged 65 or over and/or who have any of the following conditions specifically identified by the United States Centers for Disease Control as putting them at higher risk for severe illness from COVID-19: (a) chronic lung disease including moderate to severe asthma, COPD, emphysema, chronic bronchitis, idiopathic pulmonary fibrosis and/or cystic fibrosis; (b) immunocompromised status, including status as a transplant recipient, on chemotherapy, HIV positive, prolonged use of corticosteroids, using immunosuppressive medication, and/or having an immune deficiency; (c) severe obesity (BMI of 40 or higher); (d) diabetes mellitus Type I or Type II, (e) gestational diabetes mellitus; (f) chronic kidney disease on dialysis; (g) chronic liver diseases, cirrhosis; and/or serious heart conditions, including congestive heart failure, coronary artery disease, congenital heart disease, cardiomyopathy, and/or pulmonary hypertension. ECF No. 26 at 2.

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  In considering such a motion, the court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  To survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible."  *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010).  "When a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant defendants['] motion to dismiss."  *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

With respect to the Petitioners' claim that the Warden's failure to make prompt, meaningful use of her home confinement and compassionate release authority constitutes deliberate indifference under the Eighth Amendment, I have found that the Petitioners' claim is not only plausible, but is likely to succeed on the merits.

The Petitioners have also plausibly alleged that the Warden has failed to implement adequate measures to prevent the continued spread of COVID-19 at the prison, in violation of the Petitioners' Eighth Amendment rights.  The Petitioners have plausibly alleged that they face a grave risk of serious illness or death due to COVID-19, *see, e.g.*, Petition ¶¶ 25-34 (listing Petitioners' medical conditions rendering them particularly vulnerable to COVID-19), ¶¶ 56-76 (describing why prisons are particularly susceptible to outbreaks of COVID-19), and thus that

they are "incarcerated under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834, satisfying the objective component of the deliberate indifference analysis.  The prisoners have further plausibly alleged that prison officials "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," *Brock*, 315 F.3d at 164.  Petitioners have alleged, for example, that instead of screening inmates for COVID-19 in good faith, so that symptomatic patients can be tested and, if necessary, isolated, prison officials have "falsely discounted the readings of elevated temperatures in order to avoid taking appropriate follow-up action." Petition ¶ 132.  While the Warden contests this account, I must accept the Petitioners allegations as true for the purposes of this motion.  Similarly, Petitioners allege that on April 24, a woman at the satellite prison exhibiting serious symptoms was ignored by correctional staff and left among the general population for hours, despite the urgings of the other prisoners, before finally being taken to the hospital where she tested positive for COVID-19.  Petition ¶ 54.  The Petitioners further allege that prison officials threatened retaliation against any inmate who told anyone on the outside about this incident.  *Id.*  These and other allegations—which I must accept as true for the purposes of this motion—satisfy the subjective component of the deliberate indifference standard.

For the above reasons, the Government's Rule 12(b)(6) motion to dismiss is DENIED.

## V.    RELIEF

For the reasons discussed above, I grant in part and deny in part Petitioners' motion for temporary restraining order and issue the orders set forth below.  The temporary restraining order that follows is aimed at accelerating the process for evaluating inmates for home confinement and compassionate release, and focusing that process on achieving a "reasonable" balance between the risks to inmate safety and the risks to public safety.  *See Farmer*, 511 U.S. at 847.

<u>TEMPORARY RESTRAINING ORDER</u>

1. Within **3 days** of this order, Respondent Warden (the "Respondent") shall file on the docket, under seal, a list of "medically vulnerable inmates at Danbury FCI," consisting, more specifically, of the following:

   All individuals in custody at FCI Danbury who are aged 65 or over and/or who have any of the following conditions specifically identified by the United States Centers for Disease Control as putting them at higher risk for severe illness from COVID-19: (a) chronic lung disease including moderate to severe asthma, COPD, emphysema, chronic bronchitis, idiopathic pulmonary fibrosis and/or cystic fibrosis; (b) immunocompromised status, including status as a transplant recipient, on chemotherapy, HIV positive, prolonged use of corticosteroids, using immunosuppressive medication, and/or having an immune deficiency; (c) severe obesity (BMI of 40 or higher); (d) diabetes mellitus Type I or Type II, (e) gestational diabetes mellitus; (f) chronic kidney disease on dialysis; (g) chronic liver diseases, cirrhosis; and/or (g) serious heart conditions, including congestive heart failure, coronary artery disease, congenital heart disease, cardiomyopathy, and/or pulmonary hypertension.

   a. Within 1 day of this order, counsel for petitioners and respondents shall confer with each other (to the extent they have not already done so) about how to identify promptly the inmates who fit the criteria listed above, including, if feasible, through the use of ICD codes, as discussed during the recent teleconference;

b. The list referred to in paragraph 1 shall include the identity of the inmate, the inmate's sentencing court, and the case number of the inmate's underlying criminal conviction but shall not include information about the specific medical condition suffered by each inmate;

c. The list referred to in paragraph 1 shall be organized by facility within Danbury FCI (*i.e.*, one list for the men's facility, one list for the women's satellite prison, and one list for the women's camp)

d. The list shall indicate, as to each inmate, whether that inmate (a) has submitted a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and (b) has been reviewed for home confinement since March 26, 2020, and if so, whether the inmate has been designated for home confinement.

e. If compiling the information described in paragraph 1d. will significantly delay the creation and filing of a list setting forth just the information described in paragraphs 1, 1b., and 1c., then the Respondents may initially, within 3 days of this order, file a list including only the information set forth in paragraphs 1, 1b., and 1c., and then, within 7 days of this order, file a second version of the list including all of the information described in paragraphs 1 and 1b.-1d.

f. Respondent shall provide the list to Petitioners' counsel, and the list shall be marked "Confidential-Attorneys' Eyes Only" and be treated accordingly under the Protective Order entered in this case, ECF No. 9.

g. Respondent shall file on the docket with the list a declaration setting forth the process used to identify those persons described in paragraph 1, including a description of the databases searched.

