UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DIANTHE MARTINEZ-BROOKS ET AL<br><br>*Plaintiffs*,<br><br>v.<br><br>D. EASTER & MICHAEL CARVAJAL,<br><br>*Defendants*. | No. 3:20-cv-00569 (MPS) |

**CONFERENCE MEMORANDUM AND ORDER**

At a status conference today, the Court discussed with counsel the Respondent's efforts to comply with the Court's temporary restraining order (ECF No. 30). During the discussion, counsel for the Petitioners and counsel for the Respondent represented that they had agreed (1) that, to ensure that "substantial weight" is accorded to each inmate's COVID-19 risk factors, ECF No. 30 at 71, Respondent will arrange for a medical clinician to review the medical profiles (in particular, the medical "dashboard" in the BEMERS system) as to each inmate who was previously reviewed for home confinement as set forth in the worksheets filed as ECF No. 59 on the docket, and (2) that Respondent will use additional ICD codes supplied by Petitioners to search the BEMERS system to determine whether additional inmates should be included in the medically vulnerable subclass described in paragraph 1 of the Court's temporary restraining order, ECF No. 30 at 69, ECF No. 64 at 1. The parties also agreed to confer further with an eye towards reaching agreement about (1) the role the above-mentioned medical clinician will play

in the review process as a whole, including whether he or she will generate specific, written assessments as to the severity of each inmate's risk factors and how the Respondent will weigh and incorporate any such assessments in the home confinement review process as a whole, (2) particular ICD codes that, if present in an inmate's medical record, will automatically qualify that inmate for inclusion in the above-mentioned medically vulnerable subclass, and (3) a means of identifying inmates who should be included in the subclass but are not captured by the agreed-upon ICD codes.  Regarding the last item in the preceding sentence, the Respondent shall file a declaration by close of business on June 1 as to the costs and/or burden associated with the petitioners' proposal that inmates be provided with notice of the pendency of this action and a means to forward HIPAA-compliant medical record releases to petitioners' counsel (should the inmates choose to do so), together with the costs and/or burden of searching for and providing to petitioners' counsel any medical records authorized for release under such a process.  **The parties shall, by close of business on June 2, 2020, file a notice describing any agreements they reach on these matters and indicating whether court intervention is needed as to any items on which they cannot agree.**

      The Court also discussed with counsel the Court's need better to understand the home confinement review process undertaken by the Warden in response to the temporary restraining order.  As discussed on the call, counsel shall meet and confer about (1) generating a random sample of the records reviewed by the Warden and her staff in the process reflected in the worksheets filed on the docket (ECF No. 59), and (2) providing the sample to the Petitioners' expert, as suggested in item #6 in Section V. of the Petitioners' May 27 filing (ECF No. 67 at 8). **The parties shall file any agreement about the sampling process on the docket on or before June 4, 2020.**

The Court also discussed with counsel the extent to which the information on the spreadsheet filed as docket #66 regarding the release status of those deemed eligible for home confinement shows that the Warden has fully complied with the Court's temporary restraining order.  Paragraph 2a. of the temporary restraining order states that Respondent shall "modify[] any requirement that a person approved for home confinement be quarantined at the facility for 14 days to allow for immediate release to home confinement for those inmates as to whom Respondent verifies, after reasonable inquiry, that the inmate is not showing symptoms and is able to self-isolate for the same period in the home confinement setting."  (ECF No. 30 at 71.)

Although the Court recognizes that the Respondent and her counsel have devoted substantial resources to their efforts to comply with the temporary restraining order in general, it does not appear that the Respondent has complied with the above-quoted language of Paragraph 2a. of the order.  More specifically, there is no evidence in any of the worksheets or other filings by Respondent that any efforts have been made to determine whether inmates approved for home confinement can be released immediately to home confinement because they are able to self-isolate at home.  Further, it appears from the worksheets and the spreadsheet filed as docket No. 66 that, as to most or all of those inmates who were rejected on initial review by the Warden and her staff, but later approved by the "home confinement committee" (i.e., personnel from BOP's central office in Washington, D.C., ECF No. 57-1 at 4), all of them have either already been quarantined (in the case of camp inmates) or are being quarantined as of 5/28/2020; but none of them have actually been released as of 5/28/2020.  See ECF No. 66.  Further, most of those indicated as having been "released" on the spreadsheet appear to have been recommended for home confinement even before the Court issued its temporary restraining order; as to several, for example, the worksheets are blank and simply indicate that the person is being released to home

