# EXHIBIT C

DIANTHE MARTINEZ-BROOKS -against- D. EASTER
30(b)(6)
Angela Dukate on 06/03/2020

```
 1    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 2    ------------------------------------X
      DIANTHE MARTINEZ-BROOKS,
 3    REEJEANNE COLLIER,
      JACKIE MADORE;
 4    and KENNETH CASSIDY,
      Individually, and on
 5    Behalf of All Others
      Similarly Situated,           Civ. No.
 6                                  3:20-cv-00569-MPS

 7                   PETITIONERS,

 8           -against-

 9    D. EASTER, Warden of Federal
      Correctional Institution at Danbury,
10
                     RESPONDENT.
11    ------------------------------------X

12

13                DATE: June 3, 2020

14                TIME: 12:47 P.M.

15

16

17       DEPOSITION of the Respondent, by a

18    witness, ANGELA DUKATE, taken pursuant to Rule

19    30(b)(6) of the Federal Rules of Civil

20    Procedure, taken by the Petitioner, held

21    remotely using Zoom, before a Notary Public of

22    the State of Connecticut.

23

24

25
```

```
 1   A P P E A R A N C E S:

 2
     SILVER, GOLUB & TEITELL, LLP
 3       Attorneys for Petitioners
         184 Atlantic Street
 4       Stamford, Connecticut  06901
         (203)325-4491
 5       DGolub@sgtlaw.com

 6              BY: DAVID GOLUB, ESQ.

 7                  JONATHAN M. LEVINE, ESQ.

 8                  WILLIAM PRICE, ESQ.

 9                  ZACHARY RYNAR, ESQ.

10

11   LEGAL CLINIC, QUINNIPIAC UNIVERSITY SCHOOL OF
     LAW
12       Attorneys for the Petitioners
         275 Mt. Carmel Avenue
13       Hamden, Connecticut  06518
         (203)582-5258
14       Sara.russell@quinnipiac.edu

15              BY: SARAH FRENCH RUSSELL, ESQ.

16

17   JEROME FRANK LEGAL SERVICES ORGANIZATION
            P.O. Box 209090
18          New Haven, Connecticut  06520
            (203)432-4800
19          Marisol.orihuela@ylsclinics.org

20              BY:  MARISOL ORIHUELA, ESQ.

21                   JESSICA XU

22                   BRENDAN BERNICKER

23

24

25
```

```
 1    APPEARANCES (Continued):

 2


 3         U.S. ATTORNEY'S OFFICE
              157 Church Street
 4            New Haven, Connecticut  06510
              (203)821-3700
 5            Nathaniel.Putnam@usdoj.gov

 6            BY:   NATHANIEL PUTNAM, ESQ.

 7                  DAVID NELSON, ESQ.

 8

 9    Also present:

10            ALEXANDRA HARRINGTON

11            STEPHANIE SCENNEL-VESSELLA, BOP

12

13            *       *         *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   shelf or anything like that.
 2        Q.    So we've been provided -- and we'll
 3   show you some of these in a little bit --
 4   we've been provided some documents that some
 5   are called clinical encounters, some are
 6   called activity logs, some are called
 7   consultation reports.  Are you familiar with
 8   those documents?
 9        A.    Yes.
10        Q.    And how are those documents
11   prepared?
12        A.    Anybody that has access can actually
13   pull up reports or print out clinical
14   encounters.
15        Q.    So the activities report form makes
16   reference to sick call triage among other
17   things.  Are you familiar with that term?
18             MR. PUTNAM:  If we're referring to a
19        document can we put it up on the screen?
20        Because I think there may be different
21        documents that say "activity report" on
22        it.  So I could get -- do you have a means
23        to put it up on the screen?
24             MR. GOLUB:  I will but I'm not
25        really doing it for that reason.  When I'm
```

```
 1        using a document, I'll put it up, Nate.
 2        Right now I'm just kind of doing
 3        background stuff.  So if she needs the
 4        document I'm happy to do it.  Let me see
 5        where the question's going before we do
 6        that.
 7              MR. PUTNAM:  Okay.
 8   BY MR. GOLUB:
 9        Q.    Is that a phrase that's used at
10   Danbury, sick call triage?
11        A.    Sick call primarily, yes.
12        Q.    And inmates can put a request in for
13   sick call; correct?
14        A.    Yes.
15        Q.    Is that done electronically or is
16   that done on paper by the inmate?
17        A.    That's done on paper by the inmate
18   within a designated timeframe.
