## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIANTHE MARTINEZ-BROOKS, | : | |
| REJEANNE COLLIER, | : | |
| JACKIE MADORE; and | : | |
| KENNETH CASSIDY, Individually, | : | |
| and on Behalf of All Others Similarly Situated, | : | |
| Petitioners, | : | |
| | : | |
| v. | : | C.A. No.:  3:20cv569 (MPS) |
| | : | |
| | : | |
| D. EASTER, Warden of Federal Correctional | : | |
| Institution at Danbury, and MICHAEL | : | |
| CARVAJAL, Director of the Federal Bureau | : | |
| of Prisons, in Their Official Capacities, | : | |
| Respondents. | : | June 8, 2020 |

## **RESPONDENT'S OBJECTION TO PETITIONERS' MOTION FOR SANCTIONS**

Petitioners' argue that the Respondent has failed to keep medical records and that sanctions are appropriate. For the reasons set forth herein, their motion for sanctions should be denied.

The fundamental premise of Petitioners' motion is that, absent the sick call slips, there is no way to determine if any sick call slips were ignored or whether there was a delay in responding to them. This is untrue, as demonstrated by the testimony of Angela Dukate, who is the Health Services Administrator.

Ms. Dukate testified as follows regarding the sick call slips:

Q. Well, a sick call request is a medical record; isn't it?
    MR. PUTNAM:  Objection to form.
A. No.  It's not.  It's just a form that we have created locally.  It's not a government form.  It's nothing official.  It's not anything that's required to be scanned into the medical record.
Q. When you say it's not required, what does that mean, "not required"?  Is there something that says -- let me rephrase the question.  Is it your testimony that Danbury has destroyed the sick call requests?

1

>> A. No. We haven't, like, destroyed it, from what you're saying. But we have a process where we have actually created a form. It's a form we've created at Danbury to help the inmates make sick calls. I don't recall exactly what they're making sick call for. There's even a picture on it they could draw on of a person. But it's not an official form. It's just a way -- informal way for an inmate to let us know exactly what's going on. And they actually hand those directly to a medical person so they could actually look at the form, obtain more information on the form if need be and *then people that need to be seen the same day or seen the same day and people that can be seen later are placed on our scheduler which is a function in our electronic medical record.*

Dukate, pg. 21:20-23:1 (emphasis added). Ms. Dukate then explained to Petitioners' counsel how the information from the sick call slips are transferred to the scheduler.

>> Q. Who is responsible for making that determination?
>> A. So the forms are brought back and *either the paramedics will triage them or we'll actually take them to the physician and ask the physician specifically who they would like to see and then the rest will go on our scheduler, which is an electronic function, and Beamer with a notation specifically why they're making sick call.*
>> Q. So whenever a sick call request is received and the person is not seen that day *there's an electronic schedule for a future visit prepared*; is that right?
>> A. *Yes*.

Dukate, pg. 24:17-25:6 (emphasis added). Finally, Ms. Dukate explained that, in some instances, sick call slips are/or placing people onto the scheduler is not needed because of the emergent nature of the request.

>> Q. And you can tell from your computer records *the date on which every sick call form is entered into the computer*; correct?
>> A. *Yeah. They put it in that same day with that date and then they make a notation specifically what the inmate is making a sick call in regards to*.
>> Q. And that would be true whether or not it's an urgent sick call or a deferred sick call visit, the information from the sick call form is entered into the computer and either scheduled for that day or scheduled for a day in the future; correct?
>> A. No.
>> Q. Okay. What's wrong with what I just said?
>> A. *The urgent ones are seen the same day. So they're not entered into the scheduler*.
>> Q. So what happens then? How is it that the inmate gets from whatever unit the inmate is in to see the doctor -- to see somebody, I should say -- we'll

