TRULINCS 30350047 - HECHTMAN, WENDY - Unit: DAN-O-A

---

FROM: 30350047
TO:
SUBJECT: Commentary on Settlement Agreement
DATE: 08/23/2020 08:41:51 PM

To the Members of the Court:

The following expresses our concerns regarding the Settlement Agreement (the "agreement") entered into in regard to case no. 3:20-cv-00569 (MPS) commonly referred to as "Martinez-Brooks v. Easter". It should be stated up front that we do not object to the agreement as a whole, but we do have serious concerns we wish to make the court aware of and hope the court will take into consideration for the duration of the agreement. It should also be noted that we are all inmates of the "Camp" ("campers") location at Danbury, and thus our concerns relate only to the camp, as we have no real knowledge of what goes on in the other facilities beyond second hand information.

Our first observation is that in the original lawsuit, the Petitioners asked for enlargement of the camp as a whole. The rationale behind this was that Covid-19 prevention measures are extremely difficult to effectively implement at the camp due to the communal living situation of the camp, the inability to isolate and quarantine at the camp (due to aforementioned communal living situation), and the fact that by definition no camper is a danger to the community which is why we live somewhere with no locks, no cameras, no fences, and are allowed enormous freedoms including driving privileges. Hence, the rationale was no camper should be subjected to the risk of Covid-19, and we asked for enlargement of the camp as a whole in addition to the medically vulnerable at the FCI and FSL.

Our population at the camp has been dramatically and drastically reduced, and for this we are deeply grateful. However, it has become painfully obvious to us even at this low number (we've been below 50 inmates for several weeks now) we are still at unacceptable risks for Covid-19 due to our living situation. We still share everything from toilets and showers to phones and computers. We clean and sanitize to the best of our ability and with the limited supplies provided by the Bureau of Prisons (BoP) but we are still exposed to officers who venture out in the community daily, we are still exposed to officers who work in all different areas of the other two facilities daily, and due to the reportedly low infection rate currently at Danbury, we are expected to go work in other locations such as the FCI, the FSL, Staff Housing, the Sipe Training Center, the warehouse, the garage where the prison vehicles used by various officers are serviced, etc. Strangely, we are not allowed to prepare our own food, and instead we eat food prepared for us from either the FSL or FCI depending on the day and the officer and what's going on in the compound. We are not allowed access to the gym, and we have been barred from having exercise classes. We've only recently begun crafting classes such as crochet and knitting. We have no programming going on aside from GED courses. We are told this is for our protection. So to be clear, we're expected to paint and repair and install cabinetry in staff housing, but it's too dangerous for us to have a yoga class or enter a gym to which only the 41 of us have access. The logic behind such decisions is mind-boggling and causes us to lose faith in the BoP's ability to protect us.

Further, once the agreement was decided upon, the BoP seemed to take that as a cue to stop processing anyone for the time criteria they had previously employed. People who had dates given to their family by probation now sit downstairs with no "correctional" programming, and questionable access to medical care. Why are these people here? The less people we have incarcerated, the better the odds are for those who remain to avoid infection. They are here because the BoP defaults to keeping people incarcerated for as long as humanly possible unless they are directly and pointedly informed they must (not may, must) do otherwise. Please make it clear that the BoP should not consider this agreement as a directive to cease processing people who are not designated as medically vulnerable. Everyone is vulnerable to infection. Some are just medically vulnerable. That is the only difference between us, especially in a working camp where we live more like a group home.

We have very serious concerns about the BoP's ability, intention, and / or willingness to actively follow the terms of this agreement. Our concerns stem from our experiences with the BoP, which is that "reticence" would be a polite way to describe their approach to doing anything other than the status quo. Our concerns were amplified upon reading the "Side Letter" to Attorney Golub describing an 8 point protocol for medical care the BoP says is their policy for the duration of the agreement and beyond. Again, we are not privy to the circumstances at the other two facilities here at Danbury, but we can affirm unequivocally that absolutely nothing on this list is happening at the camp. Inmates have reported feeling unwell and not been seen for days. Daily temperature checks are skipped usually once or twice a week. When they are done, they are not done by medical or a Lieutenant. They are typically done by our regular officers, many of whom report never being trained to use the temperature reader. We notice there seems to be tension around the readings; there is supposed to be a dedicated officer whereby their post assignment is to take everyone's temperature, but it seems that this officer is often pulled to do something else, and random officers get assigned to complete the temp readings instead. Some officers are upset at being directed to do this job, since they have not been trained, it's not part of their job description, they aren't being given hazard pay (for which they have their own lawsuit going on) and it's in violation of what the BoP is claiming they are doing as policy. Inmates are still being

TRULINCS 30350047 - HECHTMAN, WENDY - Unit: DAN-O-A

---

handcuffed to go to showers in the SHU while they are there in quarantine (and female SHU occupants are not receiving any recreation time). The backlog of necessary medical care is still an ongoing issue. So we see how the BoP is unable to follow through on their own directives, directives they have volunteered to adhere to, and feel this goes to show that it is unlikely they will be in compliance with an agreement they took to avoid court proceedings.

