UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES WHITTED, individually, and on behalf of all others similarly situated,<br><br>     *Petitioner*,<br>  v.<br><br>DIANE EASTER, Warden of Federal Correctional Institution at Danbury in her official capacity,<br><br>     *Respondent*. | No. 3:20-cv-00569 (MPS)<br><br><br><br><br><br>December 6, 2020 |

**MOTION TO ENFORCE SETTLEMENT AGREEMENT AND REQUIRE THE BUREAU OF PRISONS TO IMMEDIATELY RELEASE MEDICALLY VULNERABLE CLASS MEMBERS WHO HAVE BEEN APPROVED FOR HOME CONFINEMENT**

  Class members H.C., S.C., L.F., and E.Y. were granted home confinement by the Bureau of Prisons in mid-September. Almost three months later, despite suffering from conditions that render them medically vulnerable to COVID-19, they remain imprisoned at FCI Danbury without a permissible rationale under the Settlement Agreement. W.H., who was approved in August, has been waiting even longer.  In total, at least 17 individuals are currently imprisoned at FCI Danbury in violation of the Settlement Agreement and this Court's May 12, 2020 Temporary Restraining Order ("TRO"), and Petitioner respectfully moves for their immediate release.

  The Settlement Agreement (Dkt. 134-1), which incorporates the TRO, requires the federal Bureau of Prisons ("BOP") to utilize a "full and speedy" home confinement review process that "immediately maximizes appropriate transfers" of medically vulnerable prisoners to home confinement. Dkt. No. 134-1 ¶ 3, 6 (citing Dkt. No. 30). Under the Agreement, the BOP must release medically vulnerable individuals who have been approved for home confinement within

1

14 days unless public safety reasons or the person's homelessness make it unsafe to release the person within that time frame. Yet notwithstanding these commitments, individuals whom the BOP grants home confinement regularly remain imprisoned at FCI Danbury beyond two weeks. Currently, at least 17 individuals who have been approved for home confinement remain at FCI Danbury weeks after approval—and in some instances months after approval—without a legitimate public safety justification for the delay in their release. These medically vulnerable class members are all at increased risk of severe illness and death from COVID-19, have already been deemed suitable by BOP for home confinement, and have families awaiting their arrival home. Each day that they remain at FCI Danbury needlessly places them in imminent danger of contracting the illness. Immediate action is particularly warranted, as there is a new outbreak of COVID at the facility and there continues to be no ability for prisoners to socially distance given the BOP's failure to meaningfully reduce the population of the facility in the nine months since the pandemic began. The Court should therefore mandate specific performance of the Agreement and order the immediate release of these medically vulnerable individuals.

## I. EXTENSIVE DELAYS IN RELEASE OF MEDICALLY VULNERABLE CLASS MEMBERS APPROVED FOR HOME CONFINEMENT

Since the Settlement Agreement was signed on July 27, 2020, out of approximately 425 medically vulnerable class members reviewed, only 40 have been approved for home confinement. Delays in releasing individuals to home confinement have been commonplace. Eight of the 115 "List Two Inmates"[1] who were reviewed were approved for home confinement upon initial review

---

[1] As set forth in the Settlement Agreement, List Two Inmates are those individuals identified on June 3, 2020 after BOP ran a second ICD code search for individuals with medical conditions that the CDC states put individuals at heightened risk for severe illness from COVID-19, as well as 14 individuals class counsel had requested be included in the medically vulnerable class. *See* Dkt. No. 134-1, at 2-3. Class counsel received the worksheets for List Two Inmates on August 26, 2020 but has not been informed of the precise date of the HCC review for these individuals.

this summer. Although all have since been released, one was released via compassionate release after waiting more than two months for his transfer to home confinement and at least several others were forced to wait many weeks after approval.[2] Of the 52 "List One Inmates"[3] who were automatically re-reviewed this summer under the Settlement Agreement, three were approved for home confinement. Two still remain at the facility months after approval,[4] and a third waited almost two months for release after approval—weeks of which she spent in the Special Housing Unit (where the BOP was quarantining women from the Camp at the time).[5] Of the 258 individuals reviewed for home confinement who were newly identified and admitted to the class after the Agreement was signed, 27 have been approved for home confinement. Only 6 of these individuals have actually been released, and of those released, at least two waited months for release.[6]

