# EXHIBIT A

D. Easter Declaration

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES WHITTED,<br>individually and on behalf of all others<br>similarly situated,<br><br>    Petitioner,<br><br>        v.<br><br>D. EASTER, Warden of Federal Correctional<br>Institution at Danbury, in her official capacity,<br><br>    Respondent. | No. 3:20-cv-00569 (MPS)<br><br><br>**DECLARATION OF<br>DIANE EASTER, WARDEN** |

I, DIANE EASTER, hereby make the following declaration:

1.  I am currently employed by the Federal Bureau of Prisons ("BOP") of the United States Department of Justice, as Warden of the Federal Correctional Institution at Danbury, Connecticut ("FCI Danbury"). I assumed this position in February 2020. I have previously filed a declaration in the above-captioned matter which can be seen at **ECF No. 24-2.**

2.  I understand class counsel has motioned the court in this matter, seeking enforcement of the portion of the Settlement Agreement which requires BOP to "endeavor to release individuals approved for home confinement to home confinement within 14 days of the approval decision unless public safety or the absence of any home in which to place the inmate would make it unsafe to move the inmate to home confinement within that 14 day period." **ECF No. 263; see also ECF No. 134-1 at 10-11.** In this motion they include 17 "medically vulnerable" inmates whom they allege have not been placed into home confinement in accordance with this aspect of the agreement.

3.  I also understand the Court has requested several items be produced, specifically the "new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community", and also "any policy and procedures (whether BOP-wide or specific to Danbury) governing the 'specific security review' apparently being performed before 'CIM' inmates approved for home confinement by the HCC may be released on home confinement." **ECF No. 269.**

## DOCUMENTS REQUESTED BY THE COURT

4.  Per the Court's request that the Government produce the "new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community", attached as **Exhibit A** is the Memorandum to Chief Executives from Assistant Director Andre Matevousian, Correctional Programs Division; Assistant Director David Paul, Reentry Services Division; and M.D. Smith, Assistant Director, Health Services Division, dated November 16, 2020.

5.  Per the Court's request that the Government produce "any policy and procedures (whether BOP-wide or specific to Danbury) governing the 'specific security review' apparently being

Page 1 of 8

performed before 'CIM' inmates approved for home confinement by the HCC may be released on home confinement," attached as **Exhibit B** is Program Statement 5180.05 Central Inmate Monitoring. Attached as **Exhibit C** is Program Statement 7300.09 Community Corrections Manual, *excerpted in relevant part*.

## GENERAL MATTERS AFFECTING HOME CONFINEMENT REFERRALS

6.  As a preliminary matter, several events have happened in the instance of nearly every inmate set forth in this motion. First, most inmates had their home confinement referral returned during the routing process due to new BOP guidelines requiring certain language in an inmate's Bureau Electronic Medical Record ("BEMR") regarding the risk of COVID-19 in the community. *See* **Exhibit A** at p. 3. Second, with respect to a smaller number of inmates, referrals were delayed due to an electronic error associated with recent updates and migration of the BOP's email system, causing their home confinement referrals to be sent to an unmonitored mailbox. Lastly, the need to quarantine inmates for 14 days and have them test "negative" on a polymerase chain reaction ("PCR") COVID-19 test prior to release affected the ability to place these inmates into home confinement within 14 days of approval. I address these items in turn.

7.  **BEMR Documentation:** From the outset of the pandemic and when considering inmates for home confinement pursuant to the CARES Act, BOP was obligated to analyze the mandated criteria of risk to inmates of contracting COVID-19 in their proposed home confinement placements versus the risk of contracting COVID-19 at their designated facility. This charge was set forth by Attorney General William Barr's Memorandum to the Director of the Bureau [of] Prisons dated March 26, 2020, in which the Attorney General directs "...before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement." Over time, it became apparent that staff in the Residential Reentry Offices ("RROs") interpreted the requirements to satisfy this policy different. Additionally, many times, staff preparing home confinement referrals at the institution did not have information regarding the risk of COVID-19 in the jurisdiction to which an inmate was releasing. Staff in the Residential Reentry Offices ("RROs") would return these referrals to the institution seeking this, and/or alternative similar information. In fact, throughout the agency, referrals were delayed as staff in both institutions and RROs worked through this requirement. On November 16, 2020, the Assistant Directors of the Correctional Programs, Reentry Services, and Health Services Divisions resolved this matter through issuing a Memorandum to CEOs, see ¶4, *supra*. n order to account for this risk and best ensure inmates understood how home confinement could provide an opportunity for optimal infection control measures, a requirement was imposed that the inmate be educated as to the best practices they might employ to avoid COVID-19 infection and that this education be documented in the inmate's BEMR. *See* **Exhibit A** at p. 3. Now that the requirements for this documentation have been clarified by the Assistant Directors' memoranda, this issue with BEMR documentation should no longer be an issue for home confinement referrals coming out of FCI Danbury.

8.  **Migration of Email:** A second item that caused delay for several inmates' referral to home confinement was an electronic error associated with recent updates to and the migration of the BOP's email system, which caused their home confinement referrals to be sent to an unmonitored mailbox. Beginning in October 2020, BOP's Central Office began the agency-wide process of transitioning its email software from a Novell product (GroupWise) to a Microsoft product (Office 360). This necessitated modifying current GroupWise addresses to

a format compatible with the Office 360 program, which included removing certain symbols, punctuation, and spacing from shared mailboxes throughout the agency. Office 360 also required a certain letter be affixed to the end of shared mailboxes. To place an inmate into home confinement, once the referral paperwork is completed at FCI Danbury, it is transmitted to the Residential Reentry Manager's Office ("RRO") to approve the placement of the inmate into the community. All RRO's throughout BOP utilize shared mailboxes to receive home confinement referral packets, and most, if not all, of these shared mailboxes transitioned from the GroupWise address protocol to the Office 360 address protocol during the time frame the referral paperwork was being submitted to the RRO's for the inmates at issue. I have advised my staff of the need to ensure that referral packets are going to the proper mailboxes to ensure they route expediently through the RRO's.

9.    Quarantine: It is a mandated BOP policy, one which was specifically preserved in the settlement of this case, that inmates being placed into home confinement quarantine for 14 days and then test "negative" on a PCR COVID-19 test prior to release. As acknowledged by Petitioner's expert during this litigation, PCR testing is considered the "gold standard" in COVID-19 virus detection. This test detects RNA (or genetic material) that is specific to the virus and can detect the virus within days of infection, even those who have no symptoms. This most accurate test requires the services of an outside contract laboratory to provide results. We have contracted with a private laboratory to conduct all PCR tests for FCI Danbury. FCI Danbury has requested this laboratory to prioritize testing for the institution. While the contract laboratory seems amenable to prioritizing tests out of FCI Danbury, as recently as November 25, the lab informed us that recent increases in community-based testing may cause delays in providing test results. The current wait time for lab results is approximately 5 to 7 days. From the advent of this pandemic, the Attorney General explicitly directed BOP "…to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement," and this direction has not been rescinded. Given the Attorney General's directive that BOP not take "any" risk of transferring inmates to home confinement that could contribute to the spread of COVID-19, the BOP is steadfast in the need to use a 14-day quarantine, as well as the best-available means of testing inmates, prior to release. These requirements may extend the amount of time needed to allow for a full quarantine or await the return of a negative PCR test result. **Exhibit D**, Memorandum for Director of Bureau [of] Prisons from Attorney General William Barr, <u>Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic,</u> dated March 26, 2020.

10.    Although several of the inmates listed below have been made eligible for furlough, the issuance of a furlough is a rare and exceptional event. Furloughs are resource-intensive undertakings which occupy a great deal of staff time and resources. In accordance with Program Statement 5280.09 Inmate Furloughs, for inmates to be considered for a furlough several processes need to take place. First, Unit Team, Correctional Systems staff, the Case Management Coordinator, the Captain, the Associate Warden, and the Warden have to review and approve the furlough packet. Second, an inmate needs to complete the furlough application. Next, Unit Team staff reviews the inmates application, SENTRY documentation, inmate's Central File, etc. to see if the inmate may qualify. Fourth, a questionnaire is sent to the Supervising Probation Officer (USPO) to see if they agree with the inmate being placed on furlough and FCI Danbury needs to wait for their response. Finally, if the USPO agrees to assume supervision and the inmate qualifies based on all the documentation reviewed, the furlough packet is prepared. Not all inmates are eligible for a furlough, as they need to be classified "Community Custody" to receive this Bureau benefit. Accordingly, furloughs will not often be appropriate in order to expedite inmates to a home confinement placement. Attached as Exhibit E is Program Statement 5280.09 Inmate Furloughs.

## REVIEW OF INMATES REFERRED FOR HOME CONFINEMENT

11.   I have reviewed the individual circumstance of each inmate class counsel identifies in their motion. Below is an explanation of the public safety or homelessness rationale for why each such inmate was unable to be placed into home confinement within 14 days of approval.

12.   C███████-053: The Home Confinement Committee ("HCC") approved this inmate for home confinement ("HC") on 9/16/20. Her referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/3/20 the updated BEMR was received and the referral process continued. As of 11/4/20, the Residential Reentry Manager's Office ("RRM") had the referral to begin processing. On 11/23/20, contact was made with the RRM due to not yet having received an HC date. At this time the RRM's Office recognized a potential electronic error due to recent updates and migration of the email system. (The referral program is designed to use the email system at the time the Warden signs the referral and auto-generates the referral packet to the RRM's Office.) The referral was resent this same date (11/23/20). On 11/30/20 Calle was given a HC date of 12/17/2020. This date needed to be updated to 12/22/20 due to testing and quarantine protocols.  This inmate was placed in quarantine on 12/6/20 and will release to HC on December 22, 2020.

