## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES WHITTED, individually, and on behalf of all others similarly situated, <br><br> *Petitioner*, <br> v. <br><br> DIANE EASTER, Warden of Federal Correctional Institution at Danbury in her official capacity, <br><br> *Respondent*. | No. 3:20-cv-00569 (MPS) <br><br><br><br><br><br><br> December 17, 2020 |

## MOTION TO ENFORCE SETTLEMENT AGREEMENT

Petitioner-Class, by and through counsel of record, hereby submits this Motion to Enforce the Settlement Agreement. Specifically, Petitioner seeks an order for specific performance of the standards governing the BOP's home confinement process, as set forth in this Court's May 12 TRO and the Settlement Agreement, and other incidental relief.

Petitioner brings this motion because the Bureau of Prisons ("BOP")'s home confinement review process is, stated simply, significantly out of compliance with the Settlement Agreement. The statement of reasons on the BOP's worksheets often fail to evidence that the BOP has engaged in any balancing between public safety and inmate safety—let alone provided substantial weight to class members' COVID-19 risk as the Settlement Agreement requires. Worksheets regularly fail even to list, much less to consider, all of an individual's CDC risk factors. Decisions denying home confinement often rely on bases such as the percentage of time left to serve and/or a "Low" PATTERN score and/or minor, non-violent institutional misconduct as primary reasons for denial, without any individualized assessment of public safety risk. These errors violate the clear terms of

1

the Settlement Agreement and this Court's TRO standards, which the Agreement incorporates, and have had a devastating impact on medically vulnerable class members in the midst of a COVID-19 outbreak at Danbury.

For example, a 69-year-old woman who is serving a two-year sentence for a non-violent crime was denied home confinement because of "the percentage of time served for the offense" and unspecified "public safety concerns." This woman poses minimum risk according to the BOP's PATTERN score, has no history of violence, and no disciplinary infractions. She suffers from obesity and a history of upper respiratory infections. Class counsel have sought to have her home confinement denial reconsidered; that request is still pending.[1] Meanwhile, she has tested positive for COVID-19 and is now in medical isolation.[2]  In another distressing example, a 53-year-old woman who suffers from moderate-to-severe asthma and is overweight was denied because "[t]he current percentage of time served diminishes the seriousness of the offense," and because the BOP takes the view that she "does not have any risk factors that would put her at a higher risk of developing severe illness as a result of COVID-19 based on CDC guidelines."[3] She has a minimum PATTERN score (-7 points), no history of violence, no disciplinary infractions, and is incarcerated for a non-violent offense.[4] Class counsel's request that she be reconsidered for home confinement remains pending; meanwhile, she, too, has tested positive for COVID-19 and is now in medical isolation.

The result of this non-compliance is seen in the BOP's grant rate for home confinement. Out of approximately 466 medically vulnerable individuals reviewed since the Settlement

---

[1] *See* Review Packet for C.G., attached as Exhibit B (Class Member Re-Review Packets, hereinafter "Ex. B"), at 073-76.
[2] *See* Declaration of Alexandra Harrington, attached as Exhibit C, ¶ 23 (hereinafter "Harrington Decl., Ex. C").
[3] See Review Packet for S.S., Ex. B at 213.
[4] *See Id*. at 211-14.

Agreement was executed,[5] the BOP has approved for home confinement only 41, a rate of 9%. Prior to this Court's Temporary Restraining Order ("TRO"), the rate, according to Respondent, was 13% (21 of 159 individuals). *See* Dkt. 24-2, ¶ 78. In other words, just two months since the approval of the Settlement Agreement, it is now *less* likely for a medically vulnerable individual to be granted home confinement by the BOP than before this lawsuit was filed.

Class counsel has attempted to resolve these issues informally through meet and confers with the government and by requesting re-reviews for select cases that illustrate the BOP's non-compliance with the Settlement Agreement,[6] requesting that the BOP justify denials of home confinement for those class members granted release to a Residential Reentry Center (RRC), and requesting access to Presentence Reports (PSRs) in order to assess allegations made by the BOP in its worksheets. This process has been unsuccessful. Petitioner-Class now requests immediate action from the Court based on the outbreak of COVID-19 at FCI Danbury. The BOP has failed to meaningfully reduce the population of the facility in the nine months since the pandemic began.[7] And, in the past two weeks, over a tenth of the population at FCI Danbury has tested positive for COVID-19, and currently the BOP is not providing basic medical care to people who are sick, is

---

[5] Class counsel is awaiting home confinement decisions and worksheets for approximately 90 more medically vulnerable individuals, all of whom were accepted into the class more than 14 days ago. *See* Declaration of Sarah F. Russell, attached as Exhibit A, ¶ 5 (hereinafter "Russell Decl., Ex. A"). The Settlement Agreement requires that the BOP endeavor to produce these review worksheets to class counsel within 14 days. Dkt. 134-1, ¶ 6 ("BOP shall complete their home confinement review within a reasonable time from recognition and shall endeavor to do so within fourteen days").

[6] Class counsel has requested re-reviews for 59 medically vulnerable individuals thus far. Out of the ones the BOP has agreed to re-review, it has produced only 10 re-review worksheets—nine of which are virtually indistinguishable from the first non-compliant home confinement review—and have again denied home confinement. *Compare* Class Member Re-Review Packets, Ex. B, *with* Re-Review Worksheets, attached as Exhibit D (containing the "updated" worksheets and review decisions for class members that have been re-reviewed pursuant to the Settlement Agreement). Class counsel acknowledges that 15 of these 59 re-review requests were submitted very recently, on December 16, and does not expect the BOP to have responded to those requests by the time of this filing. The 10 re-review worksheets produced by the BOP are from re-reviews that were requested by Class counsel on October 27, 2020.

[7] *See* Dkt. 263, at 14 ("There are currently 899 individuals incarcerated at the facility—up from 825 at the time of the Fairness Hearing"). After this Court's involvement last week, the population is now 862. *See* FCI Danbury Website, *available at* https://www.bop.gov/locations/institutions/dan/.

subjecting sick individuals to poor conditions of confinement, and is not taking adequate measures to mitigate the outbreak. *See* Harrington Decl., Ex. C, ¶¶ 3-5, 22-25; *see also* Dkts. 270, 279.

Because the BOP is failing to comply with the terms of the Settlement Agreement, an order of specific performance is appropriate, both as to the BOP's home confinement review process and corresponding relief necessary to effectuate the terms of the parties' agreement.

## I.      THE SETTLEMENT AGREEMENT & MEET AND CONFER OBLIGATIONS.

### A.  The Settlement Agreement Guarantees Medically Vulnerable Individuals at Danbury the Process Set Forth in the Temporary Restraining Order.

The Settlement Agreement in this case incorporates the standards set forth by the Court in its May 12, 2020 TRO Order. Dkt. 134-1, ¶ 2 (describing a home confinement review "based upon the standards set forth in the May 12, 2020 TRO (see Dkt. 30)"); ¶ 3 (guaranteeing a home confinement review based on "the provisions of the May 12, 2020 TRO"); ¶ 6 (same); ¶ 8 (noting that the BOP will "mak[e] home confinement determinations under this Agreement pursuant to the May 12, 2020 TRO"); ¶ 11 ("if the Home Confinement Committee denies home confinement to a Medically Vulnerable Class member, it will comply with the May 12, 2020 TRO regarding a written explanation of the factual basis for any factors relied upon for the denial"). This Court spoke directly to the TRO's home confinement standards when it approved the Settlement Agreement, noting that the settlement "provides for review for all class members for eligibility for home confinement under standards set forth by this Court in its temporary restraining order rather than under the BOP's own standards." Dkt. 222, at 55:4-7.

As this Court knows, prior to the May 12 TRO, the BOP's home confinement review process made it extremely unlikely that medically vulnerable individuals at serious risk of injury or death due to COVID-19 would be transferred to home confinement. The BOP required medically vulnerable individuals to meet the following requirements, *inter alia*: (1) "PATTERN

risk score is MIN"; (2) "No Incident Reports in the past 12 months"; (3) "Inmate must have served at least 50% of their sentence"; and (4) "Primary Offense" is not violent offense or a sex offense. Dkt. 15-8 at 1. In the TRO, the Court ordered the BOP to eliminate these requirements. Indeed, categorical requirements for release formed the basis of the Court's determination that FCI Danbury's home confinement process was likely to prove deliberately indifferent to the care of medically vulnerable individuals—who would otherwise remain incarcerated needlessly and at great risk to their personal safety. *See* Dkt. 30, at 48 (explicitly disapproving of FCI Danbury "focusing on those who have served the larger portions of their sentences," rather than on those who demonstrated medical vulnerability, as a basis for issuance of the TRO); *id.* (noting that home confinement was being denied to "any inmate with an incident report in the past 12 months—no matter the seriousness"); *id.* (identifying that these and "[o]ther criteria in the inmate bulletins are […] at best, only tangentially related to public safety" and therefore inappropriate disqualifiers for home confinement for the medically vulnerable). The Court likewise noted the absence of any real engagement with the specific medical vulnerabilities faced by applicants for home confinement. *Id.* (noting that the BOP "evidence[d] a disregard for the seriousness of the health risk faced by vulnerable inmates").

