**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JAMES WHITTED, individually, and on behalf of all others similarly situated, | |
| *Petitioner*, | No. 3:20-cv-00569 (MPS) |
| v. | |
| DIANE EASTER, Warden of Federal Correctional Institution at Danbury in her official capacity, | |
| *Respondent*. | |

## MEMORANDUM REGARDING ORDER REQUIRING SPECIFIC PERFORMANCE OF CLASS SETTLEMENT AGREEMENT

In settling a class action brought by inmates whose medical conditions made them especially vulnerable to serious illness from COVID-19, the Warden of Federal Correctional Institution Danbury ("FCI Danbury") and the U.S. Bureau of Prisons ("BOP") agreed to "endeavor to release individuals [incarcerated at FCI Danbury who were] approved for home confinement to home confinement within 14 days of the approval decision unless public safety or the absence of a home in which to place the inmate would make it unsafe to move the inmate to home confinement within that 14 day period." ECF No. 238-1 at 11-12. The class of inmates recently filed a motion to enforce this provision of the settlement agreement on behalf of 17 inmates who were approved by the BOP for release to home confinement more than 14 days before the filing of the motion—some as long as three months before. ECF No. 263. On December 11, 2020, after considering the submissions of the parties and hearing oral argument during a telephonic status conference, I granted the motion, ordered that the 17 inmates be

released by Saturday, December 12, 2020 at 5:00 p.m., and, going forward, limited the permissible reasons for which the Warden and the BOP could delay the release of inmates to home confinement beyond 14 days from the date they are approved for home confinement. ECF No. 289. On December 14, 2020, I also ordered that one of the 17 inmates whose proposed place of home confinement was no longer available be released under the BOP's furlough authority to the care of class counsel. ECF No. 294. I noted in my December 11 and 14 orders that I would later issue an opinion to provide a more fulsome explanation of the reasons for those orders. This is that opinion. In short, as explained below, the Warden and the BOP delayed transferring the 17 inmates to home confinement for reasons that do not comport with their promise to "endeavor" to effectuate those transfers within 14 days, and the December 11 and 14 orders were necessary to realize that promise.

## I.   BACKGROUND

I assume familiarity with the factual and procedural background of this case as set forth in the Ruling on Motion for Temporary Restraining Order and Motion to Dismiss, ECF No. 30, and with the parties' submissions relating to the class's motion to enforce the Settlement Agreement. *See* ECF Nos. 263-74, 277-87. I recount the background here only as necessary to explain the December 11 and 14 orders.

On July 27, 2020, the parties entered into a Settlement Agreement resolving all claims brought by Petitioner, James Whitted, individually and on behalf of members of a proposed class, against the Respondent, Diane Easter, in her official capacity as the Warden of FCI Danbury and the BOP. ECF No. 238-1 at 2. On August 11, 2020, on motion of the parties, I certified the following Settlement Class ("Medically Vulnerable Class" or "Settlement Class"):

any person incarcerated at FCI Danbury anytime from the Effective Date of the parties' Settlement Agreement, i.e., July 27, 2020, until the termination date of the Agreement,

i.e., October 31, 2021, unless otherwise modified by the parties pursuant to the terms of the Agreement, who either (a) is a List One Inmate or List Two Inmate (as those terms are defined in the Settlement Agreement, ECF No. [238-1] at 3-4), or (b) possesses one or more underlying medical conditions which, according to current CDC guidance (i.e., the CDC guidance in effect at the time of the individual's home confinement review), either (i) places that inmate at increased risk of severe illness from COVID-19 ("Tier 1 medical conditions"); or (ii) might place that inmate at an increased risk of severe illness from COVID-19 ("Tier 2 medical conditions").

ECF No. 141 at 2-3. I ordered the distribution of notice to the settlement class and scheduled a fairness hearing for September 18, 2020 to consider final approval of the Settlement Agreement. *Id.* at 7-8. At the September 18, 2020 fairness hearing, I approved the Settlement Agreement, ECF No. 221; I later dismissed the case, expressly retaining jurisdiction to the full extent necessary to enforce the terms of the Settlement Agreement , ECF No. 241.[1]

As pertinent here, the Settlement Agreement sets forth standards and procedures for conducting home confinement reviews for members of the Settlement Class[2] and a multi-tiered dispute resolution procedure that culminates in judicial intervention. *See* ECF No. 238-1. The dispute presented by the class's motion to enforce arises from paragraph 11, which provides as follows:

BOP will endeavor to release individuals approved for home confinement to home confinement within 14 days of the approval decision unless public safety or the absence of any home in which to place the inmate would make it unsafe to move the inmate to

---

[1] I have ancillary jurisdiction over the Petitioner's motion to enforce the settlement agreement because, upon dismissal, I

reserve[d] and retain[ed] jurisdiction over the parties and this case to the full extent necessary to enforce the terms of the Settlement pursuant to the terms set forth therein (ECF No. 238-1). *See Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 381 (1994); *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113, 134 (2d Cir. 2011). The Settlement Agreement (ECF No. 238-1) is hereby incorporated in this order by reference.

ECF No. 241; *see also Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974) ("A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it.").

[2] These standards incorporated those set forth in the May 12, 2020 temporary restraining order. *See* ECF No. 238-1 ¶¶ 2, 3, 6, 10, 11; *see also* ECF No. 30 at 71.

home confinement within that 14 day period.

*Id.* at 11-12.  Where, as here, the parties are unable to resolve a dispute and seek judicial

intervention, "the sole remedy shall be specific performance of th[e] Agreement."  *Id.* at 16.

