# Exhibit S

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES WHITTED, individually, and on behalf of all others similarly situated, | : : : | |
| Petitioner, | : : | |
| v. | : : | Civ. No. 3:20 cv 569 (MPS) |
| DIANE EASTER, Warden of Federal Correctional Institution at Danbury, in her official capacity | : : : : | |
| Respondent. | : | January 4s, 2020 |

### DECLARATION OF ALEXANDRA HARRINGTON

I, Alexandra Harrington, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am an Associate Professor of Law at the University at Buffalo School of Law and Director of the School of Law's Criminal Justice Advocacy Clinic. I am one of the attorneys who has been appointed Class Counsel in this case. (ECF No. 141, ¶ 7).

2. I submit this Declaration to supplement the information filed in ECF No. 296-3 and provided by way of declaration from incarcerated and formerly incarcerated individuals.

3. FCI Danbury continues to struggle with new positive COVID-19 cases. Two weeks ago, the BOP website reflected 97 active cases among the incarcerated population. As of January 4, the BOP website reflects an additional 28 active cases.[1]

**Updates on Numbers of Positive Cases and Medical Isolation**

    **FCI**

4. The first men in general population in FCI tested positive for COVID-19 on December

---

[1] https://www.bop.gov/coronavirus/.

1

2. On that date two men from two different units tested positive. By December 17, more than 50 men in at least four different units had tested positive for COVID-19.

5. As of the date of this declaration, at least some additional men from FCI have tested positive.

6. The men who have tested positive have been held in a few different locations in the facility: A unit, which is a unit with cells on two tiers; the auditorium, which has intermittently been closed for use; and B unit, which was being used as the special housing unit for women earlier in 2020, then was shut down in the Fall,[2] and appears to have been put back into use for men who test positive for COVID.

7. The men who are placed in isolation in A unit report being locked in their cells except for three hours a week when they can shower and use the computer or the phone. Medical staff check on them to take temperatures, but not otherwise to take vital signs or do other checks. Some men have been very sick, with problems breathing and other serious symptoms. When some men relay their symptoms to staff taking temperatures, they have been told to drink more water, but not provided other care.

8. Men in the auditorium are housed on cots with a portable shower. Other men in isolation report having no lights on in their tier, scalding water in the shower with no ability to moderate the temperature, and no commissary items other than hygiene and over the counter medicine, with even those items quite limited.

9. One man, who suffers from poorly controlled Type I diabetes, found out he was COVID positive only after being hospitalized with blood sugar levels over 600. He was in a unit where 13 people tested positive, including people who sleep right next to him. Shortly after those

---

[2] Women held in B unit earlier in the year reported that before it was shut down, the unit had black mold, was freezing, and that the toilets stopped flushing and were attracting flies.

individuals tested positive, medical checked the man's blood sugar levels and discovered they were over 600. Staff drug tested the man and found he was negative. They then returned him to his unit. Staff on the unit noticed he was acting strangely and was slurring his words, at which point medical was alerted, and an ambulance was called to take him to the hospital. At the hospital the man tested positive for COVID via rapid test. Medical staff said that his oxygen levels were dropping, which would explain the blood sugar levels. They put him on oxygen and gave him a blood transfusion and plasma. During the time the man was at the hospital he was not allowed to contact his family.

10. While this man with diabetes was in isolation, he only received two insulin shots per day, despite having a doctor's order for four per day. The shots were almost always late, so late that sometimes he would have to refuse because it was dangerous for him to receive the insulin that late. He was also not provided a diabetic snack, except for three days out of the 18 he was in isolation. He was not able to purchase food from commissary to supplement his diet. His blood sugar levels spiked and dipped as a result. He checked his blood sugar and reported it to staff, but does not know what they did with the information he reported.

11. Another man who was in isolation was sick for a week before he was tested for COVID-19. He began to feel sick on November 27, and submitted a sick call request to medical outlining his symptoms. He was coughing, had loss of taste and smell, a headache, body aches, loss of appetite, trouble breathing, and chest pains. This man also told officers on his unit about his symptoms. On November 30 he told a nurse, who responded that it was probably a flu. On December 2 he received a reply message to his sick call request saying he would be seen by a provider. On December 4 he was seen and tested for COVID after experiencing severe chest pains the night before that felt like he was having a heart attack.

