## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES WHITTED, individually, and on behalf of others similarly situated, | Civ. No. 3:20-cv-00569 (MPS) |
| *Petitioner,* | |
| v. | |
| DIANE EASTER, Warden of the Federal Correctional Institution at Danbury, Conn., in her official capacity, | June 23, 2021 |
| *Respondent.* | |

## RECOMMENDED RULING ON PETITIONER'S MOTION
## IN SUPPORT OF RE-REVIEW FOR HOME CONFINEMENT [ECF No. 387]

The petitioner, James Whitted, has moved the Court for an order directing the Bureau of Prisons' Home Confinement Committee ("HCC") to re-review two inmates, "MBE" and "MBY," for home confinement. (Pet.'s Mot., ECF No. 387.) The HCC reviewed the inmates' cases and determined that they were ineligible. The petitioner seeks to have them reviewed again.

The petitioner asserts that the HCC's determinations were based on reasons "unrelated to public safety," and that both inmates are therefore entitled under the parties' July 27, 2020 Settlement Agreement to a re-review that considers only their "COVID risk factors" and "public safety, properly understood as meaning immediate danger to the public from the release of the inmate." (*Id.* at 1-2.) The respondent opposes the motion, arguing that the HCC considered the correct factors – and that "as long as it is weighing the correct considerations and assigning substantial weight to COVID-19 risk factors," the HCC's decision to approve or deny home confinement is within its "plenary discretion." (Resp.'s Opp'n, ECF No. 393, at 2-3.) The

respondent also contends that MBE and MBY are "weak re-review candidate[s]" who are not entitled to the equitable remedy of specific performance. (*Id.*)

The parties agreed to submit their dispute to the undersigned for a recommended ruling. (*See* ECF No. 387, at 1 n.1; *see also* ECF No. 394.) For the following reasons, I recommend that the petitioner's motion be **DENIED**.

### 1. Background

#### a. *The* **habeas** *petition and the May 12, 2020 TRO*

"On March 27, 2020, Congress gave federal prison officials an extraordinary tool to confront the extraordinary threat posed by the novel coronavirus within prison walls: the authority to transfer any federal inmate from prison to confinement in his or her home." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 414 (D. Conn. 2020). Six days later, the then-Attorney General of the United States, William Barr, issued a memo publicly "urg[ing] the Director of the Bureau of Prisons . . . to maximize the use of that tool as soon as possible." *Id.* at 414-15. Attorney General Barr's memo expressly noted the "significant levels of infection" then existing at the Danbury Federal Correctional Institution ("FCI Danbury"). *Id.* at 418.

On April 27, 2020, four FCI Danbury inmates filed a petition for a writ of *habeas corpus* against the warden and the director of the Bureau of Prisons ("BOP"). *Id.* at 415. They sought to represent "a class consisting of all inmates in the men's prison and the two women's prisons making up FCI Danbury, as well as a 'medically vulnerable' subclass consisting of those inmates with COVID-19 risk factors." *Id.* The petitioners alleged that the respondents were violating the Eighth Amendment by "failing to use the BOP's available statutory authority to reduce the population of FCI Danbury to mitigate the severe risk posed by COVID-19." *Id.* (brackets and quotation marks omitted). Among the forms of relief that they requested was an "order requiring

Respondents to release from custody or to home confinement" persons who belonged to the "medically vulnerable subclass" of "inmates with COVID-19 risk factors." *Id.* (brackets and quotation marks omitted).

Three days later, the petitioners "filed an emergency motion for temporary restraining order and preliminary injunction, seeking an order requiring Respondents to . . . transfer to home confinement all women" then housed at FCI Danbury's satellite camp, and also to transfer to home confinement all medically vulnerable inmates of either sex. *Id.* at 416. The respondents opposed the motion (ECF No. 24), and Judge Shea heard oral argument on May 6, 2020. (*See* ECF No. 25.) He issued a ruling on May 12, 2020. ("TRO," ECF No. 30.)

Judge Shea did not grant all of the petitioners' requested relief, but he did "issue an order that requires the Warden at FCI Danbury to adopt a process for evaluating inmates with COVID-19 risk factors for home confinement that is both far more accelerated and more clearly focused on the critical issues of inmate and public safety" than the process that the prison was then using. *Martinez-Brooks*, 459 F. Supp. 3d at 415. Specifically, the judge directed the respondent to "[f]inalize and implement a process that makes full and speedy use of the home confinement authority under 18 U.S.C. § 3624(b) and the CARES Act and, as directed by the Attorney General's April 3, 2020 Memorandum, immediately maximize appropriate transfers to home confinement for all appropriate inmates held at FCI Danbury." *Id.* at 455 (quotation marks omitted). He further ordered that this process "assign[] substantial weight . . . to the inmate's risk factors for COVID-19 based on [Centers for Disease Control and Prevention, or "CDC"] guidance," and eliminate certain categorical requirements that the respondent had not shown to be necessarily relevant to inmate or public safety – including "requirements that the inmate have served some portion of his or her sentence," "the requirement that a primary or prior offense not be a violent offense," and

"the requirement that the inmate be without incident reports in the past 12 months." *Id.* (brackets and quotation marks omitted).