2.  Within **3 days** of this order, Respondent shall:

    a.  Finalize and implement a process that makes full and speedy use of the home confinement authority under 18 U.S.C. § 3624(b) and the CARES Act and, as directed by the Attorney General's April 3, 2020 Memorandum, "immediately maximize[s] appropriate transfers to home confinement [for] all appropriate inmates held at . . . FCI Danbury," in particular, by (a) prioritizing for review for home confinement all inmates identified on the list described in paragraph 1, (b) assigning substantial weight in that review to the inmate's risk factors for COVID-19 based on CDC guidance, (c) eliminating all requirements that the inmate have served some portion of his or her sentence to be eligible for placement on home confinement, (d) eliminating the requirement that a "primary or prior offense" not be a violent offense; (e) eliminating the requirement that the inmate be "without incident reports in the past 12 months (regardless of severity level)"; (f) modifying any requirement that a person approved for home confinement be quarantined at the facility for 14 days to allow for immediate release to home confinement for those inmates as to whom Respondent verifies, after reasonable inquiry, that the inmate is not showing symptoms and is able to self-isolate for the same period in the home confinement setting.[33]

---

[33] By "eliminating" particular "requirements," I do not mean to suggest that these considerations are irrelevant to the Warden's assessment of the appropriateness of home confinement for a particular inmate.  To the contrary, a particular inmate's violent history, for example, is obviously relevant to the assessment of the danger his or her release might pose to the public and thus should be accorded weight in the determination.  The purpose of eliminating these and other categorical exclusions is to make the process more individualized and more amenable to a proper and reasonable balancing of inmate safety and public safety.

    b.  File a statement on the docket explaining why the Court should not also require the review process described in paragraph 2a. to eliminate or modify the requirements that the PATTERN risk score be "MIN" and that the Mental Health Care Level be less than IV, ECF No. 15-8 at 2.

    c.  Publish to inmates the factors to be considered in the revised home confinement review process developed by the Warden in accordance with this order.

3.  Within **7 days** of this order, Respondent shall:

    a.  Provide written notice of either (a) a referral of the matter in writing with recommendation of approval of the request, 28 C.F.R. § 571.62, or (b) a denial of the request, together with the appropriate appeal form, 28 C.F.R. §§ 571.63, 542.15, to each inmate described in paragraph 1 (or, if that is not administratively feasible, to each inmate) who has made a written request for compassionate release based on COVID-19 under 18 U.S.C. § 3582(c)(1)(A) but has not yet received a decision.

    b.  Finalize and implement a process whereby each inmate described in paragraph 1 (or, if that is not administratively feasible, each inmate) who makes a written request for compassionate release based on COVID-19 receives notice of either the referral of their request, with a recommendation of approval, or its denial, with the appropriate appeal form, within 7 days of the date the request is received by a member of the Danbury FCI staff.

    c.  File a statement on the docket explaining whether and how the criteria in the BOP's Program Statement governing compassionate release have been updated to take account of the COVID-19 crisis and, if they have not been, showing cause

why the Court should not require the Warden to promulgate revised

compassionate release criteria for use at FCI Danbury that take full and

appropriate account of the threat posed by COVID-19 to medically vulnerable

inmates.

4. Within **13 days** of this order, as to each person described in paragraph 1, the Respondent

Warden shall complete the home confinement review process described in paragraph 2a.

and shall either (a) approve such person for home confinement and (i) place him or her on

home confinement or (ii) place him or her in quarantine within the facility for 14 days

before placing him or her on  home confinement, or (b) deny such person home

confinement.

5. Within **13 days** of this order, the Respondent Warden shall provide to the Court (under

seal) an individualized explanation for each denial of home confinement as to an inmate

described in paragraph 1, including at least a brief description of the factual basis for any

factors deemed to outweigh the danger to the inmate from COVID-19, and shall show

cause why each such inmate should not be transferred to another facility within the BOP

where adequate social distancing is possible.

6. Within **13 days** of this order, Respondent shall file a status report describing her efforts to

comply with this order.

7. On **May 26, 2020, at 1:00 p.m.**, the parties shall participate in a telephonic status

conference with the Court to determine whether this order should be extended.  *See* Fed.

R. Civ. P. 65(b)(2).

<u>HEARING ON MOTION FOR PRELIMINARY INJUNCTION</u>

The Court will hold a hearing on the motion for preliminary injunction on **June 11, 2020 at 9:00 a.m.**  Before the hearing, the parties shall participate in expedited discovery.  The parties shall meet and confer within one day of this order to discuss the scope and timing of that discovery. By **May 14, 2020 at noon**, they shall file a joint proposal regarding that scope and timing, and shall indicate any disagreements.  The Court will hold a telephonic status conference to discuss the proposal on **May 14, 2020 at 3:00 p.m**.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              May 12, 2020