confinement. A few described as "released" – including two male inmates listed on the spreadsheet with initials MT and BH and a female inmate RA from the camp – do not even appear in the worksheets and were apparently not part of the court-ordered home confinement review process at all. Critically, *all* the inmates shown on the spreadsheet as having been approved for home confinement are persons who, the Warden agrees, should be placed in home confinement due to COVID-19 risk factors and other considerations. While the Court understands that the Warden and her staff may need some time to "process people out," it is not clear why they need more than a few days to do so; further, as noted, there is no evidence the Warden has attempted to determine, "after reasonable inquiry," that these inmates could not self-isolate at home.

Therefore, by way of ensuring full compliance with its temporary restraining order, the Court orders that, **by close of business on June 4, 2020**, the Respondent shall, with respect to each inmate shown on the spreadsheet (ECF No. 66) who has been approved for home confinement either (1) release such inmate to home confinement, or (2) demonstrate that public safety or medical considerations or the absence of any home in which to place the inmate would make it unsafe to move the inmate immediately to home confinement. Given the amount of time already taken to investigate each inmate's proposed release plan and the amount of additional time the Court is allowing for compliance with this order, it will not be a sufficient response to the "show cause" portion of this order for the Respondent to state that the release plan is still being investigated or that details need to be worked out.

Finally, as the Court discussed with counsel, it appears from the worksheets (ECF No. 59) that, during the review process, mistakes were made regarding PATTERN scores that may have caused inmates to be denied home confinement based on incorrect information. The Court

also discussed that the worksheets of some inmates who were denied home confinement list medical, COVID-19 risk, public safety risk, and other information that is substantively identical to the corresponding information in the worksheets of inmates who were granted home confinement.  Respondent's counsel explained that Respondent had faced tight time pressure (imposed by the Court) to review a large number of inmate profiles, and expressed a willingness to re-review particular inmate profiles to ensure that the correct information was used and consistent judgments were made.  In light of this, the Court further orders that the Respondent specifically re-review for home confinement consideration **and send to the home confinement committee for its consideration** (1) those inmates shown on Attachment A of ECF No. 67 and (2) any inmate whose "case narrative" or "final decision" explaining the reviewer's denial on the worksheets (ECF No. 59) cites only one or more of the following factors: (a) the amount of time left to serve and/or the percentage of time served, (b) any non-violent or non-sexually related disciplinary infractions, (c) non-violent conduct occurring during pretrial release, (d) the existence of pending charges, unless there is a detainer, (e) a PATTERN score of "low" or "medium," (f) a history of violence that is greater than 15 years old, (g) the seriousness of any non-violent or non-sexual offense of conviction, and/or (h) the fact that the inmate has been designated to or is awaiting placement in a Residential Reentry Center (*see, e.g.,* ECF No. 59 at 312, 572, 611, 626, 629, 644, 652, and 707).  To avoid later suggestions of further mistakes, **by close of business on June 1, 2020**, Petitioners' counsel shall provide Respondent's counsel with a list of any inmates who, in the view of Petitioners' counsel, meet the description set forth in the preceding sentence.  But if there are disagreements as to whether any particular inmate meets that description, the Respondent's view shall prevail for purposes of determining the group to re-review under this paragraph.  If necessary, the Court will adjudicate disputes later.  The

Respondent shall complete the re-review described in this paragraph **by June 9, 2020**, and shall file a declaration and worksheets setting forth the details of this process by close of business on that date.

      To be clear, the Court is not suggesting that persons who do not meet the criteria set forth in the preceding paragraph are inappropriate for home confinement or should not be re-reviewed for home confinement; rather, simply to ensure that the process is consistent, the Court is at this time requiring re-review and submission to the home confinement committee of inmate profiles that closely resemble those of other inmates whom the home confinement committee has already approved for home confinement. It is also the Court's understanding that all of the inmates who were previously reviewed for home confinement will be reviewed again with the input of a clinician, as described above. The Court leaves to the parties to discuss whether it would be most efficient to coordinate the two re-reviews as a single process. In any event, both re-reviews (either singly or in combination) shall be completed – and any additional or corrected declarations and worksheets filed – **by close of business on June 9, 2020**.

IT IS SO ORDERED.

                                                       /s/
                                    Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
               May 28, 2020