19        Q.    And that's a medical request by the
20   inmate to see some medical provider at the
21   facility; correct?
22        A.    Yes.
23        Q.    And then is the information from --
24   withdrawn.
25              And you're aware, are you not, that
```

```
 1   the petitioners in this case have asked
 2   Danbury to produce the sick call requests that
 3   were made by the inmates; right?
 4              MR. PUTNAM:  Object to form.  You
 5       can answer.
 6       A.     Yeah, I mean -- no, I didn't know
 7   that that was specifically in there, that
 8   document.  No.
 9       Q.     Did you help respond to the document
10   request that the petitioners served in this
11   case?
12       A.     It depends which part you're talking
13   about.
14       Q.     Well, was there a document request
15   that you were asked to help collect medical
16   information and medical records in connection
17   with?
18       A.     Yes.  Medical records.  Definitely
19   yes.
20       Q.     Well, a sick call request is a
21   medical record; isn't it?
22              MR. PUTNAM:  Objection to form.
23       A.     No.  It's not.  It's just a form
24   that we have created locally.  It's not a
25   government form.  It's nothing official.  It's
```

```
 1   not anything that's required to be scanned
 2   into the medical record.
 3        Q.    When you say it's not required, what
 4   does that mean, "not required"?  Is there
 5   something that says -- let me rephrase the
 6   question.
 7              Is it your testimony that Danbury
 8   has destroyed the sick call requests?
 9        A.    No.  We haven't, like, destroyed it,
10   from what you're saying.  But we have a
11   process where we have actually created a form.
12   It's a form we've created at Danbury to help
13   the inmates make sick calls.  I don't recall
14   exactly what they're making sick call for.
15   There's even a picture on it they could draw
16   on of a person.  But it's not an official
17   form.  It's just a way -- informal way for an
18   inmate to let us know exactly what's going on.
19   And they actually hand those directly to a
20   medical person so they could actually look at
21   the form, obtain more information on the form
22   if need be and then people that need to be
23   seen the same day or seen the same day and
24   people that can be seen later are placed on
25   our scheduler which is a function in our
```

```
 1   electronic medical record.
 2        Q.    So are you saying that the -- who is
 3   it that collects the sick call forms from the
 4   inmates?
 5        A.    Right now we're going to the units
 6   and collecting them.  So primarily --
 7   sometimes I go.  But primarily, right now, the
 8   main consistent person has been our dental
 9   hygienist and she's just collecting these
10   forms to bring them back.
11        Q.    How about in March and April?
12   Who --
13        A.    Same.  So social worker, dental
14   hygienist or myself or the dentist were the
15   primary people who had gone around, depending
16   who was available to make rounds and collect
17   the sick call forms.
18        Q.    And do I understand you that what
19   you said is that the person who collects it
20   will take information from the inmate to get
21   more information than this on the form?
22        A.    If need be, yes.
23        Q.    So that's taking a history from the
24   inmate of what the inmate is complaining about
25   if it's not clear from the form; is that it?
```

 1     A.     Or just ask specifically what
 2  they're requesting.  For example, I did one
 3  the other day and it just said, "I need to see
 4  a doctor."  So I inquired as far as exactly
 5  what do you mean by this, you know, what's
 6  going on versus a generic "I need to see a
 7  doctor."
 8     Q.     And then would you note that on the
 9  form?
10     A.     Yes.
11     Q.     Now, does the person who collects
12  the form make -- is that person responsible
13  for making the determination about whether the
14  inmate needs to see somebody right away or
15  not?
16     A.     No.
17     Q.     Who is responsible for making that
18  determination?
19     A.     So the forms are brought back and
20  either the paramedics will triage them or
21  we'll actually take them to the physician and
22  ask the physician specifically who they would
23  like to see and then the rest will go on our
24  scheduler, which is an electronic function,
25  and Beamer with a notation specifically why

```
 1   they're making sick call.
 2        Q.    So whenever a sick call request is
 3   received and the person is not seen that day
 4   there's an electronic schedule for a future
 5   visit prepared; is that right?
 6        A.    Yes.
 7        Q.    And who is responsible for entering
 8   that information into the computer to schedule
 9   it?
10        A.    Well, it used to be our health
11   information technician before she went out.
12   During her absence we've had the dental
13   hygienist enter it, social worker enter it,
14   and the medical assistant who works with the
15   physician also enter it.
16        Q.    And you can tell from your computer
17   records the date on which every sick call form
18   is entered into the computer; correct?
19        A.    Yeah.  They put it in that same day
20   with that date and then they make a notation
21   specifically what the inmate is making a sick
22   call in regards to.