|     | get to who that is in a minute -- how does that person get there on that same day? |
| --- | --- |
|     | MR. PUTNAM: Object to form. |
| A.  | Boy. [Sic] We actually call them up from their unit and have them brought up for an evaluation that same day. |
| Q.  | And where is that entered? |
| A.  | That would be the clinical encounter by the provider that sees them. |
| Q.  | Is there a way to determine from the entry in the computer system whether an encounter was viewed as something that needed to be done on the same day or was it a deferred encounter? |
| A.  | Can you repeat the question? |
| Q.  | Sure. You said some of the sick call requests would be scheduled out in the future, some of them would be seen on the day of the sick call request; correct? |
| A.  | Yes. |
| Q.  | Okay. Is there a way to tell from the computer which is which? |
| A.  | *The ones that are seen the same, they just have a clinical encounter and you can in the history or activities report pull those up and look at the encounter.* |
| Q.  | The ones that are deferred for the future, what would I see on those? |
| A.  | You can *view them on the scheduler and then you would be able to look at the completed ones and go to that clinical encounter, or if the physician didn't process it off you can still go under clinical encounter to see when that person was seen and look at their encounter*. |

Dukate, pg. 25:16-27:24. (Emphasis added).

Finally, Ms. Dukate explained extensively how this process would work in practice:

| Q. | Okay. So that J.H. was seen on May 13, 2020 by Rosemary Johnson, APRN; correct? |
| --- | --- |
| A. | Yes. |
| Q. | All right. *I want to find out when it was that J.H. complained of the shortness of breath. How do I do that*? |
| A. | *Well, if she was entered on the scheduler you can go to the scheduler and look her up by her reg number.* |
| Q. | Okay. So if she's entered on the scheduler and I don't know what -- where the scheduler is in this document. Do you know where the scheduler is in these documents?<br>Actually – |
| A. | I would have to – |
| Q. | Let me put it in a different way. If she's entered on the scheduler, you're saying I can put her number in, [Omitted] – |
| A. | Yes. |
| Q. | -- and that will tell me when the sick call request was put in to the system; correct? |

3

A. Yes.
Q. So that for everybody who -- now, and what happens if she complained of shortness of breath on the same day that she was seen by Rosemary Johnson?
A. Most likely she would not have been placed on the schedule but that doesn't mean she wasn't evaluated by a paramedic who then put her on a schedule for follow-up by Ms. Johnson.
Q. *So what you're saying to me is that you believe that for J.H., if I put her number in I'll either get -- I'll get a sick call -- I'll get the date that the sick call was put in of shortness of breath or I'll get nothing if she was seen on the same day; is that right*?
A. *Yes. So what I would do if I was looking at this case, I would go into her clinical encounter history and do a tracer based on that.*
Q. Based on what?
A. Based on her complaint when she was seen.
Q. When you say –
A. I'm sure she was seen by --
Q. When she was seen by Ms. Johnson?
A. Or maybe she was seen before, like I said, by a paramedic who then put her on a schedule for a follow-up.
Q. *J.H. will have a clinical encounter in her medical records; right*?
A. *She has a completed clinical encounter by Ms. Jonnson in her medical records.*
Q. And that would be dated May 13th, right?
A. Yes.
Q. And I can then trace back to see by putter her -- I can trace back by putting her number in when that appointment with Ms. Johnson was scheduled; right?
A. Potentially. Potentially. *But what I would do is actually go into the inmate's clinical encounters and see if she was in fact evaluated by a paramedic before this. There's many different ways to use Beamer and that's the method I would use versus going through the scheduler.*
Q. So you're saying I can put in this woman's number and say when was she seen prior to May 13th; is that right?
A. Yes. *You can see that in the clinical encounter you can see every entry ever made on her.*
Q. And won't I be able to tell when -- won't I be able to tell when that entry "C/O shortness of breath" was entered. Won't that be -- you can't have an entry in a computer that you can't tell the date; can you?
MR. PUTNAM: Object to form.
A. No. *They are dated.*
Q. So that if I go into J.H.'s records I'll be able to tell when that entry "C/O shortness of breath" was put into the computer; right?
A. Yes.
Q. And what do I ask for to do that?