One of the biggest reasons most people here want to be on home confinement is not actually to simply be at home. Frankly, home confinement sounds rather miserable from what many of our inmates who have gone there are telling us about it. The writer of this commentary would personally much rather stay here if it were not for the Covid situation. However, there is a Covid situation, and we're willing to put up with the monotony of home confinement in order to have appropriate access to medical care. Danbury is simply not going to provide that. A cursory reading of the national media shows that no other BoP institution is providing that either. This is another reason we still believe anyone at the camp should be by definition considered medically vulnerable and placed on home confinement. If we're such dangers to the community, why are we somewhere with such a lack of supervision and controls?

This leads us to concerns about the enforcement procedures for the settlement. The agreement reads in 23(d) that the "Petitioner agrees he shall not file a motion for contempt in connection with this Agreement. The Court may not entertain a motion for contempt, and the Court may not grant any remedial relief in the nature of a contempt of court finding against Respondent or BoP. If Petitioner prevails on any claim alleging Respondent's or BOP's non-compliance with this Agreement, the sole remedy shall be specific performance of this Agreement."

To be blunt, we wonder how "specific performance of this Agreement" is going to happen without the threat of contempt. The BOP has ignored the Court's directives repeatedly through this process, and we do not understand why it would be presumed they would start following them now. We certainly hope they do, and are aware we may be jaded, and untrusting. But that lack of trust did not happen in a vacuum. Basically, we would like to know exactly what is the Court going to do when the BoP ignores these directives, behaves in bad faith, finds loopholes, and "dilly dallies" for lack of a better term. We want to know what "enforcement" means, if for no other reason so we can sleep better at night knowing there is serious oversight and teeth to the consequences of failing to adhere to the agreement.

We also have concerns about how medical vulnerability is being interpreted by the BoP. The May 12, TRO (which is what is supposed to be followed for the terms of the agreement) reads that the medically vulnerable subclass was defined as "All individuals in custody at FCI Danbury, while the threat of COVID-19 at the facility remains, who are aged 65 or over and / or who have any of the following conditions specifically identified by the United States Centers for Disease Control as putting them at higher risk for severe illness from COVID-19:...." As of right now, inmates are being told that they have to have either one condition from "tier 1" of the conditions, or two conditions from "tier 2" and that age doesn't matter. This has resulted in a woman here who will be 65 years old on October 31st being told she doesn't qualify as medically vulnerable, even though others went who were over age 65 due to being over age 65. While we understand that tier 1 and tier 2 conditions are different in risk factor, we see nothing in the agreement stating that one has to have two risk factors under tier 2. Further, we ask the Court to make clear that being 65 and over in and of itself is a risk factor and that those falling into that category should be considered tier 1 medically vulnerable and processed accordingly.

Having recently watched an inmate with only one tier 2 risk factor have two violent asthma attacks lasting several hours over the span of two weeks, while medical told her to "calm down" because "you don't want to go to the hospital; you'll have to spend two weeks in the SHU if you go" and then only given a nebulizer treatment after two hours when another inmate provided the medication and the machine, we have serious questions as to how this level of risk is being determined. Considering how dismissive and outright condescending medical is of our complaints (the inmate with the violent asthma attacks was told she needed to get her anxiety under control and stop fixating on getting permission to use the nebulizer) we have serious concerns as to the appropriateness of Danbury medical getting to decide even something as simple as band-aid distribution, let alone the severity of any risk factor or what tier any inmate's condition falls into. The original lawsuit asked for specific oversight to ensure appropriate medical care for those inmates remaining. Whereas there will not be this oversight, whereas Danbury medical staff has repeatedly demonstrated outright neglect and flagrant willful refusal to provide even the most basic care and continues to demonstrate this lack of care, and whereas campers are again, by definition, not a danger to the community, we respectfully ask the Court to consider making campers as a whole members of the class due to their living conditions and excessive exposure to risk vis a vis their required jobs throughout the compound in the various facilities here. We need to be released to home confinement so we have appropriate access to medical care if we do in fact contract Covid, because we will not receive that care here.