There are currently 25 class members still at FCI Danbury who have been approved for home confinement yet remain at the facility more than two weeks after approval. In at least 17 of these cases, the BOP has not established that public safety or the person's homelessness would make it unsafe to immediately release the individual to home confinement. This chart shows the

---

[2] HQ was informed by his case manager that he was approved for home confinement on July 12, but he was not released until after his sentencing court ordered release on September 29. BW was still at the facility in late September, almost a month after his worksheet was received. Class counsel is unsure how long the other List Two Inmates waited for release after approval. One additional List Two Inmate, MD, was approved for home confinement upon re-review, with his worksheet received on November 20, and remains at the facility.

[3] As defined in the Settlement Agreement, List One Inmates are those 314 individuals identified on May 15, 2020 under the TRO as having medical conditions that place them at increased risk of severe illness from COVID-19. *See* Dkt. No. 134-1, at 2.

[4] These individuals are SC and WH.

[5] This individual is VH. One other List One Inmate (IC) was approved after a separate re-review. She has been waiting 46 days for release.

[6] TC waited 76 days and DG waited 91 days. One other individual, CZ, was released via a compassionate release order several weeks after approval for home confinement. The amount of time the other 3 individuals waited is not known by class counsel.

number of days each of these 17 individuals has waited since approval for home confinement, and contains information supplied by BOP relating to the status of release:[7]

| Initials | Facility | Date Home Confinement (HC) Approved | Days Waiting | Status per BOP |
|---|---|---|---|---|
| HC | FSL | 9/16/20 | 81 | HC date 12/17/20 but told by case manager it will be delayed |
| IC | FSL | 10/21/20 | 46 | HC date 1/7/21 |
| KC | FSL | 11/2/20 | 34 | HC date 12/7/20 but will be delayed |
| SC | Men's | 9/14/20 | 83 | Awaiting date from RRM |
| MD | Men's | 11/20/20* | 16 | HC date 12/15/20 |
| LF | Camp | 9/14/20 | 83 | HC date 1/19/20 |
| CF | Camp | 10/6/20* | 61 | HC date 12/22 |
| RG | Camp | 10/23/20* | 44 | HC date 12/15 |
| JH - FSL | FSL | 11/2/20 | 34 | Awaiting date from RRM |
| JH - Camp | Camp | 9/21/20* | 76 | Probation approved relocation on 11/10 |
| WH | Camp | 8/24/20 | 104 | Awaiting date from RRM |
| NL | Camp | 10/5/20 | 62 | Awaiting date from RRM (RRM seeking HC under a contract facility) |
| JM | Men's | 11/6/20* | 30 | Awaiting date from RRM |
| DM | Camp | 10/16/20 | 51 | HC date 12/15 (was delayed from 12/2) |
| MR | Camp | 10/5/20 | 62 | RRM awaiting response from probation re electronic monitoring |
| RT | Camp | 10/23/20* | 44 | Awaiting date from RRM |
| EY | FSL | 9/16/20 | 81 | HC date 12/15 (was delayed from 12/8) |

*indicates the date the worksheet was received by class counsel; the HC decision date may be earlier as worksheets are typically produced every other week to class counsel.*

In total, out of the mere 40 individuals approved for home confinement since July 27, the BOP has released only 15 from FCI Danbury.

---

[7] A version of this chart showing full names and register numbers is filed under seal as Exhibit A. Of the remaining 8 individuals approved for home confinement but still at FCI Danbury, the BOP has asserted that one is homeless, one does not have a release plan, three have pending charge issues, one had probation deny BOP's supervision request, one has probation working on a supervision issue, and one is a Central Inmate Monitoring case that needs a special security review to be completed. Class counsel is in the process of investigating these assertions. A list of these individuals is filed under seal as Exhibit B. The names and register number of the individuals referenced in footnotes 2, 4, and 6 are also listed in Exhibit B.