13.   C█████-066: The HCC approved this inmate for processing on 10/21/20. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/13/20 the updated BEMR was received and the referral process continued. As of 11/16/20, the RRM had the referral to begin processing. Because this inmate was a Central Inmate Monitoring ("CIM") case, *see* Anderson Declaration and Exhibits, a specific security review needed to be conducted. On 11/23/20, contact was made with the RRM due to not yet having received an HC date. On 11/24/20, the RRM replied that they needed additional time to investigate the address and that there was a separatee conflict in the local area. On 11/30/20, this inmate was given the earliest-available HC date of 1/7/21.  On 11/23/20, she was placed in quarantine so that she may be placed on furlough status prior to and through her HC date.  This inmate will be placed on furlough 12/11/20.

14.   C████████-050:  This inmate had a pending charge that needed to be resolved. The HCC approved the inmate for processing on 9/14/20. Due to his Projected Release Date being in 2033, inquiries to other law enforcement agencies to check for warrants and detainers had not been initiated at the time he was approved for HC. On 10/14/20, the pending charges were resolved and the referral process continued. Being that this inmate was a CIM case, a review for security concerns need to be conducted. As of 10/27/20, the RRM had the referral to begin processing. On 11/23/20, contact was made with the RRM due to not yet having received an HC date. On 11/25/20, the RRM stated they did not receive the referral likely due to the recent updates/migration of the email system and the referral packet was re-sent. This inmate will be released to HC on 12/10/20.

15.   H███████████-047: The HCC approved this inmate for processing on 8/24/20. Outstanding Canadian charges held up the referral process, despite at least two attempts (4/23/20 & 10/14/20) made by the Records Office to Canadian authorities seeking a status on the charges. On 10/23/20, the charges were confirmed, resolved, and the referral process continued. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 10/27/20 the updated BEMR was received and the referral process continued. As of 10/27/20, the RRM had the referral to begin processing.  On 11/23/20, contact was made with the RRM

due to not yet having received an HC date. The RRM replied stating they never received the referral. The referral package was re-sent on 11/24/20. As of 11/24/20, the RRM had the referral to begin processing. This inmate was placed in quarantine on 12/7/20. If results from a second COVID test to be given at 14 days are negative and received prior to 12/29/20, the inmate will be placed on furlough. This inmate has a HC date of 12/29/20.

16.  L▮▮▮▮▮▮▮▮▮-036: The HCC approved this inmate for processing on 10/5/20. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 10/27/20 the updated BEMR was received and the referral process continued. As of 10/27/20, the RRM had the referral to begin processing. On 11/24/20, contact was made with the RRM due to not yet having received an HC date. The RRM replied stating probation had denied her case for electronic monitoring and they are now seeking HC under a contract facility. She received a date for 12/15/20; however that needed to be adjusted to 12/22/20 to accommodate quarantine. This inmate was placed in quarantine on 12/1/20. If results from the second COVID test to be administered after 14 days of quarantine are negative and received prior to 12/22/20, a furlough will be considered.

17.  M▮▮▮▮▮▮▮▮▮-050: The HCC approved this inmate for processing on 10/16/20. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/6/20 the updated BEMR was received and the referral process continued. As of 11/6/20, the RRM had the referral to begin processing. This inmate received a date for HC on 12/2/20; however, this date needed to be extended to 12/15/20 due to quarantine constraints at FCI Danbury. Her second test has been received and she is in quarantine, so we will be able to process her for furlough beginning 12/10/2020, through to her HC date.

18.  R▮▮▮▮▮▮▮138: The HCC approved this inmate for processing on 10/5/20. The packet was initially prepared as a general referral and had to be revised after her approval for HC by the HCC. This updated referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 10/27/20 the updated BEMR was received and the referral process continued. As of 10/27/20, the RRM had the referral to begin processing. On 11/24/20, contact was made with the RRM due to not yet having received an HC date. The RRM stated they are waiting on a response from probation regarding electronic monitoring. Subsequently, this inmate received a date for 12/15/20; however, this needs to be updated due to quarantine and testing procedures. Date requested is 1/7/21 and is pending approval. This inmate was placed in quarantine on 12/7/20. A furlough will be considered after the results from the second COVID test administered after 14 days in quarantine are received.

19.  C▮▮▮▮▮▮▮▮-088: The HCC approved this inmate for processing on 11/2/20. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/12/20 the updated BEMR was received and the referral process continued. On 11/30/20 Carter was given a HC date of 12/7/2020; however, this was adjusted to 12/22/20 in order to accommodate quarantine and testing requirements. This inmate was placed in quarantine on 12/6/20, and will release to HC on 12/22/20.

20.  F▮▮▮▮▮▮▮-037: The HCC approved the inmate for processing on 9/14/20. Her Case Manager began the referral on 9/21/20. This referral was stalled at the Records Department due to the inmate having no FBI number on record. BOP made several attempts to correct this with the FBI. Ultimaely, the inmate's fingerprints could not be processed electronically,

requiring the Records Department to send original ink fingerprints to the FBI in order to resolve this issue. On 11/3/20, the fingerprint matter was resolved, the Records department was able to conduct their final review, and the referral continued in the process. As of 11/4/20, the RRM had the referral to begin processing. Currently, the RRM has provided a date of 1/19/21. On 11/10/20, FCI Danbury contacted the RRM to request an earlier HC date. On 11/20/20, another follow-up with the RRM was conducted. On 11/23/20, the RRM replied 1/19/2020 was the earliest date available due to bed space at the contract facility (inmates in HC are counted against an RRC's supervision quota). On 11/24/20, Danbury placed this inmate in quarantine and will place her on furlough through her HC date of 1/19/21. This inmate was placed in quarantine on 11/24/20. A second COVID test was taken on 12/7/20, if the results are negative for COVID-19 she will be placed on furlough.

21. H███-298: The HCC approved this inmate for processing on 11/2/20. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/17/20 the updated BEMR was received and the referral process continued. As of 11/20/20, the RRM had the referral to begin processing. On 11/27/20, contact was made with the RRM for status on referral. This inmate now has a HC date of 1/5/21. This inmate was placed in quarantine on 12/6/20. This inmate will be placed on furlough if the results of a second COVID-19 test to be administered on 12/20/20 are negative.

22. Y███-036: The HCC approved this inmate for processing on 9/16/20. Because the inmate is a CIM case, a review for security concerns needed to be conducted. The referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/3/20 the updated BEMR was received and the referral process continued. As of 11/4/20, the RRM had the referral to begin processing. They began working with probation for electronic monitoring. A HC date was approved for 12/8/20, however it needed to be extended to 12/15/20 due to quarantine constraints at FCI Danbury. This inmate's second COVID-19 test has been received and was negative; therefore, she will be processed for a furlough from 12/11/20 through her HC date.

23. H███-042: This inmate was initially denied by the HCC on 6/11/20. After further review, she was approved on August 24, 2020, then again denied on 9/8/20 due lack of viable release plan which probation denied. Upon additional review and the inmate providing a new release plan, the inmate was ultimately approved by the HCC on 10/23/20. It should be noted that this individual changed her release address three times during this process. In addition, because the inmate was a CIM case, a review for security concerns needed to be conducted to include contact with the United States Probation Office. After non-response from Probation, we reinitiated contact with Probation on 11/3/20. Once the necessary information was received from Probation, the CIM clearance needed to be reviewed by the Case Management Coordinator and the Warden to continue processing the referral. The Residential Reentry manager ("RRM") received the referral for processing on 11/16/20. Initially this inmate was provided a HC date for 12/9/20; however, this needed to be updated in order to meet quarantine and testing protocol. She will redesignate to HC on 12/18/2020.

24. D███-066: The HCC approved this inmate for processing on 11/9/20. Because this inmate was a CIM case, a review for security concerns needed to be conducted to include contact with the Probation Department. Once a response was received from Probation, the CIM clearance was reviewed by the Case Management Coordinator and the Warden to continue processing the referral. On 11/16/20, the inmate provided a new release plan to the unit team because the prior release plan was deemed nonviable due to drug issues at the requested placement home. On 11/19/20, Probation was again asked to review the CIM

clearance due to the newly obtained residence. The referral was completed on 11/20/20 and the RRM had the packet for processing. On 11/27/20, contact was made with the RRM due to no date received. This inmate was placed in quarantine on 11/30/20, and has a home confinement date for 12/15/20.

25.    F███████████-050: The HCC approved this inmate for processing on 9/9/20. This inmate requested a relocation of her supervision which required approval from the Probation Department prior to the start of the referral. Probation approved this relocation request on 10/14/20 and the referral process commenced. Her referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/3/20 the updated BEMR was received and the referral process continued. As of 11/6/20, the RRM had the referral to begin processing. The inmate received a date for 12/17/20; however, this needed to be adjusted to 12/22/20 in order to meet quarantine needs. This inmate was placed in quarantine on 12/1/20. If the results from a second COVID-19 test to be administered after 14 days in quarantine are received prior to 12/22/20, the inmate will be considered for a furlough.