The Court therefore ordered the BOP to remove agency requirements for home confinement and specifically ordered that the BOP:

1. "assign[] substantial weight […] to the inmate's risk factors for COVID-19 based on CDC guidance";

2. "eliminat[e] *all* requirements that the inmate have served some portion of his or her sentence to be eligible for placement on home confinement";

3. "eliminat[e] the requirement that the inmate be 'without incident reports in the past 12 months (regardless of severity level)'";

4. "eliminat[e] the requirement that a 'primary or prior offense' not be a violent offense";

5. show cause why a Minimum PATTERN Score is required to obtain release, which the BOP subsequently agreed and this Court ordered should not to be required of medically vulnerable individuals;[8] and

6. provide "an individualized explanation for each denial of home confinement […] including at least a brief description of the factual basis for any factors deemed to outweigh the danger to the inmate from COVID-19."

Dkt. 30, at 71-73, ¶¶ 2, 5.

The removal of these barriers and the explicit direction to consider medical vulnerability as a primary consideration in determining release compelled the BOP to limit its inquiry exclusively to a "proper and reasonable balancing of inmate safety and public safety" that is far "more individualized." Dkt. 30, at 71 n.33. The intended effect of the TRO was for the BOP to "immediately maximize[] appropriate transfers to home confinement [for] all appropriate inmates held at ... FCI Danbury." Dkt. 30, at 71, ¶ 2 (citing Attorney General Barr's April 3, 2020 Memorandum). The Settlement Agreement memorialized these TRO standards for the home confinement review process—which now govern the review process. *See* Dkt. No. 134-1, ¶ 3 (noting that "to the extent that the standards set forth in the May 12, 2020 TRO differ from [the Attorney General's memoranda or BOP guidance,] the provisions of the May 12, 2020 TRO shall control").

## B.  The Parties Have Met and Conferred, Unsuccessfully.

On October 27, 2020, following class counsel's review of more than a hundred worksheets provided by the BOP following execution of the Settlement Agreement,[9] and about a month after

---

[8] *See* Dkt. 55, at 9 (noting that Respondent's counsel had informed class counsel that the BOP would not disqualify an individual for home confinement based on a PATTERN score about Minimum); *see also* Dkt. 68, at 5 (this Court ordering the BOP to re-review individuals who were denied home confinement exclusively due to a "low" or "medium" PATTERN score).

[9] Assessing errors in the BOP worksheets is time-consuming, consisting of reviewing medical records, corresponding with class members, their criminal defense attorneys if involved, collecting records, etc. Class counsel also faced challenges in setting up legal calls and extended negotiations over how to provide information contained in the worksheets to individual class members.

this Court's fairness hearing, class counsel first approached the BOP regarding "widespread noncompliance issues" they identified.[10] Thus began a series of meet and confers both privately between the parties and extensively with Judge Farrish over seven weeks, in attempts to resolve these systemic issues without intervention from this Court. *See* Dkts. 252, 254, 258, 260-262. During this time, and up through this week, class counsel requested re-reviews on behalf of 59 medically vulnerable clients based both on violations of the TRO standards and factual errors in worksheets.[11] The BOP to date has reviewed and produced 10 worksheets that demonstrate, in 9 of the 10 cases, a home confinement consideration no different than the initial and non-compliant review—as evidenced by the same impermissible reasons for denial and refusal to explain why the individual's medical vulnerability is outweighed by the purported public safety concerns articulated.[12] It is therefore clear that the BOP continues to operate a deficient home confinement review process notwithstanding the parties' agreement. Having extensively met and conferred without success, the Petitioner-Class seeks relief from this Court in the form of corrective action to enforce the review process implemented under the Settlement Agreement for hundreds of vulnerable class members.[13]

---

[10] *See* Class Counsel Letters to U.S. Attorney's Office dated Oct. 27, 2020 & November 3, 2020, attached as Exhibit E, at 002-7, 008-9.

[11] Class counsel sought re-review for 21 individuals on October 27, 2020, and for an additional 23 individuals on November 18, 2020. Most recently, class counsel submitted an additional 15 individuals for re-review on December 16, 2020, such that the total number of individuals submitted for re-review is 59. We provide the Court with the re-review packets for each of these individuals. *See* Class Member Re-Review Packets, Ex. B. Because they are voluminous, class counsel have not included the medical records and other exhibits that were also included in the packets provided to BOP. Those materials are available upon the Court's request.

[12] After multiple meet and confer sessions with the assistance of Judge Farrish, class counsel agreed to a "test run" of re-reviews to assess whether the BOP's re-reviews complied with the TRO, with the expressed expectation that new re-review worksheets would be provided to class counsel by no later than December 11. Respondent agreed in principle to the test run, but has not produced any worksheets to date.

[13] The Court has retained jurisdiction over this matter "to the full extent necessary to enforce the terms of the Settlement pursuant to the terms set forth therein." (Dkt. No. 241). Under these circumstances, a breach of the parties' Settlement Agreement is a *per se* violation of this Court's dismissal order—which confers jurisdiction on this Court to issue remedial orders to cure the breach. *See, e.g.*, *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 381 (1994); *see also In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113, 134 (2d Cir. 2011) (acknowledging the power of federal courts to issue an injunction "to protect the integrity of a complex class settlement over which it retained jurisdiction").

## II.       ARGUMENT

To date, the government has produced to class counsel approximately 466 worksheets for medically vulnerable individuals who were reviewed for home confinement since execution of the Settlement Agreement. Of these, 422 class members—or over 90% of those reviewed—were denied home confinement.[14] The vast majority of these denials were premised on a statement of reasons that either arbitrarily and erroneously concluded the individual did not face a heightened risk of serious illness from COVID-19 despite having documented CDC risk factors, or failed to explain how the bases for denial demonstrated that their significant medical vulnerability was overcome by individualized public safety concerns. These stock, non-individualized decisions effectively bar class members from being genuinely considered for home confinement in violation of the Settlement Agreement. In addition, the majority of the worksheets contain reasons for denial of home confinement that are impermissible under the Settlement Agreement because they are unrelated to public safety. Class counsel provide a descriptive review of these errors as follows:

- 129 out of 391 (33%) reasons for denial claim that medically vulnerable class members do not have a condition that puts them at increased risk of serious injury or death due to COVID-19, often despite the presence of a clearly documented CDC risk factor on the face of the BOP's review worksheet;

- In a review of underlying medical records in 84 cases, 58 (70%) of home confinement worksheets were missing at least one or more of over 100 different CDC risk factors, which therefore were not considered by the BOP in conducting its home confinement reviews for these individuals;

---

[14] *See* Russell Decl., Ex. A, ¶ 6. Forty-one individuals were granted home confinement, and 31 were approved for Residential Reentry Center (RRC) placement. *Id*.

- 141 out of 391 medically vulnerable individuals (36%) have been denied home confinement in part due to a Low PATTERN Score, which is a risk score that BOP reserves for individuals who are *unlikely* to return to prison;

- 254 out of 391 medically vulnerable individuals (65%) have been denied home confinement in part due to the percentage or amount of time left on their sentence;

- 102 out of 391 medically vulnerable individuals (26%) have been denied home confinement in part due to ostensibly non-violent disciplinary history;

- An additional 31 individuals have been denied home confinement without explanation simply because they have been approved for release to a halfway house.

Russell Decl., Ex. A, ¶¶ 6-10.

Collectively, these reviews reveal a process that is utterly failing to provide a "proper and reasonable balancing of inmate safety and public safety" or the requisite "individualized" review. Dkt. 30, at 71 n.33. In failing to meet these standards articulated in the Court's TRO, the BOP's home confinement reviews violate the Settlement Agreement.

### A. The BOP's Failure to Identify and Give Substantial Weight to All of an Individual's CDC Risk Factors Violates the Settlement Agreement.