In the motion to enforce, the class alleged that 17 inmates had been approved for home

confinement but that each of them was being held at FCI Danbury for more than 14 days without

a permissible reason under the Settlement Agreement, i.e., without a public safety reason or the

lack of a home in which to place the inmate.  ECF No. 263 at 1.  At the time of filing, December

6, 2020, these inmates had been waiting to be released on home confinement, after having been

approved for such release, for between 27[3] and 104 days.  ECF Nos. 265, 282.  The class also

filed supporting declarations from four of these 17 inmates, all of whom expressed a fear of

contracting COVID-19 at FCI Danbury, as well as two other FCI Danbury inmates.  *See* ECF

Nos. 272, 273, 274, 284, 285, 279-3.  All six declarations observe a recent spike in COVID-19

cases at FCI Danbury.  *See* ECF No. 272 (observing at least five positive COVID-19 test results

in the women's camp, but none on her "quarantine floor"); ECF No. 273 (noting the recent

outbreak at FCI Danbury); ECF No. 274 (noting the recent outbreak at FCI Danbury); ECF No.

284 (noting at least four positive COVID-19 tests in the women's camp on Monday, December

7, 2020); ECF No. 285 (noting at least two positive COVID-19 tests, and one symptomatic

inmate, in the FSL between December 6 and 7, 2020); ECF No. 279-3 (this inmate, who is seven

months' pregnant, noted at least five COVID-19 positive tests at the women's camp in the past

---

[3] In the motion to enforce, class counsel identified one inmate, M.D., who had been waiting 16 days, but indicated that this date was uncertain because it was only based on the date class counsel received the approval packet and was not necessarily the actual date of approval.  ECF No. 265.  In the Warden's declaration, she clarifies that this inmate was approved for home confinement on 11/9/2020, not on 11/20/2020—the date class counsel received M.D.'s home confinement approval packet.  ECF No. 281 at 7 ¶ 24.  As a result, M.D. had been waiting for 27 days as of December 6, 2020, not 16 days.

4

week, including one symptomatic inmate whose bed is three feet away from her own).[4]  Four of

the six declarations also observe a gap in BOP staff's checking of inmates' temperatures and

COVID-19 symptoms.  *See* ECF No. 273 (no temperature or symptom checks between before

Thanksgiving and December 7, 2020); ECF No. 284 (no temperature or symptom checks from

November 23 to December 7, 2020); ECF No. 285 (noting that temperature and symptom checks

were conducted on December 7, 2020, and that everyone at the FSL was tested for COVID-19 on

the same day; this inmate recalls that temperature and symptom checks were conducted four

times in the month prior to December 7); ECF No. 279-3 (noting a gap in temperature and

symptom checks, which started again on December 7, 2020 at the women's camp).

   Each of the four declarations from inmates approved for home confinement describes a

prolonged waiting or quarantine period beyond fourteen days:

- J.H., an inmate at the women's camp, was approved for home confinement on
  September 21, 2020.  She had been in quarantine for 20 days as of December 9,
  2020, was tested for COVID-19 three times, and—based on her projected release
  date of December 17—would have been in quarantine for a full month prior to
  release.  J.H. is able to isolate at her place of home confinement, a friend's home
  in Mississippi.  *See* ECF Nos. 272, 282 at 4.

- M.R., an inmate at the women's camp, was approved for home confinement on
  October 5, 2020.  She was scheduled to be released to home confinement on
  December 5, 2020 but was placed in quarantine on December 8, 2020, and her
  release was delayed until January 5, 2021.  ECF Nos. 273, 282 at 4-5.

---

[4] As of December 21, 2020, the BOP's COVID-19 webpage reported a total of 95 active infections among a population of 862 inmates.  https://www.bop.gov/coronavirus/; https://www.bop.gov/locations/institutions/dan/ (both last visited on December 21, 2020).  This is a sharp increase from the report of 30 active inmate infections on December 6, when the motion to enforce was filed.

- N.L., an inmate at the women's camp, was approved for home confinement on October 5, 2020. She was placed in quarantine on December 1, 2020 and was tested for COVID-19 on December 1 and 8. N.L.'s scheduled release date was December 22, 2020. ECF Nos. 274, 282 at 4.

- W.H., an inmate at the women's camp, was approved for home confinement on August 24, 2020. She was scheduled to be released to home confinement on December 29, 2020, and was placed in quarantine on December 8. W.H. received a COVID-19 PCR test before entering quarantine and a rapid test after she entered quarantine. ECF No. 282 at 4, 284.

The class also provided a chart that includes the home confinement approval date, the number of days waiting, and the expected home confinement release date of each of the 17 inmates. ECF No. 265; *see also* ECF No. 282 (an updated version of the same chart produced by the Respondent).

Before the filing of the motion to enforce, Warden Easter wrote a letter, ECF No. 267, to respond to concerns about these delays being raised by class counsel. The letter, dated December 1, 2020, was written in response to a letter from class counsel dated November 23, 2020, and provides an explanation for the delay in releasing 12 inmates who had been approved for home confinement. ECF No. 267 at 2. Warden Easter explains as follows:

> As a general matter, several circumstances have converged to create challenges to redesignating inmates to HC within 14 days of being approved. First, the BOP's Health Services Division recently implemented several pre-release requirements to account for the risk of an inmate on HC [home confinement] contracting COVID while in HC, all of which must be clearly documented in the inmate's medical record ("BEMR") and included with the paperwork necessary to transfer an inmate to HC. These requirements include Health Services staff meeting with the inmate to discuss the specific type of release residence (house/apartment/group home, etc.) where the inmate will be living, account for any health concerns from individuals in the residence, secure a contact phone number for the inmate, and arrange safe transportation from the institution to the

residence.  Health Services staff must also educate the inmate as [to] how to protect themselves from COVID-19 transmission, including proper hand washing, social distancing, wearing of facial coverings and how to conduct self-assessments for signs and symptoms of COVID-19.  Health Services staff must also evaluate the release plan to determine if HC would be more effective in protecting the inmate's health than continued confinement at their present place of incarceration.  Finally, Health Services staff must make a determination whether the inmate requires medical care while serving their sentence on HC.  If frequent and ongoing medical care is required, Health Services staff coordinate with the BOP's contracted community medical provider and the BOP's Central Office to determine if the inmate's medical needs can be met in the community.  Documentation that each of the aforementioned tasks [was] performed must be included in the paperwork necessary to transfer an inmate to HC, and due to the lack of standardization of this documentation, most of the inmates referenced below needed to have this information added to their HC referral.  However, BOP has recently standardized the process of documenting the performance of these tasks, and delays due to missing/insufficient BEMR documentation should no longer be a problem for HC referrals out of FCI Danbury.