12. When this man, who has COPD, chronic bronchitis, and severe asthma, was moved to isolation, medical staff told him he might have pneumonia but that there was nothing they could do for him. He did not have his inhalers for five days in isolation. When he told staff he couldn't breathe, they told him there was nothing they could do for him. He didn't see a doctor until December 8.

13. This man continues to have troubles breathing since being released from isolation, and has to use his inhaler four times as often as he used to. He also has a lingering cough, and continuing sharp pains in his chest around his heart.

**Camp**

14. Women from the Camp were not tested until December 7 when four women received positive test results. As of December 17, there were at least 15 positive cases in the Camp.

15. Since that time, eleven more women from Camp tested positive on December 28, from tests conducted on December 22. They are currently being held in the visiting room at the FSL.

16. Class counsel have received reports from family members of women currently in isolation about the conditions in the FSL visiting room. The women in isolation have limited ability to communicate with staff and with their families. They do not have access to a computer and have been denied access to stamps. They do have a phone they can use to call family if they have money on their accounts. The emergency line on the phone, meant to allow the women to contact staff in an emergency, does not work. The women have to yell and bang on windows to get staff's attention, except for the past two days when an officer has for some periods of time been posted outside the visiting room door.

17. The women in isolation had been placed there after having evacuated the Camp because of a gas leak. When they evacuated they were not able to take most of their property with them,

4

including their self-carry medication. One woman who has a seizure disorder waited more than 24 hours to get her medication from an officer, after repeated requests. Other women had to wait four days for medication, and as of January 1 some were still waiting for self-carry medication, which is medication intended to be taken daily. Medical staff have conducted temperature checks but have not been taking vital signs of women in isolation.

18. The women are sleeping on cots, which until January 1 had no mattresses. The room is freezing at night. The women spent four days in the same clothes after they were evacuated from the Camp. Most of them had no towels to dry off after a shower. On the fourth day they were brought underwear and towels. The women have not been able to buy anything from commissary, and have not been provided sanitary or hygiene products.

19. R.H. is a 65-year-old woman who suffers from hypertension and has a BMI of 33.9. She is housed in the Camp serving a sentence for a non-violent crime. Around December 4, she began to feel ill, as if she had a sinus infection. She told the medics overseeing the pill line that she felt unwell, and they took her temperature. She did not have a fever. Staff kept her in the dorm. She continued to feel unwell and like she had a fever, but her temperature was not checked again until December 7. At that time, her temperature was 101. Staff kept her in the dorm. The next day, December 8, R.H. received both a rapid test and a test to be sent out to the lab. That evening, she felt unwell and told a correctional officer that she needed medical attention. The officer called the medics, and they informed him that R.H.'s rapid test had come back positive for Covid-19. She was removed from the Camp and put in a visiting room at the FSL with other women from the Camp and FSL who had tested positive.

20. The morning of December 9, while in the visiting room at the FSL, R.H. began vomiting. That morning, she was on the floor in the bathroom vomiting and asked another

woman to call for a correctional officer to get medical attention. That afternoon, she went to the door of the visiting room and laid on a blanket in the doorway, while vomiting, waiting for medical attention. She banged on the door to get the attention of someone on medical staff. Approximately 30 minutes later, she was seen by a doctor, and, 30 minutes after that, an ambulance came to transport her to the hospital. First, however, she was held up by two officers and an inmate to be strip searched (which is not typical practice or policy for Camp inmates).

21. R.H. was admitted to Danbury Hospital and remained there for 24 hours. Upon release, she was returned to the FSL visiting room. There was a phone in the room and a sign instructing the women there to dial 222 for emergencies. But the phone did not work. The next night, R.H. again became sick and asked a correctional officer for a medic; she was told that there was not a medic available. Instead, R.H. was again transported to Danbury Hospital. Her temperature was 103.8 at the time of her readmission.