In his ruling, Judge Shea was clear with the respondents that this process must focus on inmate safety and public safety – but he was equally clear with the petitioners that the application of such a process to a particular case could result in a denial of home confinement even to an inmate with significant medical risks. Anticipating and rebutting any claim that he was "suggesting that the Eighth Amendment requires the Warden to place on home confinement . . . every inmate who has a COVID-19 risk factor," he noted that the amendment is implicated only when prison officials "know[] that inmates face a substantial risk of serious harm *and disregard[] that risk by failing to take reasonable measures to abate it.*" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)) (quotation marks omitted, emphasis in original). He then observed that "[w]hether it is a 'reasonable measure' to place an inmate on home confinement . . . in a particular case will depend on the severity of the risk faced by the inmate from COVID-19 in light of his or her age and medical history, the danger the inmate presents to the residents of the home environment under consideration, and the danger to the public at large." *Id.* He added that "[t]he determination must be individualized . . . and, in some cases, such as where the inmate has a recent record of violence, may properly result in denying home confinement . . . even to inmates whose age or medical histories place them at risk of serious injury or death from COVID-19." *Id.*

**b.** ***The July 27, 2020 Settlement Agreement***

The petitioners had sought a preliminary injunction in addition to a temporary restraining order, and Judge Shea scheduled an injunction hearing for June 11, 2020. *Id.* at 456. While they prepared for the hearing, the parties conducted settlement negotiations. They attended over forty hours of mediation sessions spread over nine days, in addition to their direct discussions outside

4

the presence of a mediator. (Pet.'s Memo. in Supp. of Mot. for Approval of Settlement, ECF No. 218, at 11.) In late July they reached a settlement ("Settlement Agreement," ECF No. 134-1), and Judge Shea approved their deal at a September 18, 2020 fairness hearing. (Hrg. Tr., Sept. 18, 2020, ECF No. 222, at 38-59.)

The Settlement Agreement contains several provisions relevant to the current motion. First, it defined the "Medically Vulnerable Class" to include "any person incarcerated at FCI Danbury anytime from the [July 27, 2020] Effective Date until the termination date of this Agreement . . . who . . . possesses one or more underlying medical conditions which, according to current CDC guidance . . . either (i) places that inmate at increased risk of severe illness from COVID-19 ('Tier I medical conditions'); or (ii) might place that inmate at an increased risk of severe illness from COVID-19 ('Tier 2 medical conditions')." (Settlement Agreement, ECF No. 134-1, § 1.) Second, it committed the respondent to have all so-called "List Two" and "Non-List" inmates reviewed for home confinement "at the institutional level pursuant to Attorney General Barr's March 26, and April 3, 2020 memoranda, the current BOP guidance at the time of each review, and the standards set forth in the" TRO. (*Id.* §§ 3, 6.) It added that "[t]o the extent that the standards set forth in the . . . TRO differ from" the Attorney General's memoranda or BOP guidance, "the provisions of the . . . TRO shall control." (*Id.*) Moreover, the respondent "agree[d] to refer all" List Two and Non-List inmates "who are not approved for home confinement at the institutional level to the Home Confinement Committee." (*Id.*) The BOP – which was a party to the agreement – further "agree[d] to have the Home Confinement Committee make a determination for all such inmates based upon the standards set forth in the" TRO. (*Id.*)

The Settlement Agreement contained additional detail on the standards to be applied and procedures to be followed when conducting "home confinement assessments." For example, the

warden acknowledged that "[i]n making home confinement determinations under this Agreement pursuant to the" TRO, she was agreeing to "assign substantial weight . . . to the inmate's risk factors for COVID-19 based on CDC guidance." (*Id.* § 8.) She also agreed to create "Review Worksheets for each person being reviewed," with each worksheet referencing at least nine specific considerations, including "a list of the [inmate's] CDC tier one and tier two COVID-19 risk factors." And if she determined that "a Medically Vulnerable Class member is not eligible for home confinement," she agreed to "comply with the . . . TRO and provide a written explanation of the factual basis for any factors relied upon in the denial." (*Id.* § 10.) For its part, the BOP agreed that "if the [HCC] denies home confinement to a Medically Vulnerable Class member, it will comply with the . . . TRO" by providing a similar written explanation. (*Id.* § 11.) All parties agreed that "the form of documents to be provided" – that is, the form of the review worksheet and written explanation – would "be consistent with the worksheets that have been [previously] disclosed in this litigation." (*Id.*)

Finally, the Settlement Agreement contained a section entitled "Dispute Resolution Procedures." (*Id.* § 23.) The parties agreed that "[i]n the event of any dispute, controversy or claim arising out of or relating to this Agreement, or any breach or enforcement of this Agreement," their counsel would meet and confer in an effort to resolve the dispute before seeking a ruling from the Court. (*Id.* § 23.a.) They could – but were not required to – request continued mediation with the undersigned "in order to facilitate informal resolution of the issue." (*Id.* § 23.b.) In the event that neither direct discussions nor mediation resulted in a resolution, either party could "seek intervention from the Court," but "the sole remedy shall be specific performance of this Agreement." (*Id.* § 23.d.) Moreover, the judicial intervention would focus on whether the BOP followed the required processes and whether it got its facts right, rather than on how it

exercised its judgment in approving or denying an inmate for home confinement. Specifically, the parties agreed that "[t]he Home Confinement Committee's substantive determination of whether to place any particular member of the Medically Vulnerable Class on home confinement shall not be subject to judicial review, except that the Court may order the BOP to have the Home Confinement Committee reconsider a home confinement denial that is based on erroneous factual underpinnings . . . or a failure to comply with the terms of the Agreement." (*Id.* § 23.f.)