23        Q.    And that would be true whether or
24   not it's an urgent sick call or a deferred
25   sick call visit, the information from the sick
```

```
 1   call form is entered into the computer and
 2   either scheduled for that day or scheduled for
 3   a day in the future; correct?
 4        A.     No.
 5        Q.     Okay.  What's wrong with what I just
 6   said?
 7        A.     The urgent ones are seen the same
 8   day.  So they're not entered into the
 9   scheduler.
10        Q.     So what happens then?  How is it
11   that the inmate gets from whatever unit the
12   inmate is in to see the doctor -- to see
13   somebody, I should say -- we'll get to who
14   that is in a minute -- how does that person
15   get there on that same day?
16              MR. PUTNAM:  Object to form.
17        A.     Boy.  We actually call them up from
18   their unit and have them brought up for an
19   evaluation that same day.
20        Q.     And where is that entered?
21        A.     That would be the clinical encounter
22   by the provider that sees them.
23        Q.     Is there a way to determine from the
24   entry in the computer system whether an
25   encounter was viewed as something that needed
```

```
 1   to be done on the same day or was it a
 2   deferred encounter?
 3        A.    Can you repeat the question?
 4        Q.    Sure.
 5              You said some of the sick call
 6   requests would be scheduled out in the future,
 7   some of them would be seen on the day of the
 8   sick call request; correct?
 9        A.    Yes.
10        Q.    Okay.  Is there a way to tell from
11   the computer which is which?
12        A.    The ones that are seen the same,
13   they just have a clinical encounter and you
14   can in the history or activities report pull
15   those up and look at the encounter.
16        Q.    The ones that are deferred for the
17   future, what would I see on those?
18        A.    You can view them on the scheduler
19   and then you would be able to look at the
20   completed ones and go to that clinical
21   encounter, or if the physician didn't process
22   it off you can still go under clinical
23   encounter to see when that person was seen and
24   look at their encounter.
25        Q.    Why is it that the sick call
```

```
 1   requests aren't kept?
 2              Let me withdraw that.
 3              Are they kept now?
 4      A.      We have started keeping them.  Yes.
 5      Q.      When did you start keeping them?
 6      A.      I want to say maybe Monday we
 7   started.  Monday or Tuesday.
 8      Q.      You mean two days ago?
 9      A.      Yes.
10      Q.      Today's Wednesday; right?
11      A.      Yes.
12      Q.      And why did you start keeping them
13   two days ago?
14      A.      It was recommended --
15              MR. PUTNAM:  Object to form.  But
16      you can answer.
17      A.      It was recommended.
18      Q.      Where are you maintaining them now?
19      A.      We have the completed ones in a
20   folder that says completed sick calls and we
21   have another one for the uncompleted ones in
22   another folder in medical records.
23      Q.      Is it your intention to continue to
24   maintain these records for the foreseeable
25   future?
```

```
 1      A.      For now, yes.
 2      Q.      So how many inmates are positive for
 3   COVID at Danbury right now?
 4      A.      102 total from the beginning when we
 5   started testing in late March.
 6      Q.      When you say late March, what does
 7   that mean?
 8      A.      Around March 26th was when we had
 9   our first case that we started testing.
10      Q.      I assume you're aware of Attorney
11   General Barr's April 3, 2020, memorandum
12   concerning COVID in correctional institutions,
13   federal correctional constitutions?
14      A.      Yes.
15      Q.      And did you see that at the time?
16      A.      I can't recall the exact date.  But
17   I saw it.  It was around that time that it
18   came out.
19      Q.      Whether it was the same day or not
20   you would have seen it contemporaneously with
21   its issuance; correct?
22      A.      Uh-hmm.
23      Q.      Is that yes?
24      A.      Yes.  Yes.
25      Q.      And it was part of your
```

```
 1   responsibilities to be aware of that
 2   memorandum; correct?
 3        A.    Yes.
 4        Q.    You actually also saw his March 26th
 5   memorandum as well; correct?
 6        A.    Yes.
 7        Q.    And you're aware that in those
 8   memoranda, both of them, Attorney General Barr
 9   identified inmates who are medically
10   vulnerable to COVID-19 as a group that needed
11   protection; correct?
12              MR. PUTNAM:  Objection to form.
13        A.    That's what was indicated in the
14   memo.
15        Q.    Is it correct that the Bureau of
16   Prisons is a department of the Department of
17   Justice?
18        A.    Yes.
19        Q.    So that Attorney General Barr is the
20   highest-ranking member of the Department of
21   Justice; correct?
22        A.    Yes.
23        Q.    So his memoranda were binding on
24   you; is that correct?
25        A.    Yes.
```