4

| | | |
|---|---|---|
| A. | | You can go through the scheduler or you can go through the clinical encounters. |
| Q. | | When you say the scheduler, I'm looking at the computer now, right?  I have the computer entering something? |
| A. | | So the scheduler is a function in the computer.  It's in Beamer.  It's like an electronic scheduling system. |
| Q. | | And the scheduler will have "C/O shortness of breath" entered somewhere? |
| A. | | If somebody entered it as a sick call in the schedule, yes. |
| Q. | | How else could it be entered? |
| A. | | This one primarily looks like it was probably entered in as a sick call triage. |
| Q. | | Which means what? |
| A. | | That it was entered into the scheduler as needing to be seen for a sick call. |
| Q. | | Needing to be seen right away or needing to be seen when it can be scheduled? |
| A. | | It's just entered as needing to be seen.  There's no flagging system or anything like that.  If somebody needs to be seen right away they're seen right away. |
| Q. | | Okay.  So does the fact that there's this entry here "C/O shortness of breath" indicate to you that there was some kind of gap between when she put the sick call request in and when she was actually seen and that can go determined either by tracing or by doing the scheduling?<br>MR. PUTNAM:  Object to form.  Go ahead. |
| A. | | Yes.  So not necessarily.  Like I said, she could have been evaluated by a paramedic or somebody she felt needed to be seen by somebody that was a midlevel provider. |
| Q. | | On the same day as 5/13 or on a different day? |
| A. | | *I would have to go through her clinical encounter*.  I mean, potentially yes.  But I would have to, like *I said, do a trace of methodology and go through a clinical encounter*. |
| Q. | | *But that's doable for each one of these inmates who has a medical record; correct*?<br>MR. PUTNAM:  Object to form.  Go ahead. |
| A. | | *Yes.  You can look at anybody's clinical director*. |
| Q. | | *Then you could look at anybody's scheduler*? |
| A. | | *Yes*. |
| Q. | | Okay. |

Dukate, pg. 136:4-141:25 (emphasis added).

In Petitioners' own motion (as well as in the report of their expert, Doctor Venters), Petitioners acknowledge that keeping the slips is not required – "If you do not file the slips in the record, a log may be kept to monitor the stages of response.  The log needs to include the request

5

date, date and result of triage, date of the sick-call visit if required, etc."[1]  Doc. 83, pg. 4.  The above testimony from Ms. Dukate demonstrates that (1) the "request date," "date at result of triage," and the "date of sick-call visit if required" can be determined from either the scheduler, the daily activity log, or the clinical encounters, or a combination of all three.

Petitioners argue, without citation, that the sick call slip is a "medical record."[2]  This is inaccurate.  According to the Connecticut Department of Public Health, a medical record is defined as follows:

> The purpose of a medical record is to provide a vehicle for: documenting actions taken in patient management; documenting patient progress; providing meaningful medical information to other practitioners should the patient transfer to a new provider or should the provider be unavailable for some reason. A medical record shall include, but not be limited to, information sufficient to justify any diagnosis and treatment rendered, dates of treatment, actions taken by non-licensed persons when ordered or authorized by the provider; doctors' orders, nurses notes and charts, birth certificate work-sheets, and any other diagnostic data or documents specified in the rules and regulations. All entries must be signed by the person responsible for them.

§ 19a-14-40, Connecticut State Dept. of Public Health, at https://portal.ct.gov/DPH/Public-Health-Hearing-Office/Regulations/Public-Health-Code-Medical-Records-Regulations#:~:text=A%20medical%20record%20shall%20include,work%2Dsheets%2C%20and%20any%20other (Last visited at Jun. 8, 2020).  *See also United States v. Ahuja*, 209 F. Supp. 3d 489, 496 (D. Conn. 2016) (relying on § 19a-14-40 to define the patient's medical record).  Nothing in the above definition, given the information contained in the scheduler, activities log, and clinical encounters, suggests that the "sick-call slips" are part of the patient record.  Rather,

---

[1] Notably, Dr. Venters testified in his deposition on June 8, 2020, that Petitioners' did not provide him with either the scheduler or the activity logs described above.  To the extent Petitioners rely on Dr. Venters for the proposition that the sick call system at FCI Danbury failed to adequately and timely respond to prisoners' requests for medical care, such a proposition fails *inter alia* because has not reviewed the relevant documentation.