TRULINCS 30350047 - HECHTMAN, WENDY - Unit: DAN-O-A

---

FROM: 30350047
TO:
SUBJECT: Commentary on Settlement Agreement Part II
DATE: 08/23/2020 08:38:07 PM

Another issue we have noted is that the CDC has determined that smoking is a risk factor for Covid-19. While smoking is prohibited while in BoP custody, the reality is that BoP does not taking smoking seriously either as a prohibited behaviour, a health concern regardless of Covid-19, or as a risk factor for Covid-19. Non-smoking inmates are regularly exposed to the second hand smoke of smoking inmates. Like any smokers, inmate smokers are unaware that simply washing their hands and popping a peppermint does not change the fact the smoke and the toxins therein lingers on their clothing, in their hair, and proliferates the air around them with a strong odor. Inmates discovered smoking (and to be discovered smoking one must have an actual cigarette in their hand, not simply smell of smoke) are given an incident report ("shot") equivalent to that of wearing a torn shirt or painting one's fingernails. Usually the shot is dismissed for some extra kitchen or trash duty. Officers do not patrol for smoking and only intervene if they happen to accidentally stumble upon it. Therefore, there are a number of chronic smokers in BoP custody. Smokers are being told that smoking only counts as a risk factor if an inmate has developed some sort of medical condition from smoking. This isn't what the CDC says, and further makes no sense because if that was the case the arising medical condition would be the risk factor, not smoking in and of itself. Considering the absurdly high rate of smoking for inmates and staff in the BoP, we are not surprised by this stance, but we are concerned as to how it will affect people who are more at risk due to smoking and the effects of second hand smoke, whether or not the BoP takes smoking seriously as any kind of health issue.

Of further concern, we note that one of the criteria for release is a "valid release plan." Thus far, this has been interpreted as being a private residence to which the inmate can be released and that is approved by United States Probation Offices (USPO). Unfortunately, what has happened is that USPO has refused to approve relocation requests because "we don't have to" (actual quote from an actual probation officer when asked why a relocation to a home close to an inmate's family was not being approved). What they really mean is because these are Covid release inmates. This lack of approval has resulted in medically vulnerable non-violent minimum recidivism risk inmates forced to remain incarcerated in Danbury with its increased risk of Covid infection and substandard medical care.

We realize the Court may or may not have input as to the machinations of USPO and their relocation approval process (we actually don't know how much input the Court does or does not have in this instance, but we assume none at this present time). However, the lack of cooperation and display of bad faith from USPO should not force the continued incarceration of a medically vulnerable non-violent minimum recidivism risk inmate. Nor should inmates who are genuinely homeless, who do not have appropriate family or friends to live with, be forced to endure the increased risk of infection and substandard medical care. Therefore, we respectfully request that otherwise eligible inmates denied due to lack of a valid release plan (that is, a home to go to) be offered halfway house placement instead. Whereas the halfway houses are supervising the inmates on home confinement, and whereas the halfway houses are required to keep a bed available for the inmates on home confinement through this program in the event a bed is necessary for them in the case of violation, this seems a reasonable request. Obviously the exposure to Covid and the resulting infection risks of communal living in a halfway house are higher than living in a private residence. However, the risks would be no larger (and quite possibly substantially smaller) than that of living in the Danbury camp with 40 other women, and officers coming in and out from all over and inmate workers sent all over the compound all day every day. Further, the halfway house placement would allow these inmates access to appropriate medical care in the event they should be infected with Covid, something that Danbury does not, cannot, will not, and should not be trusted to provide.

On a related note, we have concerns regarding the requirement as to detainers disqualifying an inmate from consideration for home confinement. While this makes sense if one has an ICE detainer, or a detainer to go serve a state sentence once their BoP time is done, this leaves inmates at the mercy of prosecutors and their commitment to timely completion of paperwork in cases where a detainer is for a failure to appear charge, or in the case of one inmate here she was granted a reduction in sentence by her state judge and reduced to time served back in May. However, her public defender doesn't seem to understand what the big deal is, and has never filed the paperwork with the prosecutor to remove the detainer, meaning she is now maxing out on her time here and will leave October 5th once Maine Department of Corrections confirms she does in fact have no time to serve. We respectfully request that detainers for anything other than ICE and to serve time elsewhere be treated on an individual basis, preferably with Danbury processing these inmates as they would any other release and then those other agencies (in this case Maine and Massachussetts state attorneys) sending someone to pick them up or declining to detain them. Inmates should not be held at Danbury with its increased Covid infection risk and lack of medical care because some prosecutor wants to make a point and refuses to release a detainer for a simple hearing to reschedule a court date.