## II. THE BOP'S STATED RATIONALES FOR ITS DELAY ARE IMPERMISSIBLE UNDER THE SETTLEMENT AGREEMENT

On December 1, 2020, Warden Easter provided a letter describing delays in the release of these individuals that have resulted from entirely avoidable administrative issues, errors, and inattention. *See* Ex. C. With respect to some individuals, there have been multiple inexcusable bureaucratic failures that have compounded the length of the wait. In addition to relying on rationales unrelated to public safety, described below, the BOP has failed to articulate why it has declined to exercise its furlough authority to speed up the release to home confinement of medically vulnerable individuals granted home confinement. *See* 18 U.S.C. § 3622. For the reasons described below, none of the stated rationales constitute permissible justifications under the Settlement Agreement for the inordinate delay.[8]

### A. Requirements of the Settlement Agreement

The Settlement Agreement requires that medically vulnerable class members on List Two and those identified after the effective date of the agreement be reviewed for home confinement "pursuant to the standards set forth in the May 12, 2020 TRO (see ECF 30)." Dkt. No. 134-1 ¶ 3, 6. Issued on May 12, 2020, the TRO requires the Respondent to:

> Finalize and implement a process that makes *full and speedy use* of the home confinement authority under 18 U.S.C. § 3624(b) and the CARES Act and, as directed by the Attorney General's April 3, 2020 Memorandum, "*immediately* maximize[s] appropriate transfers to home confinement [for] all appropriate inmates held at . . . FCI Danbury," in particular, by (a) prioritizing for review for home confinement all inmates identified on the list described in paragraph 1, (b)

---

[8] Class counsel has satisfied the dispute resolution requirements of the Settlement Agreement, Dkt. No. 134-1 ¶ 23, through repeated outreach to Respondent's counsel about this issue that began in mid-October and continued through December 4. The parties discussed the issue with Judge Farrish on November 10, 2020, and class counsel updated Judge Farrish several times about the parties' discussions. (The parties' discussions before Judge Farrish on other allegations of non-compliance with the Agreement are ongoing ). Class counsel informed Respondent's counsel that it would seek relief before this Court if the BOP did not release the medically vulnerable individuals identified on Exhibit A by close of business on December 4 or give them a definitive date during the week of December 7 for release. Class counsel understands BOP's position to be that public safety justifies the past and continued delays. *See* Ex. E.

> assigning substantial weight in that review to the inmate's risk factors for COVID-19 based on CDC guidance, (c) eliminating all requirements that the inmate have served some portion of his or her sentence to be eligible for placement on home confinement, (d) eliminating the requirement that a "primary or prior offense" not be a violent offense; (e) eliminating the requirement that the inmate be "without incident reports in the past 12 months (regardless of severity level)"; (f) *modifying any requirement that a person approved for home confinement be quarantined at the facility for 14 days to allow for immediate release to home confinement for those inmates as to whom Respondent verifies, after reasonable inquiry, that the inmate is not showing symptoms and is able to self-isolate for the same period in the home confinement setting*.

Dkt. No. 30, at 71 ¶ 2 (emphasis added).

On May 28, 2020, after observing that many who had been approved for home confinement by May 25 were still at FCI Danbury, this Court ordered the Respondent, with respect to each such individual, by close of business on June 4 (10 days after home confinement approval), to "either (1) release such inmate to home confinement, or (2) demonstrate that public safety or medical considerations or the absence of any home in which to place the inmate would make it unsafe to move the inmate immediately to home confinement." Dkt. No. 68, at 6. The Court underscored: "Given the amount of time already taken to investigate each inmate's proposed release plan and the amount of additional time the Court is allowing for compliance with this order, it will not be a sufficient response to the 'show cause' portion of this order for the Respondent to state that the release plan is still being investigated or that details need to be worked out." *Id.* The Court also questioned whether the Warden had fully complied with Paragraph 2a of the TRO, which orders the Warden to modify the 14 day quarantine requirement where the Warden "'verifies, after reasonable inquiry, that the inmate is not showing symptoms and is able to self-isolate for the same period in the home confinement setting.'" *Id.* at 4 (quoting Dkt. 30, at 71 ¶ 2a). The Court stressed that "[w]hile the Court understands that the Warden and her staff may need some time to 'process people out,' it is not clear why they need more than a few days to do so; further, as noted, there is

no evidence the Warden has attempted to determine, 'after reasonable inquiry,' that these inmates could not self-isolate at home." *Id.* at 4.