26.    G██████████-016: The HCC approved this inmate for processing on 10/5/20. This inmate requested a relocation of her supervision which required approval from the Probation Department prior to the start of the referral. The request for relocation was prepared with the inmate for Unit Manager review on 10/7/20 and was sent to Probation on 10/11/20. On 11/3/20, follow-up was conducted with Probation. Probation approved her relocation on 11/6/20, and the referral process commenced. Her referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community. On 11/13/20 the updated BEMR was received and the referral process continued. The RRM had the referral as of 11/16/20. The inmate initially received a date for 12/8/20; however, this needed to be adjusted to 12/15/20 in order to meet quarantine needs. Her second COVD-19 test has since been received, so she will be processed for furlough beginning 12/11/20 through her HC date.

27.    M███████████-087: The HCC approved this inmate for processing on 10/22/20. The inmate requested a relocation of supervision, which pauses the HC placement process while the Probation Department reviews the request. This request was sent to Probation on 11/4/20. Although Probation was made aware of his approval for home confinement by the HCC under the CARES ACT, Probation indicated in an email on 11/10/20 that the investigation might not be completed until 12/10/20. On 11/30/20, Probation approved relocation of supervision and the HC referral resumed processing. As of 12/3/20, the Residential Reentry Manager's Office (RRM) had the referral to begin processing. On 12/8/20, FCI Danbury asked the RRM to confirm receipt of the referral. RRM requested Danbury to resend the referral. As of 12/9/20, Danbury is still waiting for RRM to process the referral.

28.    T███████████-066: The HCC approved this inmate for processing on 10/16/20. Because the inmate was a CIM case, a review for security concerns needed to be conducted by the Probation Department. On 11/3/20, contact was again made with Probation to find out the status on the clearance. Probation raised certain concerns that arose during the investigation which needed to be resolved prior to continuing the HC referral process. These concerns were resolved on 11/23/20. As of 11/23/20, the RRM had the referral to begin processing. A follow-up with the RRM was conducted on 12/1/20. The RRM stated they did not receive the first referral, likely due to an electronic error associated with recent updates and migration of the BOP's email system. The RRM has indicated that the inmate's home confinement date will likely be approved for approximately 1/12/21 due to holidays and staffing issues at the contracted Residential Reentry Center ("RRC") responsible for

supervising her while on HC. The inmate was placed in quarantine on 12/2/20, in order to prepare for a furlough prior to her home confinement date in the event quarantine and testing procedures allow.

29.     Our experience has been that placing inmates into home confinement within 14 days is not always possible due to the complex situations that many inmates need to account for before they can be safely released to the community. In nearly every case in which staff at FCI Danbury have sought to transfer an inmate to home confinement, complications arising out of the ongoing COVID-19 pandemic have made it more difficult to coordinate the redesignation. Despite these complications, we have continued to endeavor to place inmates into home confinement within 14 days of approval, consistent with public health and the safety of the community.

I declare the foregoing is true and correct to the best of my knowledge and belief, and given under penalty of perjury pursuant to 28 U.S.C. § 1746.

Executed this  _10_   day of December, 2020.

_D. Easter_
_____
Diane Easter
Warden
FCI Danbury, CT

# EXHIBIT A



**U.S. Department of Justice**
**Memorandum**
Federal Bureau of Prisons

_Correctional Programs Division_

_Central Office_
_320 First Street, N.W._
_Washington, DC 20534_

NOV 16 2020

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:          Andre Matevousian, Assistant Director
               Correctional Programs Division

               David Paul, Assistant Director
               Reentry Services Division

               M. D. Smith, Assistant Director
               Health Services Division

SUBJECT:       Home Confinement

To protect the health and safety of staff and inmates during the
COVID-19 pandemic, institution Unit Teams and Case Management
Coordinators (CMCs) should continue to review at-risk inmates
for placement on home confinement.  This memorandum provides
additional guidance and rescinds previous memoranda on the
subject.  Please note, Home Confinement referrals related to the
CARES Act will no longer routinely be forwarded to Central
Office for review.  Wardens are the final decision authority for
these referrals.  Inmates who fall outside of the criteria
described below should not be approved for placement on Home
Confinement under the CARES Act.

For public safety reasons, and in accordance with the Attorney
General's memoranda dated, March 26, 2020, and April 3, 2020,
and to ensure BOP is deploying its limited resources in the most
effective manner, the BOP assesses the following factors to
ensure inmates are suitable for home confinement:

- reviewing the inmate's institution discipline history for
  the last twelve months to ensure clear conduct has been
  maintained;
- ensuring the inmate has a verifiable release plan;
- verifying the inmate's primary or prior offense history
  does not include violence, a sex offense, or is terrorism
  related;
- confirming the inmate does not have a current detainer;
- ensuring the inmate is low or minimum security;
- ensuring the inmate has a Minimum PATTERN recidivism risk
  score;
- ensuring the inmate has not engaged in violent or gang-
  related activity while incarcerated; and
- reviewing the COVID-19 vulnerability of the inmate, in
  accordance with the CDC guidelines.

In addition, and in order to effectively deploy its limited
resources, BOP has prioritized for home confinement those
inmates who have served a certain portion of their sentences, or
who only have a relatively short amount of time remaining in
those sentences.  BOP is at this time prioritizing for
consideration those inmates who either:

- have served 50% or more of their sentences; or
- have 18 months or less remaining in their sentences and
  have served 25% or more of their sentences.

Additionally, pregnant inmates should be considered for
viability of placement in a Community Program to include Mothers
and Infants Together (MINT) programs and Home Confinement.

Referrals to a Residential Reentry Management (RRM) Office must
be made based on appropriateness for home confinement.
Consideration should be given to whether the inmate has provided
a verifiable reentry plan that will prevent recidivism and
maximize public safety, including verification that the
conditions under which the inmate would be confined upon release

would be more effective in protecting their health than continued confinement at their present place of incarceration.

To this end, the inmate must be provided education on CDC guidance for persons in the community on how to protect themselves from COVID-19 transmission.  This education includes but is not limited to: hand washing, social distancing, wearing of facial coverings and self-assessment for signs and symptoms of COVID-19.

If approved for referral, the inmates should understand how Home Confinement provides the opportunity for the inmate to practice optimal infection control measures, which may mitigate existing risks, based on rates of transmission in the local area, and exercising best practices decreases the inmate's risk of contracting COVID-19.  The information (education) provided to the inmate must be documented on the BEMR exit summary.

All the below information must be clearly documented on the referral for Home Confinement prior to submission to the RRM Office:

- Unit Team staff will screen each of the inmates identified to determine if they have a viable release residence and ask questions of the inmates regarding:

  o Specific type of release residence (House/Apt/Group home etc.);
  o With whom the inmate will be living;
  o Any health concerns of individuals in the residence;
  o Contact phone numbers of the inmate should he/she be placed on Home Confinement; and
  o Transportation plan as to how the inmate will be transferred to the Home Confinement location.

Inmates determined to have a viable release residence will be further screened by Health Services and a determination made as to whether the inmate requires frequent and on-going medical care within the next 90 days.  If frequent and on-going medical care is required:

- Health Services staff will coordinate with Naphcare and the RRM Branch's Health Services Specialists to determine if the inmate's medical needs can be met in the community at this time.  Naphcare will establish follow-up care prior to

inmate transfer.  The inmate must be transferred with at
least 90 days of any prescribed medications.

- If the inmate's medical needs cannot be met in the
  community at this time, then the inmate will remain at
  their current institution.
- If inmates do not require frequent and on-going medical
  care, then referral to community will be processed.

All the above information must be clearly documented on the
referral for Home Confinement prior to submission to the RRM
Office.

Residential Reentry Management (RRM) Office staff must carefully
review all institution CARES Act referrals to ensure that they
meet the eligibility criteria outlined above.  Any questions as
to eligibility will be referred to the Residential Reentry
Management Branch Administrator.

If an inmate is referred for home confinement due to the COVID-
19 pandemic, the Case Management Activity (CMA) assignment
**CV-COM-REF** is required to be keyed.

In regards to litigation, Home Confinement referrals to Central
Office will continue in cases where inmates are being considered
outside of the criteria due to court orders, settlement
agreements, or other legal matters.  Central Office reviews will
continue for FCI Danbury, FCI Elkton, and FCC Lompoc.
Additional referrals for Home Confinement may be added if
necessary by the Office of General Counsel.

Institutional CMCs must track all inmates determined to be
ineligible for Home Confinement or the Elderly Offender Pilot
Program and ensure the appropriate denial code is entered in
SENTRY.  Reports outlining reasons for denial must be forwarded
to the Correctional Programs Administrator in the appropriate
Regional Office.

The Correctional Programs Branch in Central Office is
responsible for providing a weekly list to the Executive Office
for United States Attorneys of all inmates approved for
placement on Home Confinement under CARES Act authorities.

If an inmate does not qualify for CARES Act Home Confinement
under the above criteria, they should be reviewed for placement

in a Residential Reentry Center and/or Home Confinement at a later stage in accordance with applicable laws and BOP policies.

If you have any questions, please contact David Brewer, Administrator, Correctional Programs Branch.

# EXHIBIT B

*(filed under seal)*

# EXHIBIT C



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** CCD
**NUMBER:** 7300.09
**DATE:** 1/12/98
**SUBJECT:** Community Corrections Manual

1.       PURPOSE AND SCOPE.  To operate community-based corrections for offenders who are reintegrating into communities and require more supervision than traditional probation or parole, or who need an alternative to incarceration. Community corrections is also responsible for managing Federal offenders confined in non- Bureau facilities.                Most Bureau community corrections programs are implemented through contracts and agreements with private service providers and with state or local governments.