The Settlement Agreement requires the BOP to identify, list, and consider all relevant CDC medical conditions (Dkt. No. 134-1 ¶¶ 7, 10), to give "substantial weight" to COVID-19 risk factors (*id.* ¶ 8), and, importantly, to "comply with the May 12, 2020 TRO regarding a written explanation of the factual basis for any factors relied upon for the denial." *Id.* ¶ 11. In turn, the TRO mandates that an individualized explanation of the denial decision include a "factual basis for any factors deemed to outweigh the danger to the inmate from COVID-19." Dkt. 30, at 73, ¶ 5. The BOP is not complying with these requirements.

The vast majority of home confinement worksheets reviewed by class counsel explicitly discount documented COVID-19 risk factors as irrelevant and/or offer no particularized explanation for why those factors are outweighed by public safety concerns. Many fail to identify all of an individual's CDC conditions, and often do not recognize age in particular as a specific CDC risk factor. Collectively, these errors evince a home confinement review process that "evidence[s] a disregard for the seriousness of the health risk faced by vulnerable inmates." Dkt. 30, at 48.

1. The BOP's Statements of Reasons for Denial Indicate the BOP is Not Applying a "Substantial Weight" Standard in Assessing Suitability for Home Confinement.

By incorporating the TRO standards, the Settlement Agreement requires the BOP to give "'substantial weight . . . to the inmate's risk factors for COVID-19 based on CDC guidance" and provide a "factual basis for any factors deemed to outweigh the danger to the inmate from COVID-19" prior to denying a medically vulnerable individual home confinement. Dkt. 30, at 71, 73, ¶¶ 2, 5. The substantial weight given to COVID risk is to be balanced against public safety. *Id.* at 70 n.33 (noting that the inquiry is one that provides a "proper and reasonable balancing of inmate safety and public safety").

But the review worksheets provided by the BOP make it impossible to tell whether this standard has been complied with. Exceedingly few of the 466 review worksheets provided to class counsel since the Settlement Agreement was executed appear to give substantial weight to an individual's CDC conditions or to provide any justification for why an individual's medical vulnerability—their risk of serious injury or death based on the relevant CDC conditions—fails to outweigh competing public safety concerns. *See* Dkt. No. 134-1 ¶¶ 10, 11 (the BOP will "comply with the May 12, 2020 TRO and provide a written explanation of the factual basis for any factors relied upon for the denial"). Instead, often, the only explanation given is that the BOP considered

the "totality of circumstances to include medical risk factors" followed by purported reasons that fail to explain how substantial weight was provided or how the BOP balanced inmate and public safety. For example, a 69-year-old woman suffering from obesity and a history of upper respiratory infections was denied after review "based on the totality of the circumstances to include medical risk factors," citing only the percentage of time served and unexplained "public safety concerns."[15] In another instance, a 63-year-old man with obesity, Type II diabetes, and uncontrolled hypertension that recently required hospitalization, among other medical issues, was similarly denied after review "based on the totality of the circumstances to include medical risk factors," citing "his low recidivism risk level, [purported] lack of a viable release plan, as well as the amount of time remaining on his sentence,"[16] without any explanation of why his extreme medical vulnerability failed to outweigh reasons for denial facially unrelated to public safety risk.

The result is, in effect, a system where the BOP asks class counsel and this Court to simply trust that the TRO standards are being correctly applied. This is precisely the situation that was to be avoided under the review procedures established by the Settlement Agreement. Dkt. 218, at 39 ("Class Counsel have secured a settlement that ensures Counsel will remain an integral part of the home confinement review process under the supervision of this Court—insulating protections for medically vulnerable individuals from further alteration").[17] Without an adequate statement of reasons, review of the BOP's decision, and whether it applied the required standard, is frustrated.

---

[15] C.G., Ex. B at 075. In addition to her advanced age, she is serving a 24-month sentence for a non-violent crime, has a minimum PATTERN score (-6 total points), no criminal history or history of violence, and a spotless institutional record.  Nothing in her home confinement review materials demonstrate "public safety" risk, much less one that would outweigh the enormous risk to her health in light of her advanced age and medical conditions. *See* Ex. B at 073-74.

[16] S.A., Ex. B at 209. He is incarcerated for a non-violent crime, and has a PATTERN score of 11—only one point away from the "minimum" cutoff—reflecting no history of violence and no recent institutional misconduct, among other accomplishments. He has served more than 56% of his sentence, and has a viable release plan.

[17] Indeed, the BOP's repeated reference to consideration of "a totality of the circumstances to include medical risk factors" suggests that BOP is using an incorrect standard in making its determinations (i.e., a standard where COVID risk is not given substantial weight but is simply considered one of a number of other factors).

Where a statement of reasons reflects that the BOP has failed to provide "substantial weight" to the appropriate COVID risk factors, the statement is demonstrably inadequate. *See*, *e.g.*, *Pate v. Saul*, No. 3:19-CV-00633-FDW-DSC, 2020 WL 6216817, at *4 (W.D.N.C. Oct. 22, 2020) (overturning decision in social security benefits case in part because conclusory statements failed to "provide persuasive, specific, and valid reasons for giving less than substantial weight" to an appropriate consideration).[18] The BOP's written denial must therefore reflect that substantial weight was actually given to the risk factors, and provide an individualized explanation of the factors significant enough to outweigh the risk to the person's health. *See*, *e.g.*, *In Re William M. Palmer*, 238 Cal. Rptr. 3d at 69 (identifying that the "great weight" requirement in a juvenile parole statute creates a default presumption of suitability for release "absent substantial evidence of countervailing considerations that indicate unsuitability"). The BOP has consistently failed to meet this obligation.

In the meet and confer process, the BOP contended that because the parties agreed as to the *form* that the home confinement worksheets would take as part of the Settlement Agreement (Dkt. 134-1, ¶ 11), that the class has waived its ability to challenge the contents of any particular reasons for denial as violative of the TRO standards. But Respondent failed to explain how an

---

[18] In the context of juveniles serving lengthy adult prison sentences, it is often required that the parole board give special weight to youth-related factors, and cases determining the contours of this similar requirement are instructive here. For example, in California, the parole board is required by statute to give "great weight to the diminished culpability of youth." Cal. Penal Code § 4801. A California appellate court has determined that, when giving "'great weight' to the youth offender factors, the Board must accept those factors as indicating suitability for release on parole absent substantial evidence of countervailing considerations indicating unsuitability." *In Re William M. Palmer*, 238 Cal.Rptr.3d 59, 69 (Cal. App. 2018) (unpublished, review granted). The youth-related factors must be treated as *more significant* than "the regulatory and other factors it conventionally relies upon to determine whether a [] prisoner is suitable for release." *Id.* at 72. The board is therefore required to give a statement of reasons that "satisfactorily explains" the decision when it does not find the youth offender suitable for release, despite the youth factors being present, to ensure that the board properly applied "great weight" to these factors. *Id.* at 75; *see also Rivera v. Stanford*, 172 A.D.3d 872, 874 (N.Y. App. Div. 2019) (concluding that parole board's statement of reasons for denying parole to juvenile demonstrated insufficient consideration of youth and reflected that the "determination appears to be solely based on the seriousness of the crimes he committed").

agreement as to form automatically translates an agreement as to content, let alone compliance with the terms of the Settlement Agreement. And, plainly, the very purpose of the Settlement Agreement was to establish a home confinement review process through which class counsel has the opportunity to challenge any denials that are non-compliant. *See*, *e.g.*, Dkt. 222, 27:9-15 (Respondent's counsel noting that "class counsel wanted to make sure that there was something in the agreement to make sure that they could hold us accountable if we didn't do, you know, what we promised to do").

2. <u>Numerous Worksheets Fail to Even List All of an Individual's CDC Conditions</u>

The Settlement Agreement requires that "a medical clinician employed or appointed by Respondent or BOP will verify that all Tier 1 medical conditions and Tier 2 medical conditions that each such inmate has, based on qualifying medical records as set forth in Section 4(e) herein, are identified and listed for consideration at both the institutional and Home Confinement Committee levels of review." Dkt. No. 134-1, ¶ 7. Furthermore, the review worksheets must include "a list of the person's CDC tier one and tier two COVID-19 risk factors." *Id.* ¶ 10. But in numerous cases, BOP has failed to meet its obligations to identify, list, and consider each class member's full set of CDC risk factors.

For example, in an initial set of 84 worksheets reviewed by class counsel during the meet and confer process, over 70 percent were missing at least one COVID-19 risk-factor apparent in the individual's BOP medical records. In total, in those 84 cases, there were at least 101 different CDC risk conditions that the BOP missed in its review. This includes, among many similar examples, the review worksheet of a 57-year-old man who suffers from thoracic aneurysm—a serious heart condition and Tier I CDC risk factor—obesity (BMI of 37.2, also a Tier I CDC risk

factor), and hypertension.[19] His worksheet identified sleep apnea as his only risk factor, and misidentified his age as 31.[20] In another example: the worksheet of a 55-year-old man who suffers from obesity, hypertensive heart disease, history of smoking, hypertension, and has only one lung due to a prior operation, among other medical risk factors, similarly identified "sleep apnea" as his only medical condition.[21] Class counsel continues to review medical records for the remainder of the class.