ECF No. 267 at 2-3.  The Warden continues:

A second factor impacting BOP's ability to place inmates into HC within 14 days of approval is the clinically informed and empirically sound requirement that inmates test negative on a "PCR" or "swab" COVID-19 test prior to release to the community.  The private laboratory FCI Danbury relies upon to provide test results that meet current "best practice" testing standards has been unable to provide us with results quickly enough to always allow a 14-day quarantine, although we have requested this laboratory place some priority on FCI Danbury tests.  While the contractor seems amenable to prioritizing tests out of FCI Danbury, as recently as November 25th they informed us that recent increases in community-based testing may cause further delay in providing test results.  However, given the AG's direction that BOP not take "any" risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, we reiterate the belief that we need to use the best-available means of testing inmates prior to redesignation even if it extends the quarantine period.

Finally, several other factors have arisen over the past few months impacting the ability to move inmates to HC as expeditiously as possible.  First, the resumption of inmate movement throughout the agency has created a need to quarantine newly-arriving inmates at FCI Danbury before they can be placed into the general population.  While strict adherence to this practice is responsible for the fact there have been no new cases of COVID within the general population for several months,[5] quarantine space at FCI Danbury is severely limited and the space occupied by incoming inmates is not available to outgoing inmates (such as those transferring to HC) as it was prior to the resumption of inmate movement.  Second, the female Special Housing Unit has been closed to facilitate

---

[5] While the reference to "no new cases of COVID within the general population for several months" may have been accurate at the time the Warden wrote her letter, it was obsolete by the time the class filed the motion to enforce on December 6.  *See supra* note 4.

necessary improvements, further reducing the quarantine space available for inmates transferring to HC.  Third, a recent update and migration of the BOP's email system caused a number of HC referrals to be sent to the wrong location in the agency, impacting several inmates class counsel inquires about.  Finally, FCI Danbury has temporarily lost three Case Managers due to unforeseeable personal circumstances; as Case Managers are pivotal to marshaling HC referrals through the agency, their absence has adversely affected the speed of HC redesignations.

*Id.* at 3.  The Warden then provides specific explanations for the delays in releasing 12 inmates[6] approved for home confinement, in which the general themes just described recur in individual cases.

For example, the first inmate was approved for home confinement on September 16, 2020, but her "referral was returned during the routing process due to new BOP guidelines requiring certain language in BEMR regarding the risk of COVID-19 in the community."  *Id.* The referral for home confinement was received as of November 4, 2020, by the pertinent Residential Reentry Manager's Office ("RRM"), a separate BOP office located in various regions and charged with placing inmates into the community for service of the remainder of their sentences—usually in Residential Reentry Centers ("RRCs"), which are often called "halfway houses."[7]  ECF No. 278-2 at 2.  Because of "a potential electronic error due to recent updates and migration of the email system[,]" however, the RRM did not provide a home confinement release date—in this case, December 17, 2020—until November 30, 2020.  *Id.*  In another case, an inmate was approved for home confinement on August 24, 2020.  *Id.* at 4.  This inmate's release was delayed due to outstanding Canadian charges that the BOP confirmed were

---

[6] Of these 12 inmates, 11 overlap with the 17 inmates identified in ECF No. 282, whose individual cases are discussed in the Warden's later-filed declaration.  ECF No. 281 at 5-9.  This is the same group of 17 inmates I ordered released in the December 11 order.

[7] "RRCs are not BOP facilities and do not employ BOP staff; rather, they are private corporations with whom BOP contracts to provide structured assistance to federal inmates releasing to the community."  ECF No. 278-2 at 3. RRCs run halfway houses and also supervise inmates released on home confinement.  *Id.*  Contractual arrangements limit the number of inmates a RRC can supervise at any given time.  *Id.*  Nearly all federal inmates who are released to home confinement—94 percent—are supervised by RRCs.  *Id.*

resolved on October 23, 2020, and because of the requirement that certain language be in the

inmate's BEMR.  *Id.*  The referral process continued on October 27, 2020, but because the RRM

did not receive it, the RRM did not begin processing the referral until November 24, 2020.  *Id.*

Other reasons for delay in specific cases include security-related reviews; checks with law

enforcement for outstanding warrants, detainers, or pending charges; denials of supervision by

probation; quarantine constraints at FCI Danbury; and, in one case, the need to send ink

fingerprints to the FBI.  *Id.* at 4-6.

      The Warden's declaration, written on December 8, 2020 in response to the class's motion

to enforce, elaborates on the explanation provided in the December 1 letter and addresses the

delays experienced by the 17 individuals the class contended were being held at FCI Danbury in

violation of the Settlement Agreement.  Specifically, the Warden explains:

> As a preliminary matter, several events have happened in the instance of nearly every
> inmate set forth in this motion.  First, most inmates had their home confinement referral
> returned during the routing process due to new BOP guidelines requiring certain language
> in an inmate's Bureau Electronic Medical Record ("BEMR") regarding the risk of
> COVID-19 in the community.  Second, with respect to a smaller number of inmates,
> referrals were delayed due to an electronic error associated with recent updates and
> migration of the BOP's email system, causing their home confinement referrals to be sent
> to an unmonitored mailbox.  Lastly, the need to quarantine inmates for 14 days and have
> them test "negative" on a polymerase chain reaction ("PCR") COVID-19 test prior to
> release affected the ability to place these inmates into home confinement within 14 days
> of approval.