22. On December 18, R.H. was discharged from the hospital. Upon her return to Danbury, she was put in a locked room that is usually used for suicide watch or drug withdrawal. The room had a bed in the middle of it and nothing else. The door to the room was locked. There was a phone outside of the room that did not work for the first five days she was in the room, and to which she had access only when her door was left unlocked. Often, she was left in the room for hours without any contact with others. One night, she banged on the window for attention and inadvertently scared a correctional officer who had not realized that anyone was in the room. He told her that he would not have known to feed her if she had not banged on the window. During her time in the suicide watch room, R.H. continued to wear the clothes she had returned from the hospital in—she did not have any clean clothes to change into, and did not receive any, despite multiple verbal and written requests for clean clothes over several days.

6

After 8 days in the locked room, R.H. was taken to shower; the shower did not have hot water. She was given a pair of pants that were several sizes too big, so she hand-washed her hospital pants and put them back on. She was finally able to buy new pants after 13 days in the suicide watch room. On January 2, her 16th day in the suicide watch room, R.H. was returned to the Camp. During her time in the isolation room, she was rarely checked only by medical staff. She began to experience panic attacks during this time.

### FSL

23. The first women in the FSL to test positive were tested on December 6. As of December 15, there were at least 23 women who had tested positive from FSL.

24. At least two more women from FSL have tested positive since the last round of testing and have been placed in isolation.

### Lack of Medical Care for Medically Vulnerable Individuals

25. Class counsel have repeatedly expressed concerns to the government about medical care for medically vulnerable individuals at Danbury. The examples that follow are just some of numerous examples of delays in receiving urgently needed medical care.

26. Most recently, class counsel relayed concerns about a man, R.M., who suffers from Barrett's disease of the esophagus. The man had been sent last year for a consultation with a gastroenterologist to have an endoscopy performed. After, medical staff at the facility told him the endoscopy result was normal. At a follow-up gastroenterologist appointment on November 10, he learned that the endoscopy showed pre-cancerous cells, which would require him to undergo three procedures to have his esophagus "burned." The specialist that he saw advised that the treatment should already have been scheduled after the earlier endoscopy and needed to be schedule as soon as possible. In December, however, medical staff at Danbury told R.M that

they were unaware of the recommended procedures, and no follow-up appointment was in the system. Medical staff are now apparently working to schedule the procedures, but have informed R.M that the wait time is likely to be 6-9 months.

27. In addition, class counsel expressed concern about T.G., a man with a history of bladder cancer who has not been receiving the treatment he needs. This man has been complaining of recurring abdominal pain for more than three years. On October 19 he had an MRI of his lower abdomen scheduled, but was told the test could not be performed and had to be cancelled because BOP had failed to administer the required prep medication. This was the second time that the procedure was cancelled because the required medication had not been administered to T.G.. In addition, T.G. had three post-cancer bladder scopes cancelled because of failure to follow prep procedures. On December 17 T.G. asked medical staff when he would be rescheduled for his MRI. The doctor reviewed his chart and found that he had been scheduled for an MRI the day earlier but was not taken to his appointment. As of this date, another appointment has yet to be scheduled.

28. Finally, class counsel have raised concerns on multiple occasions re M.B., a woman incarcerated at FSL. M.B. has had masses growing on her body for over a year now. Two masses on her vulva were first confirmed by the facility in early 2020, and an outside consultation was scheduled in March. That consultation was cancelled because of the pandemic. Since that date, the masses have grown and have spread to her breasts and her jawline. Medical staff has confirmed the new mases, and schedule M.B. for outside consultations with an oncologist. Twice in the last couple of months M.B. was scheduled for an appointment with an oncologist, and both times the facility failed to transport her to the appointment. M.B. was also scheduled for a mammogram because of the lumps found during a breast exam, but the facility failed to transport

her to that appointment as well. Medical staff have informed her that she needs immediate biopsies to determine a course of treatment. She has yet to receive them or be taken for the oncology appointments. The facility has indicated plans to transfer her to Carswell, TX. Class counsel has expressed concerns for her safety and COVID exposure in transport, and that the transfer will not expedite her necessary treatment, which will still need to be scheduled via outside consult at Carswell.

**Gas Leak at Camp**

29. In addition to the information obtained via declaration from women at the Camp, class counsel have gathered other information that on December 26, the gas company attempted to access the Camp to investigate the gas leak but were turned away by BOP staff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2021.

*/s/ Alexandra Harrington*
Alexandra Harrington