### c. *The December-January disputes*

In December 2020, disputes arose over the BOP's performance of the Settlement Agreement. (*See* Pet.'s Mot. to Enforce, Dec. 6, 2020, ECF No. 263; Pet.'s Mot. to Enforce, Dec. 17, 2020, ECF No. 296.) Observing that a smaller percentage of inmates were being released to home confinement after the Settlement Agreement than before the TRO, the petitioner moved for an order of specific performance, contending that the HCC's review worksheets "fail[ed] to evidence that the BOP has engaged in any balancing between public safety and inmate safety – let alone provided substantial weight to class members' COVID-19 risk as the Settlement Agreement requires." (Pet.'s Mot. to Enforce, Dec. 17, 2020, ECF No. 296, at 1.) The BOP objected, noting that the Settlement Agreement contemplated a "substantive versus procedural" framework under which judicial review would generally be available only for questions of process, and arguing that the petitioner's complaints about the worksheets impermissibly questioned the HCC's substantive judgments. (Resp.'s Opp'n to Mot. to Enforce, ECF No. 310, at 3.) In the course of resolving these disputes, Judge Shea interpreted the Settlement Agreement in several ways that are relevant to the current motion.

To begin with, he made it clear that in incorporating the TRO, the Settlement Agreement obliged the HCC to balance inmate safety and public safety when conducting home confinement

reviews. "The concept of balancing public safety against inmate safety in the home confinement review process is a recurring theme in the opinion accompanying the TRO." *Whitted v. Easter*, No. 3:20-cv-00569 (MPS), 2021 WL 165015, at *2 (D. Conn. Jan. 19, 2021). "It is thus clear that, in adopting the standards of the" TRO, "the Settlement Agreement requires the BOP to balance inmate safety against public safety and, in that balancing process, to 'assign substantial weight' to the inmate's COVID-19 risk factors when making decisions on whether to transfer an inmate to home confinement." *Id.* (footnote omitted).

The BOP argued that the Settlement Agreement permitted the HCC to consider factors other than inmate safety and public safety, but Judge Shea disagreed. "Contrary to the BOP's argument," the TRO's command to consider inmate safety and public safety "is not a mandate (or a license) for the BOP to consider the 'totality of the circumstances' – a term that appears nowhere in the TRO, the underlying opinion, or the Settlement Agreement." *Id.* (footnote omitted). Rather, the TRO directed "the BOP to weigh certain factors – those related to inmate safety and public safety – and not others, and direct[ed] it to accord a specified albeit imprecise quantity of weight – 'substantial weight' – to a set of inmate-safety-related factors, i.e., COVID-19 risk factors." *Id.* In other words, the "Settlement Agreement's assignment to the BOP of the task of reading the scale . . . is not a grant of authority to determine the ingredients of the items to be weighed." *Id.* at *3 (footnote omitted). Still, "as long as it is weighing the correct considerations and assigning some level of 'substantial weight' to COVID-19 risk factors, the BOP has plenary discretion to read the scale and determine whether a particular public safety consideration outweighs a particular COVID-19 risk factor." *Id.* at *5.

Judge Shea also elaborated on what the TRO – and, by extension, the Settlement Agreement – meant when it used the term "public safety." "'[P]ublic safety' does not mean

whatever the BOP says it means." *Id.* at *3. "To the contrary, as used in the TRO, the underlying opinion, the Settlement Agreement, and former Attorney General Barr's memoranda, 'public safety' has a specific meaning, i.e., an immediate danger to the public from the release of an inmate into the community." *Id.* He provided examples of inmates who would present such a danger, including inmates "with an active propensity for violence" and "those with recent conduct demonstrating an active propensity for distributing dangerous drugs." *Id.* at *3 & n.4.

The judge also elaborated on the TRO's command to ""assign[] substantial weight . . . to the inmate's risk factors for COVID-19 based on CDC guidance." As noted above, the Settlement Agreement had distinguished between "Tier 1 medical conditions" and "Tier 2 medication conditions," with the former defined as those conditions that, according to the CDC, *do* place an inmate "at increased risk of severe illness from COVID-19," and the latter defined as those conditions that *might* place the inmate at such a risk. (Settlement Agreement, ECF No. 134-1, § 1.) In his ruling, Judge Shea "agree[d] with the BOP that the Settlement Agreement allows it to accord less weight to Tier II risk factors." *Whitted*, 2021 WL 165015, at *4. "'Substantial weight' in this context must be understood to define a spectrum, and Tier I factors, which are supported by more robust scientific evidence of an association with COVID-19, belong at the weightier end of that spectrum." *Id.* "[T]he Settlement Agreement's command to assign 'substantial weight' to an inmate's risk factors based on CDC guidance must be understood to leave some discretion to the BOP in determining each inmate's risk profile. . . . And this discretion may frequently, and properly, result in a finding that an inmate's Tier II conditions are outweighed by public safety considerations." *Id.* at *5.