[2] Petitioners also fail to cite to any BOP policy that would require the retention of the sick call slips.

it appears that the clinical encounters contain the information that is the medical record. Finally, given that Petitioners have requested the inmates to provide releases for all of the medical records, Petitioners will have the information they desire for any inmate who has signed an authorization for release.

There has been no spoliation by Respondent. The Second Circuit has defined spoliation of evidence as: "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001). The spoliation of evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). The sanction of an unfavorable inference serves the threefold purpose of "(1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." *West*, 167 F.3d at 779.

The imposition of sanctions is not formulaic, however, because "even where a party has shown that its opponent had an obligation to preserve certain evidence and willfully failed to do so, sanctions need not automatically follow; instead, [the Second Circuit has] simply held that such conduct *may* provide sufficient circumstantial evidence that relevant and prejudicial data was lost." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 630 (2d Cir. 2018) (emphasis in original). As the *Klipsch* Court explained, the Petitioners' "must show by a preponderance of the evidence: (1) that the party having control over the evidence had an

7

obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id*. at 628 (internal quotation marks omitted).

Petitioners cannot satisfy their burden and sanctions should not be imposed in this case. BOP did not have an obligation to preserve the sick call slips themselves. The information in the sick call slips was preserved throughout BOP systems and has been provided to the Petitioners.[3] Additionally, the Respondent has disclosed activity reports for each of the providers for the institution, which show every single inmate that the providers have seen, the date, and the time. Further, even though the BOP does not concede that the NCCHC standards are authoritative or even appropriate, the information preserved in the system complies with the NCCHC's idea of a log. Neither the NCCHC nor the state Department of Public Health requires these slips to be saved given that the information is captured.

The slips were not destroyed with a culpable state of mind. BOP did not destroy, for the purposes of the litigation, anything that it kept in the regular course of business. It is illogical to argue that the failure to retain a document that was never retained in the ordinary course demonstrates that the destruction was done with a culpable state of mind.

The Petitioners have not be deprived of evidence in this litigation. As set forth above, the BOP's information systems already captures the information from the sick call slip. While the information may not be in the format the Petitioners desire, that does not justify an accusation

---

[3] Petitioners' brief fails to mention the discussions with the Respondent regarding this issue. On the evening of Thursday, June 4, 2020, counsel for the Petitioners and counsel for the Respondent discussed the issue of the sick call slips. During that call, counsel for the Respondent offered to ask BOP to examine whether, in Beamer, it was possible to generate a document that would demonstrate both the date an individual was first placed on the scheduler and the date when a provider completed the clinical encounter. The Petitioners' counsel asked the Respondent's counsel to attempt to generate this information. Counsel for the Respondent received this additional information at approximately 5:30pm today and will produce it to counsel for the Petitioners forthwith.

that the BOP purposely destroyed evidence.  Additionally, even if the slip call slips were preserved, the Petitioners would *still* have to look to the scheduler, the daily activity log, and the clinical encounter notes to determine if the inmate was appropriately treated.  Moreover, such an analysis would require an inmate by inmate examination of their entire medical record, which is beyond the scope of the case as alleged.  Further, the Petitioners can always ask the inmate about the request for the sick call, to the extent they believe further inquiry into any sick call would provide evidence.  Simply put, the sick call slips alone do not answer Petitioners' question.

Finally, the sanction requested by the Petitioners is simply a backdoor way of proving the ultimate issue – whether FCI Danbury's care of its inmates constitutionally deficient such that the Court should, as Petitioners request, order the release of all medically vulnerable inmates.  As the Court has indicated, this case should be litigated on the merits.

Respectfully Submitted

Respondents
By Their Attorneys

John H. Durham
United States Attorney

      /s/
John B. Hughes, ct05289
Michelle L. McConaghy, ct27157
David C. Nelson, ct25640
Nathaniel M. Putnam, phv10463
Jillian R. Orticelli, ct28591
Assistant U.S. Attorneys
203-821-3700

**CERTIFICATION**

       I hereby certify that on June 8, 2020, a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                      /s/
                      Michelle L. McConaghy (ct27157)
                      David C. Nelson (ct25640)
                      Assistant U.S. Attorneys