Finally, we wish to make the court aware that despite repeated requests, work orders, and pointed demands, the living

TRULINCS 30350047 - HECHTMAN, WENDY - Unit: DAN-O-A
--------------------------------------------------------------------------------

conditions of the Camp have not changed in any way since the May 28th inspection with photographs taken of our decrepit bathrooms and showers. The toilets have at least been unplugged and we are grateful for that. But as of August 27th the camp will have gone 14 weeks without reliable hot water and regularly has cold showers. There is still black mold due to the inadequate ventilation in these showers. There are still cracks in the foundation and flooring where the subfloor and interior building frame are visible and collecting dirt, dust, and other debris. There is still exposed wiring, unfinished ceilings, asbestos and mildew. There are still no fire alarms or sprinkler systems. There is no real ventilation system (beyond opening windows and doors). We are currently infested with mud wasps, and although the Safety Department has been up here twice and used a dozen cans of spray trying to combat the swarms, five of us have been stung in the last week. Considering there are only 41 of us and we've been studiously avoiding them, that is no insignificant number. It should be noted there are no epi-pens in the building, and if one of the several allergic inmates gets stung, including the writer of this commentary, medical has to be summoned from the other buildings which is a significant time delay.

In light of all of the foregoing, and the fact that again, by the BoP's own definition no camper is a danger to the community, we ask the Court to please specifically recommend that all campers be released to home confinement under the terms of the May 12th TRO. The unique living conditions of the camp make being a camper a vulnerability factor in and of itself, and we ask that the Court take this into consideration. At the very least, please consider directing the BoP to continue releasing vulnerable inmates who are not designated as medically vulnerable according to the BoP's own criteria, espcially ones who were already given dates and then pulled back for no reason other than "the judge clarified we don't have to do that anymore" (as told to us June 26th 2020 FPC Danbury Town Hall with Unit Manager Moore, Case Manager Ramos, and Warden Easter). We further ask that the fact we do not receive medical care at Danbury be taken into consideration when deciding which inmates are eligible for home confinement.

Thank you for your time and consideration.

Sincerely, 8/24/2020

1. Wendy Hechtman, Author 30350-047
   on behalf of the remaining campers, both the vulnerable & medically vulnerable

2. Jessica M Teixeira 16124-049
3. ANDREEA DUMITRU 85508-054
4. Janice Torres 52478-066
5. Jennifer Dwyer 13372-082
6. Bettye Williams 92623-083
7. Lisa Lambert 13460-036
8. Stacy Spagnardi 71097-019
9. Lisa M. Fore 54389-037
10. Birdie Hoaks 31752-064
11. Nicole Roskos 15814-049
12. Leitscha Poncedeleon 27946-055
13. Jasmir Humphrey 72199-050
14. Stacie Miller 68266-112
15. Latoya Meredith 25885-014

Aurora D. Sanchez
#56234-054 (16)
A. Sanchez

Tedkieya McFadden (17)
#54388-066
[signature]

Danielle Houpe (18)
#90495053
Danielle Houpe

Minerva Ruiz (19)
00488-138
Minerva Ruiz

Renee Gattglus (20)
Renee Tartagliore
74950-066

Alkesha Edwards (21)
74753 067
Alkesha Edwards

Tiara Felix (22)
68229-054
Tiara Felix

Rhondalyn Cornett (23)
17162-028
Rhondalyn Cornett

Evelyn Manning (24)
75282066
[signature]

Yonesia Pujols (25)
12069070

Jazmin Vega (26)
07061-050
Jazmin Vega

(27) Luz Perez De Martinez
#15968-049
[signature]

(28) Louise Edwards
92358-083
Louise Edward

(29) Crystal Serfass
72357-067
Crystal Serfass

(30) Viet 46820-050
i o HIV 4th

(31) Isha Sampson
Isha S-El
76922-066

(32) Crystal Santos Zoltowski
76159-066
Crystal Santos Zoltowski

(33) Virginia Blanco
79564-054
[signature]

(34) Carolyn T. Freeman
#70769-050
C. Free

(35) Kyme Ashby
72720-067

(36) Minnolta Chhay #13542-036
MChhay

(37) Amanda Hickman
19166035

(38) Anna Grisanti
26444-078
[signature]

39. Judy Harmon
17940-042

(40) Monique N. Brady
12117070

(41) Mayda Hernandez
#72654-058
Mayda Hernandez

(42) Katherine DeJesus
28214055
Katherine DeJesus

(43) Jacqueline Torres
Jacqueline Torres
#72308019