In addition to incorporating the TRO's requirement that BOP implement a review process that makes "full and speedy use" of home confinement and "immediately maximize[s] appropriate transfers to home confinement," the Settlement Agreement provides that "BOP will endeavor to release individuals approved for home confinement to home confinement within 14 days of the approval decision unless public safety or the absence of any home in which to place the inmate would make it unsafe to move the inmate to home confinement within that 14 day period." Dkt. No. 134-1 ¶ 11. As a condition of class counsel signing the Agreement, on July 27, the U.S. Attorney's Office confirmed in writing that should there be an issue as to the timeliness of a home confinement release, the office "will not argue that a delay beyond 14 days is warranted unless public safety or the absence of any home in which to the place the inmate would make it unsafe to move the inmate to home confinement with the 14 day period." Ex. D. This explicit agreement continues to bind the BOP.[9]

---

[9] To the extent the BOP asserts that the word "endeavor" in the Settlement Agreement permits delays beyond 14 days based on reasons other than public safety or homelessness, such an argument would be contrary to the parties' agreement. When, as a condition of executing the Settlement Agreement, class counsel secured a written commitment from the BOP confirming that it would only permit release delays beyond 14 days for a legitimate homelessness or public safety reason, that contemporaneous writing became an enforceable part of the parties' agreement. *See* Restatement (Second) of Contracts § 213 ("Where writings relating to the same subject matter are assented to as parts of one transaction, both form part of the integrated agreement."); *see also E.E.O .C. v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 204 (E.D.N.Y. 2003) ("[C]ontracts with the federal government are governed by federal common law, which incorporates 'the core principles of the common law of contracts that are in force in most states.'"); *Bowden v. United States*, 106 F.3d 433, 439 (D.D.C. 1997) (noting that the Restatement (2d) of Contracts constitutes the federal common law rule "since those principles represent the 'prevailing view' among the states"); *White and Williams LLP v. Seidner*, 649 Fed. Appx. 170, 173 (3d Cir. 2016) ("Because the United States is a party to the Settlement Agreement, we will apply federal common law in interpreting it.").

In any event, it is clear that the BOP is not, in fact, endeavoring to accomplish release within a 14-day period. To "endeavor" means to undertake efforts toward reaching a goal: here, to release individuals within 14 days. *See* Black's Law Dictionary (defining "endeavor" as "[t]o exert physical or intellectual strength toward the attainment of an object or goal"); *see also* Miriam-Webster, Online Dictionary (defining "endeavor" to mean "to attempt (something, such as the fulfillment of an obligation) by exertion of effort"),

**B.     The Extensive Delays in Release Violate the Settlement Agreement**

The Warden's December 1 letter sets forth a series of explanations that fail to justify the lengthy delays in releasing individuals approved for home confinement under the Settlement Agreement.

**1.     Missing Packets**

After an individual is approved by HCC for home confinement, the BOP reports that its administrative process is for staff at FCI Danbury to submit a "referral packet" to the Residential Reentry Management field office ("RRM"), which then arranges with either a contract facility (halfway house) or the U.S. Probation Office to undertake supervision of the person on home confinement. But with respect to three people, the Warden states that "electronic errors" in the email system caused FCI Danbury staff to believe referral packets had been submitted to the RRMs when the RRM had not in fact received them. Ex. C, at 2. In each of these instances, the error was not discovered until November 23—multiple weeks after the referrals packets were supposedly sent to RRMs. These errors resulted in delays of 29 days (SC), 28 days (WH), and 19 days (HC). Tellingly, it is apparent from the Warden's letter that staff at FCI Danbury did not follow up with the RRMs during these lengthy periods of delay (as had they done so, the error would have been discovered more quickly). Notably, class counsel first inquired about the delay in WH's release on October 16, on October 18 about SC's delay, and on October 30 about HC's delay. Class counsel inquired multiple times thereafter about these individuals, including by letter on November 23,