2.       PROGRAM OBJECTIVES.  The expected results of this program are:

a.        A variety of community-based correctional services and programs will be available for offenders.

b.        Contracts and budgets for community-based services and programs will be effectively managed.

c.        Offenders in community programs will receive appropriate supervision.

d.        The public will be protected from undue risk.

e.        Offenders in community programs will be provided safe living environments.

f. Eligible inmates in community programs will have opportunities for work experiences to develop positive skills, knowledge, and work habits.

5.3.6.      **CCC Placement as a Release Condition**

Offenders who are placed on supervised release or have a
supervised release period stipulated to follow confinement in
their Judgment in a Criminal Case may be required to reside in a
CCC as a condition of supervised release for the time specified
by the court.   The USPO may refer offenders serving a supervised
release term in the community who require a more structured
environment to the CCM for CCC placement.   When inmates are
released directly from institutions with a court or U.S. Parole
Commission ordered supervision release condition that they reside
in a CCC, institution staff shall forward a referral package to
the CCM and providing CIMS clearance when appropriate.   Refer to
the Program Statement on **Community Corrections Center (CCC)
Utilization and Transfer Procedure.**

5.4.   **CENTRAL INMATE MONITORING SYSTEM**

The Central Inmate Monitoring (CIM) System is a classification
system the Bureau uses to monitor the transfer, temporary
release, and community-based activities of inmates who present
special concerns for management.   The CCM has clearance authority
for all CIM assignments, except Witness Security cases, which are
reviewed by the Central Office Inmate Monitoring Section.
Community corrections staff shall notify the "Review Authority"
of clearances using EMS Form 404, Requesting Central Inmate
Monitoring Clearance.   See the Program Statement on **Central
Inmate Monitoring System** for additional information and guidance
on who the appropriate "Review Authority" is in different cases.

As CIM "Coordinators" for inmates confined at contract
facilities, CCMs have the same responsibility as the
institutional CIM "Coordinators" for CIM cases in their areas.
CCMs are involved in the designation process and in providing
case management services to inmates in the community.   They are
the first to become involved with inmates when U.S. Marshals
request a designation.   It is required that the CCM and case
manager be certified in CIM procedures and complete CIM
Certification every three years.

CIM areas unique to community corrections offices are:

5.4.1.      Watching for local media and other information on
potential CIM cases; keeping a daily log and a file with CIM
material and sending material to the regional office, as
appropriate; and keeping the file in a locked drawer if it is a
Witness Security case so only those with a need to know have
access.

5.4.2.    Identifying inmate management issues that may pose concerns during confinement or while in the community.

5.4.3.    Initiating requests for written documentation that substantiates CIM classification.  Forwarding information gathered on inmates to the CIM Coordinator at receiving institutions.

5.4.4.    Transmitting CIM information to the regional designator for consideration with designation requests.  Information about separatees and WITSEC inmates **must not** be included in the Remarks section of the designation request form, but shall be communicated by phone, SENTRY, or BOPNet.

5.4.5.    Ensuring that any inmate for whom a contract facility is designated is notified in writing, as promptly as possible, of the CIM classification and the basis for it.  The inmate shall sign for and receive a copy of the notification form.

5.4.6.    Preparing the packet on all inmates for whom contract facilities are designated and are identified as CIM cases, as outlined in the Program Statement on **Central Inmate Monitoring System.**  The CCM shall ensure that the files of **all** inmates so identified contain the 8½ x 11 inch white card stamped:  **"NOT TO BE TRANSFERRED OR PARTICIPATE IN COMMUNITY ACTIVITIES WITHOUT CIM CLEARANCE."**

5.4.7.    Ensuring that clearance for CIM cases approved for CCC transfer has been obtained before the inmate arrives at the facility.  This clearance is to be documented in the file, with a hard copy printed no earlier than one to seven days before an inmate's arrival.  Checking for prior CIM classification on public law cases is necessary.  If a prior separatee is at the CCC, the CCM must ensure the inmate's safety is not jeopardized.

5.4.8.    Monitoring of clearances for transfers or community activities outside the commuting area of the contract facilities by the CCM.

In reference to additional CIM clearance for CIM cases who are transferred from a CCC to a home confinement program, the CIM activity clearance for a CCC placement is from the time the inmate departs the institution through the time he or she is released from the CCC or other community programs.  There is no need for CIM clearance for inmates going from a CCC to home confinement if the home confinement location is within the same commuting area.  This also applies to inmates transferring from one contract facility to another under the same CCM office;

however, a review of the CIM status shall be conducted to ensure
separatees are not placed at the same facility.

5.4.9.     Register numbers for uncommitted separatee(s)can be
obtained from the regional designator.   See the Program Statement
on **Central Inmate Monitoring System.**

5.4.10.     CCM authorization of CIM clearance when CCC inmates
must be transferred.   Another unique responsibility is approving
CIM inmates for furloughs outside the commuting area.   In
separation/state boarder cases, the CCM approving the furlough
shall complete the SENTRY clearance transaction using EMS Form
404, Requesting Central Inmate Monitoring Clearance.

5.5.     **REPORTING SIGNIFICANT INCIDENTS, EMERGENCIES AND DEATHS**

CCMs shall report and route unusual and serious incidents,
assaults, deaths, disturbances, fires, natural disasters, weapons
discharges, and adverse incidents that may result in significant
publicity using the Report of Incident form.   Uses of force,
restraints, or chemical agents shall also be reported on the
Report of Incident form.   An After-Action Review Report (EMS Form
586) shall be prepared as necessary.   Each of these forms shall
be routed to all listed on the bottom of the form and to the MCA,
CCRA, and the Central Office COMM CORR mailbox.

The regional duty officer shall be notified when the occurrence
is on a weekend or after normal business hours.   There will be
circumstances when some of these incidents present regional or
national sensitivities and require immediate or next day
telephonic alert to respective staff in the regional and Central
offices.   For example, if there is a probability for regional or
national media attention to the incident, immediate telephonic
reporting may be called for in addition to completing the
Incident Report.

In the event of a significant escape, related incident, or death
of an inmate in a contract facility, the CCM shall follow
procedures outlined in the Program Statement on **Escapes/Deaths
Notification.**   The CCM performs the same role as the chief
executive officer.   In the event of an inmate death, CCC or jail
staff shall take a rolled right thumb print and arrange for the
death certificate to be completed.   These two documents shall be
mailed to the CCM, who shall make sure both are placed in the
Inmate Central File. A copy of the death certificate shall be
mailed to the Regional Health Services Administrator.

The CCM shall instruct contract facility staff to call the local
coroner to review the case if the death is violent, accidental

# EXHIBIT D



**Office of the Attorney General**

**Washington, D. C. 20530**

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:              Prioritization of Home Confinement As Appropriate in Response to
                             COVID-19 Pandemic

　　　　Thank you for your tremendous service to our nation during the present crisis.  The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times.  We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe.  At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities.  I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

**I.　　TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH**

　　　　One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances.  I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.  Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.  But for some eligible inmates, home confinement might be more effective in protecting their health.

　　　　In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

- The security level  of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex offenses, will render an inmate ineligible for home detention.  Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement.  We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.  You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   **PROTECTING THE PUBLIC**

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public.  That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways.  I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement.  Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public.  I thank you for your service to the country and assistance in implementing this Memorandum.

# EXHIBIT E



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

| | |
|---|---|
| OPI: | CPD/CPB |
| NUMBER: | 5280.09 |
| DATE: | January 20, 2011 |
| EFFECTIVE DATE: | February 10, 2011 |

# Inmate Furloughs

/s/
*Approved*: Harley G. Lappin
Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

**§ 570.30 Purpose.**

**The purpose of this subpart is to describe the procedures governing the furlough program of the Federal Bureau of Prisons (Bureau), which is authorized by 18 U.S.C. § 3622.  Under the furlough program, the Bureau allows inmates who meet certain requirements to be temporarily released from custody under carefully prescribed conditions.**

Authority to grant furloughs to inmates whose offenses occurred before November 1, 1987, was given to the Attorney General under 18 U.S.C. § 4082(c) and delegated to the Director of the Bureau of Prisons under 28 C.F.R. § 0.96(d).

For the purposes of this Program Statement, the term "institution" includes any Bureau, contract, or private correctional facility.  "Warden" refers to the Chief Executive Officer (CEO) of any Bureau institution, as well as any contract or private correctional facility.

a. **Summary of Changes**

*Directive Rescinded*
P5280.08       Furloughs (2/4/98)

**Federal Regulations from 28 CFR are shown in this type**.
Implementing instructions are shown in this type.

Significant changes to this Program Statement include:

- Eliminates the requirement that a memorandum be prepared for the Inmate Central File (Post-Furlough Interview Form).
- Requires each inmate who is approved for a social furlough to prepay administrative and testing costs associated with a urinalysis.
- Requires staff to notify victims and witnesses when an inmate is approved for a local medical furlough or transfer furlough.
- Encourages institutions to furlough transfer appropriate inmates to a minimum security institution, unless a more cost-effective means of transportation is available.
- Allows eligible inmates transferring from one camp to another camp to be transported by family members.
- Limits the furlough eligibility for inmates found guilty of drug use, drug possession, possession of drug paraphernalia, or introduction of drugs into Bureau institutions.
- Requires post-furlough interviews to be conducted ordinarily within three business days of the inmate's return from a social furlough.
- Combines the Furlough Questionnaire forms (BP-A0302 and BP-A0303) into one form titled Furlough Questionnaire, BP-A0952.
- Requires staff to submit the Furlough Questionnaire (BP-A0952) to the supervising agency for each furlough (except a local medical furlough and transfer furloughs), unless the supervising agency requests not to be notified.
- Requires staff to identify the specific type of furlough approved on the Furlough Application - Approval and Record form (BP-A0291) – i.e., crisis, educational, religious, recreational, civic, release planning, family and community ties, legal, training, community service project, medical, and transfer furloughs.
- Adds an additional advisement to Conditions of Furlough, Page 2 of the Furlough Application - Approval and Record form (BP-A0291) that a urinalysis test will be conducted upon completion of each social furlough as defined in the Program Statement.
- Eliminates the requirement for inmates to have an HIV test prior to a furlough.
- Written approval of the Regional Director is not required for inmate furloughs.
- A new procedure is created for abbreviated recommendations for disapproval of furloughs.
- Places limitation on family transportation furloughs in excess of 12 hours.