Accurately listing an individual's CDC risk factors is not merely a question of technical compliance with the Settlement but one of primary importance to the health and safety of medically vulnerable individuals. According to the CDC, "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[22] Without identifying the full set of risk factors, the BOP cannot meaningfully assess a class member's specific medical risk of developing severe illness as a result of COVID-19. Failure to identify and consider a COVID risk factor therefore necessitates re-review.

   3.   <u>Many Worksheets List CDC Risk Factors but Then Appear to Discount Them as Irrelevant</u>

In many instances, a home confinement review worksheet lists a CDC condition but then explicitly discounts the risk in its statement of reasons, denying home confinement in whole or part because that person purportedly "does not have any risk factors that would put him/her at a

---

[19] A.P., Ex. B at 178.
[20] *Id.*
[21] E.P., Ex. B at 163. After class counsel identified these errors to the BOP in seeking re-review, he was reviewed again. His new worksheet listed obesity, hypertension, hypertensive heart disease, and prior smoking, but again failed to mention that he has only one lung. Ex. D at 009. He was again denied "based on the totality of the circumstances to include medical risk factors" because of "the national publicity of his current offense, public safety concerns, amount of time remaining on his sentence, as well as the percentage of time served for the current offense." *Id.* He is incarcerated for a non-violent crime and has a minimum PATTERN score (-11 points) reflecting no criminal history or history of violence and an impeccable institutional record, among other accomplishments. *See* Ex. B at 161-62.
[22] "People with Multiple Underlying Conditions," CDC (last updated Dec. 1, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

higher risk of developing severe illness as a result of COVID-19 based on CDC guidelines." It appears the BOP makes this assertion most frequently when a person has Tier II rather than Tier I risk conditions—although the statement does appear in some worksheets where an individual has a Tier I condition.[23] For example, a 50-year-old man with a BMI of 28 and hypertension—both Tier II risk factors—identified on his worksheet was denied because he "does not have any risk factors that would put him at higher risk of developing severe illness as a result of COVID-19 based on CDC guidelines."[24]

Notably, at the time the TRO issued in May 2020, *all* of the conditions listed by the CDC were described as ones that "might" increase the risk of severe illness, as is now the designation for Tier II conditions. As the parties and this Court recognized at that time, "might" obviously means something in evaluating risk. It is therefore not accurate to say that someone with a Tier II CDC risk factor is not or would not be at higher risk due to COVID.[25] In fact, the CDC says that such a person might be at higher risk based on available research (unlike a person who does not have such a condition). Tier II conditions should therefore be given substantial weight in the home confinement assessment, as they were following issuance of the TRO, and as is plainly required under the terms of the Settlement Agreement itself. Dkt. No. 134-1 ¶¶ 7, 10 (requiring the BOP to list and consider both Tier I and Tier II conditions for each home confinement review).

---

[23] The CDC's guidance states that "adults of any age with the following conditions are at increased risk" and then lists various conditions. *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention (last updated Dec. 1, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. These are the so-called Tier I conditions. The guidance then states: "COVID-19 is a new disease. Currently there are limited data and information about the impact of many underlying medical conditions and whether they increase the risk for severe illness from COVID-19. Based on what we know at this time, adults of any age with the following conditions might be at an increased risk for severe illness from the virus that causes COVID-19." The conditions that follow that explanation are the Tier II conditions.

[24] In the box on his review worksheet for "COVID Risk Factor," the BOP has written "**NONE** 28% BMI and hypertension." *See*, O.F., Ex. B at 059.

[25] Letter from Dr. Jaimie P. Meyer, attached as Exhibit F, at p. 1-2.

When the BOP purports that medically vulnerable class members "do[] not have any risk factors that would put [them] at higher risk of developing severe illness as a result of COVID-19," the BOP errs by failing to assign CDC risk factors any weight at all, let alone "substantial weight," as required by the TRO. *See* Dkt. No. 30, at 71, ¶ 2(a); *see also id.* at 49 ("*See* Dkt. No. 30, at 49 ("[T]he lack of any express mention of such factors . . . suggest[s] that prison officials are not giving these risk factors the weight they plainly deserve.")

4. There is no Indication that the BOP is Considering Age as a Risk Factor Unless a Person is 65 or Older

It also appears that the BOP is failing to give weight to a person's age in the home confinement evaluation. The CDC says: "The risk for severe illness with COVID-19 increases with age, with older adults at highest risk. For example, people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s. The greatest risk for severe illness from COVID-19 is among those aged 85 or older."[26] The CDC guidance contains the following chart:

| Age | Hospitalization | Death |
|---|---|---|
| 18-29 years | Comparison group | Comparison group |
| 30-39 years | 2x higher | 4x higher |
| 40-49 years | 3x higher | 10x higher |
| 50-64 years | 4x higher | 30x higher |
| 65-74 years | 5x higher | 90x higher |
| 75-84 years | 8x higher | 220x higher |
| 85+ years | 13x higher | 630x higher |

---

[26] *See Older Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Dec. 13, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

Moreover, age combined with underlying medical conditions increases risk still further. *See If You are at Higher Risk*, Harvard Medical School (last updated Nov. 23, 2020), *available at* https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk ("The risk of serious illness or death from COVID-19 increases steadily with age. This is true whether or not you also have an underlying medical condition, although the sickest individuals and most of the deaths have been among people who were both older and had chronic medical conditions . . . .").

Yet despite the significance of a person's age in assessing COVID risk, the BOP's home confinement worksheets contain no indication that age was weighed in the analysis where the individual was under 65. For example, a 63-year-old man who is overweight and suffers from hypertension was denied in part because he "does not have any risk factors which would put [him] at a higher risk of developing severe illness as a result of COVID-19 based on CDC guidelines," showing clearly that his age was not considered a risk factor or given weight in his home confinement review.[27] For individuals age 65 or older, some worksheets list age under "COVID

---

[27] S.B. Ex. B at 027. S.B. is incarcerated for a non-violent crime, has a minimum PATTERN score, and has served more than 50% of his sentence. *See* Ex. B at 025-26. The only other reason given for denial was that "[t]he current percentage of time served diminishes the seriousness of the offense." Ex. B at 027. Notably, in addition to failing to consider S.B.'s hypertension, age, and BMI as COVID risk factors, S.B.'s worksheet did not reflect that his sentence had been reduced and he has thus served more than 50% of the sentence.

    Respondent has asserted that S.B. is not entitled to re-review because he was transferred out of FCI Danbury in late September 2020 and is currently at MDC Brooklyn. But members of the Medically Vulnerable Class are entitled to a home confinement review in compliance with the standards set forth in the Agreement regardless of whether they are transferred from the facility to another BOP facility after the Effective Date of the Agreement.

    The Agreement defines the Medically Vulnerable Class as "any person incarcerated at FCI Danbury anytime from the Effective Date until the termination date of this Agreement, October 31, 2021, unless otherwise modified by the parties pursuant to the terms of this Agreement, who either: (a) is a List One Inmate or List Two Inmate, or (b) possesses one or more underlying medical conditions which, according to current CDC guidance (i.e., the CDC guidance in effect at the time of the individual's home confinement review), either (i) places that inmate at increased risk of severe illness from COVID-19 ("Tier 1 medical conditions"); or (ii) might place that inmate at an increased risk of severe illness from COVID-19 ("Tier 2 medical conditions")."

    S.B. is a "List Two Inmate" and was still incarcerated at FCI Danbury following the Effective Date of the Agreement. He thus fits the Agreement's definition of a Medically Vulnerable Class member and is entitled to a home confinement review in compliance with the Settlement Agreement. As a result of the Agreement, S.B. lost the ability to pursue an individual 2241 petition in this district seeking release to home confinement based on his medical vulnerabilities. Indeed, he had filed such a petition in May 2020 seeking release and this petition was

Risk Factor" while many others do not. Even in cases where the person is 65 or older, *none* of the worksheets mention age in the case narrative or in the statement of reasons for the denial.[28]

Under the Settlement Agreement, the risk to an individual from COVID must be given substantial weight and balanced against public safety risk. If a person's COVID risk has not been accurately assessed based on a failure to properly consider the increased risk to older adults then the weighing process must be redone. *See* Dkt. 222, at 22:10-20 (noting the parties' shared understanding that "age is a balancing factor along with other circumstances and that the older you get, the greater that you consider the age as a factor").