ECF No. 281 at 3 (internal citations omitted).  With respect to delays resulting from the

requirement that the BEMR [i.e., the inmate's medical record] contain certain language, the

Warden explains that delays were initially caused by differences in interpretation among the

BOP's regional RRMs of Attorney General William Barr's March 26, 2020 directive, which

required the BOP, before releasing any inmate on home confinement, to "make an assessment of

the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison

facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement [based on CDC guidance]." *Id.* at 3 (quoting Attorney General William Barr, Memorandum for Director of Bureau Prisons (March 26, 2020), Ex. D to the Warden's declaration). On November 16, 2020, the BOP adopted a uniform approach, requiring that any inmate approved for home confinement "be educated as to the best practices they might employ to avoid COVID-19 infection and that this education be documented in the inmate's BEMR." *Id.* The Warden further explains that because the issue has been clarified, "BEMR documentation should no longer be an issue for home confinement referrals coming out of FCI Danbury." *Id.* With respect to delays caused by the agency's migration to a new email system, which began in October 2020 and caused home confinement referrals to be sent to an unmonitored mailbox at a RRM's Office,[8] the Warden explains that she has "advised [her] staff of the need to ensure that referral packets are going to the proper mailboxes to ensure they route expediently through the RRO's." *Id.* at 4.

With respect to delays due to quarantine constraints, the Warden explains that "[i]t is a mandated BOP policy, one which was specifically preserved in the settlement of this case, that inmates being placed into home confinement quarantine for 14 days and then test 'negative' on a PCR COVID-19 test prior to release." *Id.*[9] Due to recent increases in community based testing, the "current wait time for lab results is approximately 5 to 7 days[]" despite the BOP's request that tests from FCI Danbury receive priority. *Id.* The Warden continues as follows:

> From the advent of this pandemic, the Attorney General explicitly directed BOP "to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement," and

---

[8] "To place an inmate into home confinement, once the referral paperwork is completed at FCI Danbury, it is transmitted to the Residential Reentry Manager's Office ('RRO') to approve the placement of the inmate into the community." ECF No. 281 at 4.

[9] The statement that a 14-day quarantine was "specifically preserved in the settlement of this case" apparently refers to language in a Side Letter entered into in connection with the Settlement Agreement. I address this point below.

this direction has not been rescinded.  Given the Attorney General's directive that BOP not take "any" risk of transferring inmates to home confinement that could contribute to the spread of COVID-19, the BOP is steadfast in the need to use a 14-day quarantine, as well as the best-available means of testing inmates, prior to release. These requirements may extend the amount of time needed to allow for a full quarantine or await the return of a negative PCR test result.

*Id.* (citing AG Barr's March 26, 2020 memorandum).  Before discussing the individual cases of the 17 inmates approved for home confinement,[10] the Warden notes that "[a]lthough several of the inmates listed below have been made eligible for furlough, the issuance of a furlough is a rare and exceptional event."  *Id.* (explaining the process for placing an inmate on furlough); *see also* 18 U.S.C. § 3622 (BOP's statutory furlough authority); ECF No. 281 at 39 (Program Statement 5280.09 Inmate Furloughs, Ex. E to the Warden's declaration) ("A furlough is an authorized absence from an institution by an inmate who is not under escort of a staff member, U.S. Marshal, or state or federal agents. . . .  A ['transfer furlough' is a] furlough for the purpose of transferring an inmate from one Bureau facility to another, a non-federal facility, or community confinement (including home confinement) . . . .").  The Warden concludes the declaration as follows:

> Our experience has been that placing inmates into home confinement within 14 days is not always possible due to the complex situations that many inmates need to account for before they can be safely released to the community.  In nearly every case in which staff at FCI Danbury have sought to transfer an inmate to home confinement, complications arising out of the ongoing COVID-19 pandemic have made it more difficult to coordinate the redesignation.  Despite these complications, we have continued to endeavor to place inmates into home confinement within 14 days of approval, consistent with public health and the safety of the community.

---

[10] Because the individual explanations for delays in releasing each of the 17 inmates are consistent with the general themes described in the Warden's declaration, and are largely identical to those described in the Warden's letter, I do not detail these explanations here.

ECF No. 281 at 9.  In fact, however, neither party has identified any class member approved for home confinement who was actually released to home confinement within 14 days of the approval for home confinement.

The Respondent also provided a declaration from Erik Anderson, the Eastern Sector Administrator of the Residential Reentry Management Branch at the BOP.  ECF No. 278-2.  Mr. Anderson's declaration describes the process for placing an inmate into home confinement under the supervision of a RRC or a local United States Probation Office ("USPO").  *Id.* at 2.  In brief, once an inmate is approved for home confinement, either by the Warden or by the Home Confinement Committee ("HCC"), the following steps occur before the inmate is released to home confinement under the supervision of a RRC: (1) the BOP prepares a "home confinement packet" containing the necessary paperwork for an inmate to be transferred to community custody, *id.* at 3; (2) the home confinement packet is sent via internal email to the RRO located where the inmate will be released, *id.*; (3) RRO staff reviews the packet for completeness including, for CARES Act placements,[11] language in the inmate's BEMR "accounting for the inmate's risk of contracting COVID-19 in home confinement versus the risk if they were to remain in a BOP facility", *id.*; (4) if the packet is incomplete, the RRO will return the packet to the sending institution for corrections, *id.*; (5) once the RRO determines that the packet is complete, and includes a requested placement date, the RRO transmits the packet to the RRC, *id.*; (6) RRC contractors then verify the suitability of the home confinement location and respond with an acceptance or denial of the packet; though the BOP's pandemic response plan provides that such a response is due within 3 days of the RRC receiving the packet, the RRC is allowed 30 days to respond under its contract with the BOP, *id.*; and (7) the RRC (or the USPO, if it is

---

[11] The CARES Act, adopted in March 2020 in response to the COVID-19 pandemic, expanded the BOP's authority to release inmates to home confinement.

conducting the supervision) conducts a review and investigation to ensure that certain principles of public safety are accounted for, *id.* at 5.