Judge Shea also addressed several sub-issues. The parties disputed whether the HCC could properly rely upon the percentage of an inmate's sentence that had been served when evaluating

that inmate for home confinement; Judge Shea held that "the BOP many not rely on this consideration in denying transfers to home confinement or, if it does so, it must offer a more detailed explanation demonstrating a connection between percentage of time served and public safety, properly understood." *Id.* at *6. The parties also disagreed on the role that disciplinary infractions should play in the HCC's evaluation; Judge Shea held that "if the BOP is going to rely on disciplinary incidents, the worksheet must make clear why they are related to public safety." *Id.* And he resolved a dispute over the role of the BOP's "PATTERN" recidivism assessment tool by holding that, "[w]hile the BOP may not categorically deny inmates home confinement on the basis of a particular PATTERN score . . . it is free to rely on an inmate's PATTERN score, including a 'Low' score, in its weighing analysis."[1] *Id.* at *7.

Ultimately, Judge Shea did not grant relief to all of the inmates who requested it. Observing that "a court's authority to award specific performance is an equitable power," he concluded that it would be inequitable to order the HCC to re-review "cases where the BOP violated the 'substantial weight' requirement . . . but other facts apparent from the face of the worksheet make it likely the violation was harmless." *Id.* at *5. "The BOP has limited resources, and it should not be required to divert its staff to filling out worksheets more carefully just to demonstrate compliance with the settlement agreement," when "[i]t is not at all clear that ordering re-reviews will make a difference for many inmates." *Id.* "For example, for inmates whose conditions barely qualify them for Tier II status (such as someone whose BMI barely exceeds 25) or for inmates who, though they have serious co-morbidities, also have criminal records, offenses of conviction,

---

[1] "Low" is not the lowest PATTERN score an inmate can receive. As Judge Shea explained, the PATTERN tool "assigns each inmate to one of four categories for risk of recidivism: minimum, low, medium, or high. A 'Low' PATTERN score is supposed to indicate a higher risk of recidivism than a 'minimum' score." *Id.*

or disciplinary records that raise serious public safety concerns, there would be little point in requiring a re-review." *Id.*

While these disputes were being briefed, argued, and decided, the Food and Drug Administration ("FDA") authorized the Pfizer-BioNTech COVID-19 vaccine for emergency use.[2] At oral argument on January 8, 2021, the respondents' counsel informed the Court that FCI Danbury had begun to vaccinate inmates the day before. (Hrg. Tr., Jan. 8, 2021, ECF No. 331, at 79:22-80:6.) He further stated that the vaccine had been offered to 127 inmates, but 51 had refused to take it. (*Id.* at 81:2-15.)

Judge Shea did not discuss the vaccine in his January 19, 2021 order, but he shared his views on so-called "vaccine refusers" during a January 12, 2021 status conference. (Hrg. Tr., Jan. 12, 2021, ECF No. 330.) He explained that it did not "make[] sense for the Court to spend time on this process, the home confinement reviews, enforcing [the] settlement agreement and the like on folks who are unwilling to receive the vaccine unless one of those people [has] a documented medical reason for not receiving the vaccine per CDC or other professional guidance." (*Id.* at 4:12-18.) He reiterated that "in dealing with disputes under the settlement agreement," the Court "is exercising extraordinary equitable powers," and he added that "the case for doing so has to match the . . . extraordinariness of that." (*Id.* at 11:5-9.) "And when someone comes along and says, 'Well . . . I'm just not going to [take the vaccine], but I want my case considered for home confinement,'" she has likely not presented a compelling case for the exercise of those extraordinary equitable powers. (*Id.* at 11:9-12.)

---

[2]     Press Release, U.S. Food & Drug Admin., FDA Takes Key Action in Fight Against COVID-19 by Issuing Emergency Use Authorization for First COVID-19 Vaccine (Dec. 11, 2020), available at www.fda.gov/news-events/fda-newsroom/press-announcements.

Having received such clear and detailed guidance from Judge Shea, the parties have evidently been able to resolve the vast majority of their disputes over whether the HCC's review process complied with the Settlement Agreement in a given case. Yet they have not been able to resolve their disagreements about two inmates who, for medical privacy reasons, they refer to as "MBE" and "MBY" in their public filings. The parties agreed to submit these two cases to the undersigned for a recommended ruling (*see* ECF No. 387, at 1 n.1), and for the reasons that follow, I recommend that the petitioner's request for an order directing the HCC to re-review MBE and MBY for release to home confinement be **DENIED**.