---

https://www.merriam-webster.com/dictionary/endeavor. Endeavoring to do a task within 14 days means actually trying to accomplish the task within the specified time period. BOP plainly is not endeavoring to release people within 14 days after home confinement approval: staff have allowed more than a month to go by without checking in with the RRMs on progress towards release, packets have been held up for more than a month so that information can be filled in on medical records, RRMs are setting home confinement dates out more than a month in the future, and FCI Danbury is requiring individuals to quarantine for more than 14 days.

8

which appears to have finally prompted a follow up by staff at FCI Danbury and the discovery that the process had not even begun at the RRM for these three individuals—all of whom had been approved for home confinement in August or September.

### 2. Delays in Adding Information to Medical Files

According to the Warden's December 1 letter, another source of delay in some cases has been the BOP's requirement that a prisoner's medical record ("BEMR") document contain certain information related to the person's risk of contracting COVID while on home confinement. Ex. C, at 1. In the cases of nine individuals, the referral packets were returned by the RRM to FCI Danbury to add the required information to the medical file. It is unclear from the Warden's letter how long the packets were at the RRM before being returned to FCI Danbury as opposed to how long FCI Danbury staff took to complete the routine information. But regardless, the result was significant delays by BOP: 49 days (HC), 49 days (EY), 23 days (IC), 22 days (NL), 22 days (MR), 21 days (DM), 15 days (JH - FSL), 10 days (KC), 4 days (WH).

### 3. Waiting on Home Confinement Dates from RRMs

Delay is also occurring during the time period that FCI Danbury waits on a "home confinement date" from the RRM, or because the RRM provides a "home confinement date" far into the future. For example, although the RRM received IC's referral packet on 11/16/20, she was given a home confinement date of 1/7/21. Ex. C, at 3. LF's packet was received by the RRM on 11/4/20 and she was given a date of 1/19/21. *Id.* at 4. The time period between receipt of the packet by the RRM and the home confinement date provided by the RRM is as follows for other

9

individuals: 35 days (EY)[10], 34 days (HC)[11], 27 days (DM)[12], 26 days (KC).[13] Others are still waiting on dates from the RRM, despite their packets being received by the RRMs weeks ago. The wait times thus far are: 11 days (SC), 12 days (WH), 12 days (NL), 17 days (JH – FSL), and 41 days (MR).[14]

The government has yet to articulate the cause of the RRM's delay in issuing home confinement dates, or why BOP would maintain that dates in January are the "earliest-available" dates for home confinement for some individuals. It is clear, however, that BOP has the authority to furlough individuals, and this power can and should be used to expedite release in instances where the agency is purportedly unable to place someone immediately on home confinement for whatever administrative reasons. *See* 18 U.S.C. § 3622. Indeed, the Warden's letter notes that Ms. Fore will be furloughed in advance of her home confinement date, though does not provide a date when the furlough will begin or an explanation for why others at the facility are not being furloughed.

4.      **Quarantine-Related Delays**

The Warden also attributes the delay in release to two different issues relating to quarantining individuals before release: (1) a delay in getting COVID test results and (2) lack of quarantine space.

---

[10] The Warden's letter says that EY's date was extended another 7 days from the date given by the RRM because of quarantine constraints. Ex. C, at 5.

[11] HC was told her date of 12/17/20 will need to be extended because of quarantine constraints.

[12] The Warden's letter says DM's date was extended another 13 days from the date given by the RRM because of quarantine constraints. Ex. C, at 3.

[13] The Warden's letter says that KC's date given by the RRM will need to be extended because of quarantine requirements. Ex. C, at 4. The length of the extension has not been provided.

[14] The Warden's letter says that the RRM is "waiting on a response from probation regarding electronic monitoring" for MR. Ex. C, at 4. The BOP has not provided information about when the inquiry was made to the probation office and why electronic monitoring through a contract facility cannot be arranged if an answer from probation has not been forthcoming.