The following changes are a result of the Reduction and Elimination of Duties Management Assessment Project (REDMAP) initiatives:

- Eliminates the requirement to contact the Regional Health Services Administrator for approval when an inmate is placed on furlough for medical care when the expense is borne by the government.
- Eliminates the requirement to obtain the approval of the Assistant Director, Correctional Programs Division, and the Medical Director for medical furlough requests when the expense is borne by the inmate.

b.  **Program Objectives**.  The expected results of this program are:

- A furlough is not an entitlement.  Neither is it a reward for good behavior or successful programming, nor a means to shorten a criminal sentence.
- Furloughs will be granted to eligible inmates to achieve specific correctional goals.
- The reduction of recidivism by securing transitional needs and enhance community reintegration prior to release.
- The public will be protected from undue risk.
- Any inmate who violates a condition of furlough will be disciplined, according to the severity of the violation.

c.  **Institution Supplement**.  An Institution Supplement that addresses items listed below is required.  The institution involves the Regional Correctional Programs Administrator in developing the Institution Supplement, which specifies:

- Any cooperative arrangements with outside agencies, such as the U.S. Probation Office (USPO), Court Services and Offender Supervision Agency for the District of Columbia (CSOSA), U.S. Marshals Service (USMS), or local medical facility.
- Transportation and administrative procedures to facilitate an inmate's release and return (including how to process an inmate returning from furlough during non-business hours).
- Procedures for transfer furloughs from an institution to a Residential Reentry Center (RRC.)
- Criteria and procedures for transfer furloughs from a camp-to-camp or a low to a camp.
- Procedures to follow when an inmate chooses an alternative mode of transportation, including:

  - Verification of transportation funds.
  - Receipt of airline ticket.
  - Travel itinerary.
  - Time frames for receiving pertinent information relating to travel arrangements;

- Procedures to address inmates eligible for transport to a camp or RRC by family members.
- Local urinalysis procedures.

d.  **Pretrial, Holdover, and Detainee Procedures**

(1)  **Pretrial Inmates.**  The Warden may not grant a furlough or participation in any other community program to a pretrial inmate except by court order.  In an emergency, staff contact the pretrial inmate's attorney of record, who may seek from the court a decision concerning release from custody or an escorted trip, pursuant to 28 CFR part 551, Subpart J.  The Warden establishes procedures with the USMS when an escorted trip of a pretrial inmate is necessary.  Such initial contact will be documented in the Inmate's Central File.

(2) **Holdovers/Detainees/Inmates With Detainers.**  Sentenced Bureau holdovers are not automatically precluded from furlough participation; however, sound correctional judgement should be used on a case-by-case basis.

Ordinarily, the Warden shall not grant a furlough to an inmate who is an Immigration and Customs Enforcement (ICE) detainee or whose deportation status is unknown.

Ordinarily, the Warden does not grant a furlough to an inmate with a detainer.

Furlough requests by non-Bureau holdovers or detainees are referred to the appropriate agency for action and decision making.  The Warden establishes procedures with the agency when an furlough of a holdover or detainee is necessary.

e.  **Victim/Witness Notifications**.  Victim/witness notifications must be made for inmates on furloughs, including local medical furloughs and transfer furloughs, as required by the Program Statement **Victim and Witness Notification Program**.

2.  **INMATE ELIGIBILITY FOR FURLOUGHS**

**§ 570.31 Inmate eligibility for furloughs.**

**(a)  Eligible inmates.  The following types of inmates may be eligible for furloughs:**

**(1)  Sentenced inmates housed in Bureau facilities.**

**(2)  Pretrial inmates housed in Bureau facilities (provided that they comply with the requirements of 28 CFR part 551, Subpart J).**

**(3)  Sentenced inmates housed in Bureau facilities and classified as central inmate monitoring cases (provided that they comply with the requirements of 28 CFR part 524, Subpart F).**

**(b)  Ineligible inmates.  The following types of inmates are not eligible for furloughs:**

**(1)  Sentenced inmates housed in contract facilities are not eligible to participate in the Bureau's furlough program under these rules, but may apply for furloughs as specified in that facility's written agreement with the Bureau.**

**(2)  Inmates who are U.S. Marshals prisoners housed in contract facilities are not eligible to participate, but must direct any furlough requests to the U.S. Marshals.**

3.  **TYPES OF FURLOUGHS**

**§ 570.32 Types of furloughs.**

**A furlough is an authorized absence from an institution by an inmate who is not under escort of a staff member, U.S. Marshal, or state or federal agents.  The two types of furloughs are:**

**(a)  Transfer furlough – A furlough for the purpose of transferring an inmate from one Bureau facility to another, a non-federal facility, or community confinement (including home confinement) as noted below at § 570.33(a).**

**(b)  Non-transfer furlough – A furlough for any purpose other than a transfer furlough, and which may be defined based on its nature, as either emergency or routine, as follows:**

**(1)  Emergency furlough – A furlough allowing an inmate to address a family crisis or other urgent situation as noted below at § 570.33(b).**

Immediate family includes mother, father, stepparents, foster parents, brothers and sisters, spouse, and children.

**(2)  Routine furlough – A furlough for any of the reasons noted below at § 570.33 (a) and (c)-(j).**

**(c)  Duration and distance of non-transfer furlough –**

**(1)  Day furlough – A furlough within the geographic limits of the commuting area of the institution, which lasts 16 hours or less and ends before midnight.**

Generally, day furloughs (approximately a 100-mile radius)  are used to strengthen family ties or enrich institution program experiences.  Such furloughs are frequently associated with inmate organizations inside the institution (Jaycees, Toastmasters, etc.) or with structured group programs (religious, educational, recreational, etc.), that address specific correctional goals.

**(2)  Overnight furlough – A furlough which falls outside the criteria of a day furlough.**

Ordinarily, the length of an overnight furlough is 3 to 7 calendar days.  This time frame may only be extended for specific medical, educational, or vocational reasons per 18 U.S.C. § 3622 and § 4082.

d.  **Social Furlough**.  A social furlough is defined as a day or overnight furlough used primarily for purposes listed in Section 4.(b)-(e).  The type of "social" furlough (i.e., release planning, family and community ties, religious,  educational, recreational, civic, or crisis) is identified on

the Furlough Application - Approval and Record form (BP-A0291) and in SENTRY (the SENTRY assignment, FURL SOC (social) has been discontinued).

Refer to Section 8.(a)(10)-(14) for additional information regarding completion of the BP-A0291 and Attachment A for the list of furlough SENTRY assignments.

e.  **Transfer Furlough.**  Inmate movement that is institution-to-institution or institution-to-Residential Reentry Center (RRC), which is also known as an transfer furlough.

A transfer furlough is used primarily for purposes listed in Section 4(a)(1)-(3).  Contact with the USPO office is not necessary.

f.  **Legal Furlough**.  A legal furlough is defined as a day or overnight furlough used primarily for purposes listed in Section 4(f)-(h).

g.  **Training/Work Furlough**.  A training/work furlough is defined as a day or overnight furlough used primarily for purposes listed in Section 4(i).

h.  **Supervising Agency**.  This term refers to either the U.S. Probation Office (USPO) or the Court Services and Offender Supervision Agency for the District of Columbia (CSOSA).

4.  **JUSTIFICATION FOR FURLOUGH**

**§ 570.33 Justification for furlough.**

**The Warden or designee may authorize a furlough, for 30 calendar days or less, for an inmate to:**

**(a)  Transfer directly to another Bureau institution, a non-federal facility, or community confinement;**

While the Warden or Acting Warden may not further delegate authority to approve furloughs, the Regional Director may authorize selected satellite Camp Administrators to approve furloughs at that camp.  This authorization is made on the basis of the Camp Administrator's correctional experience and, for this section's purpose, is authorized under 28 CFR 500.1(a), which defines the Warden as the CEO of any Federal penal or correctional institution.

(1)  **Transfer to a RRC**.  Staff may transfer an inmate via a transfer furlough to a RRC from a Bureau institution, or a private/contract correctional facility.  See Section 5, Expenses of Furlough, and the Program Statement **Unescorted Transfers and Voluntary Surrenders** for additional information.

When approving travel arrangements for inmates, unit staff consider all aspects of the inmate's travel arrangement (e.g., the method of transportation is direct with few, if any, stops prior to reaching the final destination) to ensure inmates have limited opportunities to engage in

inappropriate behavior.  Ordinarily, immediate family transportation will not be considered if travel cannot be completed within 12 hours of departure.