### B.   The BOP is Impermissibly Denying Home Confinement for Reasons Unrelated to Public Safety or Without Explaining Relation to Public Safety.

The Settlement Agreement requires that each class member receive an individualized review that balances the safety of class members and the public. *See* Dkt. 134-1, ¶ 8; Dkt. 30, at 56–57, 71 n.3 (explaining that the home confinement review process ordered by this Court "must be individualized" and aimed at achieving "a proper and reasonable balancing of inmate safety and public safety"). In its TRO Order, the Court specifically identified three factors for balancing inmate versus public safety and determining when home confinement placement is appropriate: "[1] the severity of the risk faced by the inmate from COVID-19 in light of his or her age and medical history, [2] the danger the inmate presents to the residents of the home environment under consideration, and [3] the danger to the public at large." Dkt. 30, at 56. As this Court indicated in

---

pending at the time the Agreement was signed. In return, S.B. was entitled to, and expected, a home confinement review under the Agreement. BOP is bound by the terms of the Agreement and committed to providing all Class members with a review in compliance with the terms of the Agreement. Notably, S.B. is now at MDC Brooklyn, where COVID rates are exploding. *See* Editorial, *Stop the Coronavirus Outbreak at Brooklyn's Federal Jail*, N.Y. Times, Dec. 8, 2020. As of today, there are 113 positive cases at the facility. S.B. is entitled to a home confinement review in compliance with the Agreement.

[28] See, for example, C.G., Ex. B at 075 and H.M., Ex. B at 126, citing only "the totality of the circumstances to include medical risk factors" in denying home confinement to a 69-year-old woman and 79-year-old man, respectively.

the TRO when it ordered the BOP to eliminate requirements for home confinement that were "at best, only tangentially related to public safety," the TRO and Settlement Agreement do not authorize consideration of circumstances not actually related to inmate safety, home environment safety, or public safety. Dkt. 30, at 48; *see also id.* at 57 (noting that an appropriate home confinement review process should "focus on the critical issues of inmate and public safety"). Nonetheless, the BOP has denied many people access to life-saving home confinement based on factors whose relationship to public safety is either non-existent, at best only tangential, or without the required individualized assessment.

In many cases, these compliance errors arose because the BOP failed to consider an individual's actual underlying behavior—instead denying them for the broad category their behavior nominally falls into (e.g., denying someone placement on home confinement for their "history of escape" in reference to a 1996 Failure to Appear).[29] This failure to conduct an individualized assessment violates the TRO, as a review cannot be an "individualized consideration" when it fails to account for an individual's actual acts. Dkt. No. 30, at 60. Class counsel detail three common types of non-compliance below – reliance on "Low" PATTERN scores, the amount or percentage of time served, and non-violent disciplinary history – that demonstrate the BOP's failure to conduct an individualized assessment and, at times, indicate a categorical denial based on impermissible factors.[30] The Petitioner-Class asks that this Court clarify what considerations can fairly be considered relevant enough to public safety to justify

---

[29] B.W., Ex. B at 235.
[30] In addition to these three common bases for denials, class counsel has noticed numerous instances of medically vulnerable individuals denied home confinement due to the offense of conviction without individualized assessment, in violation of the TRO and contrary to the representation of Respondent's counsel. *See, e.g.*, Ex. B at 147, 159, 178.

denial of home confinement for medically vulnerable individuals who face heightened risk of serious illness from exposure to COVID at FCI Danbury.[31]

    1.  <u>Low PATTERN Score Improperly Used as Evidence of Public Safety Risk.</u>

To date, the BOP has denied 141 individuals home confinement in part based on a Low PATTERN score. Such denials simply state that an individual is "inappropriate for placement on home confinement due to [their] low recidivism risk level." A Low PATTERN score has been a reason for denial for 30% of the Class (albeit not a bar to release in several seemingly indistinguishable cases in which home confinement has been granted notwithstanding Low or Medium PATTERN scores).[32] Class counsel cannot surmise how a "Low" PATTERN score indicates that any medically vulnerable inmate's risk of serious illness is outweighed by public safety when the BOP's *own* metric shows that the individual poses a low risk of recidivism and has made a concerted effort to better themselves through education, program completion, and work programs. If anything, a "Low" PATTERN score stands for the fact that someone is precisely the kind of candidate unlikely to return to prison and therefore particularly suitable for home confinement.

The BOP's own guidance on PATTERN scores shows that "Low" PATTERN scores are not a legitimate cause for public safety concern. In its First Step Act risk assessment guide, the BOP refers to a hypothetical inmate with a Low PATTERN score as a "model inmate" who has

---

[31] Clarity from the Court is necessary because, in addition to the three common problems addressed in this motion, class counsel have noticed other bases for denial that, on their face, do not appear to comply with the requirement to balance a class member's safety with that of the public. For example, one individual was denied home confinement because of the "publicity" of his underlying criminal case, without any explanation as to how this publicity posed a risk to public safety. Ex. D at 009.

[32] *See*, e.g., Review Worksheets of S.A., Ex. G at 002 (granting home confinement notwithstanding Medium PATTERN score); E.C., Ex. G at 006 (same); J.M., Ex. G at 013 (same); C.A., Ex. G at 003 (granting home confinement notwithstanding Low Pattern score); A.C., Ex. G at 004 (same); J.C., Ex. G at 007 (same); F.C., Ex. G at 009 (same); H.C., Ex. G at 005 (same); S.C., Ex. G at 008 (same); M.D., Ex. G at 010 (same); H.Q., Ex. G at 019 (same); B.W., Ex. G at 024 (same), E.Y., Ex. G at 026 (same).

"complete[d] maximum programs and no infractions."[33] Prior to the COVID-19 pandemic, the BOP also identified that individuals with Low PATTERN scores are exactly those for whom the home confinement program was designed. *See* BOP Operations Memorandum 001-2019 ¶ 1 (Stating that for "inmates that have *lower* risks of reoffending in the Community [...] The Bureau currently utilizes home confinement for these inmates") (emphasis added).[34] In fact, the government's most recent filing supports the view that individuals with "Low" PATTERN scores are well positioned for home confinement. *See* Anderson Decl., Dkt. 276-2, at 26 (noting that both "minimum" and "low" risk individuals are eligible for traditional community supervision programs).[35]

Denying someone for having a Low PATTERN score also implies that Minimum PATTERN scores are necessary for release to home confinement, in violation of the Settlement Agreement. Following an order to show cause from this Court, the BOP committed that Minimum scores will not be required for home confinement eligibility. *See* Dkt. No. 55, at 9 (noting that the BOP informed Class Counsel that individuals with PATTERN scores above Minimum would no longer be categorically ineligible for consideration in response to the Court's order to show cause in the TRO); Dkt. No. 30 at 72 ¶ 2b (ordering Respondent's counsel to "[f]ile a statement on the docket explaining why the Court should not also require the review process described in paragraph 2a. to eliminate or modify the requirements that the PATTERN risk score be "MIN"). The BOP's

---

[33] U.S. DEP'T OF JUSTICE, *The First Step Act of 2018: Risk and Needs Assessment System* (Jan. 2020) at 27, *available at* https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.
[34] BOP Operations Memorandum 001-2019, *available at*: https://www.bop.gov/policy/om/001-2019.pdf.
[35] The personal data underlying Low PATTERN scores are often fundamentally unrelated to public safety. Male persons receiving 11 to 33 points are assigned a "Low" score in the risk assessment tool. But a male individual under age 40 will receive 21–35 points from age alone. Of the individuals denied for "Low" PATTERN scores, a sizable number received "Low" PATTERN scores due almost entirely to their age—an immutable characteristic that has little to do with public safety. *See Algorithmic Risk Assessment and COVID-19: Why PATTERN Should Not Be Used.* Partnership on AI. April 30, 2020. At https://www.partnershiponai.org/wp-content/uploads/2020/04/Why-PATTERN-Should-Not-Be-Used.pdf.

agreement to eliminate the Minimum PATTERN score is fully consistent with the TRO's requirement that the home confinement review process be "more individualized and more amenable to a proper and reasonable balancing of inmate safety and public safety." Dkt. No. 30, at 71 n.33. By contrast, the continuous denial of individuals for having a Low PATTERN score fails to comply with the TRO by denying individuals home confinement on a basis that actually cuts in favor of release—and certainly does not implicate public safety concerns that could justify denying a medically vulnerable individual home confinement during the pandemic. The Petitioner-Class therefore asks this Court to prohibit the BOP from using a Low PATTERN score as a basis for home confinement denial under the Settlement Agreement.