Should a RRC be unavailable, either because it does not serve a particular geographic area or because it lacks any further supervision capacity or otherwise cannot accept the inmate for placement, the USPO may be able to undertake the supervision under the "Federal Location Monitoring" program ("FLM"). *Id.* at 4. The FLM program is not offered in all districts and, where available, a particular inmate's proposal for home confinement will be evaluated based on certain contractually-specified criteria except where, as here, the supervision is sought pursuant to "[s]pecial circumstances under provisional authorities granted by emergency legislation or otherwise authorized by act of Congress . . . ." *Id.*; *see supra* note 11. USPOs are provided 30 days to respond to a given request for supervision, but many have required more than 30 days because of "the exponential increase in community placements due to COVID-19." *Id.* at 5. An inmate's request may also be denied if the USPO does not have sufficient resources to take on the supervision, "for example where an inmate has too much time remaining on their sentence for the USPO to agree to supervise them for the remainder of their term." *Id.*

## II.   LEGAL STANDARD

### A.   Settlement Agreements

"A settlement agreement is a contract that is interpreted according to general principles of contract law. Once entered into, the contract is binding and conclusive." *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (internal citation omitted). "It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law." *Priebe & Sons v. United States*, 332 U.S. 407, 411 (1947). "[C]ontracts with the federal government are governed by federal common law, which

incorporates the core principles of the common law of contract[s] that are in force in most states." *E.E.O.C. v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 204 (E.D.N.Y. 2003) (citing *Falls Riverway Realty, Inc. v. City of Niagara Falls, N.Y.*, 754 F.2d 49, 55 n.4 (2d Cir. 1985)) (internal citations and quotations marks omitted) (brackets in original).  Because the Restatement (Second) of Contracts "represent[s] the 'prevailing view' among the states . . .", the principles therein provide a source from which to "fashion a federal common law rule . . . ." *Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997).

###    B.    Specific Performance

As noted, under the Settlement Agreement, "[i]f Petitioner [i.e., the class] prevails on any claim alleging Respondent's [i.e., the Warden's] or BOP's non-compliance with this Agreement, the sole remedy shall be specific performance of this Agreement."  ECF No. 238-1 at 16. "Specific performance is by definition limited to the enforcement of contract duties." Restatement (Second) of Contracts ch. 16, topic 3, intro. note (Am. Law Inst. 1981).  Where damages are inadequate "to protect the expectation interest of the injured party", *id.* § 359, and "the terms of the contract are sufficiently certain to provide a basis for an appropriate order", *id.* § 362, "specific performance of a contract duty will be granted in the discretion of the court against a party who has committed or is threatening to commit a breach of the duty[,]" *id.* § 357; *see also id.* §§ 359-69 (discussing how certain factors affect the availability of specific performance).  "An order of specific performance or an injunction will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires." *Id.* § 358(1).  The order "need not be absolute in form and the performance that it requires need not be identical with that due under the contract."  *Id.*  The commentary to the Restatement elaborates on the court's flexibility in crafting an order of specific performance:

> The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible.  Under the rule stated in Subsection (1), the court has the power to mold its order to this end.  The form and terms of the order are to a considerable extent within the discretion of the court. . . .  It may command a performance by the party in breach that is not identical with the one that he promised to render.  It may indirectly induce the party in breach to do an act by enjoining him from doing inconsistent acts.  See § 357(2)(b).

*Id.* § 358 cmt. a.

## III.    DISCUSSION

As noted, in the Settlement Agreement, the BOP agreed to "endeavor to release individuals approved for home confinement to home confinement within 14 days of the approval decision unless public safety or the absence of any home in which to place the inmate would make it unsafe to move the inmate to home confinement within that fourteen day period."  ECF No. 238-1 at 11-12.  None of the parties contend that this provision is ambiguous or invalid, none contest the court's jurisdiction to enforce the Agreement, and none dispute any facts material to the disposition of the class's motion.  Further, the parties agree that my authority to grant specific performance of the Agreement entails the authority to order the Warden to release one or more of the 17 inmates to home confinement by a particular date.[12]  Thus, as the Government notes, "[t]he issue before the Court is whether this [14-day] provision of the Settlement Agreement has been violated to warrant an order of specific performance."  ECF No. 278 at 1.

The class argues that the Warden and the BOP have not "endeavor[ed]" to release inmates on home confinement within 14 days of approval because the reasons for delay provided by the Warden are not permissible under the Settlement Agreement, i.e., they do not constitute a "public safety" concern or a lack of a home to go to warranting delay beyond 14 days.  ECF No. 263 at 1-2.  By contrast, the Warden and the BOP's position is that they *have* "endeavored to

---

[12] The parties confirmed this agreement at oral argument on the motion to enforce during the telephonic status conference of December 10, 2020.

meet this 14-day target . . ." and that "pre-release quarantine requirements and supervision[-]

related administrative requirements are legitimate public safety reasons that can permit release

delays beyond 14 days, consistent with Section 11 [of the Settlement Agreement]." ECF No.

278 at 1-2. For the reasons that follow, I agree with the class and find that the Warden and the

BOP have not "endeavor[ed]" to meet the Settlement Agreement's 14-day release target, and that

their pre-release quarantine requirements and supervision-related administrative requirements do

not constitute "public safety" concerns that would permit a delay beyond 14 days within the

meaning of the Settlement Agreement.[13]

Because the parties' dispute turns on the meaning of "endeavor" and "public safety", I

begin with definitions. To "endeavor" means to "try hard to do or achieve something."