### 2. Discussion

#### a. Inmate MBE

Inmate MBE is a 42-year-old woman who suffers from endocarditis, chronic obstructive pulmonary disease ("COPD"), and hypertension. (Ex. A to Pet.'s Mot., ECF No. 388, at 2.) She has a history of open-heart surgery and smoking. (*Id.*) MBE is currently serving a 235-month sentence for conspiring to distribute, and possessing with intent to distribute, heroin resulting in death. (Judgment, *U.S. v. [MBE]*, No. 15-cr-216 (M.D. Pa.), ECF No. 161.) The docket in her criminal case reveals that the heroin she conspired to sell was laced with fentanyl. (Tr. of Sentencing Hrg., *U.S. v. [MBE]*, ECF No. 170, at 42:12-16.)

The HCC first reviewed MBE for home confinement sometime in mid-2020.[3] (Ex. A to Pet.'s Mot., ECF No. 388, at 4.) At that time, the committee knew about her endocarditis and history of open-heart surgery, but apparently it did not yet know about (or at least did not record) her COPD, hypertension, and history of smoking. (*Id.*) It nevertheless determined that she was

---

[3] The committee's worksheets are not dated, but the Court infers this from the "percentage of time . . . served" field on the worksheet.

ineligible for home confinement "based on her low recidivism risk level, a pending charge/detainer, as well as the percentage of time served for the offense." (*Id.*) The committee observed that "[t]he current percentage of time served diminishes the seriousness of the offense." (*Id.*)

In the fall of 2020 MBE resolved the "pending charge/detainer,"[4] and the HCC reviewed her case for home confinement a second time. (*Id.* at 2.) In this second review, the committee considered the "totality of circumstances," including "medical risk factors." (*Id.*) It again concluded that "this inmate would be inappropriate for placement on home confinement due to her low recidivism risk level, the amount of time remaining on her sentence, as well as the percentage of time served for the offense." (*Id.*)

The petitioner argues that neither of these two reviews complied with the Settlement Agreement. (Pet.'s Mot., ECF No. 387, at 1-2.) He contends that, in considering the "totality of the circumstances" rather than limiting its review to the two issues of inmate safety and public safety, the HCC breached the agreement as interpreted by Judge Shea's January 19, 2021 order. (*Id.* at 2.) He also argues that "the amount of time served is an improper consideration that is not, without more, relevant to the public safety analysis." (*Id.*) And while he acknowledges that MBE's crime was a serious one, he asserts that "the seriousness of the offense is relevant only to the extent it bears on whether someone presents an immediate danger to the public if released" – and he says that MBE presents no such danger. (*Id.*)

I agree with the petitioner that the reviews failed to comply with the Settlement Agreement in at least two respects. First, Judge Shea has made it clear that the agreement does not authorize

---

[4]     The worksheet suggests that MBE had failed to pay a restitution order entered in connection with a 2005 criminal mischief charge. She apparently made the payment on September 14, 2020. (*Id.* at 2.)

the HCC "to consider the 'totality of the circumstances,'" but instead obliges it to weigh only "certain factors – those related to inmate safety and public safety – and not others." *Whitted*, 2021 WL 165015, at *2. Second, while he left some room for the HCC to consider the amount of time an inmate has left on his or her sentence, he added that if the committee chooses to do so, "it must offer a more detailed explanation demonstrating a connection between percentage of time served and public safety, properly understood." *Id.* at *6. Here, the HCC provided no such explanation; its only statement of the role played by this factor is in the first worksheet, where it said that releasing MBE to home confinement would "diminish[] the seriousness of the offense." (Ex. A to Pet.'s Mot., ECF No. 388, at 4.)

Yet these observations do not end the analysis. As Judge Shea has explained, "a court's authority to award specific performance is an equitable power," and it would be inequitable to order the HCC to re-review cases where it did not comply with the agreement in all of its particulars "but other facts apparent from the face of the worksheet make it likely that the violation was harmless." *Whitted*, 2021 WL 165015, at *5. "For example . . . inmates who, though they have serious co-morbidities, also have criminal records, offenses of conviction or disciplinary records that raise serious public safety concerns, there would be little point in requiring a re-review." *Id.* Stated differently, inmates who ask the Court to "exercis[e] extraordinary equitable powers" must have a "case for doing so . . . [that] match[es] the extraordinariness of that." (Hrg. Tr., Jan. 12, 2021, at 11:5-9.)

Following this reasoning, I conclude that it would be inequitable to compel the HCC to re-review MBE's case. She committed a spectacularly dangerous crime, and moreover the danger was not merely theoretical; the fentanyl-laced heroin that she sold *actually killed someone*, as she acknowledged at her change-of-plea hearing. (Plea Hrg. Tr., *U.S. v. [MBE]*, ECF No. 168, at

21:24-22:12.) And her crime is not ancient history either – she committed it only six years ago. Additionally, MBE committed her felony under particularly disturbing circumstances; as the sentencing judge recounted, she "sold a combination of heroin and Fentanyl to . . . [a] man [who] was at his most vulnerable, having just come out of rehabilitation." (Sentencing Hrg. Tr., *U.S. v. [MBE]*, ECF No. 170, at 42:12-18.) The petitioner attempts to diminish the level of public danger that MBE poses by pointing out that she was in the grip of her own addiction at the time she committed her crime (Pet.'s Mot., ECF No. 387, at 3), but her addiction did not compel her to choose the most fragile possible target for her deadly drug sales. "[T]he record bears out that while [the buyer] was at that crossroad between a road to sobriety and road to Perdition, [MBE] sold him drugs at the very time he came out of rehabilitation in May, and sold him drugs again on June 2, which he used, and which killed him. Those are the facts." (Sentencing Hrg. Tr., *U.S. v. [MBE]*, ECF No. 170, at 42:17-23.)