First, the Warden asserts that FCI Danbury's requirement that individuals receive a negative PCR test prior to release has caused the need to extend quarantine periods. According to the Warden, the lab being used "has been unable to provide us with results quickly enough to always allow a 14-day quarantine." Ex. C, at 2. It is surely not the case that it is taking more than 14 days to receive test results from the lab. Instead, the problem appears to be that FCI Danbury is requiring *two* negative tests—one when someone enters quarantine and one taken 14 days later.[15] Such a requirement is not supported by current CDC guidelines, which now provide that individuals exposed to COVID may exit quarantine after 10 days (with no test) if they exhibit no symptoms or after 7 days, with a negative test result collected within 48 hours before the time of planned quarantine discontinuation.[16] CDC guidelines previously recommended a 14-day quarantine after exposure and did not require a negative test result at all—and certainly not two negative results.

Second, the Warden also claims that the shortage of quarantine space has led to delays. Ex. C, at 2. But this is not an issue with respect to the nine women in the Camp who are awaiting release. FCI Danbury is using rooms within the Camp to quarantine Camp women, and there is space to hold all of the women approved for home confinement in quarantine at the Camp. Indeed, of the nine women in the Camp approved for home confinement, all but two are already in quarantine. Some have already been there for weeks.[17]

---

[15] This is the understanding of clients incarcerated in the Camp. Individuals in all three facilities have also been told that a 21-day quarantine is required.

[16] See CDC, *Options to Reduce Quarantine for Contacts of Persons with SARS-CoV-2 Infection Using Symptom Monitoring and Diagnostic Testing*, https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html.

[17] Class counsel understand that the women in the Camp entered quarantine on the following dates: DM (11/16), JH – Camp (11/20), RG (11/20), LF (11/23), CF (11/30), NL (12/1), RT (12/2).

11

But in any event, these quarantine issues should not prevent the release of medically vulnerable people who are suitable for home confinement. To ensure that releases of medically vulnerable people occurred with sufficient speed, the TRO, as incorporated into the Settlement Agreement, required the Warden to *eliminate* the requirement of a 14-day quarantine if an individual has no symptoms and can self-isolate at home. Dkt. No. 30, at 71 ¶ 2. Indeed, BOP's own policy permits waiver of a 14-day quarantine. The facility could test individuals before they leave if they want an added level of assurance.

It is apparent that the BOP understands its obligation under the Agreement to release individuals within 14 days absent a public safety justification—as it now purports that every administrative delay or oversight it has reported for the 17 individuals approved for home confinement is, in fact, related to public safety. Ex. E ("It is the BOP's position that the delays, including the quarantine and testing requirements prior to release, directly relate to public safety").[18] But the BOP surely is not permitted under the Settlement Agreement to fail to expeditiously undertake the steps necessary to move someone to home confinement and then claim

---

[18] The Warden's letter outlines other sources of delay in some individual cases, including periods of time to coordinate getting fingerprints to the FBI (LF, 51 days), awaiting the resolution of pending charges (SC, 30 days), and to investigate whether Canadian charges were resolved (WH, 60 days). Notably, WH's Canadian case was a DUI from 2015 where probation had been completed. There was no detainer filed, warrant pending, or any other reason to suspect the case was unresolved. Nonetheless, BOP did not move forward with the home confinement referral until receiving confirmation from Canadian authorities that the case was, indeed, closed.
  Through counsel, BOP has indicated that requests for probation to approve relocation requests by prisoners delayed home confinement dates for CF, RG, JH - Camp, and JM. But probation has now approved these relocation requests, and it is unclear to class counsel what portion of the delay in release is attributable to probation rather than BOP. It is also not clear that probation has the authority to prevent release to home confinement in a particular location, as BOP, not probation, possesses the home confinement release authority by statute. *See* 18 U.S.C. § 3624 (describing BOP's power to release individuals on home confinement and noting the "United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection"). With respect to RT, BOP stated that probation had "security concerns" that are now resolved. BOP did not describe the nature of these concerns or specify how long resolution of these concerns delayed her release.

that they are justified in continuing to detain the person because it is unsafe to release them (due to them failing to complete various steps).