The inmate's family members may provide transportation, at the inmate's or family member's expense, to the RRC if approved by the Warden.

Inmates are not permitted to deviate from the transfer furlough schedule and must report to the RRC at the time indicated on the furlough application/approval form.

Unit staff notify each victim/witness of an inmate's RRC placement via transfer furlough per the Program Statement **Victim and Witness Notification Program**.

(2)  **Institution-to-Institution Transfer.**  An inmate may travel via "transfer furlough" from a low or minimum security level institution to a minimum security level institution if the inmate is a minimum security level inmate and has OUT or COMMUNITY custody.  The inmate can travel via government-arranged travel or the inmate's family (on the approved visiting list) may provide transportation to the receiving institution only if the inmate is transferring from one minimum security level institution to another, and if approved by the Warden.  The inmate's family is expected to bear all transportation costs if they provide transportation.

When approving travel arrangements for inmates, unit staff consider all aspects of the inmate's travel arrangement (e.g., the method of transportation is direct with few, if any, stops prior to reaching the final destination) to ensure inmates have limited opportunities to engage in inappropriate behavior.  Ordinarily, immediate family transportation will not be considered if travel cannot be completed within 12 hours of departure.

Inmates are not permitted to deviate from the transfer furlough schedule and must report to the RRC at the time indicated on the furlough application/approval form.

(3)  **Transfer to a Medical Center.**  An inmate may be authorized an transfer furlough to or from a medical referral center when:

- The Warden determines the inmate to be physically and mentally capable of completing an transfer furlough.
- The inmate has demonstrated sufficient responsibility to provide a reasonable assurance that transfer furlough requirements would be met.
- The inmate meets eligibility requirements in Section 6, Transfer Furlough Eligibility Requirements.

**(b)  Be present during a crisis in the immediate family, or in other urgent situations;**

Immediate family includes mother, father, stepparents, foster parents, brothers and sisters, spouse, and children.  These relationships must be verified by the Presentence Report or other administratively acceptable documentation.

**(c)   Participate in the development of release plans;**

Furloughs should directly contribute to the pre-release and reentry processes.  (This sentence also applies to Sections 4(d) and (e) of this policy.)

**(d)  Establish or reestablish family and community ties;**

**(e)  Participate in selected educational, social, civic, and religious activities which will facilitate release transition;**

**(f)  Appear in court in connection with a civil action;**

**(g)  Comply with an official request to appear before a grand jury, or to comply with a request from a legislative body, or regulatory or licensing agency;**

**(h)  Appear in or prepare for a criminal court proceeding, but only when the use of a furlough is requested or recommended by the applicable court or prosecuting attorney;**

**(i)  Participate in special training courses or in institution work assignments, including Federal Prison Industries (FPI) work assignments, when daily commuting from the institution is not feasible; or**

Subsection (i) includes inmates who remain overnight at a training/work site and do not return to the institution daily.

**(j)  Receive necessary medical, surgical, psychiatric, or dental treatment not otherwise available.**

The Warden refers a request for a furlough in other situations through the Regional Director to the Assistant Director, Correctional Programs Division, for approval.

5.  **EXPENSES OF FURLOUGH**

**§ 570.34 Expenses of furlough.**

**All expenses of a furlough, including transportation, food, lodging, and incidentals, are the responsibility of the inmate, the inmate's family, or other appropriate source approved by the Warden, except that the government may bear the expense of a furlough if it is for the government's primary benefit.**

 a.  **Urinalysis**. Each inmate who completes a social furlough, regardless of length, is given a urine test as soon as practicable upon his/her return to the institution.  The inmate must pay the costs related to the urinalysis test.  The cost of a positive test is greater than the cost of a negative test, as a positive test must be sent out for further testing.  Current urinalysis fees will be posted,

updated, and available to staff on Sallyport.  Inmates should be advised of the amount of the fees upon request.

b.  **Funds Withdrawal**.  When the inmate submits a written request for furlough consideration, he/she also completes a Request for Withdrawal of Inmate's Personal Funds form (BP-199) for the full amount of the urinalysis fee in effect the date the BP-199 is initiated.  The inmate submits the completed BP-199 to the appropriate unit team member, who indicates on the form "Urinalysis," followed by the scheduled furlough return date: for example, Urinalysis 12/21/09.

If the furlough is approved, unit staff hand-deliver the BP-199 to the institution's Deposit Fund Technician, who verifies that funds are available in the inmate's trust fund account.   The Office of Financial Management (OFM) encumbers funds, in the amount of the current cost for a positive urinalysis test, until confirmation of the urinalysis results.  Unit staff ensure the cost of the urinalysis is encumbered on the inmate's account before his/her release on furlough.

c.  **Testing**.  Urine testing for inmates returning from a social furlough is done through the institution's normal testing procedures (see the Program Statement **Urine Surveillance and Narcotic Identification**).  Unit staff notify the institution's Captain of the need for post-social furlough testing, via a copy of the approved Furlough Application - Approval and Record form (BP-A0291).

d.  **Prepayment Required**.  The urinalysis fee must be paid, through an encumbrance, in full before release on furlough and cannot be waived.  Inability or failure to pay the full cost of the urinalysis results in the furlough being denied.

(1)  **Negative Urinalysis Reading**.  If the urinalysis results in a negative reading, the institution's Urine Surveillance Program Coordinator contacts the OFM and provide the inmate's name, register number, test date, and negative test result.  The OFM releases the original encumbrance of the total cost and processes a lesser fee, because the sample does not have to be sent out of the institution.  This lesser fee will be posted and updated on Sallyport.

(2)  **Positive Urinalysis Reading**.  If the urinalysis results in a positive reading, the institution's Urine Surveillance Program Coordinator contacts the OFM and provide the inmate's name, register number, test date, and positive test result.  The OFM releases the original encumbrance and processes a withdrawal for that amount in TRUFACS.

(3)  **Other**.  Regardless of the test result, the Urine Surveillance Program Coordinator may, with the concurrence of the Chief Correctional Supervisor, initiate retesting or additional tests based on other information related to the inmate's possible use of drugs while on social furlough.  For example, staff may have evidence that the inmate used an illegal drug not detectable by the standard urinalysis.  In such circumstances, additional testing is appropriate and is done at the expense of the inmate.

e.  **Testing Frequency**.  Regardless of frequency or duration, urine testing is conducted after each social furlough.  Inmates who refuse to test upon their return from a social furlough are subject to disciplinary action.

Inmates confined at a RRC who are approved for day, evening, or  weekend "passes" are not required to pay for their urinalysis.  However, inmates who participate in a "social" furlough are subject to the provisions of Section 5, Expenses of Furlough.

6.  **TRANSFER FURLOUGH ELIGIBILITY REQUIREMENTS**

**§ 570.35 Transfer furlough eligibility requirements.**

**(a)  Inmates transferring to administrative, low, medium, or high security facilities are generally not eligible for participation in the Bureau's transfer furlough program.**

**(b)  For a transfer furlough, inmates other than those described in (a) must:**

**(1)  Be physically and mentally capable of completing the furlough; and**

**(2)  Demonstrate sufficient responsibility to provide reasonable assurance that furlough requirements will be met.**

**(c)  Inmates transferring to minimum security facilities must meet the requirements described in (b), and must also be:**

**(1)  Transferring from a low or minimum security facility; and**

**(2)  Appropriate for placement in a minimum security facility based on the inmate's security designation and custody classification at the time of transfer.**

**(d)  Inmates transferring to community confinement must meet the requirements described in (b), and must also be appropriate for placement in community confinement based on the inmate's security designation and custody classification at the time of transfer.**

e.  The Warden may grant a furlough to an inmate with OUT custody only when the furlough is for transferring directly to another institution (except RRCs – COMMUNITY custody is required when transferring to a RRC) or for obtaining local medical treatment not otherwise available at the institution. (Ordinarily, local medical treatment does not exceed one day.)

f.  Except as provided in paragraphs (c) and (e) of this section, the Warden may grant a furlough only to an inmate with COMMUNITY custody.

The Warden determines the eligibility of an inmate for furlough consideration based on the inmate's projected release date and the stated purpose of the furlough.

7. **NON-TRANSFER FURLOUGH ELIGIBILITY REQUIREMENTS**

**§ 570.36 Non-transfer furlough eligibility requirements.**

**(a)  An inmate may be eligible for a non-transfer furlough if the inmate meets the criteria described in 570.35(b) and the following additional criteria:**

| If an inmate has . . . | Then the inmate may only be considered for. . . |
|---|---|
| been confined at the initially designated institution for less than 90 days | an emergency furlough. |
| more than two years remaining until the projected release date | an emergency furlough. |
| 2 years or less remaining until the projected release date | an emergency furlough or a routine day furlough. |
| 18 months or less remaining until the projected release date | an emergency furlough, a routine day furlough, or a routine overnight furlough within the institution's commuting area. |
| 1 year or less remaining until the projected release date | an emergency furlough, a routine day furlough, or a routine overnight furlough either within or outside the institution's commuting area. |

A projected release date, for purposes of this rule, refers to the first of the following dates that applies to an inmate requesting a furlough:

- The inmate's mandatory (statutory) release date.  The Good Conduct Time Release date for an inmate sentenced under CCCA is considered the "statutory" release date.
- The inmate's minimum expiration date.
- The inmate's presumptive parole date.
- The inmate's effective parole date.

If the Warden approves a furlough outside the above guidelines, he/she documents the reasons in the inmate's central file.