   2.   Percentage of Time Served or Amount of Time Remaining, Without More, is a Prohibited Basis for Denial of Home Confinement.

The Settlement Agreement, through its incorporation of the TRO, mandates the BOP to "eliminat[e] all requirements that the inmate have served some portion of his or her sentence to be eligible for placement on home confinement." Dkt. No. 30, at 71, ¶ 2(a).[36] Under the TRO, the BOP may not rely on these considerations at all in denying home confinement absent individualized nexus to the public safety risk of release to home confinement, which then must be included as part of the "individualized explanation" required by the Settlement Agreement. *See* Dkt. No. 30 at 60, 70 n. 33 ("The purpose of eliminating these and other categorical exclusions is to make the process more individualized and more amenable to a proper and reasonable balancing of inmate safety and public safety"); *see also* Dkt. No. 134-1, ¶ 11 (requiring individualized explanation). As this Court identified in its TRO, time served will continue to be one of the factors

---

[36] The TRO clearly instructed that time served had played a misguided role in denying home confinement to medically vulnerable individuals notwithstanding their serious risk of injury of death due to COVID. *See* Dkt. 30, at 48 ("And the Warden's description of the home confinement review process suggests that, rather than prioritizing review based on age, medical history, and COVID-19 risk factors, FCI Danbury is focusing on those who have served the larger portions of their sentences").

that is "unrelated to medical vulnerability and, at best, only tangentially related to public safety." *Id.* at 48.

The BOP has nevertheless continued to use time served as a basis to deny home confinement to medically vulnerable individuals—as it did prior to the TRO. Class counsel have identified at least 254 worksheets denying home confinement at least in part due to percentage of time served or time remaining on sentence. For example, two individuals were denied based only on percentage served/amount remaining and having no CDC risk factors, when they in fact have risk factors.[37] One is a 53-year-old woman with moderate to severe asthma and BMI over 25.[38] The other is 63 years old, has hypertension, and is overweight.[39] In another case, a 37-year-old woman with obesity was denied home confinement in part due to the percentage of time served, where her ultimate sentence was merely 13 months, with no explanation of why a small percentage of time served related to public safety in a case involving such a small imposed sentence.[40]

BOP's rationale for using percent of time served and amount of time remaining to deny individuals home confinement is unclear, particularly as the agency has approved people for home confinement with similar profiles. Indeed, the agency has approved for home confinement people who have served even smaller percentages of time served—for example, D.M., who had served merely 2.9% of her sentence at the time she was approved for home confinement, and R.G., who had served only 8.8% of her sentence.[41] It has also approved people with even more time remaining on their sentences, including S.C., who was approved despite having approximately 13 years remaining on his sentence.[42] This inconsistency belies the actual significance of these factors to

---

[37] *See*, S.B. and S.S., Ex. B at 027, 213.
[38] S.S., Ex. B at 213.
[39] S.B., Ex. B at 027.
[40] I.S., Ex. B at 198.
[41] Ex. G at 014, 012.
[42] Ex. G at 008.

the BOP in evaluating public safety.[43]

To comply with the Settlement Agreement, the BOP must do more than mindlessly invoke that the amount of time served "meaningfully diminish[es] the seriousness of the offense" for every medically vulnerable individual denied home confinement, it must provide (if it can) an individualized explanation as to why or how the time served relates to public safety. A once-in-a-lifetime pandemic has transformed a limited stint at FCI Danbury into an unbearable risk of serious illness or potentially a death sentence. Dkt. No. 30, at 50 (noting that home confinement is the "sole measure capable of adequately protecting vulnerable inmates"). Home confinement when granted ensures that pronounced punishments stay as close to proportionate for the crime as this monumental public health crisis allows. Because percentage of time served is, at best, tangentially related to public safety, the BOP violates the Settlement Agreement if it relies on it as a basis to deny home confinement—both on its own or in conjunction with other factors—unless the BOP provides specific information about why time served is related to public safety for the particular individual being reviewed for home confinement.[44]

---

[43] *See also* Dkt. 288 (recognizing that the BOP had failed to "endeavor" to release individuals approved for home confinement within 14 days in violation of the Settlement Agreement).

[44] Moreover, the length or percent of sentence served is not meaningfully connected to deterrence, recidivism, or, accordingly, public safety. Rather, "most studies find higher recidivism rates among individuals receiving custodial sentences regardless of sentence length than among individuals receiving non-custodial sentences." Steven N. Durlauf and D. Nagin, *Imprisonment and Crime: Can Both Be Reduced?*, 10:1 CRIMINOLOGY & PUB. POLICY 13 (2011). Similarly, numerous studies have found "little evidence that increases in the severity of punishment yield strong marginal deterrent effects." Steven N. Durlauf and D. Nagin, *The Deterrent Effect of Imprisonment*, CONTROLLING CRIME (P. Cook, J. Ludwig, and J. McCrary, eds., Univ. of Chicago Press 2011); *see also* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of imprisonment?*, 31 CRIME, LAW, AND SOCIAL CHANGE 347 (1999) (examining incarceration and crime data from 1972-1993 and finding no meaningful evidence of deterrence, concluding "imprisonment does not appear to deter most criminals").

Indeed, a Department of Justice report concluded that short prison sentences are just as likely as long sentences to deter low-level drug offenders with minimal criminal histories from future offending. The report observed:

> The great majority of recidivism studies of State prison releasees and all studies of Federal prison releasees report that the amount of time inmates serve in prison does not increase or decrease their likelihood of recidivism, whether recidivism is measured as a parole revocation, rearrest, reconviction, or return to prison . . . . Since at least the 1950s, the Federal Bureau of Prisons Office of Research and Evaluation has continually examined recidivism predictors, including time served,

3. <u>Non-Violent Institutional Misconduct as a Basis for Denial, Without More, Violates the Settlement Agreement.</u>

Denying home confinement to medically vulnerable individuals based on non-violent disciplinary conduct was yet another reason the Court found that the BOP's home confinement review process was likely to prove deliberately indifferent to the needs of the medically vulnerable prior to this Court's TRO. *See* Dkt. 30, at 48 ("Other criteria in the inmate bulletins are similarly unrelated to medical vulnerability and, at best, only tangentially related to public safety. For example, any inmate with an incident report in the past 12 months—no matter the seriousness—is deemed ineligible for home confinement, regardless of any health condition he or she might have"). The mere fact of disciplinary history is not related to public safety when it is only ostensibly for a non-violent, routine rules violation. *See* Dkt. No. 30, at 71, ¶ 2(a) ("eliminating the requirement that the inmate be "without incident reports in the past 12 months (regardless of severity level)"; *see also* Dkt. 68, at 5 (this Court ordering re-review where the reasons for denial only included certain factors, including "non-violent or non-sexually related disciplinary infractions," where it seemed that others with a similarly routine disciplinary record had been granted home confinement). Even where disciplinary history appears by its category to be potentially more serious, that history alone is not necessarily relevant to public safety without an individualized examination of the individual's underlying conduct. Dkt. No. 30 at 60, 70 n. 33 ("The purpose of eliminating these and other categorical exclusions is to make the process more

---

for Federal prison releasees. Time served in prison has never been found to decrease, or increase, the likelihood of recidivating when time served is examined alone in relation to recidivism, or when controls are introduced for demographic variables (including age), education, work experience, prior arrests, convictions, and incarcerations, drug and alcohol dependency, and post-arrest living arrangements.

U.S. Dep't of Justice, *An Analysis of Non-Violent Drug Offenders with Minimal Criminal History* (1994).

individualized and more amenable to a proper and reasonable balancing of inmate safety and public safety").

But the BOP's categorical approach to institutional misconduct continues to treat even innocuous conduct as a basis for denial in violation of the TRO standards. Nor has the BOP attempted to describe and evaluate an individual's actual conduct or explain how it is meaningfully connected to public safety. Almost every denial related to disciplinary misconduct, or "tickets," only mentions the mere existence of the ticket as a reason for denial. All tickets are not the same, but the BOP is handling them like they are. In the worksheets class counsel has reviewed, the BOP describes an assault on a fellow inmate and the taking of a second lunch tray the same way: "recent disciplinary conduct"—citing both as bases for denying home confinement.[45] Although the BOP occasionally cites "recent disciplinary misconduct which presents public safety concerns," even those rare, conclusory assertions do not explain specific concerns with the individual's actual behavior.[46]

For example, P.Y.'s worksheet cites disciplinary history as well, which for her was buying shoes from another woman.[47] B.W. was denied in part based on smoking in an unauthorized area.[48]

The BOP's impermissible reliance on disciplinary history is widespread. About 26 percent of the class has been denied home confinement at least in part for "recent disciplinary misconduct" that appears to be non-violent and non-sexual in nature.[49] Without specifically identifying why this routine misconduct is sufficient to merit against the release of medically vulnerable individuals

---

[45] See, C.P., Ex. G at 016 and R.M, Ex. G at 015.
[46] See, e.g., T.W., Ex. G at 022. T.W.'s worksheet denied her home confinement in part because of "recent disciplinary misconduct which presents public safety concerns"—a reference to a ticket for sharing her phone account. It is not clear why a single ticket for sharing her phone account demonstrates that she presents a threat to public safety, much less why that isolated incident outweighs the substantial weight given to her CDC risk factors. The BOP provided no explanation.
[47] Ex. B at 240.
[48] Ex. B at 235.
[49] See, Russell Decl., Ex. A at ¶ 8.

at risk during the pandemic, the BOP has failed to apply this Court's TRO standards and has therefore violated the Settlement Agreement.