*Endeavor*, New Oxford American Dictionary; *see also Endeavor*, Black's Law Dictionary (11th

ed. 2019) ("[t]o exert physical or intellectual strength toward the attainment of an object or

goal."); *Endeavor*, Merriam-Webster Online Dictionary (defining "endeavor" to mean "to

attempt (something, such as the fulfillment of an obligation) by exertion of effort"),

https://www.merriam-webster.com/dictionary/endeavor (last accessed December 17, 2020);

*Endeavor*, Dictionary.Com ("to exert oneself to do or effect something; make an effort; strive."),

https://www.dictionary.com/browse/endeavor?s=t (last visited December 20, 2020). "Public

safety" is defined to mean "[t]he welfare and protection of the general public, usu[ally]

expressed as a governmental responsibility . . . ." *Public Safety*, Black's Law Dictionary.

The use of the verb "endeavor" does not create uncertainty as to the Warden's and the

BOP's time of performance; the contract remains sufficiently certain "to provide the basis for

---

[13] The parties also disagree about the extent to which the May 12, 2020 TRO was incorporated into the Settlement Agreement. Because I find that Respondent breached the plain terms of the Settlement Agreement, I need not, and do not, decide this issue.

giving an appropriate remedy."  Restatement (Second) of Contracts § 362 cmt. a.; *see also id.* § 33(2) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").  That is so because, here, the word "endeavor" is followed by a specific time limit—14 days—, as well as reasonably clear exceptions (public safety and the absence of a home), against which the "endeavor[ing]" can be measured.  This is a good deal more definite than many time-based performance standards found in other enforceable contracts.  *See* Restatement (Second) of Contracts § 33 cmt d. ("Uncertain time of performance. Valid contracts are often made which do not specify the time for performance.); *id.* cmt. d., illus. 3 ("A and B promise that certain performances shall be mutually rendered by them 'immediately' or 'at once,' or 'promptly,' or 'as soon as possible,' or 'in about one month.'  All these promises are sufficiently definite to form contracts.").

Here, the BOP agreed to "*endeavor* to release individuals approved for home confinement to home confinement within 14 days of the approval decision . . . ."  ECF No. 238-1 at 11-12 (emphasis added).  The Respondent has a contractual obligation to perform that duty "unless public safety or the absence of any home in which to place the inmate would make it unsafe to move the inmate to home confinement within that 14 day period." *Id.* at 12 (emphasis added).  It bears emphasizing that each of these exceptions—a "public safety" concern or the "absence of any home"—is a permissible reason to delay release *only if* either exception "would make it unsafe to move the inmate to home confinement *within that 14 day period*." *Id.* (emphasis added).  So, for example, if an inmate approved for home confinement did not have a home to go to on day 14, the Respondent may delay release until such a home is found.  But if a home were found for this hypothetical inmate on day 15, the Respondent would be obligated to "endeavor" to release that inmate to home confinement immediately because the 14-day period

had expired (assuming no "public safety" concern existed).  The same would be true were any inmate's release to home confinement delayed beyond 14 days based on a permissible "public safety" concern: As soon as that concern was resolved, the Respondent would be obligated to "endeavor" to release that inmate to home confinement immediately.

When the Warden's letter and declaration are viewed in the light of these principles, it becomes clear that she and the BOP have not been "try[ing] hard," "exert[ing] physical or intellectual strength", or "striv[ing]" to effectuate the releases of the 17 inmates that are the subject of the class's motion within 14 days of their approval for home confinement.  As described above, the Warden provides various reasons for the delays—which, when the class filed its motion to enforce, ranged from 27 days to 104 days after approval for home confinement by the BOP's Home Confinement Committee.  *See* ECF Nos. 265, 281.  Most of the reasons offered by the Warden to justify delaying release over the past several months do not comport with her and the BOP's commitment to "endeavor" to release the inmates within 14 days; and by the time I issued the December 11 specific performance order, no reason comporting with that commitment remained to further delay the release of the 17 inmates.

In most of the 17 cases, the Warden notes that, after approval by the Home Confinement Committee, "the referral [for home confinement] was returned during the routing process due to new BOP guidelines requiring certain language in the [the inmate's medical record] regarding the risk of COVID-19 in the community."  ECF No. 281 at 3; *see also* ECF No. 267 at 2-3.  This apparently refers to pre-release steps the BOP is now taking to account for the risk that the inmate will contract COVID-19 while on home confinement, all of which must be now be documented in the inmate's medical record, and includes things like educating the inmate about how to protect against infection by COVID-19.  *Id.*  While these steps are laudable, and while it

18

is sensible to document them in the inmate's medical record, they are not a basis to delay release

to home confinement under the Agreement, because they do not concern "public safety" or the

absence of a home for the inmate, and treating them as a basis for such delay is inconsistent with

the BOP's obligation to "endeavor to release" within 14 days of approval for home confinement.

In general, inmates face a substantially greater risk of contracting COVID-19 while incarcerated

than they do while living at home.[14]  The inmates at FCI Danbury certainly do: the current

number of infections among Danbury inmates suggests a substantially greater positivity rate than

among the population of Fairfield County, where the prison is located.[15]  Under these

circumstances, it is perverse to delay the release of inmates until notations in their medical record

have been made about efforts to protect them when they leave prison.  And the need to make

notations in the inmate's medical record has nothing to do with protecting the public or ensuring

that an inmate has a home to release to.  Likewise, the delays in processing a home confinement

packet/referral after it is approved due to electronic or administrative errors that, in some cases,

went undetected for nearly a month, or delays due to making any kind of comparative risk

assessment of an inmate's chances of contracting COVID-19, are unrelated to public safety or a

home to go to and do not constitute permissible reasons to delay release under the Agreement.

Accordingly, in the December 11 order, I ordered that, going forward, the BOP and the Warden

could not delay releasing an inmate beyond 14 days after approval by the Home Confinement

---

[14] *See* Brendan Saloner et al., *COVID-19 Cases and Deaths in Federal and State Prison*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249 (as of June 6, 2020, concluding that: (1) the "COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate . . ."; (2) the "crude COVID-19 death rate in prisons was 39 deaths per 100 000 prisoners, which was higher than the US population rate of 29 deaths per 100 000"; and (3) the "mean daily case growth rate was 8.3% per day in prisons and 3.4% per day in the US population" between March 31, 2020, to June 6, 2020).