Judge Shea has repeatedly placed dangerous drug sales in the group of crimes that "present obvious risks to the public safety." *Whitted*, 2021 WL 165015, at *3 n.4. In his view, that group includes "illegally possessing firearms" "engaging in sex-related offenses," and "*recent conduct demonstrating an active propensity for distributing dangerous drugs.*" *Id.* (emphasis added). At a recent hearing, he listed "selling fentanyl" and "selling heroin" as felonies that, once noted on an HCC worksheet, could excuse the absence of other detail. (Tr. of Oral Arg., Apr. 28, 2021, ECF No. 385-6, at 31-32; *see also id.* at 34-35 (analogizing Court's task in reviewing HCC decisions for compliance with the Settlement Agreement to its task in reviewing administrative agency decisions; where the worksheet permits the Court and class counsel to "discern [the HCC's] logic," no more is required). The dangers of selling fentanyl-laced heroin to anyone – let alone to

fragile, recovering addicts – is obvious, and in any conceivable re-review, the "public safety" side of the scale would weigh heavily in favor of denying home confinement to MBE.

Of course, there is another side of the scale to be considered as well – inmate safety. *Whitted*, 2021 WL 165015, at *2 (stating that the "theme" of the TRO was to "balance[e] public safety against inmate safety"). As the respondent concedes, MBE does have "several co-morbidities" (Resp.'s Opp'n, ECF No. 393, at 3), including COPD and hypertension. But she adds that MBE "enjoys significant COVID-19 immunity" because she has taken one dose of the Moderna vaccine. (*Id.*) This statement is supported by the cited authorities (*id.* at 4 nn. 3, 4), and indeed the petitioner does not attempt to contradict it.

In summary, a re-review could only have one result. MBE recently committed a very dangerous felony that actually killed someone – the sort of felony that Judge Shea regards as presenting "obvious risks to the public safety." *Id.* at *3 n.4. The risks to inmate safety, while by no means non-existent, do not outweigh such a danger in this instance. Because there "would be little point in requiring a re-review," *id.* at *5, it would be inequitable to order one.

### b. Inmate MBY

Inmate MBY is a 46-year-old woman with three "Tier II" COVID-19 risk factors. She suffers from hypertension;[5] has a body mass index of 26.4 kg/m$^2$, and has a history of smoking.

---

[5]     Hypertension qualifies as a "Tier 2 medical condition" under the Settlement Agreement. The parties agreed that "Tier 2 medical condition[s]" would include those that, "according to . . . CDC guidance in effect at the time of the individual's home confinement review . . . *might* place that inmate at an increased risk of severe illness from COVID-19." (Settlement Agreement, ECF No. 134-1, § 1) (emphasis added). Even now, half a year after MBY's home confinement reviews, the CDC lists hypertension as a condition that "*possibly* . . . can make you more likely to get severely ill from COVID-19." Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions* (May 13, 2021), available at www.cdc.gov/coronavirus/2019-ncov/ (last visited June 21, 2021) (emphasis added). Similarly, being "overweight" – that is, having a body mass index between 25 kg/m$^2$ but less than 30 kg/m$^2$ – and having a history of smoking "*can* make you more likely to get severely ill from COVID-19." *Id.* (emphasis added).

(Ex. C. to Pet.'s Mot., ECF No. 390, at 2.) Like MBE, she has received one dose of the Moderna COVID-19 vaccine. (Pet.'s Mot., ECF No. 387, at 3.)

On April 25, 2019, the FBI charged in a criminal complaint and supporting affidavit that MBY committed felony wire fraud by, among other things, taking "$10,076,291 in investments from 32 individuals based on numerous false and fraudulent representations." (Compl. & Aff., *U.S. v. [MBY]*, No. 19-cv-54 (D.R.I.), ECF No. 1.) She was arrested and appeared in court the next morning, and after a detention hearing on May 3, 2019, a magistrate judge ordered that she be detained as a flight risk. (Order of Detention, *U.S. v. [MBY]*, ECF No. 9) (holding, after evidentiary hearing, that "her recent plans to travel to Vietnam with her bankruptcy lawyer/paramour were a failed attempt to flee from prosecution"). The next month, a grand jury returned an indictment charging her with the wire fraud offense, and adding charges of aggravated identity theft and obstruction of an IRS investigation. (Indictment, *U.S. v. [MBY]*, ECF No. 10.) On July 11, 2019, she pled guilty to those charges. (Minute Entry, *U.S. v. [MBY]*, July 11, 2019.)