The requirement for expedient release goes to the very core of the Settlement Agreement and its adoption of the TRO's home confinement review process for medically vulnerable prisoners. Unfortunately, the experience of the past four months demonstrates that BOP is falling far short of fulfilling the Settlement Agreement's requirement that it utilize a speedy home confinement review process that immediately maximizes appropriate transfers to home confinement. Instead, a series of administrative delays and missteps have led to the continued incarceration of individuals for weeks—and in some cases months—after release should have been accomplished. The length of these delays has not been justified by public safety concerns, and immediate release of these 17 individuals is consistent with public safety. Indeed, immediate release is essential to protect the safety of these medically vulnerable prisoners and their rights secured under the Settlement Agreement.

### III. COVID-19 CASES AT FCI DANBURY AND IN SURROUNDING COMMUNITIES ARE ON THE RISE AND THOSE AWAITING RELEASE ARE EXTREMELY VULNERABLE TO COVID

The COVID-19 risk factors of the medically vulnerable people approved for home confinement who continue to be detained include, among other conditions, diabetes, history of smoking, hypertension, and moderate-to-severe asthma. Many suffer from obesity, recognized as one of the most serious risk factors for severe illness and death from COVID.[19] One woman has a BMI of 49.9. Two of the women are 65 years old.

---

[19] Barry M. Popkin et al, *Individuals with obesity and COVID-19: A global perspective on the epidemiology and biological relationships*, Obesity Reviews (Aug. 26, 2020) (meta-analysis of the studies on the relationship of individuals with obesity and COVID-19 show individuals with obesity were more at risk for hospitalization (113% higher); for ICU admission (74% higher); and for mortality (48% increase in deaths), https://onlinelibrary.wiley.com/doi/10.1111/obr.13128; *see also* Jennifer Abbasi, *Large Meta-*

The need to release these medically vulnerable individuals from FCI Danbury is particularly urgent given the rising number of positive cases at the prison complex and its surrounding communities. After a period of time with no reported positive cases, the BOP's website is now reporting five inmates and three staff members have tested positive. *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/. Prisoners received a memo from the Warden on December 3 stating that there were 7 active cases among them. Class counsel understands that at least three of those positive individuals, who had positive tests within the past week, were housed in three separate dorms in the men's facility (units C, F, and J). One of the men, from C unit, had been working in the kitchen at the time of his positive test, where men from across the facility had been coming to get food. Just today, class counsel has learned that three more men in C unit were informed that they are positive, as well as three more men in the J unit. Also today, two women tested positive in the FSL. There has been no facility-wide testing conducted since May, and thus the number of reported positive cases almost certainly understates the extent of the outbreak. Temperature and symptom checks are not being performed consistently.[20] There continues to be movement of prisoners and staff across the complex, and social distancing is still impossible for prisoners housed in crowded dorms. Although some incarcerated at FCI Danbury when the pandemic began were released to home confinement or via compassionate release orders, BOP resumed transfers of new prisoners into the facility this summer. There are currently 899 individuals incarcerated at the facility—up from 825 at the time of the Fairness Hearing.

---

*analysis Digs Into Obesity's COVID-19 Risks*, JAMA (Oct. 15, 2020) (discussing meta-analysis), https://jamanetwork.com/journals/jama/fullarticle/2772071.
[20] For example, women in the Camp have not had symptom or temperature checks since November 23.