**(b) Ordinarily, Wardens will not grant a furlough to an inmate if:**

**(1) The inmate is convicted of a serious crime against a person;**

**(2) The inmate's presence in the community could attract undue public attention, create unusual concern, or diminish the seriousness of the offense; or**

**(3) The inmate has been granted a furlough in the past 90 days.**

If the Warden approves a furlough for such an inmate, he/she documents the reasons in the inmate's central file.

c. Ordinarily, inmates considered inappropriate for a furlough include, but are not limited to:

(1)  Inmates who have a current or prior offense listed in the Program Statement **Categorization of Offenses**.  Furloughs for such inmates are considered only in highly unusual circumstances. Ordinarily, an inmate is precluded from receiving a furlough if he/she has an offense listed in either Section 3, Offenses Categorized as Crimes of Violence, or Section 4, Offenses that at the Director's Discretion Shall Preclude an Inmate's Receiving Certain Bureau Program Benefits.

The Warden may approve such inmates for a transfer furlough to a minimum security institution and documents the reasons in the inmate's central file.

(2)  Inmates who have a Public Safety Factor (PSF) that the Designation and Sentence Computation Center (DSCC) Administrator has not waived.  Furloughs for inmates with PSFs are considered only in highly unusual circumstances and require the Regional Director's prior written approval.

The Regional Director's review of a proposed furlough is not necessary for inmates assigned PSFs that have been waived.  In addition, an inmate approved for an transfer furlough to an RRC placement ordinarily does not require the Regional Director's prior written approval or a PSF waiver.

The Community Corrections Regional Administrator (CCRA) is the review authority for furlough requests for RRC inmates assigned PSFs.

Ordinarily, the Warden consults with the Regional Director before approving a furlough for an inmate identified in subsections (3) through (10) below:

(3)  Inmates who refuse to participate in the Inmate Financial Responsibility Program.  Inmates not making payments commensurate with their ability to pay are also ineligible for furlough participation.  See the Program Statement **Inmate Financial Responsibility Program** for additional information.

(4)  Inmates who withdraw from educational programming before receiving their GED.

(5)  Inmates who refuse to participate in required drug abuse treatment or the Release

Preparation Program.

(6)  Inmates who have been found to have committed 100 OR 200 level prohibited acts, or the prohibited acts of using drugs or alcohol, drug possession, possession of drug paraphernalia, or introduction of drugs into Bureau institutions within the last three years from the date of the incident.

(7)  Inmates who have received any other incident report(s) not listed above (based on a UDC/DHO finding of guilt) are assessed in terms of overall institutional adjustment.

(8)  Inmates with a prior history of escape or attempted escape from secure custody.

(9)  Inmates with a detainer or unresolved outstanding warrant.

(l0)  Inmates requesting furloughs outside the jurisdiction of the United States.  A furlough may only be authorized within the U.S. and possessions and territories in which the U.S. Government retains jurisdiction (e.g., Guam, Puerto Rico, Virgin Islands).  The Regional Director for the sending institution approves furloughs to Guam, Puerto Rico, or the Virgin Islands.

An inmate classified as a Central Inmate Monitoring case may be considered for a furlough if the requirements of the Program Statement **Central Inmate Monitoring System** are met.

Staff at a contract facility may approve a furlough for a sentenced inmate housed there as specified in that facility's contractual agreement with the Bureau.

Contract staff follow procedures outlined in the facility's Statement of Work (SOW).  They may recommend to the Community Corrections Manager (CCM) that an inmate participate in a furlough.  Contact the CCM for questions on these cases.

The Bureau does not have the authority to furlough U.S. Marshals prisoners in contract jails.  Staff refer requests for such furloughs to the U.S. Marshals Service.

Furloughs for pretrial inmates are arranged per the Program Statement **Pretrial Inmates**.  Section 1.d(1) of this Program Statement also contains information on pretrial furlough procedures.

## 8.  PROCEDURES TO APPLY FOR A FURLOUGH

**§ 570.37 Procedures to apply for a furlough.**

**(a)  Application.  Inmates may submit a furlough application to staff, who will review it for compliance with these regulations and Bureau policy.**

**Abbreviated Recommendation for Disapproval** – If the Unit Team reviews the inmate's furlough request and identifies a reason(s) for recommending disapproval, a memorandum

signed by the Unit Manager can be forwarded to the Warden explaining the reason(s), and seeking the Warden's agreement to disapprove the furlough request without requiring the full application procedure described in the next section.

The reason(s) for recommending disapproval of the furlough request may be based on any of the reasons provided in this policy, including, but not limited to, Sections 2, 4, or 7.  By using this abbreviated procedure, the Unit Team is recommending to the Warden that the furlough request be denied based on the existence of the inmate's ineligibility.

While all the possible reasons for recommending disapproval under this procedure cannot be listed, the following example memorandum provides a non-exhaustive sample of how a disapproval recommendation memorandum can be written.  The example provided is illustrative only, and should not be considered the only method of presenting an abbreviated recommendation for disapproval of the inmate's furlough request.

What is required in all cases, however, is that the underlying reason for disapproving the furlough request be explained in narrative form; it is insufficient to simply "check a box" or reference a section number of policy.  Additionally, it is required that the Warden indicate in writing, and on the memorandum itself, the decision and reason for disapproving the furlough request.

Example:

| | |
|---|---|
| DATE: | [insert date] |
| MEMORANDUM TO: | Warden |
| FROM: | Unit Manager, Bravo Unit |
| SUBJECT: | Furlough Request – Inmate Doe, Reg. No. 12345-678<br>Abbreviated Recommendation for Disapproval |

On January 1, 2010, Unit Team Bravo reviewed inmate Doe's request for a furlough. Inmate Doe requested an overnight furlough to [insert details of furlough request].

Upon initial review, it is Unit Team Bravo's recommendation that inmate Doe's furlough request be denied for the following reason(s):

☐　　　Does not meet eligibility or justification criteria:
　　　　[insert narrative  explanation]

☐　　　Presents undue risk based on inmate's history:
　　　　[insert narrative explanation]

---

☐      Would diminish the seriousness of the offense:
[insert narrative explanation]

☐      Other policy based reason(s):
[insert narrative explanation, citing applicable policy section]

WARDEN'S DECISION / SIGNATURE / DATE:

☐      AGREE – The inmate's furlough request is denied for the above reason(s).

☐      DISAGREE – The inmate's furlough request is not denied at this time.  The Unit Team should submit a full application for consideration.

---

If the Warden agrees to disapprove the furlough request, s/he signs and dates the memorandum. A copy is provided to the inmate and the original is filed in Section Six of the inmate's Central File.

If the Warden disagrees with the recommendation to disapprove the furlough request, s/he signs and dates the memo and provides further instructions to the Unit Team as appropriate to complete the full application process.

An inmate may submit a furlough request to staff.  Before approving the request, staff verify that a furlough is indicated.

Before the inmate's furlough:

(1)  A member of the inmate's unit team contacts the family member or person being visited to verify that the inmate is welcome.  This communication is documented and placed in Section 6 of the Inmate Central File.  Verification is not necessary for transfer furloughs.

(2)  A Furlough Questionnaire (BP-A0952) is forwarded to the supervising agency in the district to be visited (sentencing or non-sentencing district), unless the supervising agency has requested not to be notified.

(3)  Before the inmate's initial furlough, and all subsequent furloughs as applicable, a Furlough Questionnaire (BP-A0952) is also forwarded to the supervising agency in the sentencing district if the inmate is going on a furlough to another district (non-sentencing district), unless the supervising agency has requested not to be notified.

(4) Before the inmate's initial furlough, and all subsequent furloughs as applicable, a copy of the Presentence Investigation Report (PSR) is forwarded to the supervising agency in the non-sentencing district if there has been no prior contact with that district (including relocations),

unless the non-sentencing district indicates the PSR is not necessary.  This will not apply to local medical furloughs and transfer furloughs.

(5)  A Furlough Questionnaire (BP-A0952) is not necessary for local medical furloughs and transfer furloughs.

(6)  D.C. Code offenders are subject to the provisions of this Program Statement.  The Furlough Questionnaire (BP-A0952) is forwarded to CSOSA for processing;

(7)  Unit staff contact the supervising agency to determine the status of the Furlough Questionnaire (BP-A0952) if it has not been returned within two weeks after mailing.  If the questionnaire has not been returned within three weeks and contact has been made with the supervising agency, unit staff may continue to process the furlough.

(8)  If the supervising agency recommends that the furlough be denied, the Warden may still grant the furlough, but documents the reason(s) and provides a letter to the supervising agency advising of the final decision.  A copy is placed in Section 6 of the Inmate Central File.  Unit staff also document on the Furlough Application - Approval and Record (BP-A0291) any objections indicated by the supervising agency.

(9)  The BP-A0291 is used to document approved furloughs.  The specific type of furlough is identified on the BP-A0291 in the section titled "SENTRY Assignment."  See Attachment A for the list of furlough SENTRY assignments.  For example, the SENTRY assignment for family visits is FURL TIES; to attend religious functions, FURL RLG; to attend court proceedings, FURL LEG.  Responsible staff (ordinarily ISM) enter the assignment in SENTRY.

(10)  Each furlough application is routed through ISM for a final detainer and legal status check before delivery to the Warden.  Upon signature by the Warden, four copies (completed original plus three copies) of the BP-A0291 are distributed as indicated at the bottom of the form.