    4.   Home Confinement Denials Citing Multiple of the Bases Discussed Above Still Violate the Settlement Agreement.

In the meet and confers, the government asserted that the BOP's home confinement worksheets comply with the Settlement Agreement because the TRO only prohibits relying *solely* on one of the impermissible factors such as percentage of time served or Low PATTERN score. This argument misses the point – the Settlement Agreement requires an individualized assessment of danger to public safety, and relying on these factors, whether solely or in conjunction, without assessing their relation to public safety, is what constitutes a violation of the Agreement.

Numerous worksheets illustrate the violation of the Settlement Agreement when the BOP relies, in a conclusory manner, on multiple bases in denying home confinement. K.D. has severe obesity, hypertension, asthma, and a history of smoking.[50] She has no history of violence, no history of discipline, and a projected release date in 2022—yet was denied for having a "Low" PATTERN score and for the amount of time served.[51] T.S. was also denied for these reasons, despite having a BMI of 49.5, hypertension, and congestive heart failure.[52] J.W., who is severely obese, was denied based on Low PATTERN and amount of time remaining, despite a projected release date in 2023.[53] J.T. was denied based on percent of time served and Low PATTERN, despite her obesity and history of smoking.[54] In K.P.'s case, amount of time served was cited as a reason for denial when he has a projected release date in 2024 and he has already served more than

---

[50] *See*, Ex. B at 044-45.
[51] Ex. B at 046.
[52] *See*, Ex. B. at 200-02. Although Dr. Jacoby, a cardiologist at Yale reviewed T.S.'s records and concluded he "requires urgent evaluation and treatment, quite likely including hospital admission," T.S. has still not seen a cardiologist.
[53] Ex. B at 226.
[54] *See*, Ex. B at 220-22.

50% of his sentence.[55] He was also denied based on Low PATTERN and the absence of COVID risk factors, despite having hypertension and a BMI over 25.[56]

When these factors—alone or together—form the sole reasons that a vulnerable individual is denied home confinement, without further explication of individualized public safety risk, the denial is arbitrary and mandates a re-review. *See* Dkt. 68, at 5 (this Court ordering re-review where the reasons for denial "cite[d] only one or more of the following factors," including, "the amount of time left to serve and/or the percentage of time served," "any non-violent or non-sexually related disciplinary infractions," and "a PATTERN score of low or medium").

5.   <u>At Times, the BOP's Decisions Appear to Apply Categorical Requirements for Home Confinement, In Violation of the Settlement Agreement</u>

At times, the BOP's stated reasons for denial appear to apply categorical requirements in violation of the Settlement Agreement. Two examples of this are denials solely on the amount or percentage of time served, or the offense of conviction. The only basis for denial for M.B. is the amount of time remaining on her sentence and the percentage of time served for the offense.[57] Yet she has a significant smoking history, hypertension, a BMI over 25.[58] H.M., a 79-year-old man with obesity, hypertension, and borderline diabetes, was denied based on the amount of time remaining on his sentence and sentence length.[59] For those convicted of possession or receipt of child pornography, the crime of conviction is often used as the sole basis for denial, without a description of the person's current public safety risk. For example, A.P. was denied based on receipt of child pornography, despite his Minimum PATTERN score, obesity, serious heart

---

[55] Ex. B at 170.
[56] *Id*.
[57] Ex. B at 023.
[58] *See*, Ex. B at 021-22.
[59] *See*, Ex. B at 124-26.

condition, and hypertension.[60] K.M., who also has a Minimum score, was denied based on possession, and suffers from obesity, hypertension, and serious heart conditions (he has had three heart attacks and has a stent).[61]

Because the TRO eliminated the requirements cited above, among others, (Dkt. No. 30, at 71, ¶ 2(a)), it (and the Settlement Agreement) therefore prohibit the BOP from effectively reinstating those categorical bars by using them as the sole reason for denial or as a reason for denial without individualized explanation of how that reason relates to public safety and outweighs the individual's medical risk. *See* Dkt. No. 30, at 71 n.33 ("The purpose of eliminating these and other categorical exclusions is to make the process more individualized and more amenable to a proper and reasonable balancing of inmate safety and public safety."). Time served, current or prior crimes of violence, recent disciplinary infractions, and a PATTERN score above Minimum cannot serve as a reason for denial without specific explanation of how these factors connect to a particular individual's public safety risk. *See* Dkt. No. 30 at 71.[62] In order to comply with the Settlement Agreement, the BOP must show an individualized assessment, which may include, for example, including in the reasons for denial the nature of the recent disciplinary ticket and how it connects to public safety risk; the nature and age of prior crimes of violence and why they continue to present a concern for public safety; or how the portion of time served by the person relates to the person's dangerousness.

## III.   A COURT ORDER REGARDING ISSUES INCIDENTAL TO ENFORCEMENT OF HOME CONFINEMENT REVIEW PROCESS IS APPROPRIATE.

### A. The BOP Has Refused to Consider All Individuals Already Approved for a Halfway House for Home Confinement in Violation of the Settlement

---

[60] *See*, Ex. B at 176-78.

[61] *See*, Ex. B at 145-47.

[62] *See also* Dkt. 43-2, at 1 (listing an "inmate's score under PATTERN" as one of a list of "discretionary factors" for consideration following the Court's order to show cause).

Agreement.

Class counsel have repeatedly identified to the BOP individuals who have been denied home confinement but are awaiting placement in a halfway house or Residential Reentry Center ("RRC")—which may take weeks to months.[63] In these instances, the BOP provides no reasons for denying home confinement and simply notes RRC approval—which is not a justification for denial of home confinement authorized by the TRO. Indeed, only home confinement can ensure that medically vulnerable individuals are not kept in congregate settings such as halfway houses that are, unavoidably, also hotspots for the virus. If any of these individuals continues to be denied home confinement, the BOP should comply with the requirement of the TRO and the Settlement Agreement to provide a written explanation for the reasons for the denial that is based on a balance of personal and public safety. *See* Dkt. No. 30, at 73, ¶ 5 (stating that when denying a medically vulnerable individual home confinement, the BOP must provide "an individualized explanation for each denial of home confinement . . . including at least a brief description of the factual basis for any factors deemed to outweigh the danger to the inmate from COVID-19"); Settlement Agreement ¶¶ 10, 11 (requiring written explanation of denial).

Furthermore, this Court has previously indicated that individuals approved for placement in a halfway house or RRC should be promptly granted home confinement and released unless there is some particular reason why they are unsuitable for home confinement release but appropriate for placement in an RRC. *See* Dkt. 70, at 6 (granting bail release to all those approved for release to an RRC, except those with high PATTERN scores or serving a sentence for sex or violence offenses, unless the BOP could "demonstrate that public safety or medical considerations

---

[63] *See* Class Counsel Letter to U.S. Attorney's Office dated November 18, 2020, attached as Exhibit E, at 010-11. In some instances, the BOP indicates RRC dates many months away. *See* Ex. G at 011, 018, 021 (noting RRC dates in March and April 2021). Some of the individuals identified in the November 18 letter have since been released to RRCs.

or the absence of any home in which to place the inmate would make it unsafe to move the inmate immediately to home confinement" and noting that "[t]he fact that a greater degree of supervision will be available at an RRC will not, by itself, be deemed sufficient to demonstrate that it is unsafe to move the inmate to home confinement"). The BOP should therefore immediately review these individuals for home confinement consistent with the Settlement Agreement and the corrective guidance from this Court. To the extent medically vulnerable individuals have already been released to RRCs, they are still entitled to re-review in compliance with the Settlement Agreement.

### B. The BOP's Refusal to Provide Presentence Reports to Class Counsel Prevents Meaningful Review of the Home Confinement Review Process.