[15] Even if the current number of 95 active infections reflected testing of all 862 inmates at FCI Danbury—a generous assumption, as there is nothing in the record to suggest that all Danbury inmates have been tested recently—, the positivity rate would be about 11%—a good deal higher than the 7.8% positivity rate currently being reported for Fairfield County.  *See supra* note 3; *see also* https://www.covidactnow.org/us/connecticut-ct?s=1460419 (last visited on December 21, 2020).

Committee on any of these grounds, and set deadlines aimed at minimizing delays caused by the need for FCI Danbury to coordinate with RRMs.  *See* ECF No. 289 at 3.

The Warden cites as another reason for delay the need to quarantine inmates and to test them for COVID-19 before releasing them to home confinement, and the delays in getting test results.  In support of its position that all inmates must quarantine for 14 days and *then* receive a negative PCR COVID-19 test (which, given the 5-7 day wait for test results, *see* ECF No. 281 at 4, extends any pre-release quarantine from 14 days to between 19 and 21 days), the Warden states it is a "mandated BOP policy," citing Attorney General Barr's March 26, 2020 memorandum, and one that was "specifically preserved in the settlement of this case."  For the latter statement, the Warden is apparently relying on the Side Letter, because the Settlement Agreement itself says nothing about preserving a mandatory 14-day quarantine period.  The Side Letter, which was entered into in conjunction with the Settlement Agreement, states that "it is BOP policy that all inmates who are approved for home confinement or residential reentry center placement be quarantined for 14 days prior to release from FCI Danbury[.]"  But the same paragraph provides that inmates approved for home confinement "may seek a waiver of the 14-day quarantine requirement . . .", indicating that the Warden has discretion to refrain from requiring an inmate approved for home confinement to quarantine for 14 days before releasing that inmate to home confinement.  ECF No. 138-1 at 3.  In any event, the Side Letter is a unilateral statement of intent by the BOP about hygiene and other safety-related measures it expects to take while the Settlement Agreement remains in effect; the class is not a party to the Side Letter, and the Side Letter expressly states that it is not part of the Settlement Agreement. *Id.*  It thus cannot qualify the BOP's and the Warden's agreement to "endeavor" to release inmates within 14 days of approval of home confinement.  Finally, with regard to Attorney

General Barr's March 26, 2020 memorandum, the Warden neglects to mention his subsequent

April 3, 2020 memorandum, which directs the BOP, and FCI Danbury in particular, to

"immediately process [all inmates approved for home confinement] for transfer and then

immediately transfer them following a 14-day quarantine period at an appropriate BOP facility,

*or, in appropriate cases subject to your case-by-case discretion, in the residence to which the

inmate is being transferred.*"[16]

      Further, although I agree that minimizing the risk that inmates being released on home

confinement are COVID-positive is consistent with protecting the public safety, it is far from

clear that FCI Danbury's requirement of quarantine plus testing for those approved for home

confinement is enhancing the public's safety.  Current CDC guidance suggests that it would not

be necessary to test these inmates at all if they were placed in a proper quarantine—either at

home or while still incarcerated.[17]  It is unclear whether the BOP is making attempts—

endeavoring—to determine whether inmates approved for home confinement can safely

quarantine at home, an option expressly left open by the Attorney General's April 3 memo and

one the TRO specifically required the BOP to explore.  *See* ECF No. 30 at 71.  The class has also

presented some evidence suggesting that the quarantine arrangements at Danbury are not ideal,

*see* ECF No. 263 at 13-14; ECF No. 270 at 1-3; ECF No. 279 at 1; *see also* Federal Bureau of

Prisons, COVID-19 Update, https://www.bop.gov/coronavirus/index.jsp (last accessed

December 18, 2020) (reporting 95 inmates infected with COVID-19, one inmate death from

---

[16] Federal Bureau of Prisons, Memorandum for Director of Bureau of Prisons from Attorney General William Barr: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020) (emphasis added), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

[17] *See When to Quarantine*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (stating that people who have been in close contact with someone who has COVID-19 should quarantine at home "for 14 days after [the] last contact with a person who has COVID-19 . . ."; and that one option to reduce quarantine time is to "stop[] quarantine . . . [a]fter day 10 without testing . . . .") (last accessed December 18, 2020).

COVID-19, and 82 inmates and 69 staff recovered from COVID-19), and that some inmates have become exposed to COVID while in quarantine.[18] Others have been exposed while waiting to enter quarantine from the general population due to constraints on quarantine space that have no doubt been exacerbated by the practice of keeping inmates in quarantine far longer than required under CDC guidelines.[19] All this defeats the purpose of the quarantine. Further, while the CDC has suggested that quarantine can be shortened when it is combined with testing, that will work only if test results are obtained promptly, which is apparently not the case here given a 5-7 day waiting period for test results. If quarantine is ineffective, there is no point in delaying release due to quarantine, especially given the possibility of a home-based quarantine; and if quarantine is effective, then there is no point in extending it by 5 to 7 days of testing return time. Similarly, limitations on quarantine space for outgoing inmates should not be a basis for delaying release, at least not until other options, like quarantining at the place of home confinement, have been exhausted. Thus, in the order of specific performance, I prohibited the BOP from delaying release to home confinement based on either (1) the need to quarantine an inmate at FCI Danbury unless the BOP found, for specific reasons, that the inmate could not safely quarantine at home, or (2) the need to await COVID-19 test results or to further quarantine an inmate if the inmate had quarantined for 14 days at FCI Danbury and was not showing symptoms of COVID-19. ECF No. 289 at 3.