After several continuances to permit her to gather mitigation evidence, the trial judge sentenced MBY to ninety-six months of incarceration on February 11, 2020. (Judgment, *U.S. v. [MBY]*, ECF No. 36.) He also ordered her to pay restitution in the amount of $4,788,625.00 to twenty-three victims, with one victim owed $929,809.00. (*Id.*) Before reporting to federal prison, MBY filed an emergency motion seeking release "to 24-hour home confinement until the COVID-19 pandemic has subsided." (Def.'s Emer. Mot. for Release, *U.S. v. [MBY]*, ECF No. 38.) She also sought "permission to self-report to FCI-Danbury" at the end of the pandemic, citing news reports about the conditions then existing there. (*Id.*) The sentencing judge denied her motion, noting in a brief docket entry that "[t]here is nothing unique about Ms. Brady's personal situation

that would cause this Court to release her from imprisonment at this time." (Order, *U.S. v. [MBY]*, Apr. 6, 2020.)

Since arriving at FCI Danbury, MBY has been reviewed for home confinement by the HCC on at least three occasions. (Ex. C to Pet.'s Mot., ECF No. 390.) The committee conducted the first review under the "totality of the circumstances" framework that it was then applying, and it determined that MBY "would be inappropriate for placement on home confinement due to the amount of time remaining on her sentence, as well as the percentage of time served for the offense." (*Id.* at 6.) It continued to apply the "totality of the circumstances" approach in the second review, but this time it expressly noted that those circumstances included "medical risk factors and sound correctional judgment." (*Id.* at 5.) Like the first review, the second review concluded that MBY would be "inappropriate for placement on home confinement," but this time it gave different reasons. (*Id.*) The second review stated that home confinement would be inappropriate "due to her role in the current offense and public safety concerns that may jeopardize her safety in the community." (*Id.*)

MBY figured prominently in the parties' December-January disputes. The petitioner's counsel chose her case as their lead case in their January 4, 2021 supplemental memorandum, ostensibly because in its second review, the HCC had denied home incarceration due to MBY's "role in current offense" without explaining how that role related to public safety. (ECF No. 307, at 1-2.) Judge Shea's January 19, 2021 order did not include any relief specific to MBY, but it did direct the parties to "meet and confer to identify specific class members whose cases warrant re-review" after his explication of the TRO and Settlement Agreement. *Whitted*, 2021 WL 165015, at *9. After this meet-and-confer process, the HCC reviewed MBY's case a third time.

According to its worksheet, the HCC conducted the third review not on the now-rejected "totality of the circumstances" standard, but rather "based on balancing public safety against inmate safety with substantial weight assigned to COVID-19 risk factors." (Ex. C to Pet.'s Mot., ECF No. 390, at 2.) The HCC nonetheless "deemed [MBY] inappropriate for home confinement placement . . . due to her role in the current offense and the egregious amount of loss" inflicted on her victims. (*Id.*) In an evident response to complaints that it had not adequately explained why MBY's "role in the current offense" created a public safety risk, the committee suggested that anyone who would not scruple to steal millions of dollars from friends, neighbors and the disabled presented just such a risk. It wrote that MBY's "victims consisted of personal friends, her step-brother, an older woman who was a nanny to her children, firefighters and an elderly man with Alzheimer's in the community in which she plans to return to and reside." (*Id.* at 2-3.) The committee also noted that FCI Danbury had received e-mails from two of MBY's victims, "express[ing] concern for her release to the community and the financial impact [her] current offense had on her family." Hinting but not saying that these people might hurt MBY if she were to be released to home confinement, the HCC stated that "a potential public safety concern exists for [*MBY's*] well-being in the community." (*Id.* at 3) (emphasis added). The committee also noted that "[t]his inmate has received the first dose of a COVID-19 vaccine and is set to receive a second dose of the vaccine at the institution, which weighs significantly against home confinement." (*Id.*)

The petitioner argues that even the third review fails to comply with the Settlement Agreement. (Pet.'s Mot., ECF No. 387, at 4.) He contends that the HCC should not have considered "the severity of [MBY's] offense," because that is "not the focus of the inquiry under the" Settlement Agreement. (*Id.*) He rightly notes that the Settlement Agreement "requires balancing inmate safety versus public safety" (*id.*) and does not permit consideration of factors

other than those two, and his argument that the HCC erred is based on his belief that the severity of an inmate's offense is irrelevant to public safety. The respondent replies that an inmate's "propensity for engaging in extraordinary acts of significant fraudulent criminal conduct that impoverished and harmed numerous victims" is plainly relevant to the question of whether "she presents an immediate public safety risk."[6] (Resp.'s Opp'n, ECF No. 393, at 5.)

I agree with the respondent that the BOP did not breach the Settlement Agreement when it considered the severity and magnitude of MBY's crimes. It is obvious to me that a person who did not flinch from stealing millions of dollars from her own friends and neighbors, and from the disabled elderly, would present an "immediate danger to the public" if she were to be released to home confinement – or, at least, that it would be reasonable for the HCC to hold that view. In my estimation, the petitioner's contrary view arises out of a misapprehension of Judge Shea's comments on the role of offense severity in the home confinement review process.