## IV. THIS COURT HAS JURISDICTION TO ORDER SPECIFIC PERFORMANCE AND FURTHER DECLARATORY AND INJUNCTIVE RELIEF AGAINST THE BOP FOR BREACH OF THE SETTLEMENT AGREEMENT

The Court has retained jurisdiction over this matter "to the full extent necessary to enforce the terms of the Settlement pursuant to the terms set forth therein." (Dkt. No. 241). The Court also expressly incorporated the terms of the Settlement Agreement in its order of dismissal. (*Id.*). Under these circumstances, a breach of the parties' Settlement Agreement is a *per se* violation of this Court's dismissal order—which confers jurisdiction on this Court to issue remedial orders to cure the breach. *See*, *e.g.*, *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 381 (1994) (stating that where the "parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order" then "a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist"); *see also In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113, 134 (2d Cir. 2011) (acknowledging the power of federal courts to issue an injunction "to protect the integrity of a complex class settlement over which it retained jurisdiction"). The parties have consented to specific performance as the injunctive remedy of the first instance this Court is empowered to order, with civil contempt or any other injunctive order issuable against the BOP thereafter for further non-compliance. Dkt. 134-1, ¶ 23(d); Dkt. No 222, at 27:18-24 (affirming the Court's "full panoply of powers" to enforce the settlement, specifically including the power of contempt). Accordingly, the class respectfully requests that this Court issue an Order to:

(a) Declare that the Settlement Agreement requires the BOP to "immediately release" all 17 medically vulnerable individuals approved for home confinement set forth in

15

      Exhibit A absent further delay and without quarantine at FCI Danbury, provided that the individual is not showing symptoms of COVID-19;

(b) Declare that the Settlement Agreement prohibits the BOP from holding any medically vulnerable individual approved for home confinement for longer than 14 days, unless the BOP identifies that the individual is homeless or there is a legitimate public safety reason why it would be unsafe to transfer the individual to home confinement within the 14-day period; such public safety reason shall *not* include the failure to timely complete administrative requirements/processes or secure the necessary bureaucratic approvals, or reliance on present COVID-19 conditions either at the facility or in the broader community;

(c) Mandate specific performance of the Settlement Agreement, including an order that the BOP release within 24 hours all 17 medically vulnerable individuals identified in Exhibit A who have been approved for home confinement but remain incarcerated at FCI Danbury;

(d) Require the BOP to, within two (2) days, release any other medically vulnerable individuals approved for home confinement or identify for the Court the specific reasons why they cannot be immediately released to home confinement; and

(e) Issue other supplemental orders this Court may deem appropriate to enforce the Settlement Agreement.

Dated: December 6, 2020				Respectfully submitted,

						*Counsel for the Respondent*

						/s/  Sarah F. Russell_____
						Sarah French Russell, ct26604
						Tessa Bialek, ct30582
						Alexis Farkash, *Law Student Intern*
						Abigail Mason, *Law Student Intern*
						George Morgan, *Law Student Intern*
						Krista Notarfrancesco, *Law Student Intern*
						Samantha Pernal, *Law Student Intern*
						Grace Ronayne, *Law Student Intern*
						Hannah Snow, *Law Student Intern*
						Kathryn Ulicny, *Law Student Intern*
						Kylee Verrill, *Law Student Intern*
						Legal Clinic, Quinnipiac University School of Law
						275 Mt. Carmel Avenue
						Hamden, CT 06518
						Telephone: (203) 582-5258
						Email: sarah.russell@quinnipiac.edu
						         tessa.bialek@quinnpiac.edu

						Marisol Orihuela, ct30543
						Zal K. Shroff, phv10872
						Ariadne Ellsworth, *Law Student Intern*
						Alexandra Gonzalez, *Law Student Intern*
						Alexander Nocks, *Law Student Intern*
						Phoenix Rice-Johnson, *Law Student Intern*
						Jerome N. Frank Legal Services Organization
						P.O. Box 209090
						New Haven, CT 06520
						Telephone: (203) 432-4800
						Email: marisol.orihuela@ylsclinics.org

						Alexandra Harrington, ct 30943
						Criminal Justice Advocacy Clinic
						University at Buffalo School of Law
						507 O'Brian Hall, North Campus
						Buffalo, NY 14260
						Telephone: (716) 984-2453
						Email: aharr@buffalo.edu

						David S. Golub, ct00145
						Jonathan M. Levine, ct 07584
						Silver Golub & Teitell LLP

17

184 Atlantic Street
Stamford, CT 06901
Telephone: (203) 325-4491
Email: dgolub@sgtlaw.com
jlevine@sgtlaw.com

*Counsel for the Petitioner-Class*