(11)  The Warden and supervising agency in the local district may initiate a cooperative arrangement to use a blanket approval letter for all (or specific types) of furloughs in lieu of the Furlough Questionnaire (BP-A0952).  This letter requires the signature of both the supervising agency and Warden, and is reviewed and re-signed by both parties every two years.

(12)  A separate Furlough Application - Approval and Record (BP-A0291) is executed for each furlough; however, when multiple furloughs are necessary over an extended period or on a recurring basis, processing more than one furlough application for each inmate and each occurrence may not be practical.  Under these circumstances, the Warden may forward an exemption request to the Regional Director.  If approved, staff complete one furlough application, which expires when the activity concludes or on the one-year date of the initial furlough.  If an exemption is still required upon expiration of the year, the Warden submits a new request.  These procedures apply to inmates participating in a training, educational, or work program in the community.  For guidance on Mothers and Infants Together (MINT) Program procedures, see the

Program Statement **Community Corrections Center (CCC) Utilization and Transfer Procedure**.

**(b)  Notification of decision.  An inmate will be notified of the Warden's decision on the furlough application.  Where a furlough application is denied, the inmate will be notified of the reasons for the denial.**

**(c)  Appeal.  An inmate may appeal any aspect of the furlough program through the Administrative Remedy Program, 28 CFR Part 542, Subpart B.**

9.  **CONDITIONS OF FURLOUGH**

**§ 570.38 Conditions of furlough.**

**(a)  An inmate who violates the conditions of a furlough may be considered an escapee under 18 U.S.C. § 4082 or 18 U.S.C. § 751, and may be subject to criminal prosecution and institution disciplinary action.**

**(b)  A furlough will only be approved if an inmate agrees to the following conditions and understands that, while on furlough, he/she:**

**(1) Remains in the legal custody of the U.S. Attorney General, in service of a term of imprisonment;**

**(2) Is subject to prosecution for escape if he/she fails to return to the institution at the designated time;**

**(3) Is subject to institution disciplinary action, arrest, and criminal prosecution for violating any conditions(s) of the furlough;**

**(4)  May be thoroughly searched and given a urinalysis, breathalyzer, and other comparable test, during the furlough or upon return to the institution, and must pre-authorize the cost of such test(s) if the inmate or family members are paying the other costs of the furlough.  The inmate must pre-authorize all testing fee(s) to be withdrawn directly from his/her inmate deposit fund account;**

**(5)  Must contact the institution (or United States Probation Officer) in the event of arrest, or any other serious difficulty or illness; and**

**(6) Must comply with any other special instructions given by the institution.**

**(c)  While on furlough, the inmate must not:**

**(1)  Violate the laws of any jurisdiction (federal, state, or local);**

**(2)  Leave the area of his/her furlough without permission, except for traveling to the furlough destination, and returning to the institution;**

**(3)  Purchase, sell, possess, use, consume, or administer any narcotic drugs, marijuana, alcohol, or intoxicants in any form, or frequent any place where such articles are unlawfully sold, dispensed, used, or given away;**

**(4)  Use medication that is not prescribed and given to the inmate by the institution medical department or a licensed physician;**

**(5)  Have any medical/dental/surgical/psychiatric treatment without staff's written permission, unless there is an emergency.  Upon return to the institution, the inmate must notify institution staff if he/she received any prescribed medication or treatment in the community for an emergency;**

**(6)  Possess any firearm or other dangerous weapon;**

**(7)  Get married, sign any legal papers, contracts, loan applications, or conduct any business without staff's written permission;**

**(8)  Associate with persons having a criminal record or with persons who the inmate knows to be engaged in illegal activities without staff's written permission;**

**(9)  Drive a motor vehicle without staff's written permission, which can only be obtained if the inmate has proof of a currently valid driver's license and proof of appropriate insurance; or**

**(10)  Return from furlough with anything the inmate did not take out with him/her (for example, clothing, jewelry, or books).**

Each inmate approved for a furlough must agree to abide by the specified conditions on the Furlough Application - Approval and Record (BP-A0291).

Once the furlough is approved, the staff member releasing the inmate ensures that the inmate's mode of transportation is the same as that listed on the furlough form.

The Conditions of Furlough (see the standard conditions on the BP-A0291) apply to all inmates going on furlough or an transfer furlough.  Staff ensure that the inmate reads any additional condition(s) before signing the form.  If the Warden determines that additional conditions are warranted, they are added to the Special Instructions on the BP-A0291.

d. **Documentation of Furlough**.  Upon completion of a furlough, staff record in the Inmate Central File anything unusual that occurred during the furlough.

A member of the unit team conducts and documents a post-furlough interview with each inmate returning from a non-medical furlough, ordinarily no later than within three business days of the inmate's return, to determine if the furlough's purpose and conditions were met.

Normally, an entry in the Inmate Activity Record (BP-A0381) in the Inmate Central File, Section 2, is sufficient to document that a meaningful, timely post-furlough interview has taken place.  The entry (typed or legibly handwritten) includes:

- Furlough date(s).
- Date the interview was conducted.
- Purpose of the furlough and whether it was fulfilled.
- Summary of furlough activity, and any problems or concerns encountered by the inmate.
- Interviewer's signature.

Staff report anything unusual that occurred during a medical or non-medical furlough to the unit team via memorandum, which is filed in the Inmate Central File, Section 6, or Privacy Folder, Section 2.

Unit Staff contact the appropriate community resource (USPO, CSOSA, family, local law enforcement, etc.) to gather information when they learn that anything unusual occurred during a furlough.  Information from the inmate and any contacts is recorded in the post-furlough interview entry in the Inmate Activity Record.  Freedom of Information Act Exempt information is documented in a memorandum and filed in the Section 2 of the Privacy Folder.

An inmate who absconds from furlough or fails to meet any conditions of the furlough is deemed an escapee under 18 U.S.C. § 4082 and § 751.  D.C. Code offenders may also be subject to the provisions of D.C. Code § 22-2601.

Staff process as an escapee an inmate who absconds from furlough.

Staff may take disciplinary action against an inmate who fails to comply with any of the conditions of the furlough.  See the Program Statement **Inmate Discipline and Special Housing Units**.

## 11.  REPORTING PROCEDURES

Escapes or serious incidents that occur during a furlough must be reported via e-mail as soon as practicable to the Central Office and Regional Correctional Services Administrators.  See the Program Statements **Correctional Services Procedures Manual** and **Escapes/Deaths Notifications** for further information.

## 12.  AGENCY ACA ACCREDITATION PROVISIONS

*ACA Standards*
- 4th Edition Standards for Adult Correctional Institutions: 4-4443, 4-4444, 4-4445, 4-4501, 4-4500-1, and 4-4502.

- 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-5B-16 and 4-ALDF-5B-17.
- 2nd Edition Standards for Administration of Correctional Agencies:  None.

## REFERENCES

*Program Statements*

| | |
|---|---|
| P1490.06 | Victim and Witness Notification Program (5/23/02) |
| P5140.37 | Unescorted Transfers and Voluntary Surrenders  (1/31/03) |
| P5162.05 | Categorization of Offenses (3/16/09) |
| P5180.05 | Central Inmate Monitoring System (PS only) (12/31/07) |
| P5270.08 | Inmate Discipline and Special Housing Units (12/04/09) |
| P5380.08 | Financial Responsibility Program, Inmate (8/15/05) |
| P5500.12 | Correctional Services Procedures Manual (10/10/03) |
| P5553.07 | Escapes/Deaths Notifications (2/10/06) |
| P5800.15 | Correctional Systems Manual (1/1/09) |
| P6060.08 | Urine Surveillance and Narcotic Identification (03/08/01) |
| P7310.04 | Community Corrections Center (CCC) Utilization and Transfer Procedure (12/16/98) |
| P7331.04 | Pretrial Inmates (1/31/03) |

*United States Code*

| | |
|---|---|
| 18 U.S.C. § 751 | Prisoners in custody of institution or officer |
| 18 U.S.C. § 3622 | Temporary release of a prisoner (applicable to inmates whose offenses occurred on or after November 1, 1987 under the Comprehensive Crime Control Act (CCCA)) |
| 18 U.S.C. § 4082 | Commitment to Attorney General; residential treatment centers; extension of limits of confinement; work furlough (applicable to inmates whose offenses occurred before November 1, 1987) |

*Federal Regulations*
Regulations cited in this Program Statement are contained in 28 CFR §§ 570.30-38. Regulations referenced in this Program Statement are contained in 28 CFR Part 2 (Parole, Release, Supervision and Recommitment of Prisoners, Youth Offenders, and Juvenile Delinquents).

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport and BOPDOCS.

**Attachment A**

| Furlough  SENTRY Assignments | |
|---|---|
| **SENTRY Assignment** | **Description** |
| **Social Furloughs** | |
| FURL CRI | Crisis |
| FURL EDC | Educational |
| FURL REC | Recreational |
| FURL REL | Release Planning |
| FURL RLG | Religious Program |
| FURL TIES | Family/Community Ties |
| FURL CIV | Civic |
| **Legal Furlough** | |
| FURL LEG | Comply With Legal Process |
| **Training/Work Furloughs** | |
| FURL CSP | Community Service Project |
| FURL TRAIN | Training |
| **Medical Furlough** | |
| FURL MED | Medical |
| FURL MED E | Medical Emergency |
| **Transfer furloughs** | |
| FURL TR NC | Transfer furlough **Not** to RRC (i.e., to another institution) |
| FURL TRANS | Transfer furlough to a RRC |