The Settlement Agreement does not merely enshrine the Court's expedited home confinement review process, but also includes a review mechanism that enables both class counsel and this Court to confirm that the BOP is in fact complying with the expedited home confinement process articulated by the Court in its May 12, 2020 TRO. *See* Dkt. 218, at 39 ("Class Counsel have secured a settlement that ensures Counsel will remain an integral part of the home confinement review process under the supervision of this Court—insulating protections for medically vulnerable individuals from further alteration").

For many individuals, the BOP denies release based on a purportedly concerning criminal history or sentencing information that is only contained in the individual's Presentence Report (PSR)—which the BOP have categorically refused to provide to class counsel even with clients' express release authorization.[64] But class counsel require access to PSRs as a part of the home confinement review process contemplated under the Settlement Agreement to verify the accuracy of the information presented by the BOP and to move for re-review of particular clients in light of

---

[64] *See* Oct. 19, 2020 Email from Nathaniel Putnam, attached as Exhibit E, at 012 ("We will not be producing PSRs to you.")

any factual errors. *See* Dkt. 134-1, ¶ 12 (articulating this process for individualized re-review based on factual error).[65]

This is surprising for several reasons. First, class members have statutory right under FOIA to obtain their own PSRs; and they may also then authorize disclosure to counsel. *See*, *e.g.*, *United States v. Pugh*, 69 Fed. Appx. 628, 629 (4th Cir.2003) (authorizing disclosure of PSRs under FOIA); *see also Justice v. Julian*, 486 U.S. 1 (1988). The question then is not *whether* the BOP is required to disclose PSRs to class counsel, but merely *when*. But more directly, this Court has already recognized that PSRs are essential to adequate oversight of the home confinement review process. *See* Dkt. 81 (noting that "in light of the important private and public interests at issue in this case, and the apparent role of these presentence reports in the Respondent's decision-making process, Petitioners' have made a compelling demonstration that disclosure [with clients' permission]. . . is necessary to meet the ends of justice"). This Court should therefore order the BOP to disclose PSRs to class counsel upon request and with client authorization as required both by FOIA and as necessary to effectuate the home confinement review process under the Settlement Agreement.

## CONCLUSION

Immediate intervention from this Court to correct the deficiencies in the BOP's home confinement process is warranted for two reasons. First, it will ensure that the parties do not

---

[65] For example, the BOP continuously denies home confinement based on "public safety factor[s]" without further explanation. A Public Safety Factor (PSF) is relevant factual information regarding the defendant's current offense, sentence, criminal history or previous institutional behavior that can only be reviewed by consulting the PSR.

A.M, a 71-year-old man who suffers from hypertension and chronic kidney disease, was denied in part based on purported "serious history of violence"—with no specific description of that violence. *See*, Ex. B at 113-15. Review of his Presentence Report shows only one "violent" conviction—a misdemeanor assault conviction from 1971 (50 years ago) when A.M. was 22 years old. He received a conditional discharge for the offense. In another example, I.S. was denied home confinement based on an alleged of past violence, and class counsel has been unable to access her PSR. *See*, Ex. B at 198. However, the federal prosecutor's sentencing memorandum in her case called her so-called violent prior offense a "relatively minor" offense and noted that she received no jail time for it.

continue to engage in successive rounds of home confinement re-reviews for the same medically vulnerable individuals without Agreement-compliant results. Second, it will ensure that the process through which medically vulnerable individuals may seek to serve their sentences safely on home confinement, away from the uncontrolled COVID-19 outbreak at Danbury, functions as the parties agreed that it would.

Accordingly, Petitioner-Class respectfully requests that this Court issue an Order to:

(a) Declare that the BOP has failed to comply with the standards set forth in the May 12, 2020 TRO, and order specific performance, directing the BOP to:

    i.   Consider all CDC Risk factors as valid risk factors that render a home confinement applicant medically vulnerable, including Tier II conditions, and that all CDC Risk factors are to be afforded "substantial weight" in any home confinement decision; such consideration shall be reflected in the case narrative or reasons for denial provided by the BOP. Dkt. No. 134-1 ¶¶ 7, 10;

    ii.   Explicitly consider an individual's age as a CDC risk factor to be afforded "substantial weight" for any class member over the age of 50, in conjunction with all other CDC medical risk factors; such consideration shall be reflected in the case narrative or reasons for denial provided by the BOP;

    iii.   List and consider *all* of a class member's CDC risk factors on that individual's home confinement review sheet; Dkt. 134-1, ¶ 10;

    iv.   Reflect in any home confinement denial that "substantial weight" was actually given to the individual's CDC risk factors and include an explanation of why these risk factors are overcome by substantial evidence of countervailing public safety considerations; any such denial must provide an individualized

explanation of the reasons why the public safety concerns specific to the individual class member's circumstances are sufficient to overcome their serious medical vulnerability to COVID-19;

    v.    Not rely in home confinement decisions on a "Low" PATTERN Score as a basis to deny home confinement to class members;

    vi.    Not rely in home confinement decisions on factors that are only tangentially related to public safety, including percentage or amount of time served or recent disciplinary history that is both non-violent and non-sexual;

    vii.    Not rely in home confinement decisions on any exclusion previously lifted by this Court's TRO as the sole basis for denying home confinement, such as disciplinary history or offense of conviction, unless the BOP details the nature of the underlying factual circumstances and why they raise substantial evidence of countervailing public safety considerations sufficient to overcome the individual's serious medical vulnerability to COVID-19;

(b) Declare that the BOP must forthwith conduct a re-review in accordance with the Settlement Agreement and this Order for home confinement for:

    i.    all class members already approved for placement in an RRC; in the event of a denial of home confinement, such denial must demonstrate that public safety or medical considerations or the absence of any home in which to place the inmate would make it unsafe to move the inmate immediately to home confinement; the fact that a greater degree of supervision will be available at an RRC will not, by itself, be deemed sufficient to demonstrate that it is unsafe to move the inmate to home confinement; *see* Dkt. 70, at 6;

34

    ii.    all class members for whom class counsel has submitted requests for re-review not already granted home confinement;[66]

(c) Order the BOP to disseminate the PSR release form already drafted by the parties for purposes of this litigation (*see* Dkt. 81), to all present and future members of the Settlement Class; should class members authorize such disclosure, the BOP shall produce the PSR of such inmates to Petitioners' counsel;

(d) Order the BOP to not refuse to conduct a home confinement review or a re-review for any recognized class member it transfers out of FCI Danbury;

(e) Issue other supplemental orders this Court may deem appropriate to enforce the Settlement Agreement.


Dated: December 17, 2020                Respectfully submitted,

*/s/ Marisol Orihuela*
Marisol Orihuela, ct30543
Zal K. Shroff, phv10872
Ariadne Ellsworth, *Law Student Intern*
Alexandra Gonzalez, *Law Student Intern*
Alexander Nocks, *Law Student Intern*
Phoenix Rice-Johnson, *Law Student Intern*
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520
Telephone: (203) 432-4800
Email: marisol.orihuela@ylsclinics.org
       zal.schroff@ylsclinics.org

Sarah French Russell, ct26604
Tessa Bialek, ct30582

---

[66] *See* Ex. B. At this time, Petitioner-Class does not seek a retroactive order directing the BOP to re-review all class members, due to the burden this would impose on Respondent. However, class counsel intend to continue reviewing BOP worksheets and communicating with class members in order to seek re-reviews in appropriate cases, and the relief sought here is in no way meant to preclude class counsel from seeking re-reviews for individuals for whom class counsel has already received worksheets.

Alexis Farkash, *Law Student Intern*
Abigail Mason, *Law Student Intern*
George Morgan, *Law Student Intern*
Krista Notarfrancesco, *Law Student Intern*
Samantha Pernal, *Law Student Intern*
Grace Ronayne, *Law Student Intern*
Hannah Snow, *Law Student Intern*
Kathryn Ulicny, *Law Student Intern*
Kylee Verrill, *Law Student Intern*
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
Telephone: (203) 582-5258
Email: sarah.russell@quinnipiac.edu
        tessa.bialek@quinnipiac.edu

Alexandra Harrington, ct 30943
Criminal Justice Advocacy Clinic
University at Buffalo School of Law
507 O'Brian Hall, North Campus
Buffalo, NY 14260
Telephone: (716) 984-2453
Email: aharr@buffalo.edu

 David S. Golub, ct00145
Jonathan M. Levine, ct 07584
Silver Golub & Teitell LLP
184 Atlantic Street
Stamford, CT 06901
Telephone: (203) 325-4491
Email: dgolub@sgtlaw.com
        jlevine@sgtlaw.com

*Counsel for the Petitioner-Class*