---

[18] After the December 11 order was entered, the Government reported to chambers, via email, that two of the 17 class members I ordered released had received positive COVID-19 tests *after* entering quarantine. These individuals were K.C., who entered quarantine on December 7, 2020, ECF No. 265 at 2, and R.G., who entered quarantine on December 1, 2020, *id.* at 3. One of these had already been released, and I directed both sets of counsel to contact this individual to ensure she understood she had tested positive. The second had not been, and I allowed the Warden to delay release until the inmate tested negative.

[19] Some of the BOP's constraints on quarantine space are understandable and do not, by themselves, provide grounds for a finding that the Respondent breached the settlement agreement. These include the efforts to quarantine incoming inmates, the closure of the women's SHU due to construction or repair, and the temporary loss of Case Managers. *See* ECF No. 281 at 3.

By the time the class filed its motion, the Warden was continuing to hold the 17 inmates only because of the extended quarantine and testing requirements or, in a few cases, because the other types of delays described above had postponed the period of quarantine until at least several weeks after the approval for home confinement, with the BOP making no documented effort to determine if the inmate could quarantine safely in the home. One of the 17, discussed below, was held for 104 days from the date of approval of her home confinement; another was held for 88 days,[20] two others were held for 83 days, and two others for 81 days. ECF No. 282. Because the reasons for the delay in their release were not consistent with the BOP's and the Warden's promise to "endeavor" to effectuate release within 14 days of approval for home confinement, I concluded that the Warden and the BOP had breached the Settlement Agreement and ordered these inmates to be released. The December 11 order required Respondent to release each of the 17 inmates (identified in ECF Nos. 265 and 282) by 5:00 p.m. on Saturday December 12, 2020. In addition, the order required the Warden and the BOP, going forward, to explain to class counsel within 5 days of the expiration of the 14-day period any delays (and a plan to resolve them) beyond the 14 days. Such explanations will help fulfill the purpose of the Agreement and realize the BOP's and the Warden's promise to "endeavor" to meet the 14-day release target. It will also facilitate judicial review in the event of further disputes.

Following the entry of the order of specific performance, I also ordered that one inmate be released to the care of class counsel on furlough while the BOP works to approve a community supervision plan for this inmate. I did so for several reasons. First, this inmate was

---

[20] This inmate, C.F., was listed in motion to enforce as having been approved for home confinement on 10/6/2020. ECF No. 265. However, this date was based on the date class counsel received C.F.'s home confinement approval paperwork. *Id.* In the Warden's declaration, she clarifies that C.F. was approved for home confinement on 9/9/2020, and therefore had been waiting to be released on home confinement for 88 days as of December 6, 2020, not 61 days. *See* ECF No. 281 at 8 ¶ 25.

approved for home confinement on August 24, 2020 and had been waiting *104 days* to be released on home confinement as of December 6, 2020.  ECF No. 265 at 2.  For the reasons described above, the Respondent provided no permissible reason under the Agreement to delay release of this inmate for that period, and plainly was not "endeavor[ing]" to release her within 14 days.  In addition, this inmate's proposed place of home confinement became unavailable after I entered the order of specific performance, apparently through no fault of her own, and class counsel offered reasonable grounds to find that a feasible supervision plan could be put in place before the expiration of the 30-day furlough.  The BOP has the authority to grant an inmate furlough for the purpose of transferring the inmate to home confinement and may do so *without* a pre-approved supervision plan.  *See* 18 U.S.C. § 3622(a), (6) (authorizing the BOP to temporarily release an inmate from the place of imprisonment, under certain conditions, to, *inter alia*, allow an inmate to "visit a designated place for a period not to exceed thirty days, and then return to the same or another facility, for the purpose of . . . engaging in any other significant activity consistent with the public interest . . . ."); *see also* ECF No. 281 at 39 (Program Statement 5280.09 Inmate Furloughs, Ex. E to the Warden's declaration) ("A furlough is an authorized absence from an institution by an inmate who is not under escort of a staff member, U.S. Marshal, or state or federal agents. . . .  A ['transfer furlough' is a] furlough for the purpose of transferring an inmate from one Bureau facility to another, a non-federal facility, or community confinement (including home confinement) . . . .").  The purpose of the December 14 furlough order is to transfer the inmate to home confinement and, in any case, I find that the furlough itself is a "significant activity consistent with the public interest . . .", 18 U.S.C. § 3622(a)(6), namely to protect the health of a medically vulnerable inmate approved for home confinement and who had already been put at undue risk of infection.

The December 11 order of specific performance was written to "best [] effectuate the purposes for which the [Settlement Agreement] was made and on such terms as justice requires." Restatement (Second) of Contracts § 358(1).  In addition, though the performance mandated by the order is not identical to the BOP's and the Warden's duties under the Settlement Agreement, ultimately the order does no more than require the BOP and the Warden to refrain from acting inconsistently with their contractual obligations.  *See id.* § 358 cmt. a.  I also note that the finding supporting the December 11 order of specific performance is narrow—I find only that the pre-release quarantine requirements and supervision-related administrative requirements described by the Warden do not constitute "public safety" concerns or the absence of a home to go to under the Settlement Agreement, and that, based on the undisputed facts presented by the parties, the BOP has not "endeavor[ed]" to release inmates within 14 days after approval for home confinement.  This opinion and the December 11 and 14 orders do not set forth any "bright-line" rule that *any* delay beyond 14 days, where no public safety or lack of a home would otherwise permit delay, constitutes a breach of the terms of the Settlement Agreement.  I need not decide that question, i.e., the extent to which the term "endeavor" gives the BOP flexibility in its contractual time of performance when it is sincerely undertaking exertions of effort to meet the 14-day target.  I decide only that, given the undisputed facts before me, the Warden and the BOP breached the Settlement Agreement and the specific performance I ordered on December 11 and 14 is appropriate and warranted.

## IV.    CONCLUSION

For the reasons and to the extent stated above, I granted Petitioner's motion to enforce the

Settlement Agreement (ECF No. 263) and entered the December 11 and 14 orders. (ECF Nos.

289, 294).


_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                December 22, 2020