To be sure, the judge held that the HCC ordinarily may not consider offense severity for purposes unrelated to public safety – for example, for the purpose of determining whether the time that the inmate has spent in prison "reflect[s] the 'seriousness of the offense.'" *Whitted*, 2021 WL 165015, at *6. Put another way, the HCC ordinarily may not deny home confinement to an inmate on the ground that serving only part of her sentence in prison – and serving the rest at home – somehow "diminishes the seriousness of" her crimes. *Id.* at *6 & n.17. But nothing in Judge

---

[6]     The respondent also interprets the petitioner as arguing that "'public safety risk' is limited to, essentially, street crimes." (Resp.'s Opp'n, ECF No. 393, at 5.) I do not interpret the petitioner's motion the same way, but had the petitioner made that argument, I would agree with the respondent that "public safety risks can . . . arise from crimes" other than those "involving physical violence." (*Id.*) *Cf., e.g., U.S. v. Madoff*, 316 Fed. App'x 58, 59-60 (2d Cir. 2009) (summary order) (holding, in the context of post-conviction, pre-sentencing requests for bail under 18 U.S.C. § 3143, that "danger may, at least in some cases, encompass pecuniary or economic harm"). I would also agree that limiting "public safety risks" to crimes of violence "would unjustly stratify into a higher caste white collar criminals like MBY." (*Id.*)

Shea's January 19, 2021 order or in his transcribed remarks would prevent the HCC from considering that inmates who commit serious crimes may present higher and more immediate public safety concerns than inmates who commit lesser crimes. That is what the HCC did in MBY's case, and it did not breach the Settlement Agreement when it did so.

The petitioner also contends that MBY is entitled to a re-review because the HCC impermissibly considered the alleged threats to her own safety that would be posed by her release. (Pet.'s Mot., ECF No. 387, at 4.) Judge Shea has already stated, however, than an inmate's own safety is something that the HCC can rightly place on the scale. (Hrg. Tr., Jan. 8, 2021, at 84:18-24) ("I can see situations where it might be dangerous to put an inmate in a particular place."). While he also stated that he would expect the HCC to explain itself on this point (*id.*), and while MBY's worksheet lacks detail about the alleged threats (Ex. C to Pet.'s Mot., ECF No. 390, at 2-3), these worksheets are to be read "as a whole." *Whitted*, 2021 WL 165015, at *8 ("[T]he Settlement Agreement does not, in general, require a lengthy explanation of a home confinement denial as long as the worksheet, taken as a whole, presents a sufficient factual basis to infer that the BOP determined that public safety factors, properly understood and supported by the facts, outweighed the risk of severe illness to the inmate from COVID-19."). Even if the alleged threats are taken out of the equation, the worksheet as a whole would present a sufficient factual basis for concluding that the public safety risks posed by MBY's release outweighed her risks from COVID-19. She presents only Tier II risk factors, and she has partial immunity from having taken the first dose of the Moderna vaccine.

Finally, even if the HCC had not complied with the Settlement Agreement, I would recommend that the Court not exercise its extraordinary equitable powers in MBY's favor. Shortly after the FDA approved the first COVID-19 vaccine for emergency use, Judge Shea indicated that

he was disinclined to exercise those powers in favor of "folks who are unwilling to receive the vaccine," unless they "have a documented medical reason for not receiving the vaccine per CDC or other professional guidance." (Hrg. Tr., Jan. 12, 2021, ECF No. 330, at 4:12-18.) Since he made those remarks, a number of disputes have arisen over whether a given inmate should be regarded as a "vaccine refuser." (*See, e.g.,* Pet.'s Req. for Status Conf., ECF No. 350) (alerting Court to dispute over whether inmates "who initially declined the vaccine in early January but, since learning more about the safety of the vaccine, are not willing to be vaccinated" should be regarded as vaccine refusers). While the judge has yet to rule on all of the various classes of "vaccine refuser" disputes, he has observed that since "the Court's authority to grant specific performance is an equitable authority," "consideration of the equities warrants consideration of" the incentives that would be created by deciding a particular dispute in a given way. (Hrg. Tr., Jan. 12, 2021, ECF No. 330, at 12:6-10.)

Here, MBY has declined to take the second dose of vaccine based on a claimed allergic reaction to the first dose. (Pet.'s Mot., ECF No. 387, at 3; Ex. E to Pet.'s Mot., ECF No. 392, at 5.) But the allergic reaction was entirely self-reported, was not contemporaneously observed by any medical professional, and indeed was not brought to the attention of any such professional until almost a month after it allegedly occurred. (*Id.*) If inmates could regularly do this and still remain under consideration for home confinement, opportunities for "gaming the system" would abound. (*See* Hrg. Tr., Jan. 12, 2021, ECF No. 330, at 21) (expressing concern about "craft[ing] an order in a way that" would "incentivize others at the facility to think, 'oh, here's the way to game the system'"). I would not incentivize inmates to refrain from promptly reporting adverse reactions to the prison medical staff.

### 3. Conclusion

For the foregoing reasons, I recommend that the motion of the petitioner, James Whitted, for an order directing the Bureau of Prisons' Home Confinement Committee to re-review Inmates MBE and MBY for home confinement be **DENIED**.

Dated at Hartford, Connecticut this 23rd day of June, 2021.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge